IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

FELIPE OTEZE FOWLKES,

                 Plaintiff,

                                   Civil Action No.
                                   9:08-CV-1198 (LEK/DEP)

      v.

COMMISSIONER CHAUNCEY G.
PARKER, *et al.,*

                 Defendants.

_____

APPEARANCES:                      OF COUNSEL:

FOR PLAINTIFF:

FELIPE OTEZE FOWLKES, *Pro Se*
W9402
Souza-Baranowski Correctional Facility
P.O. Box 8000
Shirley, MA  01464

FOR RENSSELAER COUNTY
DEFENDANTS:

GOLDBERG, SEGALLA LAW FIRM    JONATHAN BERNSTEIN, ESQ.
8 Southwoods Blvd., Suite 300      WILLIAM J. GREAGAN, ESQ.
Albany, NY 12211-2526

FOR STATE DEFENDANTS:

HON. ANDREW M. CUOMO         ADELE TAYLOR-SCOTT, ESQ.
Office of the Attorney General      Assistant Attorneys General
State of New York
The Capitol
Albany, NY 12224

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

Plaintiff Felipe Oteze Fowlkes, a former New York State inmate who

is presently incarcerated in Massachusetts, has commenced this action

pursuant to 42 U.S.C. § 1983 alleging deprivation of his civil rights. The

focus of plaintiff's complaint is upon a number of events spanning a period

of more than eight years and involving both state and local government

employees.  Fowlkes attributes defendants' conduct toward him to his

race, his membership in a group claimed by him to be religious in nature

but regarded by law enforcement officials as a gang, and retaliatory

animus based upon his commencement of a civil rights action against the

Superintendent of the Rensselaer Correctional Facility and various other

local government employees.  Among the claims asserted by the plaintiff

and implicated by the motion now before the court are causes of action for

of deprivation of his right to due process, unlawful retaliation, and

conspiracy, all of which relate to plaintiff's designation as a level three sex

offender under New York's registration regime.  Plaintiff's complaint seeks

various forms of relief including compensatory and punitive damages.

Following a transfer of the action to this district four of the named

defendants, including the Commissioner and three other employees of the

New York State Division of Criminal Justice Services ("DCJS"), have

moved for judgment on the pleadings, arguing that the complaint fails to

state a cognizable claim against them.  For the reasons set forth below I

recommend that the DCJS defendants' motion be granted.

I.    BACKGROUND[1]

       Prior to his release on May 23, 2003 plaintiff was an inmate at the

Arthur Kill Correctional Facility ("Arthur Kill"), located in Staten Island, New

York.  Complaint (Dkt. No. 1) § 6, ¶ 19.  On May 3, 2003 defendant Daniel

Keating, the Rensselaer County Sheriff, and defendant Johnny Mae, one

of Keating's deputy sheriffs, contacted Regina Rodriguez, plaintiff's

_____

       [1]       In light of the procedural posture of this case the following recitation is
drawn principally from plaintiff's complaint, the contents of which have been accepted
as true for purposes of the pending motion.  *Sheppard v. Beerman,* 18 F.3d 147, 150
(2d Cir.), *cert. denied,* 513 U.S. 816, 115 S. Ct. 73 (1994); *see also* See *Erickson v.
Pardus,* 551 U.S. 89, 127 S. Ct. 2197, 2200 (2007) (citing *Bell Atlantic Corp. v.
Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1965 (2007)).   Portions of the background
description which follows have been derived from the exhibits attached to plaintiff's
complaint, which may also properly be considered in connection with a dismissal
motion.  *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir.
1991), *cert. denied*, 503 U.S. 960, 112 S. Ct. 1561 (1992); *see also Samuels v. Air
Transp. Local 504*, 992 F.2d 12, 15 (2d Cir. 1993), as well as other public documents
of which the court is entitled to take judicial notice.  *See* Federal Rules of Evidence
201 and 1005; *see also*, *Wilson v. Limited Brands, Inc.,* 08 CV 3431, 2009 WL
1069165 at *1 n. 1 (S.D.N.Y. April 17, 2009).   It is well-established that a district court
may rely on matters of public record in deciding whether to dismiss a complaint.  *Pani
v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir.1998) (citations omitted);
*see also Anderson v. Coughlin*, 700 F.2d 37, 44 n.5 (2d Cir. 1983).

corrections counselor at Arthur Kill, and advised her that Fowlkes would

be required to sign a sex offender registration form prior to his release

from prison based upon a 1996 Troy City Court conviction for having

sexual contact with an individual over the age of seventeen but incapable

of consent, in violation of New York Penal Law § 130.60.  Complaint (Dkt.

No. 1) at § 6 ¶¶ 2, 18.  According to the plaintiff, when the form was

presented he signed it, after having been assured by Ms. Rodriguez that

he would be assigned the lowest risk level of one for sex offenders

subjected to New York's Sex Offender Registration Act, ("SORA"), N.Y.

Corr. Law § 168 *et seq.*[2]  *Id.*  Plaintiff claims the actions of the Rensselaer

defendants were in furtherance of a scheme to violate his civil rights

based upon his race and membership in the "Nation of Gods and Earths:

The Five Percent" (the "Five Percenters") and in retaliation for his having

brought a prior action against various county employees. Complaint (Dkt.

No. 1) at ¶ 19.  Plaintiff maintains that, armed with the sex offender

registration, Rensselaer county employees engaged relatives and friends

to pursue Fowlkes in an effort to entrap him into a situation where he

---

[2]     The SORA represents a comprehensive statutory provision under which
convicted sex offenders are required to register with law enforcement authorities so
that information regarding registered offenders can be disseminated, including to local
law enforcement authorities, particularly vulnerable potential victims and, under certain
circumstances, the general public.  *See Doe v. Pataki*, 481 F.3d 69 (2d Cir. 2007).
The various requirements imposed under the SORA are discussed in more detail
further on in this report.  *See* pp. 15-23, *post.*

could be prosecuted for additional sex crimes.  Complaint (Dkt. No. 1) at

¶¶ 20-26.  Plaintiff asserts that as a result of the level three registration he

has also been denied business and employment opportunities, *id.* at ¶¶ 12

and 19 and Exhs. N, O, and P, and that the level three designation has

endangered him during the course of his present incarceration in

Massachusetts.  *Id.* at ¶ 30.

The record now before the court reflects that plaintiff's signing of the

sex registration at Arthur Kill was not the culmination of the process

contemplated under the SORA.  Instead, following the plaintiff's execution

of the sex offender registration form it was sent by prison officials at Arthur

Kill to the DCJS.  Complaint (Dkt. No. 1) § 6, ¶ 2.   In accordance with the

procedures outlined under the SORA, the DCJS Board of Examiners of

Sex Offenders in turn forwarded the registration, together with a

recommendation regarding the level to assign to Fowlkes, to the Troy City

Police Court, the court that sentenced him on the 1996 sex offense

conviction on October 6, 2003.[3]  *See* Defendants' Memorandum (Dkt. No.

45) Exh. A.  The form was signed on May 28, 2004 by an acting Troy City

Court judge who was not the sentencing judge but who at the time sat on

_____

[3]         According to the Board of Examiners of Sex Offenders form, after
completion by the sentencing court copies were to be forwarded to the DCJS and to
Fowlkes.  Defendants' Memorandum (Dkt. No. 45) Exh. A.

the sentencing court; that court designated plaintiff a level three offender, but found no basis to also label him as a sexually violent offender, a predicate sex offender, or a sexual predator.  *See* Defendants' Memorandum (Dkt. No. 45) Exh. A.  Plaintiff was therefore listed by the DCJS as a level three sex offender, and information regarding him was distributed and made available pursuant to the governing provisions of the SORA.  Complaint (Dkt. No. 1) §6, ¶ 5.

According to the plaintiff, he did not become aware of the designation until reading a news article, in which he was described as a level three sex offender, in January of 2005.  Complaint (Dkt. No. 2) § 6, ¶ 6.  Since learning of the designation plaintiff has written to DCJS officials, including the moving defendants, requesting that he be removed from the sex registry, without success.  *Id.* at ¶¶ 6-11 and Exhs. D-G.

## II.    PROCEDURAL HISTORY

Plaintiff commenced this action in or about January of 2007 in the Southern District of New York.[4]  The matter was subsequently transferred to the Eastern District of New York by order entered on March 5, 2007.  Dkt. Nos 2, 3.

---

[4]    It is difficult to ascertain from the court's records precisely when plaintiff's complaint, which is dated January 16, 2007, was first received by that court.  Dkt. No. 2.

Plaintiff's complaint named many defendants falling into three groups, including 1) defendants Regina Rodriguez, Edward M. Adler, Dennis Breslin, and Commissioner Glenn S. Goord, all employees of the New York State Department of Correctional Services ("DOCS") (the "DOCS Defendants"); 2) Commissioner Chauncey G. Parker, Kenneth J. Connolly, Gerard Murphy, Lorraine Felegy, Kimberly Szady, and Scott Steinhardt, all of whom are employees of the DCJS (collectively, the "DCJS defendants"); and 3) Sheriff Daniel Keating, Robert Loveridge, Harold Smith, Anthony Patricelli, Johnny Mae, and Officer Aldrich, all employees of Rensselaer County (collectively, the "County defendants"). Complaint (Dkt. No. 2) § 3.  In his complaint plaintiff asserts various constitutional claims, alleging a denial of equal protection, unlawful retaliation for having exercised protected First Amendment rights, and conspiracy to interfere with his civil rights.[5]  *See id.* at § 7.

Following the transfer of the action to the Eastern District, three

---

[5]    Plaintiff's first cause of action is described in his complaint as follows:

> [t]o seek relief and damages to defend and protect
> [plaintiff's] rights against erroneous registration as a risk
> level '3' sex offender which has caused [him] to sustain
> injuries and deprivations from being targeted as a member
> of a suspect class of level '3' sex offenders.

Complaint (Dkt. No. 2) § 7.  Liberally construed, that cause of action appears to encompass a procedural due process claim associated with the level three determination.

motions were filed on behalf of the various defendants in response to plaintiff's complaint.  Dkt. Nos. 20, 41, 45.  Defendants' motions sought dismissal of plaintiff's claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on a variety of bases, and a transfer of the action to this court pursuant to 28 U.S.C. §§ 1391(b) and 1404(a).  *Id.*  In response to those motions, District Judge Nina Gershon issued an opinion and order on November 7, 2008 in which she 1) granted dismissal of plaintiff's claims against the DOCS defendants and two of the DCJS defendants, Kimberly Szady and Scott Steinhardt, on the basis of lack of personal involvement; 2) dismissed plaintiff's procedural due process and retaliation claims against the County defendants arising from the SORA registration; 3) dismissed plaintiff's conspiracy claim under 42 U.S.C. § 1985; and 4) transferred the action to this district.  Dkt. No. 50.  Judge Gershon's opinion left intact plaintiff's erroneous sex offender registration claims against remaining DCJS defendants Parker, Connolly, Murphy and Felegy, based solely upon the fact that those defendants did not seek dismissal of plaintiff's claims in the 12(b)(6) motion filed in the Eastern District, *see* Dkt. No. 50, *slip op.* at p. 19, n. 18, as well as plaintiff's claim of retaliation based upon the County defendants' alleged interference with Fowlkes' ability to prosecute his claims in *Fowlkes v. Loveridge*, *et al.,* No.

97-CV-1503 (LEK/DEP), an action filed in this court in 1997.[6]

On June 18, 2009 the remaining DCJS defendants, including Chauncy G. Parker, Kenneth J. Connolly, Gerard Murphy, and Lorraine Felegy, filed a motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, seeking dismissal of plaintiff's claims against them and a protective order barring discovery as against those defendants pending resolution of their motion.[7]  In their motion the DCJS defendants argue that the reasoning supporting Judge Gershon's dismissal of plaintiff's claims against the DOCS defendants and defendants Szady and Steinhardt applies with equal force to Fowlkes' claims against them and warrants their dismissal from the action.  *Id.* Those defendants also argue that plaintiff's due process claims lack merit based upon the adequacy of remedies provided under the SORA for

---

[6]     Following issuance of that order plaintiff filed a notice of appeal of Judge Gershon's order and the resulting partial judgment to the United States Court of Appeals for the Second Circuit.  Dkt. No. 62.  That appeal was dismissed on motion of the plaintiff seeking voluntary dismissal based upon the lack of entry of a final appealable order.  Dkt. No. 77.  In addition, plaintiff moved in this court for amendment of the resulting partial judgment, purporting to invoke Rules 52(b) and 59 of the Federal Rules of Civil Procedure, in essence requesting reconsideration of Judge Gershon's order.  Dkt. No. 61.  That motion was denied by decision and order of Senior District Lawrence E. Kahn dated February 3, 2009.  Dkt. No. 76.

[7]     In response to the request for a stay the court has since exercised its discretion by entering an order staying the obligation of the DCJS defendants to respond to plaintiff's discovery demands pending determination on their motion.  Dkt. No. 86.  A similar request by the County defendants for a stay of discovery, however, was denied.  *See* Dkt. No. 87.

challenging determinations associated with the required sex registration under the Act. *Id.* Plaintiff has since responded in opposition to the pending motion. Dkt. No. 88, which is now ripe for determination and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed. R. Civ. P. 72(b).

III.    DISCUSSION

A.    Standard of Review

Defendants' motion is brought pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, which governs the entry of judgment on the pleadings.[8] When analyzing a Rule 12(c) motion, the court must apply the same standard as that applicable to a motion under Rule 12(b)(6). *See, e.g.*, *Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir.), *cert. denied*, 513 U.S. 816, 115 S. Ct. 73 (1994); *Wynn v. Uhler*, 941 F. Supp. 28, 29 (N.D.N.Y. 1996) (Pooler, J.).

---

[8]    Rule 12(c) provides that "[a]fter the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." Rule 12(d) further mandates that:

> [i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.

Fed. R. Civ. P. 12(d).

A motion to dismiss a complaint, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal*, ___ U.S. ___, ___, 129 S. Ct. 1937, 1949 (2009) (citing *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1964-65 ). In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party. *Cooper v. Pate*, 378 U.S. 546, 546, 84 S. Ct. 1733, 1734 (1964); *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir.), *cert. denied*, 540 U.S. 823, 124 S. Ct. 153 (2003); *Burke v. Gregory*, 356 F. Supp. 2d 179, 182 (N.D.N.Y. 2005) (Kahn, J.).  In the wake of *Twombly* and *Iqbal*, however, it is clear that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 129 S. Ct. at 1949.

The burden undertaken by a party requesting dismissal of a complaint under Rule 12(b)(6) is substantial; the question presented by such a motion "is not whether [the] plaintiff is likely to prevail ultimately, 'but whether the claimant is entitled to offer evidence to support the

claims.'" *Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.*, 223 F. Supp. 2d 435, 441 (S.D.N.Y. 2001) (quoting *Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir. 1995)) (citations and quotations omitted). Accordingly, a complaint should be dismissed on a Rule 12(b)(6) motion only where the plaintiff has failed to provide some factual basis for the allegations that support the elements of his or her claim. *See Twombly*, 550 U.S. at 563, 570,127 S. Ct. at 1974; *see also Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007) ("In order to withstand a motion to dismiss, a complaint must plead 'enough facts to state a claim for relief that is plausible on its face.'") (quoting *Twombly,* 550 U.S. at 570, 127 S. Ct. at 1974*)*.  "While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974).

When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action. *See Erickson v. Pardus*, 551 U.S. 89, 94, 127 S. Ct. 2197, 2200 (2007) (quoting *Estelle*

*v. Gamble*, 429 U.S. 97, 106, 97 S. Ct. 285, 292 (1976)) ("'[A] *pro se*

complaint, however inartfully pleaded, must be held to less stringent

standards than formal pleadings drafted by lawyers.'") (internal quotations

omitted); *Davis v. Goord*, 320 F.3d 346, 350 (2d Cir. 2003) (citation

omitted); *Donhauser v. Goord*, 314 F. Supp. 2d 119, 121 (N.D.N.Y. 2004)

(Hurd, J.).

In the event of a perceived deficiency in a *pro se* plaintiff's

complaint, a court should not dismiss without granting leave to amend at

least once if there is any indication that a valid claim might be stated.

*Branum v. Clark*, 927 F.2d 698, 705 (2d Cir.1991); *see also* Fed. R. Civ.

P. 15(a) ("The court should freely give leave [to amend] when justice so

requries.").

B.    Merits of Defendants' Motion

In their motion defendants maintain that the reasoning that

prompted Judge Gershon to dismiss plaintiff's due process and retaliation

claims arising from the SORA registration and level three designation as

against the two DCJS defendants on whose behalf the earlier dismissal

motion was brought, as well as the County defendants, equally applies to

plaintiff's claims against the remaining DCJS defendants.   The DCJS

defendants therefore argue that Judge Gershon's decision represents the

law of the case with respect to those issues and should be followed by this court in dismissing plaintiff's remaining claims against them.

Generally speaking, law of the case principles dictate that when a court rules upon an issue, that decision should continue to govern the same issues during subsequent stages of that case.  *Pescatore v. Pan American World Airways, Inc.,* 97 F.3d 1, 7-8 (2d Cir. 1996).  Although the doctrine is admittedly discretionary and a court is always free to modify its own pretrial rulings at any time before it enters a final judgment, based upon jurisprudential principles underlying the law of the case doctrine – including the desire that litigants be able to rely on judicial rulings and adjust their conduct accordingly – courts are generally reluctant to re-examine issues previously decided in a case absent compelling circumstances, such as an intervening change of controlling law, the introduction of new evidence, or the need to correct a clear error or prevent manifest injustice.  *Doe v. New York City Dep't of Soc. Servs.,* 709 F.2d 782, 789 (2d Cir.) (citations omitted), *cert. denied sub nom., Catholic Home Bureau v. Doe,* 464 U.S. 864, 104 S. Ct. 195 (1983).

Judge Gershon's dismissal of plaintiff's SORA and retaliation claims was based upon lack of personal involvement, the applicable three-year statute of limitations, and the fact that under the SORA sex registrants like

the plaintiff are afforded ample due process when it comes to challenging

the requirement of registration and the designated level to be applied.

      1.    <u>Due Process</u>

Plaintiff's claim against the remaining DCJS defendants related to

his registration as a sex offender arises principally under the due process

clause of the Fourteenth Amendment.  In order to prevail on such a due

process claim, asserted under 42 U.S.C. § 1983, a plaintiff must prove

that he or she 1) possessed an actual liberty interest, and 2) was deprived

of that interest without being afforded sufficient procedural safeguards.

*Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000) (citations omitted);

*Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998); *Bedoya v. Coughlin*,

91 F.3d 349, 351-52 (2d Cir. 1996).  Plaintiff's due process claim is

comprised of two elements.  First, Fowlkes contends that he should not

have been required to register as a sex offender at all.  Plaintiff further

argues that in any event he should have been assigned a risk level of one,

rather than the resulting designation as a level three sex offender.

The SORA, which is codified in New York Correction Law §§ 168-a

to 168-w, took effect in 1996, though it has since been amended several

times.  The Act requires individuals who have been convicted of certain

designated sex crimes to register with the DCJS.  Information regarding

registered offenders is then disseminated to law enforcement authorities and others, depending upon the offender level assigned to the individual. The purpose for enacting the SORA was described as follows by the United States Court of Appeals for the Second Circuit:

> The SORA aims both to protect members of the public, especially vulnerable populations, from sex offenders by notifying them of the presence of sex offenders in their communities and to enhance law enforcement authorities ability to investigate and prosecute sex offenses.

*Doe v. Pataki*, 481 F.3d 69, 70 (2d Cir. 2007) (citing 1995 N.Y. Laws 2870, § 1).

Under the SORA, a sex offender scheduled to be released from a correctional facility must be informed of his or her duty to register under the Act and required to read and complete a registration form and provide the requested information.  N.Y. Corr. Law § 168-e(1).  Three copies of the registered form are then generated; one is retained by the facility, another is provided to the inmate, and the third is forwarded to the DCJS.[9] *Id.*  The SORA further provides that the Board of Examiners of Sex Offenders must next make a recommendation to the sentencing court concerning the appropriate designation for an offender being registered, and sets out the criteria to be applied in determining which of the three

---

[9]     The duty to register is reaffirmed further on in the SORA.  N.Y. Corr. Law §§ 168-f, 168-n.

levels to assign.  N.Y. Corr. Law § 168-l.  The procedures to be followed

by the sentencing court in making a judicial determination regarding sex

offense level are also detailed in the SORA.  N.Y. Corr. Law § 168-n.[10]

Under the Act, a registered offender has a right of appeal from the

sentencing court's determination pursuant to New York Civil Practice Law

and Rules, Articles 55, 56, and 57.  *Id.* at § 168-n (3).

An offender who is registered under the SORA is assigned a risk

level of one, two, or three, depending upon the perceived risk of

recidivism.  N.Y. Corr. Law § 168-l; *see also Doe,* 481 F.3d at 71.  Level

three offenders, deemed to be the most likely to commit new offenses, are

subject to a lifetime registration requirement and dissemination of their

relevant information to a wide range of law enforcement and publicly

accessible sources.[11]  N.Y. Corr. Law § 168-l (6)(b), 168-h (2); *see Doe*,

481 F.3d at 71.  Under the SORA, the New York State Board of Sex

Offenders first makes a recommendation regarding the risk level utilizing

"risk assessment guidelines, developed with the assistance of a group of

---

[10]     Plaintiff does not allege that the procedures outlined in section 168-n were not followed in this case, other than to argue, without legal support either in the statute or otherwise, that only the sentencing judicial officer may make the required designation.

[11]     Since 2002 the SORA has also permitted additional designations of individuals as a "sexual predator", a "sexually violent offender", or a "predicate sex offender."  *Doe*, 481 F.3d at 71.  The designation form completed the Troy City Court did not place the plaintiff in any of these categories.

experts with experience of dealing with sex offenders. . .".  *Doe v. Pataki*, 3 F. Supp.2d 456, 461-62 (S.D.N.Y. 1998).  Those factors "include whether the offender has a mental abnormality or personality disorder, whether the offender's conduct was characterized by repetitive and repulsive behavior, the age of the offender and of the victim, the use of weapons, and the number of prior offenses."  *Woe v. Spitzer,* 571 F. Supp.2d 382, 385 (E.D.N.Y. 2008) (citing N.Y. Corr. Law § 168-l (5)).  The ultimate designation is made by the sentencing court based upon the Board's recommendation.  N.Y. Corr. Law § 168-n; *see Kominski v. Rapsatt*, No. 07-CV-01119, 2009 WL 1707124, at *9 (N.D.N.Y. June 17, 2009) (McAvoy, S. J.).[12]

As was noted above, plaintiff's due process claim challenges both the requirement that he register as a sex offender and the designated level three determination.  As Judge Gershon found in her earlier decision in this action, plaintiff's complaint reveals that he signed a sex offender registration form on May 5, 2003 relating to his 1996 sexual abuse conviction.   Since that registration occurred more than three years prior to commencement of this action, any claim that he was wrongfully registered as a sex offender is precluded by the applicable three-year statute of

---

[12]    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

limitations.[13]  *See Wynder v. McMahon*, 360 F. 3d 73, 76 (2d Cir. 2004).

Even if plaintiff's sex offender registration claim were timely, it would nonetheless fail on the merits.  The offense for which plaintiff was convicted is specifically defined under the SORA as a sex offense for which registration is required.  N.Y. Corr. Law § 168-a (2).  Any potential claim that the requirement of registration was not accompanied by due process would lack merit since the requirements of due process were presumably satisfied in connection with plaintiff's underlying conviction.  *See* Woe, 571 F.Supp.2d at 389.  As was noted by the Ninth Circuit Court of Appeals in *Neal v. Shimoda*, a case cited by the plaintiff in his opposition papers, "[a]n inmate who has been convicted in a sex crime in a prior adversarial setting, whether as a result of a bench trial, jury trial, or plea agreement, has received the minimum protections required by due process."  131 F.3d 818, 831 (9th Cir. 1997); *see also Connecticut Dep't*

---

[13]     Consistent with the Supreme Court's pronouncement that in actions brought under 42 U.S.C. § 1983 the applicable limitations period is derived from the general or residual statute of limitations for personal injury actions under the laws of the forum state, *see Owens v. Okure,* 488 U.S. 235, 249-50, 109 S. Ct. 573, 582 (1989), plaintiff's federal claim in this action is governed by the three-year statute of limitations which applies in New York to personal injury claims of an otherwise unspecified nature.  *See* N.Y. C.P.L.R. § 214(5); *see also Ormiston v. Nelson*, 117 F.3d 69, 71 (2d Cir. 1997) (quoting *Owens*); *Pinaud v. County of Suffolk*, 52 F.3d 1139, 1156 (2d Cir. 1995); *Lugo v. Senkowski*, 114 F.Supp.2d 111, 113 (N.D.N.Y. 2000) (Kahn, J.) (citing *Pinaud* and *Owens*).  For purposes of gauging the timeliness of his claims, I have deemed plaintiff's complaint in this action to have been filed on January 16, 2007.  Plaintiff's claims are thus untimely because they accrued before January 16, 2004.

*of Public Safety v. Doe*, 538 U.S. 1, 123 S. Ct. 1160 (2003) (where

Connecticut Sex Registration Law requires registration of all individuals

solely based upon their conviction, without a showing of dangerousness,

due process clause does not require a further hearing to establish facts

not relevant to the state's statutory scheme); *see also United States v.*

*Senogles*, 570 F.Supp.2d 1134, 1155 (D.Minn. 2008) ("SORNA defines a

'sex offender' as 'an individual who was convicted of a sex offense,' and

an offender is placed in one of three tiers, based upon the nature of his

past conduct, and not on an assessment of his current level of

dangerousness or his risk of recidivism.  As a consequence, a [h]earing

on those issues would not be material to the SORNA registration

requirements, and we find that the Defendant has failed to state a

procedural Due Process claim.") (citations omitted).  In short, I concur with

Judge Gershon's determination that  plaintiff's due process challenge to

the requirement that he register as a sex offender, even if timely raised,

lacks merit, and recommend this court accord deference to that

determination.

The second prong of plaintiff's SORA claim challenges the

determination that he should be regarded as a level three sex offender.

At the outset I note that it is not altogether clear that the decision of what

level to assign to a registered sex offender implicates a cognizable liberty interest for purposes of the Fourteenth Amendment.  *See Henderson v. Heffler*, No. 07-CV-04870, 2010 WL 2854456, at *5 (W.D.N.Y. Jul. 19, 2010).  Indeed, there is not unanimity on the question of whether the requirement to register as a sex offender in and of itself implicates such a liberty interest.  *See Roe v. Goldman*, No. 02 CV 5370, 2009 WL 4891810 (E.D.N.Y. Dec. 9, 2010) (noting that the Second Circuit has not addressed the issue and the district courts are split); *but see Vega v. Lantz*, 596 F.3d 77, 81-82 (2d Cir. 2010) ("[I]t continues to the be the case that wrongly classifying an inmate as a sex offender may have a stigmatizing affect which implicates a constitutional liberty interest") (citations omitted)) and *Blake v. Fischer*, No. 09-CV-266, 2010 WL 2522198, at * 10 (N.D.N.Y. Mar. 5, 2010) (Homer, M.J.) ("courts within the Second Circuit appear to be reaching a consensus that recommendations for sex offender classification and programming do not trigger due process rights") (citing *Vega*, 2008 WL 3992651, at *15-17; *Fitfield v. Eaton*, No. 07-CV-6521 L, 2009 WL 3429791, at *2-3 (W.D.N.Y. Oct. 20, 2009) (granting motion to dismiss inmate's claim that he was denied parole opportunities due to his refusal to participate in SOP because inmate had no liberty interest in parole, conditional release, discretionary good time credits, or choosing

his programming); *Tinsley v. Goord*, No. 05 Civ. 3921(NRB), 2006 WL 2707324, at *5 (S.D.N.Y. Sept. 20, 2006) (finding no constitutionally protected right, either federally or state-created, which allows "prisoners [to] ... avoid classification as sex offenders or participat[e] in related treatment programs.")), report and recommendation adopted, 2010 WL 2521978 (N.D.N.Y. Jun 15, 2010) ( Hurd, J.). For purposes of the instant motion I will assume that plaintiff possesses a cognizable liberty interest in the proper sex offender designation to be made.

Plaintiff's due process claim nonetheless lacks merit.  When a person's liberty interests are implicated, due process requires at a minimum notice and an opportunity to be heard.  *Hamdi v. Rumsfeld*, 542 U.S. 507, 533, 124 S. Ct. 2633, 2648-49 (2004) (plurality opinion) (The "central meaning of procedural due process" is that parties "whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified.  It is equally fundamental that the right to notice and an opportunity to be heard must be granted at a meaningful time and in a meaningful manner.") (citations and internal quotation marks omitted); *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S. Ct. 1187, 1191 (1965); *see also United States v. James Daniel Good Real Property*, 510 U.S. 43, 53, 114 S. Ct. 492, 500-501 (1993); *Wisconsin v.*

*Constantineau*, 400 U.S. 433, 437, 91 S. Ct. 507, 510 (1971).  The SORA

provides an elaborate procedural scheme for making and challenging sex

offender level designations.  Once the Board of Examiners of Sex

Offenders makes a recommendation regarding the appropriate level to be

assigned the matter is remitted to the sentencing court to make the actual

determination.  N.Y. Corr. Law § 168-n(2).  Prior to that determination the

offender is provided notification of the recommendation and an opportunity

to be heard, with counsel to be assigned in appropriate circumstances.

N.Y. Corr. Law § 168-n(3).  Once the designation is made by the

sentencing court, the offender can then appeal the determination.  *Id.; see*

*Simms v. Sperrazza,* 28 A.D.3d 944, 800 N.Y.S.2d 486 (4th Dep't. 2005).

The SORA procedures thus provided plaintiff with a meaningful

opportunity to be heard regarding his classification both prior to and after

that determination was made, and plaintiff makes no claim that he was

denied the use of these procedures.  It seems clear that the availability of

these procedural safeguards satisfies the Fourteenth Amendment's

procedural due process requirements and demonstrates that plaintiff's

due process claim lacks merit.[14]  *Cf. Kansas v. Hendricks*, 521 U.S. 346,

---

[14]      Even if plaintiff was denied or did not avail himself of the procedural safeguards associated with the initial termination of his risk level, he is nonetheless not without recourse.  The SORA provides a mechanism by which a defendant may challenge his or her level designation at any time, though not more than once per year, and may pursue that issue into the appellate courts.  *See* N.Y. Corr. Law § 168-o.

360, 117 S. Ct. 2072, 2081 (1997) (noting procedures in civil commitment statute relating to sex offenders sufficient for due process purposes); *United States v. Waters*, 23 F.3d 29, 32 (2d Cir. 1994) (noting that New York Mental Hygiene Law § 9.07(a) provides an involuntarily admitted patient with "a rather elaborate procedural scheme for notice, hearing, review, and judicial approval of continued retention in a mental health facility", which have withstood challenges that it was facially unconstitutional.) (citing *Project Release v. Prevost*, 722 F.2d 960, 971-81 (2d Cir. 1983)), *cert. denied*, 513 U.S. 867, 115 S. Ct. 185 (1994); *McQuilkin v. Central New York Psychiatric Center*, No. 9:08-CV-00975, 2010 WL 3765847, at * 20 (N.D.N.Y. Aug. 27, 2010) (Peebles, M.J.) (finding that since defendants followed the procedures outlined in N.Y. Correction Law 402 the prison inmate plaintiff was afforded adequate due process prior to his involuntary commitment of to a mental health facility), report and recommendation adopted, 2010 WL 3765715 (N.D.N.Y. Sep 20, 2010) (McAvoy, S.J.).

  2. <u>Personal Involvement</u>

  There is a second, independent ground upon which dismissal of plaintiff's claims against the remaining DCJS defendants is warranted, as

_____

Judge Gershon concluded.  As the foregoing demonstrates, the

determination of the appropriate level to be assigned to the plaintiff was

the responsibility of the sentencing court, in this case the Troy City Court.

While the DCJS, through its Board of Examiners of Sex Offenders, plainly

had input into that decision, the final determination rested elsewhere.  It is

well-established that in order to be held accountable for a civil rights

violation under section 1983 an individual must have had personal

involvement in the deprivation alleged.  *Wright v. Smith,* 21 F.3d 496, 501

(2d Cir. 1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d

Cir. 1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977),

*cert. denied*, 434 U.S. 1087, 98 S. Ct. 1282 (1978)).  Since the moving

DCJS defendants did not make the final determination regarding plaintiff's

sex offender level designation, they are entitled to dismissal of plaintiff's

claims against them on the additional basis that they lacked the requisite

involvement in the conduct alleged to have violated plaintiff's constitutional

rights.

III.    <u>SUMMARY AND CONCLUSION</u>

Plaintiff's procedural due process claim, which is addressed to his

registration as a level three sex offender, implicates two separate

determinations, one requiring his registration, and the second assigning

an appropriate offender level.  With regard to the first, that requirement

was automatic upon plaintiff's criminal conviction for an offense

designated under the SORA as a sex offense, thereby precluding any

viable procedural due process claim with regard to that aspect of the

registration requirement.  Moreover, as Judge Gershon found in her

earlier decision, any claim associated with the registration itself in this

action would be untimely since plaintiff was plainly on notice more than

three years prior to commencement of suit that he was being required to

register.

Turning to the issue of the level designation, it is clear that it was

made pursuant to a comprehensive scheme providing adequate

procedural safeguards, including the right to a hearing, the provision of

assigned counsel under appropriate circumstances, and an appeal

mechanism, thus satisfying any potential due process concerns even

assuming the existence of a constitutional cognizable liberty interest in

what level designation is to be assigned.  The moving DCJS defendants

are therefore entitled to dismissal of plaintiff's due process claims against

them on this basis as well as the separate, independent ground that they

were not personally involved in the determination which, under the SORA,

was relegated to the responsibility of the sentencing court.

Based upon the foregoing it is therefore hereby respectfully

RECOMMENDED, that the motion of defendants Parker, Connolly,

Murphy and Felegy for judgment on the pleadings dismissing all claims

against them in this action (Dkt. No. 81) be GRANTED, and that all claims

against those defendants set forth in plaintiff's complaint be DISMISSED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge

written objections to the foregoing report.  Such objections shall be filed

with the clerk of the court within FOURTEEN days of service of this report.

FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE

APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d),

72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is further ORDERED that the clerk of the court serve a copy of this

report, recommendation and order upon the parties in accordance with

this court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated:      December 9, 2010
            Syracuse, NY

Slip Copy, 2009 WL 1707124 (N.D.N.Y.)
(Cite as: 2009 WL 1707124 (N.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Thomas KAMINSKI, Petitioner,
v.
Calvin RAPSATT, Superintendent, Respondent.
**No. 07-CV-01119.**

June 17, 2009.

West KeySummary
**Constitutional Law 92** 🗝 **4838**

92 Constitutional Law
  92XXVII Due Process
    92XXVII(H) Criminal Law
      92XXVII(H)12 Other Particular Issues and
Applications
        92k4838 k. Parole. Most Cited Cases

**Pardon and Parole 284** 🗝 **93**

284 Pardon and Parole
  284II Parole
    284k93 k. Discharge from parole. Most Cited
Cases
Parolee who was released to parole supervision did not
have a constitutionally protected liberty interest under due
process clause in receiving early discharge from parole, as
the New York statute authorizing early release left that
determination to the discretion of the Parole Board. Thus,
the parolee's due process rights were not violated when the
New York State Division of Parole failed to resubmit his
three-year discharge papers in a timely fashion,
notwithstanding the parolee's argument that the failure to
timely submit the discharge application resulted in an
arbitrary and capricious denial of the right to a parole
discharge. U.S.C.A. Const.Amend. 14; McKinney's
Executive Law § 259-j.

Thomas Kaminski, Marcy, NY, pro se.

Jodi A. Danzig, New York State Attorney General, New
York, NY, for Respondent.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior District Judge.

**I. INTRODUCTION**

**\*1** Petitioner Thomas Kaminski ("Kaminski" or
"Petitioner"), acting *pro se,* petitions the Court for a writ
of habeas corpus pursuant to 28 U.S.C. § 2254. The matter
was referred to the Hon. Victor E. Bianchini, United
States Magistrate Judge, for a Report and
Recommendation pursuant to 28 U.S.C. § 636(b) and
Local Rule 72.3(c). The Report and Recommendation,
dated March 2, 2009, recommended that the petition be
denied and the petition dismissed. *See* Rep. & Rec. [dkt.
# 22].

Petitioner filed objections to the Report and
Recommendation, *see* Objections Memorandum
("Petitioner's Memorandum") [dkt. # 25], and Respondent
filed a letter brief in opposition. *See* Letter Brief in
Opposition ("Respondent's Letter Brief") [dkt. # 23].

**II. STANDARD OF REVIEW**

When objections to a magistrate judge's report and
recommendation are lodged, the district court makes a *"de
novo* determination of those portions of the report or
specified proposed findings or recommendations to which
objection is made." *See* 28 U.S.C. § 636(b)(1)(C). General
or conclusory objections, or objections which merely
recite the same arguments presented to the magistrate
judge, are reviewed for clear error. *Farid v. Bouey,* 554
F.Supp.2d 301, 306 n. 2 (N.D.N.Y.2008); *see Frankel v.
N.Y.C.,* 2009 WL 465645 at \*2 (S.D.N.Y. Feb.25,
2009).[FN1] After reviewing the report and recommendation,
the Court may "accept, reject, or modify, in whole or in
part, the findings or recommendations made by the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1707124 (N.D.N.Y.)
(Cite as: 2009 WL 1707124 (N.D.N.Y.))

magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." 28 U.S.C. § 636(b)(1)(C).

> FN1. The Southern District wrote in *Frankel:*
>
> The Court must make a *de novo* determination to the extent that a party makes specific objections to a magistrate's findings. *United States v. Male Juvenile,* 121 F.3d 34, 38 (2d Cir.1997). When a party makes only conclusory or general objections, or simply reiterates the original arguments, the Court will review the report strictly for clear error. *See Pearson-Fraser v. Bell Atl.,* No. 01 Civ. 2343, 2003 W L 43367, at *1 (S.D.N.Y. Jan. 6, 2003); *Camardo v. Gen. Motors Hourly-Rate Employees Pension Plan,* 806 F.Supp. 380, 382 (W.D.N.Y.1992). Similarly, "objections that are merely perfunctory responses argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original [papers] will not suffice to invoke de novo review." *Vega v. Artuz,* No. 97 Civ. 3775, 2002 WL 31174466, at *1 (S.D.N.Y. Sept.30, 2002).
>
> 2009 W L 465645, at *2.

## III. DISCUSSION

Petitioner's objections to the Report and Recommendation are, for the most part, conclusory arguments or arguments that were presented to Magistrate Judge Bianchini. Having reviewed those arguments and the Report and Recommendation, the Court finds no clear error and adopts those portions of the Report and Recommendation addressed to these issues.

To the extent Petitioner argues that the magistrate judge erred because he failed to address Petitioner's then-pending state court challenge to his 1979 conviction, the objection is without merit. As explained by Magistrate Judge Bianchini, the instant petition does not challenge

Kaminski's 1979 rape conviction (or any of his subsequent convictions) but rather challenges "the New York State Division of Parole's conduct and [Kaminski's 2004] reclassification as a Risk Level 3 Sex Offender" under New York's Sex Offender Registration Act ("SORA"). Rep. Rec. p. 1; *see id.* at pp. 5-6. Petitioner's state court challenge to his 1979 conviction is immaterial to the merits of the petition before this Court. Furthermore, the challenge, which as has since been rejected by the Third Department of the New York State Supreme Court, *see People v. Kaminski,* 61 A.D.3d 1113, 876 N.Y.S.2d 242 (3rd Dept.2009), would constitute an unexhausted basis for habeas relief.

**\*2** To the extent Petitioner objects to the Report and Recommendation on the grounds that the magistrate judge failed to apply the pre-amendment version of New York Executive Law § 259-j that was in effect following Kaminski's conviction and which, Kaminski asserts, would have allowed him to receive a parole discharge dispute his rape first degree conviction, the argument is also without merit. Petitioner fails to recognize that Magistrate Judge Bianchini gave several alternative reasons for rejecting Petitioner's claim that he was deprived of his constitutional rights in connection with the discharge application process. *See* Rep. Rec. pp. 11-13. The Court adopts the alternative reasons and the claim is dismissed for these reasons.

Finally, to the extent Petitioner contends that the magistrate judge erred because he failed to address Petitioner's challenge to New York's SORA based on a theory of unconstitutional "profiling," the argument is rejected. The Court adopts Magistrate Judge Bianchini's conclusion that Kaminski's constitutional challenge to New York's SORA is unexhausted and procedurally barred. *Id.* p. 16-19, 876 N.Y.S.2d 242.

## IV. CONCLUSION

Having reviewed Judge Bianchini's Report and Recommendation, Petitioner's Memorandum, and Respondent's Letter Brief, the Court adopts Magistrate Judge Bianchini's Report and Recommendation for the reasons stated therein and as addressed above.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1707124 (N.D.N.Y.)
(Cite as: 2009 WL 1707124 (N.D.N.Y.))

Accordingly, it is hereby

**ORDERED** that the petition for a writ of habeas corpus
is **DENIED,** and the petition is **DISMISSED.** Because
Petitioner has failed to make a substantial showing of a
denial of a constitutional right, this Court will not issue a
certificate of appealability.

**IT IS SO ORDERED.**

### REPORT AND RECOMMENDATION

VICTOR E. BIANCHINI, United States Magistrate Judge.

### I. INTRODUCTION

Petitioner Thomas Kaminski, acting *pro se,* commenced
this action seeking relief pursuant to 28 U.S.C. § 2254.
Petitioner is an inmate at the Marcy Correctional Facility
in Marcy, New York. In 1980, he was convicted in a New
York State court of first degree rape, two counts of first
degree sodomy, and second degree burglary. Later, in
1983, the New York Court of Appeals reversed the two
sodomy convictions. In 1996, Petitioner was classified as
a Risk Level 3 Sex Offender with respect to his rape
conviction under New York's Sex Offender Registration
Act. Petitioner does not challenge his underlying
conviction, but rather the New York State Division of
Parole's conduct and his reclassification as a Risk Level 3
Sex Offender.

This matter was referred to the undersigned by the
Honorable Norman A. Mordue, Chief United States
District Judge, pursuant to 28 U.S.C. § 636(b (1 (A and
(B, and is presently before this Court for a eport and
recommendation. (Docket No. 18).

### II. BACKGROUND

**A. Facts**

Petitioner does not contest his underlying convictions or
the facts of his convictions. By way of background, the
following factual summary was provided in the Appellate
Division, Third Department's decision on Petitioner's
direct appeal:

**\*3** On the evening of October 20, 1979, complainant,
home alone with her 15-month-old baby, fell asleep
awaiting her husband's return, later that night, from a
business trip. Their dwelling was located in a rural area,
the nearest neighbor being approximately one-quarter
mile away. Sometime after 10:00 P.M., this slight
114-pound, five-foot four-inch woman felt something
covering her face and awoke to the frightful apparition
of an intruder wearing a ski mask and holding a gloved
hand over her mouth. She testified that at that point she
believed she was going to die. The masked man then
said "quiet" and, while kneeling on the bed between her
and the only doorway to the room, demanded money.
When the victim, who further testified she feared not
only for her own but her child's safety as well, acceded
to his request and started up from the bed to get money,
defendant pushed her back down declaring, "No, I want
you". While throughout she kept imploring him not to
hurt her or the baby and leave, defendant unmasked,
disrobed, yanked away the covers she was clutching and
penetrated her until she summoned enough strength to
push him away. Her attempt to escape was thwarted
when he grasped her leg, after which he sodomized her,
and then fled. The victim immediately reported the
incident to her neighbors and the police.

*People v. Kaminski,* 87 A.D.2d 724, 724-725, 449
N.Y.S.2d 328 (3d Dep't 1982).

Petitioner was convicted after trial on the following
charges: Rape in the First Degree, two counts of Sodomy
in the First Degree, and Burglary in the Second Degree.
Petitioner was sentenced on May 23, 1980, to an
indeterminate term of imprisonment of eight and one third
(8 1/3) years to twenty five (25) years for each of the rape
and sodomy convictions, and a concurrent term of five (5)
to fifteen (15) years for the burglary conviction. (Docket
No.16, at "Exhibit A").

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1707124 (N.D.N.Y.)
(Cite as: 2009 WL 1707124 (N.D.N.Y.))

Petitioner appealed his conviction to the Appellate Division, Third Department on the grounds that the evidence of rape was insufficient, certain evidence was improperly introduced, and his sentence was harsh and excessive. On March 25, 1982, the Appellate Division unanimously affirmed Petitioner's judgment of conviction. *Kaminski,* 87 A.D.2d at 724-25, 449 N.Y.S.2d 328. On February 15, 1983, the New York Court of Appeals reversed the sodomy convictions, finding error in the trial court's jury instructions, but affirmed Petitioner's other convictions. *People v. Kaminski,* 58 N.Y.2d 886, 460 N.Y.S.2d 495, 447 N.E.2d 43 (1983).

**B. Parole**

On February 9, 1989, Petitioner was released to parole supervision. (Docket No. 16 "Exhibit D"). In 1991, while on parole, he was arrested for criminal impersonation. (*Id.*). Petitioner was returned to prison, but was re-paroled on May 1, 1992. (*Id.* at "Exhibit E").

**C. Sex Offender Registration Act Reclassification**

In February of 1996, Petitioner was classified as a Risk Level 3 Sex Offender under New York's Sex Offender Registration Act ("SORA"). *See* N.Y. Correct. Law § 168 *et seq.* Level-three offenders must personally verify their address with the local law enforcement agency every ninety days. *See id.* § 168-f(3).

**D. Further Convictions**

**\*4** In 1999, Petitioner was arrested, indicted for, and pled guilty to, unlawful production of official United States identification documents, in violation of 18 U.S.C. § 1028(a)(1); possession of false identification documents, in violation of 18 U.S.C. § 1028(a) (6); forging the signature of a United States Magistrate Judge, in violation of 18 U.S.C. § 505; and the manufacture and possession of false badges, identification cards, and insignia, in violation of 18 U.S.C. § 701. *United States v. Kaminski,* 229 F.3d 1136, 2000 WL 1527932 (2d Cir. October 12, 2000) (unpublished decision).

These convictions were the result of a visit by Petitioner's parole officers to his home, where the officers discovered a web page containing an advertisement by Petitioner for the sale of police badges. The parole officers conducted a further search and found, among other things, a New York State Inspector General's identification tag with Petitioner's name and photograph on it, a Department of Criminal Justice Service Investigator's identification card, two police shields, two official parking placards, a U.S. Marshal's certificate of appointment bearing Petitioner's name, two police radio frequency scanners, and a police gun belt. *Id.* at *1.

Petitioner was also charged in Broome County with two counts of Forgery in the Second Degree, in violation of New York Penal Law ("NYPL") § 170.10(3) and ten counts of Criminal Possession of a Forged Instrument in the Second Degree, in violation of NYPL § 170.25. Petitioner pled guilty to both forgery counts and six of the ten possession counts. On February 14, 2000, Petitioner was sentenced, as a second felony offender, to a concurrent indeterminate term of two (2) to four (4) years imprisonment for each conviction. On June 14, 2001, the Appellate Division, Third Department unanimously affirmed the judgment. *People v. Kaminski,* 284 A.D.2d 660, 728 N.Y.S.2d 213 (3d Dep't 2001). The New York Court of Appeals denied Petitioner leave to appeal on November 28, 2001. *People v. Kaminski,* 97 N.Y.2d 656, 737 N.Y.S.2d 57, 762 N.E.2d 935 (2001).

On March 9, 2000, Petitioner was sent back to state prison to complete the remaining portion of his sentence from the Chemung County convictions (the 1980 convictions), and to serve his sentences in the federal and Broome County cases. *See* (Docket No. 16 at "Exhibit I").

**E. SORA Proceedings**

In 2004, the Board of Examiners of Sex Offenders reviewed Petitioner's case and recommended that he be re-classified as a Risk Level 3 Sex Offender. (Docket No. 16 at "Exhibit K"). Thereafter, on October 4, 2004, Petitioner appeared before the County Court with a court-appointed attorney, Michael P. Nevins, Esq., and demanded a hearing. (*Id.* at "Exhibit M"). Petitioner's hearing took place on December 2, 2004. The People

Slip Copy, 2009 WL 1707124 (N.D.N.Y.)
(Cite as: 2009 WL 1707124 (N.D.N.Y.))

argued that Petitioner was a Risk Level 3 by virtue of the score he received when the Board of Examiners assessed him using the SORA Risk Assessment Instrument [FN1] ("RAI"). Petitioner argued that he never received a copy of the RAI. The court provided Petitioner with a copy of the RAI and adjourned the proceedings. (*Id.* at "Exhibit P" 17-20, 27-19).

> FN1. The RAI uses fifteen enumerated risk factors to tally the sex offender's risk factor score.

**\*5** When the hearing proceeded, Petitioner was represented by new counsel, Paul R. Corradini, Esq. Petitioner was the sole witness at the hearing and challenged the RAI risk factor calculation. For example, he claimed that risk factor seven of the RAI had been assessed incorrectly. Risk factor seven deals with the relationship to the victim. Petitioner claimed his score was too high because the victim was not a stranger to him and that his girlfriend's brother boarded horses on the victim's property, and that, the victim allowed him to order pizza from her phone on several occasions. (*Id.* at "Exhibit O" 37-38).

In an order dated July 26, 2005, the County Court re-classified Petitioner a Risk Level 3 Sex Offender. The County Court rejected Petitioner's claim that he was not a stranger to the victim. The Court cited SORA as defining "stranger" as "anyone who is not an actual acquaintance of the victim." (*Id.* at "Exhibit K" 1-2). The County Court found Petitioner's remaining arguments meritless and found him to be a "high risk to the community." (*Id.* at 3-4).

Petitioner, represented by Randolph V. Kruman, Esq., appealed to the Appellate Division, Third Department. On March 22, 2007, the Appellate Division, Third Department, unanimously affirmed the County Court's decision. *People v. Kaminski,* 38 A.D.3d 1127, 833 N.Y.S.2d 266 (3d Dep't 2007). Leave to appeal to the New York Court of Appeals was denied on June 28, 2007. *People v. Kaminski,* 9 N.Y.3d 803, 840 N.Y.S.2d 763, 872 N.E.2d 876 (2007).

**F. Article 70 Proceeding**

On November 13, 2007, Petitioner, represented by A.J. Bosman, Esq., moved pursuant to Article 70 of the New York Civil Practice Law and Rules ("CPLR"), for release from prison. Petitioner argued that his parole officer failed to submit his three year discharge application, with respect to his 1980 convictions, resulting in his incarceration. (Docket No. 16 at "Exhibit Y"). The New York State Department of Corrections opposed the motion, arguing that it was without factual or legal basis. (*Id.* at "Exhibit Z").

On February 5, 2008, the Oneida County Supreme Court ruled that "the Division of Parole's failure to submit the Petitioner's three year discharge papers while Petitioner was on parole was arbitrary, capricious, and an abuse of discretion." (*Id.* at "Exhibit AA"). The Court referred the matter to the Division of Parole for a review of the decision.[FN2]

> FN2. To date, this Court has not been updated on the status of the Division of Parole's review of the decision.

**G. Federal Habeas Corpus Proceedings**

Petitioner, proceeding *pro se,* commenced this action on October 23, 2007, by filing a Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. (Docket No. 1). In his Petition, Petitioner asserts that: (1) the New York State Division of Parole violated his constitutional rights by failing to follow its own procedures that required it to re-submit his three-year discharge papers prior to his February 1998 parole review; (2) the RAI is unconstitutional because it fails to take into account the recency of the offender's crimes; (3) Attorneys Nevins and Corradini, who represented Petitioner prior to and during the SORA hearing, provided ineffective assistance; and (4) Attorney Kruman, who represented Petitioner with respect to the SORA appeal, provided constitutionally ineffective representation. Respondent filed a Response and memorandum of law in opposition on May 29, 2008. (Docket Nos. 13, 14, & 16).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1707124 (N.D.N.Y.)
(Cite as: 2009 WL 1707124 (N.D.N.Y.))

**\*6** For the reasons that follow, the petition for habeas corpus should be DISMISSED.

### III. DISCUSSION

#### A. Federal Habeas Standard

Federal habeas corpus review of a state court parole decision is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Under AEDPA, federal courts must give substantial deference to a state court determination that has adjudicated a federal constitutional claim "on the merits." 28 U.S.C. § 2254(d); *Sellan v. Kuhlman,* 261 F.3d 303, 309-10 (2d Cir.2001). The Second Circuit has stated that an "adjudication on the merits" is a "substantive, rather than a procedural, resolution of a federal claim." *Sellan,* 261 F.3d at 313 (quotation omitted). The Second Circuit has also held that even a one-word denial of a petitioner's claim is sufficient to constitute an "adjudication on the merits" for purposes of AEDPA. *Id.* at 312-313.

Specifically, AEDPA requires that where a state court has adjudicated the merits of a Petitioner's federal claim, habeas corpus relief may not be granted unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Both AEDPA and its predecessor statute recognize that a presumption of correctness shall apply to state court findings of fact, *Whitaker v. Meachum,* 123 F.3d 714, 715

n. 1 (2d Cir.1997), and AEDPA requires a Petitioner to rebut that presumption by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *LanFranco v. Murray,* 313 F.3d 112, 117 (2d Cir.2002). A presumption of correctness applies to findings by both state trial and appellate courts. *Galarza v. Keane,* 252 F.3d 630, 635 (2d Cir.2001); *Whitaker,* 123 F.3d at 715 n. 1.

In *Williams v. Taylor,* 529 U.S. 362, 413, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), the Supreme Court defined the phrases "contrary to" and "unreasonable application of" clearly established federal law. A state court decision is "contrary to clearly established federal law ... if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Court] has on a set of materially indistinguishable facts." *Id.*

A state court decision involves "an unreasonable application of" Supreme Court case law if it "identifies the correct governing legal principle from [the Court's] decisions but unreasonably applies that principle to the particular facts of [a] prisoner's case." *Id.*

Under this standard, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. In order to grant the writ there must be "some increment of incorrectness beyond error," although "the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Francis S. v. Stone,* 221 F.3d 100, 111 (2d Cir.2000) (internal quotation marks omitted).

#### B. Petitioner's Claims

**\*7** As noted above, Petitioner does not challenge his underlying convictions, but raises four challenges to post-conviction proceedings in the New York State courts. Each claim will be addressed in turn.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1707124 (N.D.N.Y.)
(Cite as: 2009 WL 1707124 (N.D.N.Y.))

**1. Submission of Parole Discharge Papers**

Petitioner argues that his constitutional rights were violated because the New York State Division of Parole failed to resubmit his three-year discharge papers in a timely fashion. The background with respect to this claim may be summarized as follows:

As noted above, Petitioner was originally convicted and sentenced in 1980. He was released to parole supervision on February 9, 1989, but was arrested for criminal impersonation and returned to prison in February 1991. Petitioner was re-paroled on May 1, 1992.

The parties appear to agree that Section 9208.02 of the New York State Division of Parole Policy & Procedure Manual provides that parole officers are to prepare an application for discharge of sentence to the Board of Parole in the 34th month following release on parole and to submit the application to the Board in the 36th month.[FN3] In this case, the discharge application apparently should have been submitted to the Board in approximately February of 1992 (*i.e.,* thirty-six months after Petitioner's release).[FN4]

> **FN3.** This Court was not provided with a copy of the New York State Division of Parole Policy & Procedure Manual and was unable to locate the manual via search of available databases. In any event, the parties appear to be in agreement as to the substance of the applicable provision.

> **FN4.** The parties have not advised this Court as to whether the time period from February 1991 to May 1992, during which Petitioner's parole was revoked, should be counted toward the 36-month period. In any event, even if that period is excluded, the discharge application was not submitted until February of 1996, which was beyond the 36-month timetable under either calculation.

There also appears to be no dispute regarding the fact that Petitioner's parole officer failed to submit the discharge application until February of 1996, approximately eight-four (84) months after Petitioner was released to parole.[FN5] It further appears that the Parole Board denied the application, but directed that it be resubmitted in February 1998. The application was apparently never resubmitted.[FN6]

> **FN5.** This sequence of events is alleged by Petitioner on p. 3 of his Petition. The sections of Respondent's memorandum of law addressing this claim are remarkably unhelpful. The state court records are likewise in summary form, incomplete, and lacking in meaningful detail. In any event, Respondent has not offered an indication to the effect that there is any evidence contradicting the key factual allegation underlying Petitioner's claim, namely, that his parole officer failed to submit a discharge application in a timely fashion.

> **FN6.** This Court was not provided with the underlying documentation and, again, Respondent's papers (both those filed by the Attorney General in the state court proceedings and in this case) are remarkably deficient as to the critical facts and procedural history.

Petitioner argues that he would have "effectively been eligible" for a discharge of his sentence in February 1992, but for his parole officer's failure. Presuming that the discharge would have been granted if the application had been timely submitted, Petitioner argues that he (a) would not have been required to register as a sex offender under SORA when it became effective in 1996 and (b) would not have been on parole in May of 1999 and thus would not have been subjected to the search that ultimately led to his various federal and state convictions for forgery and related charges.

As previously set forth above, in November 2007, Petitioner filed a motion in the New York State Supreme Court, Oneida County, pursuant to Article 70 of the New York Civil Practice Law & Rules, challenging, *inter alia,* the parole officer's failure to timely submit the discharge application. (Exhibit Y).[FN7] On January 5, 2008, the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1707124 (N.D.N.Y.)
(Cite as: 2009 WL 1707124 (N.D.N.Y.))

Honorable Robert F. Julian, Justice of the Supreme Court, issued an Order finding that "the Division of Parole's failure to submit the Petitioner's three year discharge papers while Petitioner was on parole was arbitrary, capricious, and an abuse of discretion." (Exhibit AA). Justice Julian accordingly referred the matter to the Parole Board for review and decision and directed that he (or his successor on the bench) would retain jurisdiction.[FN8]

> FN7. It is not clear from the state court papers whether the challenge was made to (a) the failure to timely submit the discharge application in the first instance (*i.e.* within 36 months of the original release date); (b) the failure to re-submit the application in February 1998; or (c) both.

> FN8. Justice Julian directed that the Parole Board issue a decision within sixty (60) days, which would have been approximately March 5, 2008. However, neither Petitioner nor Respondent has provided this Court with an update concerning the status of the Parole Board's review and/or whether a decision was ever issued.

**\*8** Because Petitioner's Article 70 motion was granted by the state court, it appears that his habeas claim is either moot (because he has already obtained the requested relief in state court) or premature (because the state court process has not been completed). In any event, even assuming *arguendo* that the claim was properly exhausted and before this Court, it should be denied as clearly lacking in merit.

Subject to certain enumerated exceptions, section 259-j of the New York Executive Law gives the Parole Board discretion to discharge a parolee from supervision if it is in the best interests of society. Construing Petitioner's *pro se* claim liberally, it appears that he is contending that the parole officer's failure to timely submit his discharge application in effect "short circuited" the review process, resulting in an arbitrary and capricious denial of right to a parole discharge under § 259-j.

Under the Fourteenth Amendment, a person may not be deprived of a constitutionally protected liberty interest without due process of law. *See Hewitt v. Helms,* 459 U.S. 460, 466, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983).

However, a parolee has "no liberty interest in receiving early discharge from parole, as the statute authorizing early release [Executive Law § 259-j] leaves that determination to the discretion of the Parole Board." *Pena v. Travis,* No. 01 Civ.8534, 2002 WL 31886175, at \*12 (S.D.N.Y. Dec.27, 2002); *see also Hall v. New York State Div. of Parole,* No. 99-CIV-11317, 2000 WL 1099950, at \*3 (S.D.N.Y. July 13, 2000) ("Petitioner's claim that he was not given a parole evaluation hearing in 1997 that might have resulted in his release from parole before his September 1998 arrest is unfounded. N.Y. Executive Law 259-j leaves early parole discharge to the Parole Board's discretion."); *Smiley by Smiley v. Westby,* No. 87 Civ. 6047, 1994 WL 519973, at \*5 (S.D.N.Y. Sep.22, 1994) ("The mere fact that New York's parole scheme allows for the possibility of early discharge from parole, ... does not grant those on parole a liberty interest in early discharge.").

As such, even if the untimely submission of the discharge application (and/or the failure to resubmit the application) was arbitrary or capricious, Petitioner was not deprived of a constitutionally protected liberty interest.

Moreover, even if the untimely submission of the discharge application and/or the failure to resubmit the application was contrary to the Division of Parole's Policy and Procedure Manual, Petitioner is "still unable to state a due process claim because the Policy and Procedure Manual does not have the force of law in New York and thus cannot give rise to a liberty interest." *Smiley,* 1994 WL 519973, at \*6; *see also Hall,* 2000 WL 1099950 at \*3.

Lastly, because Petitioner's original convictions included a conviction for first degree rape, it appears that he would have been ineligible for a discharge as a matter of law in any event. Executive Law § 259-j does not permit a discharge to be granted if the parolee committed a "violent felony offense" as defined in New York Penal Law §

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1707124 (N.D.N.Y.)
(Cite as: 2009 WL 1707124 (N.D.N.Y.))

70.02. Rape in the first degree is a "violent felony offense" under § 70.02, and was so at all times relevant to this claim. Accordingly, it does not appear that Petitioner would have been eligible for a discharge even if his application had been submitted in a timely fashion.[FN9] For the foregoing reasons, Petitioner's claim that he was deprived of his constitutional rights in connection with the discharge application process is plainly without merit and should be denied.

FN9. The Attorney General presented this argument in the Article 70 proceeding. Although Justice Julian ruled that the failure to timely submit the discharge application was "arbitrary, capricious, and an abuse of discretion," he did not make any finding that Petitioner was prejudiced thereby and the Order does not address the Attorney General's argument concerning Petitioner's apparent ineligibility for a discharge. In any event, any claim Petitioner may have in this regard arises under state law and is not cognizable on habeas review. As noted above, Petitioner has no federal constitutional liberty interest in early discharge from parole.

**2. Constitutionality of RAI**

*9 Petitioner argues that the Risk Assessment Guideline system used by the State of New York pursuant to SORA is unconstitutional because it fails to adequately account for the recency of the offender's crimes.

**a. SORA**

SORA, which became effective on January 21, 1996, requires those convicted of certain enumerated sex crimes to register with the New York State Division of Criminal Justice. *See generally* N.Y. Corrections Law § 168; *Doe v. Pataki,* 120 F.3d 1263, 1266 (2d Cir.1997). The registration information is shared with local law enforcement agencies and, depending upon the "risk level" assigned to the offender, law enforcement may notify the local community. *See* N.Y. Corrections Law § 168-1(6).

The risk level is determined by the New York State Board of Sex Offenders, using "risk assessment guidelines, developed with the assistance of a group of experts with experience in dealing with sex offenders ...." *Doe v. Pataki,* 3 F.Supp.2d 456, 461-62 (S.D.N.Y.1998). "The several factors considered by the Board when determining the appropriate risk level include whether the offender has a mental abnormality or personality disorder, whether the offender's conduct was characterized by repetitive and compulsive behavior, the age of the offender and of the victim, the use of weapons, and the number of prior offenses." *Woe v. Spitzer,* 571 F.Supp.2d 382, 385 (E.D.N.Y.2008) (citing N.Y. Corrections Law § 168-1(5)). The sentencing court assigns a risk level to the sex offender based upon the SORA Board's recommendation. N.Y. Corrections Law § 168-n.

SORA allows a sex offender to petition for an order "modifying the level of notification." *See* N.Y. Corrections Law § 168-*o* (2).

Soon after SORA became effective, a class action suit challenging the constitutionality of the statute was filed in the Southern District of New York. *See Doe v. Pataki,* 940 F.Supp. 603 (S.D.N.Y.1996).

The case proceeded through several stages of litigation, involving appeals to the United States Court of Appeals for the Second Circuit. Ultimately, the State and the litigants reached an agreement creating various procedural protections that must be afforded to a sex offender in connection with the process for determining his or her risk level (*e.g.* right to notice and an opportunity to be heard, right to appointment of counsel). *See Doe v. Pataki,* 481 F.3d 69, 73-74 (2d Cir.2007). The procedures were thereafter incorporated into SORA's statutory provisions. *See* N.Y. Corrections Law § 168-n.

**b. Petitioner's SORA Proceedings**

In the present case, the Board reviewed Petitioner's case and determined that he should be classified as a Risk Level 3 Sex Offender (the highest risk category). This determination was based upon Petitioner's score of 115, which was determined using the Board's Risk Assessment

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1707124 (N.D.N.Y.)
(Cite as: 2009 WL 1707124 (N.D.N.Y.))

Guidelines ("RAG"). The RAG are used to create a Risk Assessment Instrument ("RAI"), which constitutes the Board's recommendation regarding the proper reclassification. There is no dispute that Petitioner was assigned appointed counsel and received a hearing before the Chemung County Court to challenge the Level 3 categorization. In July 2005, the County Court rejected Petitioner's challenge and classified him as a Risk Level 3 Sex Offender.

**\*10** On appeal from the County Court's reclassification decision, Petitioner, through counsel, filed a brief with the Appellate Division, Third Department, arguing the reclassification was improper because the victim was not a stranger to Petitioner and because the evidence relied upon by the prosecution was unreliable hearsay. (Exhibit S). In addition, counsel contended that Petitioner should have been granted a downward departure based upon the following mitigating factors: (1) the crime was committed in 1979 and Petitioner had not been charged or convicted of any sexual crimes since that time and (2) Petitioner's age, which was forty-nine (49) at the time of the appeal.

In a *pro se* submission filed in support of the appeal, Petitioner asserted that the RAI was flawed because it provided "no guidance as to how far back the Court should consider criminal conduct." (Exhibit U).

The County Court's ruling was affirmed by the Appellate Division, Third Department. *People v. Kaminski,* 38 A.D.3d 1127, 1128, 833 N.Y.S.2d 266 (3d Dep't 2007). Petitioner, through counsel, sought leave to appeal to the Court of Appeals and incorporated by reference the arguments raised in his appellate counsel's brief to the Appellate Division. (Exhibit W). Petitioner did not raise any claim that SORA or the RAI were unconstitutional. The Court of Appeals denied the leave application. *People v. Kaminski,* 9 N.Y.3d 803, 840 N.Y.S.2d 763, 872 N.E.2d 876 (2007).

**c. Exhaustion**

As noted above, Petitioner seeks habeas relief based upon the argument that the SORA and/or the RAI used by the Board are unconstitutional because the Guidelines do not account for the fact that an offender's crime may have occurred long ago. This claim was never fairly presented to the state courts. Although Petitioner argued in his *pro se* submission to the Appellate Division that the statute was "flawed" because it did not adequately account for the fact that his crime was committed in 1979, he did not challenge the constitutionality of the statute on that basis. Further, even assuming *arguendo* that such a claim might be deemed to have been raised by Petitioner's *pro se* submission, the claims set forth in that submission were not presented to the Court of Appeals as part of the leave application. *See Morgan v. Bennett,* 204 F.3d 360, 369 (2d Cir.2000). This claim is therefore unexhausted and procedurally barred.

"An application for a writ of habeas corpus on behalf of a person in custody pursuant to a judgment of a State court shall not be granted unless it appears that-(A) the applicant has exhausted the remedies available in the courts of the State...." 28 U.S.C. § 2254(b)(1)(A); *see e.g., O'Sullivan v. Boerckel,* 526 U.S. 838, 843-44, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999); *accord, e.g., Bossett v. Walker,* 41 F.3d 825, 828 (2d Cir.1994). "The exhaustion requirement is not satisfied unless the federal claim has been 'fairly presented' to the state courts." *Daye v. Attorney General,* 696 F.2d 186, 191 (2d Cir.1982) (en banc). This means that the petitioner must have alerted the state appellate court that a federal constitutional claim is at issue. *See e.g., Grady v. LeFevre,* 846 F.2d 862, 864 (2d Cir.1988).

**\*11** A claim may be "fairly presented" to the state courts if "the legal basis of the claim made in state court was the 'substantial equivalent' of that of the habeas claim." *Daye,* 696 F.2d at 192 (2d Cir.1982) "This means, in essence, that in state court the nature or presentation of the claim must have been likely to alert the court to the claim's federal nature." *Id.*

Additionally, a habeas petitioner may "fairly present" his or her federal claims "even without citing chapter and verse of the Constitution," by the following four methods, first summarized by the Second Circuit in *Daye v. Attorney General of New York:* (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1707124 (N.D.N.Y.)
(Cite as: 2009 WL 1707124 (N.D.N.Y.))

in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation. *Daye,* 696 F.2d at 194.

In the present case, as noted above, Petitioner did not "fairly present" his challenge to SORA and/or the RAI to the Court of Appeals in "federal constitutional terms." Thus, the conclusion is inescapable that Petitioner's claim is not exhausted.

For purposes of satisfying the exhaustion requirement, a federal habeas court need not require that a federal claim be presented to a state court if it is "clear" that the state court would hold the claim to be procedurally barred. *Reyes v. Keane,* 118 F.3d 136, 139 (2d Cir.1997) (quoting *Grey v. Hoke,* 933 F.2d 117, 120 (2d Cir.1991)) (in turn quoting *Harris v. Reed,* 489 U.S. 255, 263 n. 9, 109 S.Ct. 1038, 1043 n. 9, 103 L.Ed.2d 308 (1989)) (quotation marks omitted).

In such a case, a habeas petitioner does not have "remedies available in the courts of the State" within the meaning of 28 U.S.C. § 2254(b). *Grey,* 933 F.2d at 120. Claims that would face such a procedural bar are "deemed exhausted" by the federal courts. *See, e.g., Reyes,* 118 F.3d at 139; *Washington v. James,* 996 F.2d 1442, 1446-47 (2d Cir.1993); *Grey,* 933 F.2d at 120-21.

Petitioner no longer has any available remedies in the New York state courts, as he has already filed a direct appeal and application for leave to appeal. *See* N.Y. Court Rules § 500.10(a) (a defendant in New York has only one direct appeal). As a consequence, "the procedural bar that gives rise to exhaustion provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim," *Gray v. Netherland,* 518 U.S. 152, 162, 116 S.Ct. 2074, 135 L.Ed.2d 457 (1996).

**d. Procedural Default**

A habeas petitioner's forfeiture in state court of his federal

claims bars him from litigating the merits of those claims in federal habeas proceedings, absent a showing of cause for the procedural default and prejudice resulting therefrom. *Grey,* 933 F.2d at 121 (citing *Murray v. Carrier,* 477 U.S. 478, 492, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986); *Wainwright v. Sykes,* 433 U.S. 72, 87-91, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977)). Here, Petitioner also has not made the showing of "actual innocence" necessary to warrant the "fundamental miscarriage of justice" exception to the procedural default rule. *See Schlup v. Delo,* 513 U.S. 298, 314-16, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995).

**\*12** Because Petitioner asserts ineffective assistance of counsel claims, his Petition might arguably be read to suggest that the procedural default should be excused for "cause" because his attorneys improperly failed to prosecute the claims before the state courts.

To overcome the procedural bar on this basis, Petitioner needs to show both "cause" for not raising the claim in State court and "prejudice" resulting therefrom. *Dixon v. Miller,* 293 F.3d 74, 80-81 (2d Cir.2002). A petitioner establishes "cause" for failing to raise a claim when he can show that "some objective factor external to the defense" prevented him from following the procedural rule. *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). To show "prejudice," the petitioner must demonstrate that the constitutional error worked to his "actual and substantial disadvantage." *United States v. Frady,* 456 U.S. 152, 170, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982).

Although ineffective assistance of counsel can constitute cause, it may only do so when the representation is so ineffective that it violates the client's Sixth Amendment right to counsel. *Edwards v. Carpenter,* 529 U.S. 446, 451, 120 S.Ct. 1587, 146 L.Ed.2d 518 (2000); *Bloomer v. United States,* 162 F.3d 187, 191 n. 1 (2d Cir.1998).

For the reasons discussed below, based upon this Court's review of the record, all of the alleged errors committed by trial counsel are factually baseless, without legal merit, or both. Thus, appellate counsel cannot be found ineffective for omitting claims regarding trial counsel's

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1707124 (N.D.N.Y.)
(Cite as: 2009 WL 1707124 (N.D.N.Y.))

performance which had no likelihood of success on appeal. Moreover, a defendant cannot be prejudiced by appellate counsel's failure to raise meritless claims. *See Mayo v. Henderson* 13 F.3d 528, 534 (2d Cir.1994) ("To establish prejudice in the appellate context, a petitioner must demonstrate that there was a 'reasonable probability' that [his] claim would have been successful ...." (alteration in original)) (quoting *Claudio v. Scully,* 982 F.2d 798, 803 (2d Cir.1992)). Therefore, Petitioner is unable to establish the requisite cause and prejudice to excuse the procedural default and this claim should be denied on that basis.

**e. Merits**

Lastly, even if the procedural default could be excused, Petitioner's claim is plainly lacking in merit. Essentially, the claim is that the fact that the RAI process is violative of due process because it does not directly consider the fact that the underlying sex crime occurred many years ago. First, the Guidelines used to prepare the RAI provide for an additional ten points to be added to the risk factor calculation where the prior crime was committed within three (3) years of the instant offense. (Exhibit L). Petitioner appropriately received no points for this factor because his crime was committed in 1979. He has failed to establish any basis upon which to conclude that the mere fact that specific credit is not given for the age of the offense is so fundamentally unfair as to constitute a denial of due process. Although Petitioner offers some criticisms of the predictive value of the RAG, "he has not shown that the factors on which the guidelines are based are unreliable indicators of the risk of reoffense by a sex offender so that their use violates the sex offender's right to due process" *People v. Bligen,* 33 A.D.3d 489, 823 N.Y.S.2d 42, 43 (1st Dep't 2006).

**\*13** Second, the RAI is merely a recommendation to the sentencing court, which makes the ultimate reclassification decision. *See* N.Y. Correction Law § 168-I (6). Petitioner was afforded with an opportunity to argue that the lapse of time was a mitigating factor when evaluating the likelihood of re-offense. The fact that the sentencing court ultimately rejected that argument does not constitute a denial of due process. *See People v. Flowers,* 826 N.Y.S.2d 687, 688 (2 Dep't 2006).

Lastly, under SORA, as amended pursuant to the Stipulation of Settlement reached in *Doe v. Pataki,* 3 F.Supp.3d 456, 472 (S.D.N.Y.1998), a defendant is entitled to notice and a hearing, pre-hearing discovery, and the right to appeal. Courts considering due process claims seeking to impose additional requirements have uniformly rejected such claims as without merit and barred by the *Doe v. Pataki* stipulation. *See,* e.g., *Bligen,* 823 N.Y.S.2d at 43; *People v. Howard,* 52 A.D.3d 273, 860 N.Y.S.2d 503, 504 (1st Dep't 2008).

**3. Ineffective Assistance of SORA Hearing Counsel**

Petitioner was represented by two attorneys prior to and during the SORA hearings, Paul R. Corradini, Esq. and Michael P. Nevins, Esq. Petitioner argues that these attorneys were ineffective because they (a) were unfamiliar with the mandates of *Doe v. Pataki;* (b) failed to assert Petitioner's constitutional challenge to the RAI; (c) failed to call expert witnesses; and (d) failed to call Petitioner's parole officer as a witness.

To prevail on a claim of ineffective assistance of counsel within the framework established by the Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), a habeas petitioner must satisfy a two-part test. First, the petitioner must demonstrate that counsel's performance was so deficient that counsel was not functioning as "counsel" within the meaning of the Sixth Amendment to the Constitution. *Id.* at 688. In other words, a petitioner must show that his attorney's performance "fell below an objective standard of reasonableness." *Id.*

Second, the petitioner must show that counsel's deficient performance prejudiced him. *Id.* at 694. To establish the "prejudice" prong of the *Strickland* test, a petitioner must show that a "reasonable probability" exists that, but for counsel's error, the outcome of the trial would have been different. *Id.* at 694. The issue of prejudice need not be addressed, however, if a petitioner is unable to demonstrate first that his counsel's performance was inadequate. "[T]here is no reason for a court deciding an ineffective assistance claim to ... address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1707124 (N.D.N.Y.)
(Cite as: 2009 WL 1707124 (N.D.N.Y.))

First, Petitioner's ineffective assistance claims were never presented to the New York Court of Appeals and are thus unexhausted and procedurally barred. Further, even assuming *arguendo* that the claims were not barred, they are plainly lacking in merit. Petitioner's claim that his attorneys were unfamiliar with *Doe v. Pataki* is conclusory and contradicted by the record, which indicates that counsel was both aware of *Doe* and cognizant of the relevant legal issues and standards. *See* (Exhibit P, at p. 7-8, 11; Exhibit O, at p. 37-47).

**\*14** Counsel can not be deemed ineffective for failing to raise Petitioner's constitutional challenge to the RAI because, as noted above, that constitutional challenge is plainly lacking in merit. In any event, it should be noted that counsel did ensure that Petitioner's *pro se* objections (Exhibit Q), in which Petitioner asserted various constitutional challenges, were received by the sentencing court and made a part of the record. (Exhibit O, at p. 32-33).

Likewise, Petitioner's claim regarding counsel's failure to call an expert witness is conclusory. Petitioner fails to identify any expert witnesses that might have testified and has offered no specifics concerning how the testimony of such witnesses would have even arguably impacted the court's reclassification decision. *See Vasquez v. United States,* No. 96 CIV. 2104(PKL), 1996 WL 694439, at *7 (S.D.N.Y.Dec.3, 1996) (dismissing ineffective assistance claim where petitioner's "allegations [we]re vague, conclusory, and unsupported by citation to the record, any affidavit, or any other source"; finding that "[t]he vague and unsubstantiated nature of the claims do not permit the Court to conclude that the charged errors reflect performance falling below an objective standard of reasonableness or that but for the errors the result would have been different"); *United States v. Vargas,* 871 F.Supp. 623, 624 (S.D.N.Y.1994) (rejecting ineffective assistance claim based on failure to investigate and failure to call character witnesses where there was "no evidence that avenues suggested by the client which might have altered the outcome were ignored" and petitioner "fail[ed] to identify what persuasive character witnesses would have been involved, or to show that counsel was unwise in not opening up such witnesses to cross-examination");

*Madarikan v. United States,* No. 95 Civ.2052, 1997 WL 597085, at *1 (E.D.N.Y. Sept.24, 1997) (denying ineffective assistance claim based on failure to investigate or interview witnesses where petitioner's allegations of ineffective assistance were "conclusory, and g[a]ve no indication as to what exculpatory evidence may have been revealed by an investigation"); *United States v. Schaflander,* 743 F.2d 714, 721 (9th Cir.1984) (denying as merely "conclusory" ineffective assistance claim based on counsel's failure to interview witnesses where the claim was unsupported by affidavits or statements from any witness or counsel)).

Lastly, Petitioner's claim that counsel was ineffective for failing to call his parole officer must fail because Petitioner has not established any reasonable likelihood that the parole officer's testimony would have altered the outcome of the proceedings.

Accordingly, for the foregoing reasons, Petitioner's ineffective assistance of counsel claim regarding the SORA hearing should be denied.

**4. Ineffective Assistance of Appellate Counsel**

Petitioner was represented by Randolph V. Kruman, Esq. on appeal from the sentencing court's SORA decision. Petitioner contends that Kruman was ineffective because he (a) failed to raise an ineffective assistance claim as to the performance of Attorneys Corradini and Nevins at the SORA hearing and (b) refused to raise the constitutional challenges to the RAI.

**\*15** Although *Strickland*'s two-pronged test was originally formulated to judge trial counsel's performance, it applies in the context of evaluating the effectiveness of appellate counsel's representation as well. *Mayo v. Henderson,* 13 F.3d 528, 533 (2d Cir.1994). To establish that appellate counsel failed to render effective assistance, a petitioner must do more than simply demonstrate that counsel omitted a non-frivolous argument, because appellate counsel is not required to raise all potentially colorable arguments. *Id.* (citing *Jones v. Barnes,* 463 U.S. 745, 754, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983)). As such, failure

Slip Copy, 2009 WL 1707124 (N.D.N.Y.)
(Cite as: 2009 WL 1707124 (N.D.N.Y.))

to raise an argument on appeal constitutes ineffective assistance only when the omitted issue is clearly stronger and more significant than those presented. *See id.* (citing *Gray v. Greer,* 800 F.2d 644, 646 (7th Cir.1986)).

As a threshold matter, Petitioner's ineffective assistance of appellate counsel was never presented to the New York Court of Appeals. Typically, such a claim would be presented by way of a writ of error *coram nobis,* the method by which defendants in New York collaterally challenge the performance of their appellate counsel. Because there is no time limit for filing a *coram nobis* application, Petitioner still could return to State court and file such an application. Thus, his ineffective assistance of appellate counsel claims remain unexhausted.

In the past, a State prisoner's Federal habeas petition had to be dismissed if the petitioner did not exhaust available State remedies as to any of his Federal claims. *See Rose v. Lundy,* 455 U.S. 509, 522, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). However, an exception to the exhaustion requirement set forth in *Rose v. Lundy* has been provided for by statute. Now, pursuant to AEDPA, a district court may, in its discretion, deny on the merits habeas petitions containing unexhausted claims. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the state.").

Section § 2254(b)(2) allows a district court to reach the merits of a habeas corpus petition despite nonexhaustion, thereby "effectuat[ing] congressional intent, conserv[ing] judicial resources, and afford[ing] petitioner prompt adjudication of his claim." *Steele v. Walter,* 11 F.Supp.2d 252, 257 (W.D.N.Y.1998) (quoting *Cowan v. Artuz,* 1996 WL 631726, at *5 (S.D.N.Y.1996)) (quoted in *Loving v. O'Keefe,* 960 F.Supp. 46, 49 (S.D.N.Y.1997)).

Although the Second Circuit has not yet articulated a standard for determining when unexhausted claims may be denied on the merits, the majority of district court decisions in this Circuit have embraced a "patently frivolous" test for denying unexhausted claims. *See, e.g., Naranjo v. Filion,* 2003 WL 1900867, at *8 (S.D.N.Y.

April 16, 2003) (collecting cases).

A minority of courts have expressed the test for denial under § 2254(b)(2) as whether " 'it is perfectly clear that the [petitioner] does not raise even a colorable federal claim,' in which case the Court should dismiss the unexhausted claim on the merits (or rather the clear lack thereof)." *Id.* (quoting *Hernandez v. Lord,* 2000 WL 1010975, at *4-5 n. 8 (S.D.N.Y. July 21, 2000) (citing cases, and analyzing the diverging views without deciding which standard is appropriate)) (internal quotations omitted in original).

**\*16** In the present case, Petitioner's unexhausted ineffective assistance of appellate counsel claims fail either standard, as they are both patently frivolous and entirely meritless. Appellate counsel was not ineffective for failing to raise a claim of ineffective assistance of counsel regarding Attorneys Corradini and Nevins because, for the reasons outlined above, such a claim was lacking in merit and the record contradicts Petitioner's claim that counsel's performance fell below an objective standard of reasonableness.

Appellate counsel elected to focus on challenging the factors used by the sentencing court in reaching its determination and making the argument that Petitioner should have been granted a downward departure under the circumstances. The addition of frivolous ineffective assistance claims would likely have distracted from the stronger arguments advanced by counsel. *See Brunson v. Tracy,* 378 F.Supp.2d 100, 113 (E.D.N.Y.2005) ("Appellate counsel's decision was therefore simply not ineffective, but prudent, as the raising of this frivolous argument may well have distracted from other, more meritorious issues urged by appellate counsel."). Petitioner has failed to demonstrate any reasonable probability that an ineffective assistance claim would have been successful on appeal. *See Mayo,* 13 F.3d at 534("To establish prejudice in the appellate context, a petitioner must demonstrate that 'there was a "reasonable probability" that [his] claim would have been successful ....' ") (alteration in original) (quoting *Claudio v. Scully,* 982 F.2d at 803); *see also Bolender v. Singletary,* 16 F.3d 1547, 1573 (11th Cir.1994) ("[T]he failure to raise nonmeritorious issues does not constitute ineffective

Slip Copy, 2009 WL 1707124 (N.D.N.Y.)
(Cite as: 2009 WL 1707124 (N.D.N.Y.))

assistance.").

Petitioner's argument regarding appellate counsel's decision not to raise his constitutional challenge to the RAI fails for the same reason, namely that there is no likelihood that such a challenge would have been successful on appeal. Indeed, as noted above, the New York appellate courts have uniformly rejected such challenges as lacking in merit and barred by the *Doe v. Pataki* stipulation.

As such, Petitioner's ineffective assistance of appellate counsel claim should be denied.

### IV. CONCLUSION

For the reasons stated above, the Court recommends Thomas Kaminski's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 be denied and that the Petition be dismissed. Because Petitioner has failed to make a substantial showing of a denial of a constitutional right, I recommend that a certificate of appealability not issue. *See* 28 U.S.C. § 2253(c)(2) (1996).

### V. ORDERS

Pursuant to 28 USC § 636(b)(1), it is hereby ordered that this Report & Recommendation be filed with the Clerk of the Court and that the Clerk shall send a copy of the Report & Recommendation to all parties.

**ANY OBJECTIONS to this Report & Recommendation must be filed with the Clerk of this Court within ten(10) days after receipt of a copy of this Report & Recommendation in accordance with 28 U.S.C. § 636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, as well as NDNY Local Rule 72.1(c).**

**\*17 FAILURE TO FILE OBJECTIONS TO THIS REPORT & RECOMMENDATION WITHIN THE SPECIFIED TIME, OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WAIVES THE RIGHT TO APPEAL ANY SUBSEQUENT ORDER BY THE DISTRICT COURT ADOPTING THE RECOMMENDATIONS CONTAINED HEREIN.** *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *F.D.I.C. v. Hillcrest Associates,* 66 F.3d 566 (2d. Cir.1995); *Wesolak v. Canadair Ltd.,* 838 F.2d 55 (2d Cir.1988); *see also* 28 U.S.C. § 636(b) (1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and NDNY Local Rule 72.1(c).

Please also note that the District Court, on *de novo* review, will ordinarily refuse to consider arguments, case law and/or evidentiary material *which could have been, but were not,* presented to the Magistrate Judge in the first instance. *See* *Patterson-Leitch Co. Inc. v. Massachusetts Municipal Wholesale Electric Co.,* 840 F.2d 985 (1st Cir.1988).

SO ORDERED.

N.D.N.Y.,2009.
Kaminski v. Rapsatt
Slip Copy, 2009 WL 1707124 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 2854456 (W.D.N.Y.)
(Cite as: 2010 WL 2854456 (W.D.N.Y.))

**H**
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
W.D. New York.
Raymond HENDERSON, Plaintiff,
v.
David Glenn HEFFLER and Timothy Jones,
Defendants.
**No. 07-CV-0487C.**

July 19, 2010.

David J. Seeger, Esq., Buffalo, NY, for Plaintiff.

Feldman Kieffer LLP (Stephen A. Manuele, Esq., of Counsel), Buffalo, NY, for Defendant Heffler.

Cheryl A. Green, Erie County Attorney (Jeannine M. Purtell, Assistant Erie County Attorney, of Counsel), Buffalo, NY, for Defendant Jones.

**BACKGROUND**

JOHN T. CURTIN, District Judge.

**\*1** Plaintiff commenced this action with the filing of a complaint on July 27, 2007 (Item 1). He has alleged two causes of action against both defendants: pursuant to Title 42 U.S.C. § 1983 for the deprivation of due process, and a violation of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). He has also alleged two claims against defendant Heffler only: the violation of New York General Business Law § 350-b and

common law fraud. On August 15, 2007, defendant Jones filed a motion to dismiss the complaint or to stay the action on the authority of Younger v. Harris, 401 U.S. 37 (1971) (Item 5). In a Memorandum and Opinion filed July 24, 2008, the motion was denied (Item 12).

Defendant Heffler filed an answer to the complaint on August 20, 2007 (Item 6), and defendant Jones filed an answer on December 19, 2008 (Item 17). On September 30, 2009, plaintiff filed a motion to compel answers to interrogatories (Item 41). Heffler filed a response to the motion to compel on October 6, 2009 (Item 43). The parties were directed to confer in an attempt to resolve any outstanding discovery disputes (Item 53). On November 3, 2009, the court allowed defendant Heffler the opportunity to file an amended answer, which was filed on November 5, 2009 (Item 45).

On January 5, 2010, defendant Heffler filed a motion for summary judgment (Item 50). Defendant Jones filed a motion for summary judgment on February 11, 2010 (Item 56). In an order filed May 7, 2010, the court directed plaintiff to file a response to the motions and to advise the court if there were any outstanding discovery disputes. Plaintiff was advised that if he did not so advise the court by May 21, 2010, the motion to compel would be dismissed as moot (Item 67). Plaintiff filed a response in opposition to the motions for summary judgment on May 12, 2010 (Item 68). Defendant Jones filed an affirmation in reply (Item 69), and defendant Heffler filed a reply memorandum (Item 71). Plaintiff did not advise the court that any further action should be taken on the plaintiff's motion to compel, and that motion (Item 41) is therefore dismissed as moot. Additionally, the court determined that oral argument on the motions for summary judgment was unnecessary. For the reasons that follow, the motions are granted, and the complaint is dismissed.

**FACTS**[FN1]

FN1. The factual summary is taken from the parties' statements of material fact pursuant to Local Rule 56.1 (Items 50, Exh. F; 57; 68) and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2854456 (W.D.N.Y.)
(Cite as: 2010 WL 2854456 (W.D.N.Y.))

the exhibits thereto.

On February 23, 2006, plaintiff pleaded guilty to a violation of New York State Penal Law § 260.10-1, endangering the welfare of a child, a Class A misdemeanor, in the Amherst Town Court, Amherst, New York (Item 50, Exh. G). On June 8, 2006, he was sentenced to a three-year term of probation by the Hon. Mark Farrell. *Id.,* Exh. H. The Order of Probation provides that, "[a]t the direction of the Probation Officer," defendant was to "attend, actively participate and remain in sex offender treatment and comply with all the rules and regulations of the program." *Id.* Additionally, plaintiff was required to "[s]ubmit to any program of psychological or physiological assessment at the direction of the Probation Officer ...," including polygraph testing. *Id.* The conditions of probation were slightly modified in court on August 10, 2006 to allow plaintiff to have contact with family members under the age of seventeen with adult supervision. *Id.* The Order of Probation indicates that plaintiff was still required to be evaluated for sex offender treatment. *Id.* At the time, Judge Farrell stated that plaintiff must "undergo an assessment by a licensed treatment provider, and if they require treatment ... then he has to go to treatment." (Item 68, Exh. A. 18).

**\*2** Plaintiff was referred for evaluation for sex offender treatment at Horizon Health Services. Dr. Hak J. Ko found no major mental health issues and no consistent pattern of sex offense, but found that plaintiff "could benefit from [the] educational phase of sex offense treatment in view of his admission of exercising poor judgment." (Item 68, Exh. B). Plaintiff refused treatment and was discharged from the program (Item 57, Exh. D). As a result of his refusal to participate, plaintiff was charged with a violation of probation (Item 50, Exh. I).

At a hearing on May 10, 2007, Judge Farrell found that plaintiff was in violation of the terms of probation for his refusal to participate in the treatment program at Horizon and ordered him to appear the next day for treatment (Item 50, Exh. J, pp. 7-8). At that time, the Assistant District attorney conveyed a request of defendant Jones and asked if Judge Farrell would order an assessment by defendant Heffler. *Id.,* p. 9. Judge Farrell ordered "that we start from square one," that plaintiff submit to an evaluation by

defendant Heffler, and that plaintiff's treatment would consist of "whatever is deemed appropriate" following the evaluation (Item 50, Exh. J, p. 10).

Plaintiff attended approximately six sessions with defendant Heffler, from May 11, 2007 until June 26, 2007 Item 50, Exh. K). He commenced this action on June 27, 2007 (Item 1). At that time, defendant Heffler ceased his assessment of plaintiff due to the conflict of interest (Item 50, Exh. L).

**DISCUSSION**

**1. Summary Judgment Standard**

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c) (2); *see also Anderson v. Liberty Lobby. Inc.,* 477 U.S. 242, 247 (1986). The burden of demonstrating the absence of any genuine dispute as to a material fact rests with the moving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970). In determining whether there is a genuine issue as to any material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Anderson,* 477 U.S. at 255.

"Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991). Summary judgment cannot be entered " 'if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party." *Yurman Design, Inc. v. Golden Treasure Imps., Inc.,* 275 F.Supp.2d 506, 508 (S.D.N.Y.2003). The trial court's function at the summary judgment stage "is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Services, Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994); *see also Keystone Manufacturing Co., Inc. v. Jaccard*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2854456 (W.D.N.Y.)
(Cite as: 2010 WL 2854456 (W.D.N.Y.))

*Corp.,* 394 F.Supp.2d 543, 549 (W.D.N.Y.2005).

**2. Quasi-Judicial Immunity**

**\*3** Defendants contend that they are immune from the plaintiff's claims under the doctrine of quasi-judicial immunity, which is a form of absolute immunity that applies to non-judicial officers when they perform judicial functions. In order to qualify, "[t]he proponent of a claim of absolute immunity bears the burden of establishing the justification of such immunity...." *Antoine v.. Byers & Anderson, Inc.,* 508 U.S. 429, 432 (1993). To determine whether a defendant is entitled to quasi-judicial immunity, the court must take a "functional approach" and examine the conduct at issue. *Cleavinger v. Saxner,* 474 U.S. 193, 201-02 (1985); *King v. Simpson,* 189 F.3d 284, 287-88 (2d Cir.1999); *Saint-Guillen v. United States,* 657 F.Supp.2d 376, 381 (E.D.N.Y.2009).

The Second Circuit has identified two situations in which this immunity applies. First, the immunity shields conduct that is functionally comparable to that of a judge. Therefore, a "parole board official is absolutely immune from liability for damages when he decide[s] to grant, deny, or revoke parole, because this task is functionally comparable to that of a judge." *Scotto v. Almenas,* 143 F.3d 105, 111 (2d Cir.1998) (citations and internal quotation marks omitted, modification in original). Second, the immunity also applies to tasks that are "integrally related to judicial proceedings. *Mitchell v. Fishbein,* 377 F.3d 157, 172 (2d Cir.2004) (citing *Scotto,* 143 F.3d, 111-12). In deciding whether an actor is entitled to absolute immunity on the basis that his role is analogous to that of a judge, the court must evaluate the challenged proceedings in light of the "characteristics of the judicial process" set forth in *Butz v. Economou,* 438 U.S. 478 (1978). These factors include:

(a) the need to assure that the individual can perform his functions without harassment or intimidation; (b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (c) insulation from political influence; (d) the importance of precedent; (e) the adversary nature of the process; and (f) the

correctability of error on appeal.

*Cleavinger v. Saxner,* 474 U.S. at 202 (citing *Butz,* 438 U.S. at 512); *see also DiBlasio v. Novello,* 344 F.3d 292, 297-98 (2d Cir.2003), *cert. denied,* 541 U.S. 988 (2004).

Defendant Heffler is entitled to absolute quasi-judicial immunity. He was appointed by the court to conduct an evaluation of plaintiff and to provide whatever treatment was indicated. Absolute immunity has been extended to court-appointed social workers, doctors, psychiatrists, and evaluators who conduct activities which are "inexorably connected with the execution of [court] procedures and are analogous to judicial action." *Scotto,* 143 F.3d at 111, quoting *Cleavinger,* 474 U.S. at 200. In *McKnight v. Middleton,* 2010 WL 1221431, *15 (E.D.N.Y. March 29, 2010),* court-appointed forensic evaluators and social workers were granted absolute quasi-judicial immunity for their actions in interviewing and consulting the parties in a Family Court proceeding and preparing a report to the court. The court found that the evaluators "did not initiate the child custody proceedings but were drawn in the dispute by the appointment of the Family Court. Thus, they functioned 'more like witnesses or assistants to the court than advocates.' " *Id.* (quoting *Hughes v. Long,* 242 F.3d 121, 126 (3d Cir.2001)). Similarly, in *Hunter v. Clark,* 2005 WL 1130488 (W.D.N.Y. May 5, 2005), the court found that court-appointed psychiatrists, who examined the plaintiff and submitted reports to the court regarding the plaintiff's competency to stand trial in a criminal proceeding, were entitled to absolute immunity. Here, defendant Heffler was appointed by the court to evaluate plaintiff for sex offender treatment, and to provide the appropriate treatment. Defendant Heffler is entitled to absolute immunity from suit, and the complaint against him is dismissed in its entirety.[FN2]

FN2. Even accepting plaintiff's argument that the defendants "agreed among themselves to dispense with standard evaluation, assessment and diagnostic tools in order to, in effect, pre-determine that Plaintiff was or is a sex offender requiring treatment for the purpose of depriving Plaintiff of liberty and property (the cost of a prolonged string of treatment sessions)" (Item 58, p. 7), such allegations of malice or bad

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2854456 (W.D.N.Y.)
(Cite as: 2010 WL 2854456 (W.D.N.Y.))

faith do not overcome absolute quasi-judicial immunity. *See Bliven v. Hunt,* 579 F.3d 204, 209 (2d Cir.2009).

**\*4** In the case of defendant Jones, the court finds that his supervision of plaintiff's probation is not "integrally related" to the judicial process. Under the "integrally related" test, "[t]he more distant a function is from the judicial process, the less likely judicial immunity will attach." *Scotto,* 143 F.3d at 111 (citations and internal quotation marks omitted, modification in original). Thus, the Second Circuit has granted quasi-judicial immunity to probation officers for preparing pre-sentence reports because, in preparing such reports, "a federal probation officer acts as an arm of the court and that task is an integral part of one of the most critical phases of the judicial process." *Dorman v. Higgins,* 821 F.2d 133, 137 (2d Cir.1987). In contrast, the Second Circuit found that a state parole officer's actions in preparing a parole violation report and in recommending that an arrest warrant issue were not entitled to absolute immunity because the conduct was "not performed under judicial direction and occurred before the initiation of parole revocation proceedings." *Scotto,* 143 F.3d at 112 (citations omitted). Likewise, in *Saint-Guillen,* the court denied absolute immunity for a probation officer's failure to adequately supervise a parolee. *Saint-Guillen,* 657 F.Supp.2d at 382 ("[S]upervisory conduct is investigatory in nature, and, therefore, comparable to the role of a police officer rather than that of a judge or prosecutor.").

Here, defendant Jones was not acting as an "arm of the court" and his actions were not performed under judicial direction. His supervisory conduct, in supervising plaintiff's sex offender evaluation with defendant Heffler, was investigatory in nature, and was intended to determine what, if any, treatment, was indicated. Accordingly, defendant Jones is not entitled to absolute quasi-judicial immunity for his supervision of plaintiff's probation.

**3. Qualified Immunity**

Although he does not enjoy absolute quasi-judicial immunity for his supervision of plaintiff's probation, defendant Jones enjoys qualified immunity. The doctrine

of qualified immunity provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Qualified immunity analysis involves two-steps: first, the court must determine whether the facts alleged make out a violation of a constitutional right. If the plaintiff establishes a constitutional violation, the court must then determine whether the conduct alleged violated "clearly established" statutory or constitutional rights of which a reasonable person would have known. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). "Only Supreme Court and Second Circuit precedent existing at the time of the alleged violation is relevant in deciding whether a right is clearly established." *Moore v. Vega,* 371 F.3d 110, 114 (2d Cir.2004). Additionally, "[t]he qualified immunity test is an objective one." *Zellner v. Summerlin,* 494 F.3d 344, 367 (2d Cir.2007). It looks to the circumstances confronting an official, not to the official's "subjective intent." *See Anderson v. Creighton,* 483 U.S. 635, 641 (1987).

**\*5** A recent case from the Eastern District of New York is instructive. In *Rose v. Goldman,* 2009 WL 4891810 (E.D.N.Y. December 9, 2010), the plaintiff was sentenced to probation based on a guilty plea to a nonsexual offense. The terms of plaintiff's probation did not require sex offender counseling, but he was directed by his probation officer to undergo sex offender therapy. Plaintiff only attended one forty-five minute session, and his subsequent failure to attend counseling as directed resulted in the filing of a charge of violation of probation. Even assuming that the probation officer violated plaintiff's constitutional rights by directing him to undergo sex offender counseling, the court found that this right was not clearly established as the Second Circuit has not addressed the issue, while the district courts have split. *Id.,* at *6-7 (citing *Vega v. Lantz,* 2008 WL 3992651, at *14 (D.Conn. August 25, 2008) ("[b]eing classified in prison as a sex offender not only invokes a constitutionally protected liberty interest but it causes a 'stigma-plus' "), and *Tinsley v. Goord,* 2006 WL 2707324, at *5 (S.D.N.Y. September 20, 2006) (prisoner's classification as a sex offender did not implicate a constitutionally protected liberty interest)).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2854456 (W.D.N.Y.)
(Cite as: 2010 WL 2854456 (W.D.N.Y.))

Here, plaintiff was directed to undergo sex offender evaluation, and Dr. Ko found that plaintiff "could benefit from the educational phase of the sex offense treatment in view of his admission of exercising poor judgment" (Item 68, Exh. B). Plaintiff refused to comply, and the court ordered that he be reevaluated, this time by defendant Heffler, and to undergo whatever treatment was indicated by the evaluation. To the extent that defendant Jones directed that plaintiff undergo sex offender evaluation by defendant Heffler, such an evaluation was objectively reasonable and did not violate a clearly established constitutional right. Moreover, plaintiff's allegations of bad faith do not reintroduce into the qualified immunity analysis an inquiry into the defendants' subjective intent. *See Norton v. Town of Islip, 2010 WL 2070550, \*4 (2d Cir. May 25, 2010)* (quoting *Anderson, 483 U.S. at 641).* Accordingly, defendant Jones enjoys qualified immunity from plaintiff's section 1983 claim.[FN3]

> [FN3.] Defendant Heffler would also enjoy qualified immunity under this analysis as his evaluation was objectively reasonable under the circumstances and did not violate a clearly-established constitutional right.

**4. HIPAA**

Plaintiff concedes that HIPAA does not create a private cause of action and that his HIPAA cause of action against both defendants should be dismissed.

## CONCLUSION

Plaintiff's motion to compel (Item 41) is dismissed as moot. Defendant Heffler's motion for summary judgment is granted. The motion for summary judgment of defendant Jones is likewise granted, and the complaint is dismissed. The Clerk of the Court is directed to enter judgment for defendants.

So ordered.

W.D.N.Y.,2010.

Henderson v. Heffler
Slip Copy, 2010 WL 2854456 (W.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2009 WL 4891810 (E.D.N.Y.)
(Cite as: 2009 WL 4891810 (E.D.N.Y.))

**H** Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
E.D. New York.
Wayne ROSE, Plaintiff,
v.
Robert GOLDMAN; William Ford; Jude Okora;
Colleen Walsh; Evelyn SAntiago; Christopher Stanecki;
Anthony Casale, Jr.; Christopher Kazlau; DAvid Bethel;
Sylvia Way; the City of New York; and the State of
New Jersey, Defendants.
**No. 02 CV 5370(NGG)(LB).**

Dec. 9, 2009.
As Corrected Dec. 16, 2009.

Wayne Rose, Rockaway Beach, NY, pro se.

Jed Matthew Weiss, Johana Castro, Mary Theresa O'Flynn, Office of The Corporation Counsel, Erika L. Omundson, Mintzer, Sarowitz, Zaris, Ledva & Meyers, New York, NY, Bradley J. Levien, Mintzer, Sarowitz, Zeris, Ledva & Meyers, Hicksville, NY, Joseph Ives Picillo, Barbara J. Stoop, State Of New Jersey - Office of The Attorney General, Raymond C. Barzey, State of NJ-Department of Law, Trenton, NJ, for Defendants.

## REPORT AND RECOMMENDATION

BLOOM, United States Magistrate Judge.

**\*1** Plaintiff, Wayne Rose, brings this *pro se* action against the City of New York and New York City Probation Officers Robert Goldman, David Bethel, and Sylvia Way

("City Defendants"); the State of New Jersey and New Jersey Probation Officers Anthony Casale, Jr., Christopher Stanecki, Colleen Walsh, Jude Okoro, and Evelyn Santiago ("New Jersey Defendants"); New Jersey Public Defender Christopher Kazlau; [FN1] and William Ford, a licensed Certified Social Worker. Plaintiff alleges that defendants violated his rights under 42 U.S.C. §§ 1983, 1985, 1986, 1987, 1988, and 14141, and the First, Fourth, and Fourteenth Amendments to the United States Constitution. Plaintiff also asserts a malpractice claim against Ford. Defendants move for summary judgment pursuant to Fed.R.Civ.P. 56.[FN2] The Honorable Nicholas G. Garaufis referred defendants' motions to me for a consolidated Report and Recommendation pursuant to 28 U.S.C. § 636(b). For the following reasons, defendants' motions should be granted and the case should be dismissed.

> FN1. The record does not reflect that defendant Kazlau was properly served in this action. Plaintiff submits a certified mail receipt listing Kazlau's address and signed "Byrone B," but states that he "has not received the return receipt from ... Kazlau." Document 7. The time to serve under Fed.R.Civ.P. 4(m) has long since passed. Even if Kazlau had been properly served within the prescribed period, he should be dismissed from this action because public defenders are not "state actors" under 42 U.S.C. § 1983. *See Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981).

> FN2. Defendants provided plaintiff with the requisite notice under Local Civil Rule 56.2. Documents 150, 152, 155.

## BACKGROUND

The following facts are not in dispute unless otherwise stated.[FN3]

> FN3. Rule 56.1 of the Local Civil Rules of the

Not Reported in F.Supp.2d, 2009 WL 4891810 (E.D.N.Y.)
(Cite as: 2009 WL 4891810 (E.D.N.Y.))

United States District Courts for the Southern and Eastern Districts of New York ("Local Rule 56:1") requires a party moving for summary judgment to submit "a separate, short and concise statement" of the allegedly undisputed material facts, set out in numbered paragraphs, on which the moving party relies in arguing that there is no genuine issue to be tried. See Local Rule 56.1(a); *see also Gianullo v. City of New York,* 322 F.3d 139, 140 (2d Cir.2003); *Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 72 (2d Cir.2001). The City Defendants, New Jersey Defendants, and Ford have each submitted statements of undisputed material facts, Documents 150, 152, 155, and plaintiff filed three corresponding counter-statements under 56.1(b). Documents 177-179. The Court may not rely solely on the Rule 56.1 statements of undisputed facts: "[i]t must be satisfied that the citation to the evidence in the record supports the assertion." *Vt. Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004); *see Gianullo,* 322 F.3d at 143 n. 5. Therefore, only those facts in the parties' Rule 56.1 statements that are supported by admissible evidence and not controverted by the record are deemed admitted.

## I. Factual History

On November 23, 1998, plaintiff Wayne Rose was arrested in New Jersey on charges of child abuse in the 4th degree. N.Y. Ex. I. The Adult Presentence Report reflects that plaintiff was accused of furnishing drugs and alcohol to minors and allowing them to view pornography on his computer. Id Plaintiff admits that children were smoking marijuana in his house, but denies that he allowed them to view pornography. Pl. Dep. at 61.

On April 16, 1999, the Honorable Camille M. Kenny, New Jersey Superior Court, Hudson County, sentenced plaintiff to five years probation after he pled guilty to one count of Child Abuse, N.J. Stat. Ann. § 9:6-3. N.Y. Ex. J. The Judgment of Conviction, signed by Judge Kenny, prescribes: "Probation for a period of five (5) years. Defendant is to submit to random urine monitoring, avoid contact with children and must not get involved in

programs regarding children." *Id.* Judge Kenny also issued an Order for Mental Health Assessment directing "[Rose] to be examined by a mental health screener." [FN4] N.Y. Ex. L.

> FN4. Plaintiff did not appear at the court-ordered mental health assessment scheduled on April 28, 1999. N.Y. Ex. O.

Plaintiff was subsequently referred to the New Jersey Department of Probation. The New Jersey Court's referral form lists random urine monitoring, no involvement in mentoring young people, and mental health assessment, as special conditions of plaintiff s probation. N.Y. Ex. K. Plaintiff reported to New Jersey Probation Officer Jude Okoro and signed a copy of the State of New Jersey Standard Conditions of Adult Probation. *See* N.Y. Ex. M. The standard conditions require, among other things, "cooperat[ion] in any medical and/or psychological examinations, tests and/or counseling your probation officer recommends," and the special conditions require "court ordered treatment program, mental health counseling," "random urine monitoring," and "no involvement in mentoring young people." *Id.*

*2 About two months after his conviction, plaintiff moved from New Jersey to New York. Pl. Dep. at 72. The supervision of plaintiff s probation was transferred to the New York City Department of Probation, and Robert Goldman was assigned as plaintiff's New York City Probation Officer. *See* N.Y. Ex. Q; N.J. 56.1 St. ¶¶ 9-10. Goldman directed plaintiff to undergo a mental health examination at Bellevue Hospital. N.Y. 56.1 St. ¶ 33. On May 16, 2000, Dr. Myles Schneider examined plaintiff and diagnosed him with substance abuse and antisocial personality traits, and noted that plaintiff "does not wish counseling." N.J. Ex. I.

Goldman subsequently referred plaintiff to Mustard Seed Forensic Social Work Services, P.C. ("Mustard Seed"), a private company that specializes in the assessment and treatment of adult and adolescent sexual offenders. Ford 56.1 St. ¶¶ 3, 4. On June 15, 2000, plaintiff met with William Ford, a licensed Certified Social Worker, for approximately forty-five minutes. *Id.* ¶ 5. Plaintiff testified

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 4891810 (E.D.N.Y.)
(Cite as: 2009 WL 4891810 (E.D.N.Y.))

that he told Ford that he could not afford therapy and would not attend sex offender counseling, and that "Ford advised me that everybody pays, that I'll pay, he told me to get out." Pl. Dep. at 245-247. Ford sent Goldman a "Letter of Termination," which states,

> Mr. Rose was seen by our agency due to his involvement in deviant sexual behavior. He denies the charges brought against him. Additionally he states that he is unable to pay for services and if he is made to attend treatment he will be unable to do so because he has just filed for bankruptcy. Therefore it appears at this time that we will be unable to provide services for Mr. Rose.

N.Y. Ex. T.

By letter dated June 19, 2000, Goldman informed Okoro that Rose vacated his apartment without notifying probation. N.Y. Ex. II. Plaintiff maintains that he notified Goldman that he vacated his apartment by cell phone. PL 56.1(b) N.Y. Response ¶ 36. Thereafter, Goldman notified New Jersey Probation that plaintiff was not in compliance with his probation. Goldman Dep. at 29. Consequently, on July 19, 2000, Okoro filed a Violation of Probation ("VOP") charging plaintiff with failure to report to the New York Probation Department, moving without providing a current address, failing to pay court-ordered fees, and failing to report for urine monitoring. N.Y. Ex. U. Prior to the court hearing on the violation, Goldman contacted Okoro and clarified that plaintiff had reported to probation as directed and submitted to urine monitoring, but that he had not entered mental health counseling as directed. N .Y. Ex. S.

On September 15, 2000, Judge Kenny held a hearing on the VOP, and plaintiff appeared with counsel, Christopher Kazlau. N.J. Ex. K. At the hearing, Okoro withdrew all charges except that plaintiff had failed to attend counseling. Id at 2-3. Judge Kenny did not rule on the VOP. Instead, she directed Rose to attend counseling as directed by the New York probation officers and scheduled another hearing. Id at 4, 7. On September 1, 2000, plaintiff began counseling at the Federation Employment and Guidance Service, Inc. ("FEGS"). Pl.Ex.

35. His attendance at FEGS was communicated to Judge Kenny at the hearing on December 15, 2000. N.J. Ex. L. Judge Kenny left the VOP "open" and ordered plaintiff to continue to adhere to the terms of his probation. Id

*3 On March 12, 2001, Okoro filed a second VOP charging plaintiff with failure to report to a probation officer, pay court-ordered fees, and provide proof of continued counseling as ordered by the Court. N.J. Ex. N. However, by letter dated April 11, 2001, Okoro withdrew the VOP. See N.J. Ex. O; see also N.Y. Ex. W.

On November 27, 2001, plaintiff was discharged from FEGS because of non-compliance with his appointments and his "desire to stop" counseling. N.Y. Ex. X. Plaintiff states that he discontinued counseling because the expense and distance was burdensome and because he was "fine." Pl. Dep. at 91-92. Additionally, on May 14, 2002, plaintiff informed his New York City Probation Officer, David Bethel, that he had successfully completed his mental health treatment at FEGS. N.Y. Ex. Y. On November 19, 2002, plaintiff reported to Bethel and informed him that he had reenrolled at FEGS. Id. Bethel contacted FEGS and learned that plaintiff had made and then cancelled one appointment and had not rescheduled the appointment. Id. Therefore, Bethel, with the signed approval of his supervisor, Sylvia Way, informed New Jersey Probation Officer Evelyn Santiago that plaintiff failed to attend counseling and requested that she file a VOP. N.Y. Ex. EE. On January 9, 2003, plaintiff was served with a VOP hearing summons signed by Santiago and her supervisor Colleen Walsh. N.Y. Ex. FF. [FN5]

> FN5. Prior to the hearing, plaintiff filed an action in the Southern District of New York against David Bethel, Sylvia Way, the City of New York, Evelyn Santiago, and Colleen Walsh alleging many of the same claims that he makes herein as well as claims that defendants retaliated against him for filing this action. See Rose v. Bethel, et al., No. 03 Civ. 1241 (S.D.N.Y. filed February 25, 2003).

Prior to the VOP hearing, plaintiff re-enrolled at FEGS on May 5, 2003. N.Y. Ex. X. A month later, plaintiff attended

Not Reported in F.Supp.2d, 2009 WL 4891810 (E.D.N.Y.)
(Cite as: 2009 WL 4891810 (E.D.N.Y.))

the VOP hearing on June 5, 2003, and Judge Mark J. Nelson, J.S.C., found plaintiff in compliance with his probation and dismissed the VOP. N.Y. Ex. HH. On June 18, 2003, plaintiff was discharged from FEGS because he needed "more supervision." N.Y. Ex. X. On April 16, 2004, plaintiff's probation ended. N.Y. 56.1 St. ¶ 62.

**II. Procedural History**

On October 4, 2002, plaintiff initiated this *pro se* action alleging that defendants violated his rights under 42 U.S.C. §§ 1983, 1985, and 1986. Plaintiff's claims include harassment, malicious prosecution, false imprisonment, failure to supervise employees, discrimination, and libel. FN6 In lieu of an answer, defendants moved to dismiss the complaint.

> FN6. Plaintiff's complaint names the following defendants: the Honorable Arthur N. D'Italia, Honorable Camille M. Kenny, Honorable Lawrence P. Debello, Anthony Casale, Christopher Stanecki, Colleen Walsh, Jude Okoro, Evelyn Santiago, Robert Goldman, David Bethel, Sylvia Way, the State of New Jersey, the State of New York, William Ford and Christopher Kazlau. On December 12, 2002, plaintiff stipulated to dismiss all claims against the State of New York. *See* Document 11.

On March 10, 2004, the Court granted defendants' motions in part and denied them in part. *See* Document 50. The Court dismissed plaintiff's claims against New Jersey Superior Court Judges Arthur N. D'Italia, Camille M. Kenny, and Lawrence P. Debello, based on absolute judicial immunity. Next, the Court held that the New Jersey Defendants were not entitled to absolute immunity from claims that they knowingly filed false probation violation reports and declined to dismiss the action based on the doctrine of qualified immunity. With respect to plaintiff's claims pursuant to 42 U.S.C. §§ 1985 and 1986, the Court granted plaintiff sixty days to amend his complaint, stating, "[s]hould the plaintiff fail to timely file an amended complaint, the court will, upon motion of Ford, grant Ford's motion to dismiss the §§ 1985 and 1986 claims." The Court dismissed plaintiff's libel claim against Ford.

**\*4** The New Jersey Defendants moved for reconsideration on the issue of absolute immunity, and plaintiff moved for reconsideration on his libel claim. The Court held that:

> (1) the New Jersey probation officers are absolutely immune from the plaintiff's claims related to treatment by William Ford; (2) the New Jersey probation officers are only entitled to qualified immunity from the plaintiff's claim related to the probation violation for failing to make required monetary payments; (3) the New Jersey probation officers' belated requests for summary judgment and dismissal on the basis of qualified immunity are held in abeyance until discovery is complete; and (4) the plaintiff's libel claim against William Ford is barred by the statute of limitations.

Document 64 at 12.

By Order dated March 30, 2005, the Court dismissed plaintiff's §§ 1985 and 1986 claims against Ford with prejudice for failure to timely file an amended complaint in accordance with the Court's March 10, 2004 Order. Document 90. The Court granted plaintiff's motion to amend his complaint and allowed him to add a malpractice claim against Ford. *Id.* at 11.

On June 2, 2005, plaintiff filed an amended complaint adding a malpractice claim against Ford and asserting claims pursuant to 42 U .S.C. §§ 1983, 1985, 1986, 1987, 1988, and 14141. Document 104. Thereafter, the parties conducted discovery. The City Defendants, the New Jersey Defendants, and Ford now move for summary judgment. Plaintiff opposes the motions. FN7

> FN7. In his opposition, plaintiff moves to supplement his amended complaint to add a malpractice claim against Goldman and Allen Washington, Ford's partner at Mustard Seed. Pl. Opp. at 16. Plaintiff has already been given the opportunity to replead his malpractice claim. Moreover, there is no basis for plaintiff's claim against Washington. Plaintiff's motion to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 4891810 (E.D.N.Y.)
(Cite as: 2009 WL 4891810 (E.D.N.Y.))

supplement his amended complaint should therefore be denied. *See Wingate v. Gives, et al., No. 05 Civ. 1872, 2009 WL 424359, at *4 (S.D.N.Y. Feb.13, 2009)* (a motion to supplement should be denied based on undue delay, prejudice, bad faith, dilatory motive, or futility).

## STANDARD OF REVIEW

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Fed.R.Civ.P. 56(c)*. A fact is material if it is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)*. "An issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir.2007)* (quoting *Anderson, 477 U.S. at 248); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)*. "The trial court's function in deciding such a motion is not to weigh the evidence or resolve issues of fact, but to decide instead whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational trier could find in favor of that party." *Pinto v. Allstate Ins. Co., 221 F.3d 394, 398 (2d Cir.2000); see also Baker v. The Home Depot, 445 F.3d 541, 543 (2d Cir.2006)* (resolving all ambiguities and drawing all inferences in favor of the nonmoving party on summary judgment).

However, "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must-by affidavits or as otherwise provided in this rule-set out specific facts showing a genuine issue for trial." *Fed.R.Civ.P. 56(e) (2)*. In other words, the non-moving party must provide "affirmative evidence" from which a jury could return a verdict in its favor. *Anderson, 477 U.S. at 257.* "Conclusory allegations, conjecture, and speculation ... are insufficient to create a genuine issue of fact." *Niagra Mohawk Power Corp. v. Jones Chem., Inc., 315 F.3d 171, 175 (2d Cir.2003)* (quoting *Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir.1998)*). Moreover, "[t]he 'mere existence of a scintilla of evidence' supporting the non-movant's case is also insufficient to defeat summary judgment." *Niagra, 315 F.3d at 175* (quoting *Anderson, 477 U.S. at 252).* Here, because plaintiff is proceeding *pro se,* we read his papers "liberally and inteipret them to raise the strongest arguments that they suggest." *Brownell v. Krom, 446 F.3d 305, 310 (2d Cir.2006)* (quoting *Jorgensen v. Epic/Sony Records, 351 F.3d 46, 50 (2d Cir.2003)* (internal quotations omitted).

## DISCUSSION

### I. Due Process

**\*5** The Due Process Clause of the Fourteenth Amendment prohibits states from depriving "any person of life, liberty, or property, without due process of law." *U.S. Const. amend. XIV.* Here, plaintiff's complaint arises in large part from the requirement that he attend counseling as a condition of his probation. Plaintiff maintains that the sentencing court never ordered him to attend mental health counseling and that "defendants altered an the [sic] original Order of the Court (Okora) as proof is shown by two NJ state judges, stating on the record that the court never ordered any therapy and/or counseling." Pl. Memo at 1. Plaintiff states that "Goldman had knowledge that the plaintiff was never ordered any counseling and relied upon a hand written note rather then [sic] the original sentence." *Id.* at 3.

Plaintiff is correct that the Judgment of Conviction does not include mental health counseling as a condition of his probation. *See* N.Y. Ex. J; *see also* N.J. Ex. Q (Judge Nelson stated at the June 5, 2003 VOP hearing, "I looked at the original judgment of conviction in this matter ... The judge didn't order any counseling. It's not in the judgment of conviction. It is not in the judgment of conviction. At least I didn't see it in there, and I think I can read fairly well."). Nonetheless, Judge Garaufis previously held that "the New Jersey probation officers were not acting in the complete absence of jurisdiction when they prosecuted the probation violation for failing to attend mental health counseling." Document 64 at 7. The Court stated,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 4891810 (E.D.N.Y.)
(Cite as: 2009 WL 4891810 (E.D.N.Y.))

First, at a September 15, 2000 hearing, the New Jersey court stated that "Didn't I order counseling? It doesn't appear on the JOC [Judgment of Conviction]. If probation in New York thinks it's appropriate, I don't disagree." Second, there is some evidence that the court did order the mental health treatment, even if the plaintiff disputes this evidence. Third, there appears to be undisputed evidence that the plaintiff was required to undergo a mental health assessment as a special condition of his probation. Implicit in this order requiring a mental health assessment is some discretionary authority that probation should require the plaintiff to receive further mental health counseling in the event that the assessment indicated that it was appropriate. Fourth, the State of New Jersey "Standard Conditions of Adult Probation" form states that probationers shall cooperate in any medical and/or psychological examinations, tests and/or counseling [the probationer's] probation officer recommends.

*Id.* at 6-7 (internal citations and quotations omitted). The Court also stated that the Standard Conditions form "is evidence that the court has authorized New Jersey probation officers' to require probationers to receive counseling," and noted that on June 5, 2004, the court ordered plaintiff to continue counseling as recommended by probation. *Id.* at 7 (internal quotations omitted). Therefore, defendants did not violate plaintiff's rights by requiring that he attend counseling.

**a. Sex Offender Counseling**

**\*6** Whether defendants violated plaintiff's constitutional rights by directing him to undergo sex offender counseling is a more difficult question. The Fifth, Ninth, Tenth and Eleventh Circuits have held that prisoners who have not been convicted of a sex offense have a liberty interest in not being classified or treated as a sex offender without due process protections. *See Coleman v. Dretke.* 395 F.3d 216, 222 (5th Cir.2004) ("prisoners who have not been convicted of a sex offense have a liberty interest created by the Due Process Clause in freedom from sex offender classification and conditions"); *Chambers v. Colo. Dep't of Corr.,* 205 F.3d 1237, 1242 (10th Cir.2000) (inmate

had right to procedural due process before being classified as sex offender); *Kirby v. Siegelman,* 195 F.3d 1285, 1292 (11th Cir.1999) (holding the stigmatizing effect of being classified as a sex offender constitutes a deprivation of liberty under the Due Process Clause); *Neal v. Shimoda,* 131 F.3d 818, 831 (9th Cir.1997) (a state must provide a hearing before classifying a prisoner as a sex offender and requiring the prisoner to complete a treatment program as a condition to parole eligibility). Relying on *Vitek v. Jones,* 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980), the Courts in *Coleman, Chambers, Kirby,* and *Neal* acknowledged the stigmatizing consequences of being labeled a sex offender. *See Vitek,* 445 U.S. at 494 (the Supreme Court held that "the stigmatizing consequences of a transfer to a mental hospital for involuntary psychiatric treatment, coupled with the subjection of the prisoner to mandatory behavior modification as a treatment for mental illness, constitute the kind of deprivations of liberty that requires procedural protections.").

By contrast, the Seventh Circuit in *Grennier v. Frank.* 453 F.3d 442 (7th Cir.2006) held that a prisoner who had not been convicted of a sex offense did not have a protected liberty interest in being free from sex offender classification. The Court distinguished *Coleman, Chambers, Kirby,* and *Neal* by stating that in those cases, "[i]t was the liberty or property interest stemming from statutes and regulations, and not the "sex offender" label alone, that required the hearing." *Grennier.* 453 F.3d at 445. Similarly, the Eighth Circuit denied a prisoner's due process claim where he was required to register as a predatory offender even though he was not convicted of a predatory offense. *Gunderson v. Hvass.* 339 F.3d 639, 644 (8th Cir.2003). The Court stated that "[d]amage to reputation alone, however, is not sufficient to invoke the procedural protections of the due process clause." *Gunderson,* 339 F.3d at 644.

The Second Circuit has not addressed this issue, but the district courts have split on the issue. *Compare Vega v. Lantz.* No. 3:03-cv-2248, 2008 WL 3992651, at *14 (D.Conn. Aug.25, 2008) ("[b]eing classified in prison as a sex offender not only invokes a constitutionally protected liberty interest but it causes a "stigma-plus"), *with Tinsley v. Goord.* No. 05 Civ. 3921, 2006 WL 2707324, at *5 (S.D.N.Y. Sept.20, 2006) (prisoner's

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 4891810 (E.D.N.Y.)
(Cite as: 2009 WL 4891810 (E.D.N.Y.))

classification as a sex offender did not implicate a constitutionally protected liberty interest). Here, the Court need not determine whether defendants violated plaintiff's due process rights by sending him to sex offender counseling because defendants are entitled to qualified immunity on this claim.

**b. Qualified immunity**

**\*7** The doctrine of qualified immunity provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Qualified immunity analysis involves two-steps: first, the Court must determine whether the facts alleged make out a violation of a constitutional right; if the plaintiff establishes a constitutional violation, the Court must then determine whether the conduct alleged violated "clearly established" statutory or constitutional rights of which a reasonable person would have known. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). "Only Supreme Court and Second Circuit precedent existing at the time of the alleged violation is relevant in deciding whether a right is clearly established." *Moore v. Vega,* 371 F.3d 110, 114 (2d Cir.2004). The Supreme Court recently held that the sequence of the *Saucier* two-step analysis is not mandatory, and that "[t]he judges of the district courts ... should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan,* --- U.S. ----, ----, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009).

In this case, plaintiff was sentenced to probation based on a guilty plea to a nonsexual offense. The terms of plaintiff s probation did not require sex offender counseling. Goldman directed plaintiff to Mustard Seed to undergo sex offender therapy with Ford; however, plaintiff only attended one forty-five minute session. It is undisputed that plaintiff's failure to attend counseling as directed resulted in the filing of a VOP charge. However, plaintiff's

probation was not revoked as a result of the charge and plaintiff was not required to attend any further sex offender therapy.

Even assuming, *ad arguendo,* that plaintiff's right to due process was violated when he was required to attend a single forty-five minute session of sex offender counseling, this right was not clearly established at the time of the violation. Moreover, it was objectively reasonable for defendants to believe that their actions were lawful. Plaintiff admits that children were smoking marijuana in his house, Pl. Dep. at 61, and although he denies allowing them to view pornography, he admits that he had been accused of allowing them to view pornography on his home computer. *Id.* at 119. Goldman testified that

> plaintiff was referred to Mustard Seed for an evaluation to determine whether or not he was appropriate for treatment there based on the presentence report, the conviction of endangering the welfare of a child and the complaint information that was received from Hudson County which included inappropriate contact with minors, pornography shown to minors, drugs and alcohol used in bedrooms with minors.

**\*8** Goldman Dep. at 16. Likewise, Ford states that Goldman told him that "the plaintiff was being referred for sex offended [sic] treatment." Ford. Dep. at 6. Although plaintiff was not convicted of a sex offense, Goldman's reliance on the presentence report to refer plaintiff to Mustard Seed for an evaluation to determine whether he was appropriate for treatment was objectively reasonable. Likewise, Ford's belief that plaintiff was referred for sex offender treatment was objectively reasonable.

Both Goldman and Ford are entitled to qualified immunity as at the time of the events raised in plaintiff's complaint, the law was not clearly established as to whether a probationer who was not convicted of a sex offense could be required to attend sex offender counseling. Moreover, it was objectively reasonable for Goldman and Ford to believe that their actions were lawful. Accordingly, Goldman and Ford are entitled to qualified immunity and plaintiff's claim that defendants violated his rights when he

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 4891810 (E.D.N.Y.)
(Cite as: 2009 WL 4891810 (E.D.N.Y.))

was sent for sex offender counseling should be dismissed.[FN8]

> [FN8.] Plaintiff also alleges that the City Defendants "submitted information to its Board of Examiners of Sex Offenders with knowledge that plaintiff herein is not and has not been a sex offender." Am. Compl. ¶ 51. However, the record reflects that plaintiff was provided with an opportunity to be heard on this issue, and that the Board of Sex Offenders concluded that plaintiff would not have to register as a sex offender. N.Y. Ex. CC. Accordingly, plaintiff was afforded due process and fails to state a claim that the City Defendants violated his constitutional rights.

## II. Malicious Prosecution

Plaintiff alleges that defendants violated his "constitutional rights via malicious prosecutions in that the defendants did initiate and continued to institute malicious and frivolous probation violations." Am. Compl. ¶ 69. "To prevail on a malicious prosecution claim under § 1983, a plaintiff must show a deprivation of [his] liberty under the Fourth Amendment ... and establish the elements of a state law malicious prosecution claim." _Sheikh v. City of New York, Police Dep't,_ Nos. 03-CV-6326, 05-CV-4718, 2008 WL 5146645, at *8 (E.D.N.Y. Dec. 5, 2008) (citing _Fulton v. Robinson,_ 289 F.3d 188, 195 (2d Cir.2002)). A plaintiff "must show: (1) that the defendant commenced or continued a criminal proceeding against him; (2) that the proceeding was terminated in the plaintiff's favor; (3) that there was no probable cause for the proceeding; and (4) that the proceeding was instituted with malice." _Kinzer v. Jackson,_ 316 F.3d 139, 143 (2d Cir.2003). A plaintiff must also establish "the existence of a post-arraignment deprivation of liberty rising to the level of a Fourth Amendment violation. _Kirk v. Metro. Transp. Auth.,_ No. 99 Civ. 3787, 2001 WL 258605, at *14 (S.D.N.Y. March 14, 2001). Here, plaintiff is unable to establish the elements of a malicious prosecution claim and defendants' motions should be granted.

### a. Defendants Commenced a Criminal Proceeding Against Plaintiff

Defendants brought three VOPs against plaintiff, and plaintiff attended court hearings on two of these violations. Thus, plaintiff has met the first prong of his malicious prosecution claim, that defendants commenced criminal proceedings against him. _See Landon v. County of Orange,_ No. 08-CV-8048, 2009 WL 2191335, at *6 (S.D.N.Y. July 23, 2009) (a VOP proceeding is considered a criminal proceeding). However, the Court previously held that "with respect to initiating the violation proceeding, the New Jersey probation officers' conduct in making the discretionary decision to prosecute the probation violation falls within the probation officers' absolute prosecutorial immunity." Document 64 at 5-6. Therefore, the New Jersey defendants are absolutely immune from plaintiff's malicious prosecution claim arising from the July 19, 2000 and the January 9, 2003 VOPs.

### b. Proceeding Ended in Plaintiff's Favor

**\*9** "As a general rule, a final termination of a criminal proceeding in favor of the accused is a favorable termination for the purposes of a subsequent malicious prosecution claim." _Rothstein v. Carriere,_ 373 F.3d 275, 286 (2d Cir.2004) (plaintiff carries the burden of demonstrating "a final termination that is not inconsistent with innocence."). Here, only the January 9, 2003 VOP expressly terminated in plaintiff's favor. The July 19, 2000 VOP was left "open," and the March 12, 2001 VOP was withdrawn. Although the New Jersey Defendants argue that the March 12, 2001 VOP "was not disposed of in a manner that was indicative of Plaintiff s innocence" since it was withdrawn pursuant to an agreement between plaintiff and Walsh, _see_ N.J. Memo at 15, for purposes of this Report, the Court will assume that all of the VOP proceedings terminated in plaintiff's favor.

### c. Probable Cause for the Proceeding

Probable cause is a "complete defense" to a malicious prosecution claim. _See Savino v. City of New York,_ 331 F.3d 63, 72 (2d Cir.2003). The operative question is not whether plaintiff violated his probation, but whether a reasonable probation officer believed that plaintiff violated his probation. _See Zellner v. Summerlin,_ 494 F.3d 344, 369 (2d Cir.2007) ("probable cause is to be assessed

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 4891810 (E.D.N.Y.)
(Cite as: 2009 WL 4891810 (E.D.N.Y.))

on an objective basis."). In this Circuit, probable cause must be established for each charge. *Posr v. Doherty,* 944 F.2d 91, 100 (2d Cir.1991).

Here, the various VOP charges against plaintiff included failure to (1) report to probation; (2) report for urine monitoring; (3) provide a current address; (4) attend counseling; and (5) pay court-ordered fees. The record reflects that defendants had probable cause to believe that plaintiff was not attending counseling. Plaintiff admits that he refused counseling at Mustard Seed. He states that he "refused to attend this type of therapy," and that he "would not go to group therapy for sexual misconduct behavior and have this on his record for the rest of his life." Pl. Aff. ¶¶ 50, 74. Plaintiff also admits that he stopped going to FEGS. Pl. Aff. ¶¶ 127, 144. He states that "I have not been in therapy for several months ... I am presently unable to get back into FEGS because they are booked solid until later February/Early January." Pl.Ex. 49. During plaintiff's deposition, defendants asked:

> **Q:** After Bethel ordered you to go to counseling and before the VOP was issued did you go to any counseling pursuant to Officer Bethel's order?

> **A:** I was scheduling counseling, yes.

> **Q:** Did you go to counseling?

> **A:** No.

Pl. Dep. at 225. The record further reflects that plaintiff made, cancelled, and did not reschedule a counseling appointment. N.Y. Ex. Y. Plaintiff argues that he could not attend the appointment because he was required to report to probation on the same day. Pl. Aff. ¶ 169. However, the record reflects that plaintiffs required attendance at FEGS during his probation was sporadic at best. Defendants also had probable cause to believe that plaintiff was not paying his courtordered fees. Plaintiff concedes that he was "behind in his payments" Pl. Aff. ¶ 53, and that his payments were "[o]n and off" Pl. Dep. at 200. Therefore, defendants had probable cause to charge

plaintiff with failure to attend counseling and pay court-ordered fees.[FN8]

**d. The Proceeding was Instituted with Malice**

**\*10** Even if plaintiff established that defendants lacked probable cause for any of the VOPs brought against him, plaintiff has not demonstrated that defendants acted with malice. The fourth prong of a malicious prosecution claim requires plaintiff to demonstrate "that the criminal prosecution was commenced or continued against him with malice, *i.e.,* with a wrong or improper motive, something other than a desire to see the ends of justice served." *Fulton v. Robinson,* 289 F.3d 188, 198 (2d Cir.2002) (internal quotations and citations omitted).[FN9] "In most cases, the lack of probable cause-while not dispositive-tends to show that the accuser did not believe in the guilt of the accused, and malice may be inferred from the lack of probable cause." *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 573 (2d Cir.1996) (citation omitted). However, "while the absence of probable cause may bear on the malice issue, the two remain independent elements of a malicious prosecution action." *Sulkowska v. City of New York,* 129 F.Supp.2d 274, 295 (S.D.N.Y.2001). "There must be a showing of some deliberate act punctuated with awareness of conscious falsity to establish malice." *Landon,* 2009 WL 2191335, at \* 9 (citing *Korthas v. City of Auburn,* No. 5:04-CV-537, 2006 WL 1650709, at \*5 (N.D.N.Y. June 9, 2006)).

> FN9. The Court assumes, *ad arguendo,* that plaintiff has established the fifth prong of his malicious prosecution claim, the existence of a post-arraignment deprivation of liberty rising to the level of a Fourth Amendment violation. *See Rose v. Bethel,* No. 03 Civ. 1241, 2007 WL 2476389, at \*15 (S.D.N.Y. Aug, 29, 2007) ("[c]onditions of pretrial release that limit travel or require repeated court appearances can also constitute seizures within the meaning of the Fourth Amendment and are sufficient deprivations of freedom to sustain a Section 1983 malicious prosecution claim.").

Here, plaintiff presents no evidence from which a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 4891810 (E.D.N.Y.)
(Cite as: 2009 WL 4891810 (E.D.N.Y.))

reasonable jury could conclude that defendants acted with malice. Plaintiff did not comply with the conditions of his probation, and defendants recommended or filed VOPs against him. Although the July 19, 2000 and March 12, 2001 VOPs included what may have been questionable charges, defendants immediately withdrew those charges. Plaintiff's conclusory use of the word "malicious" to describe defendants' actions is insufficient to withstand summary judgment. Therefore, defendants' motions should be granted and plaintiff's malicious prosecution claims should be dismissed.

### III. Retaliation

Plaintiff alleges that defendants engaged in numerous retaliatory acts. *See, e.g.,* Am. Compl. ¶ 59. He claims that defendants retaliated against him for refusing to attend sex offender counseling, *Id.* ¶ 16, 39, 113; for speaking out against his probation, *Id.* ¶ 30; Pl. Dep. at 181-92; and for filing this lawsuit. Pl. Memo at 18.

"To establish a *prima facie* case of First Amendment retaliation, a plaintiff must establish (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) (citing *Morales v. Mackalm,* 278 F.3d 126, 131 (2d Cir.2002)). The plaintiff bears the initial burden of showing that his conduct was constitutionally protected, and that this conduct was a substantial or motivating factor for defendants' adverse action. *Mt. Healthy City Sch. Dist. Bd. Of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

**\*11** The Second Circuit has noted that claims by inmates are prone to abuse as prisoners can claim retaliation for any decision they dislike, *Gonzalez v. Narcato,* 363 F.Supp.2d 486, 495 (E.D.N.Y.2005), and that Courts must approach such claims "with skepticism and particular care." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), abrogated on other grounds; *see also Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (recognizing "the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with

which claims of retaliation may be fabricated"). In *McCloud v. Kane,* 491 F.Supp.2d 312, 317 (E.D.N.Y.2007), the Court stated that this skepticism and particular care likewise applies to retaliation claims by parolees. Like incarceration and parole, probation carries similar restrictions and adversities. *See Gall v. U.S.,* 552 U.S. 38, 128 S.Ct. 586, 595-96, 169 L.Ed.2d 445 (2007) ("inherent in the very nature of probation is that probationers do not enjoy the absolute liberty to which every citizen is entitled") (citing *Griffin v. Wisconsin,* 483 U.S. 868, 874, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987)). Therefore, the Court approaches plaintiff's instant retaliation claims with particular care.

#### a. Constitutionally Protected Activity

Plaintiff alleges that defendants retaliated against him for refusing to attend sex offender counseling, speaking out against the conditions of his probation, and filing this lawsuit. For the purposes of this Report, the Court assumes, *ad arguendo,* that plaintiff's refusal to attend sex offender counseling was constitutionally protected conduct. The Court also finds that speaking out against the conditions of his probation and filing the instant lawsuit are constitutionally protected activities. *See Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996) ("[t]he right to petition government for redress of grievances-in both judicial *and* administrative forums-is among the most precious of the liberties safeguarded by the Bill of Rights") (citing *Franco v. Kelly,* 854 F.2d 584 (2d Cir.1988)); *see also McCloud,* 491 F.Supp.2d at 318 (complaining about conduct of parole officer is a constitutionally protected activity). However, plaintiff fails to demonstrate that defendants took an adverse action against him and that there was a causal connection between the protected speech and the adverse action. Therefore, defendants' motions should be granted and plaintiff's retaliation claims should be dismissed.

#### b. Adverse Action

Plaintiff alleges that defendants retaliated against him by filing VOPs against him, ordering psychological examinations, engaging in extortion, submitting false reports (i.e. the Letter of Termination), ordering him to report on holidays, refusing to provide a proceeding for a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 4891810 (E.D.N.Y.)
(Cite as: 2009 WL 4891810 (E.D.N.Y.))

waiver of probationary fees, and harassing him verbally. *See* Am. Compl. ¶ 59. However, not every response to a probationer's exercise of a constitutional right gives rise to a retaliation claim. *See Dawes,* 239 F.3d at 492-93.

**\*12** Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation. Otherwise, the retaliatory act is simply *de minimis* and therefore outside the ambit of constitutional protection. This objective inquiry is not static across contexts, but rather must be tailored to the different circumstances in which retaliation claims arise. Prisoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before a [retaliatory] action taken against them is considered adverse.

*Id.* at 493 (internal citations and quotations omitted). Here, the Court assumes that the filing of a VOP constitutes an adverse action; however, plaintiffs remaining allegations are factually and legally insufficient to survive defendants' motions for summary judgment.

Plaintiff alleges that defendants ordered psychological examinations without just cause. He states that "Okora criminally altered the sentencing Court's Judgment of Conviction by handwriting ... that a special condition to the plaintiff's probation was to attend court ordered counseling." Pl. Aff. ¶ 8. However, this Court previously found that "the [New Jersey] court provides probation with some discretion to order counseling even though it may not have been ordered in the specific sentencing order." Document 64 at 7. Therefore, it was within defendants' discretion to order psychological examinations, and Okora did not retaliate against plaintiff or commit a "criminal" act by listing "mental health counseling" as a condition of plaintiff s probation.

It is less clear whether ordering plaintiff to attend sex offender counseling could constitute an adverse action since plaintiff was never convicted of a sex offense and Judge Kenny never ordered him to attend sex offender counseling. While plaintiff attended sex offender

counseling for a single, forty-five minute session, this brief session could have had potentially stigmatizing consequences which would "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *See Coleman v. Dretke,* 395 F.3d 216 (discussing the stigmatizing consequences of sex offender treatment). Nonetheless, because the Court finds that the law regarding required sex offender counseling was not clearly established (*see supra* discussion section I(b)), defendants are entitled to qualified immunity on this claim.

Plaintiff claims that Ford and Goldman engaged in extortion by ordering him to attend and pay for sex offender counseling, and that Ford retaliated against him by preparing the Letter of Termination. Pl. Memo at 22. However, plaintiff signed a contract with Mustard Seed agreeing to counseling as well as to pay the fees, Ford Ex. G, and plaintiff admits that he never paid the fee. Pl. Dep. at 249. Additionally, there was nothing retaliatory about the Letter of Termination since Ford sent the letter only to Goldman pursuant to an authorized release. Ford Ex. G. The letter informed Goldman that plaintiff would not pay for counseling and that counseling was terminated. Ford Dec. ¶¶ 4-6.

**\*13** Plaintiff claims that the New Jersey defendants retaliated against him by scheduling appointments on religious and national holidays and on Mondays. Nonetheless, reporting to probation was a condition of plaintiff's release, and the Court agrees with defendants that "[s]cheduling appointments on Mondays, scheduling an appointment on one occasion on a holiday, and refusing to re-schedule an appointment on another day when Plaintiff wanted to attend a religious service, does not rise to the level of a constitutional violation and does not constitute unlawful retaliation." N.J. Memo at 11.

Plaintiff alleges that the New Jersey defendants "refused to provide [him] with a proper proceeding for a waiver of indigency" and that "defendants continued to demand said fees from plaintiff, well aware and with knowledge that plaintiff was indigent and was entitled to said waiver." Am. Compl. ¶¶ 13-15. However, the record does not support this claim since plaintiff admits that a hearing on his motion for a waiver of fees was scheduled, and that the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 4891810 (E.D.N.Y.)
(Cite as: 2009 WL 4891810 (E.D.N.Y.))

motion was dismissed after he failed to appear at the hearing. Pl. Dep. at 202.

Finally, plaintiff alleges that defendants verbally harassed him. He recounts Ford yelling, "everybody pays, that I'll pay, that he would tell Mr. Goldman that I refused to go and I'll be violated." *Id.* at 248. Plaintiff submits the affidavit of his friend, LuAnn Kubler, who states that she witnessed Ford yelling "pay or go to jail." Kubler Aff. ¶ 11. Plaintiff also alleges that Goldman advised him to "pay the money to defendant Ford or he would have plaintiff's civil rights violated." Am. Compl. ¶ 26. Plaintiff states that he reported these incidents to Okoro, and that Okoro called him a "trouble maker" and stated that he would "teach the plaintiff a lesson." *Id.* ¶ 29. Plaintiff also claims that Santiago laughed at him because he could not find a dog sitter for his epileptic dog. Pl. Dep. at 191. However, "42 U.S.C. § 1983 was not designed to rectify harassment or verbal abuse." *Smith v. Christopher,* 9:06-CV-1196, 2008 WL 4283519, at * 12 (N.D.N.Y. Sept.16, 2008); *see also Bartley v. Collins,* No. 95 Civ. 10161, 2006 WL 1289256, at * 6 (S.D.N.Y. May 10, 2006) (collecting cases). These statements attributed to defendants are insufficient to sustain plaintiff's constitutional claims.

**c. Causal Connection**

Even if plaintiff established that defendants' actions were adverse, his retaliation claims would still fail as he has not established facts supporting an inference of a causal connection between the adverse action and the protected conduct. *Baskerville v. Blot,* 224 F.Supp.2d 723, 732 (S.D.N.Y.2002); *see also Crenshaw v. Herbert,* 445 F.Supp.2d 301, 305 (W.D.N.Y.2006) (*post hoc, ergo propter hoc* reasoning, literally, "after this, therefore because of this", is insufficient to demonstrate retaliation). A casual connection between the adverse action and the protected conduct requires specific proof of improper motivation. *Curley v. Village of Suffern,* 268 F.3d 65, 73 (2d Cir.2001). "[H]owever, a defendant may be entitled to summary judgment if he can show dual motivation, *i.e.,* that even without the improper motivation the alleged retaliatory action would have occurred." *Scott,* 344 F.3d at 287-88 (citing *Mt. Healthy,* 429 U.S. at 287); *see also Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (plaintiff bears the burden of demonstrating that the

protected conduct is "a substantial or motivating factor for the adverse actions taken by prison officials."). Courts may consider a number of factors in determining whether a causal connection exists between the alleged adverse action and the protected conduct: (1) the temporal proximity between the protected activity and the alleged retaliatory act; (2) the plaintiff's disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his motivation. *See Colon,* 58 F.3d at 872-73.

**\*14** Here, plaintiff fails to demonstrate that defendants retaliated against him by requiring him to attend sex offender counseling. The record reflects that Goldman referred plaintiff to Mustard Seed *before* plaintiff engaged in any alleged protected activity. *See, e.g., Slattery v. Swiss Reinsurance Am. Corp.,* 248 F.3d 87, 95 (2d Cir.2001) ("where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."). Further, Goldman explains that he directed plaintiff to Mustard Seed based on "the presentence report, the conviction of endangering the welfare of a child and the complaint information." Goldman Dep. at 16. Plaintiff fails to demonstrate that Goldman's decision to refer him to Mustard Seed was causally connected to any constitutionally protected conduct. Therefore, plaintiff's retaliation claim should be dismissed.

Plaintiff also fails to demonstrate that defendants charged him with VOPs because he engaged in constitutionally protected conduct. *See Bartley,* 2006 WL 1289256, at *8 ("[t]o show a causal connection between his protected act and the adverse action, a plaintiff must make more than merely conclusory allegations."). The record evidence reflects that the VOPs were based on plaintiff's noncompliance with the conditions of his probation, and plaintiff presents no evidence that defendants filed VOP charges against him for retaliatory purposes. Accordingly, defendants' motions should be granted and plaintiff's retaliation claims should be dismissed.

**IV. Supervisory Liability**

Not Reported in F.Supp.2d, 2009 WL 4891810 (E.D.N.Y.)
(Cite as: 2009 WL 4891810 (E.D.N.Y.))

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006) (quoting *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1991)). While there is no *respondeat superior* liability under § 1983, *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003), a supervisor may be held liable if it is established that he (1) directly participated in the violation, (2) failed to remedy the violation after being informed of it by report or appeal, (3) created a policy or custom under which the violation occurred, (4) was grossly negligent in supervising subordinates who committed the violation, or (5) was deliberately indifferent to the rights of others by failing to act on information that constitutional rights were being violated. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).

Here, plaintiff alleges that defendants were "negligent in failing to provide competent and sufficient supervisory personnel to monitor the actions of probation officers, judges, public defenders, licensed therapist and/or psychologist and in failing to protect and secure the plaintiff from the actions and conduct of the defendants." Am. Compl. ¶ 71. He claims that Casale, Stanecki, and Walsh were negligent because they allowed him to be sent to mental health counseling without a proper evaluation and to have VOPs filed against him. Pl. Dep. at 194-96, 223-24. Plaintiff asserts that defendants knew that the January 9, 2003 VOP was unlawful because he sent them medical records that there was "nothing wrong" with him. *Id.* at 223-24; *see also* Pl.Ex. 47, 48. With respect to Sylvia Way, plaintiff testified:

   **\*15 A:** As a supervisor capacity I brought it to her attention, she refused to do anything.

   **Q:** What did you bring to her attention?

   **A:** The conduct of Mr. Bethel and the therapy, I tried to reach out to her as a supervisor saying listen, I'm not arguing therapy, that's not the gist. If I need to go to therapy I'll comply but tell me what for and it's certainly not going to be for a sexual deviant counseling.

   **Q:** I see, okay. Anything else?

   **A:** Not that I can recall.

Pl. Dep. at 126. Lastly, plaintiff alleges that he complained to Walsh about an anti-Semitic remark made by Okoro. *Id.* at 196-97.

However, plaintiff fails to demonstrate that Casale, Stanecki, or Walsh were personally involved in any violation of his constitutional rights. Additionally, plaintiff's allegation that he "reached out" to Way and that she "refused to do anything" is insufficient to withstand defendant's motion for summary judgment. With respect to plaintiff's grievances to Walsh about Okoro's anti-Semitic comments, the record reflects that this matter was referred to Casale for an investigation, and that Casale found "no evidence of inappropriate behavior." N.J. Ex. T. Therefore, plaintiff fails to demonstrate that Casale, Stanecki, Walsh or Way were personally involved in any violation of his constitutional rights. These defendants' motions should be granted and plaintiff's claims against these supervisors should be dismissed.

**V. Malpractice Claim Against Ford**

Plaintiff alleges that Ford committed malpractice by "grossly and negligently failing to properly diagnose, observe, treat and/or administer proper care to the plaintiff." *See* Am. Compl. ¶ 116. "Malpractice is professional negligence." *JR v. DC, Psychotherapist,* 12 Misc.3d 1173(A), 2006 WL 1759457, at \*2 (N.Y. Sup.Ct. June 14, 2006). "The elements of a *prima facie* malpractice cause of action are: [1] a deviation or departure from accepted practice within the profession and within the relevant professional community; and [2] evidence that such departure was a proximate cause of injury or damage." *Id.* Expert testimony is required to establish breach of a standard of professional care where the ordinary experience of the fact finder does not provide a sufficient basis for judging the adequacy of the professional services. *S & D Petroleum Co., Inc. v. Tamsett,* 144 A.D.2d 849, 850, 534 N.Y.S.2d 800 (3d Dep't 1988).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 4891810 (E.D.N.Y.)
(Cite as: 2009 WL 4891810 (E.D.N.Y.))

Here, no reasonable jury could conclude that Ford committed malpractice. Plaintiff was referred to Mustard Seed and briefly met with Ford. At the consultation, plaintiff agreed to be treated "for sexually abusive behavior" and permitted Mustard Seed to communicate with his probation officers. *See* Ford Ex. G. However, since plaintiff stated that he could not pay for Mustard Seed's services, Ford sent Goldman a letter terminating the counseling. According to Joan Beder, LCSW, DSW, "[a]ll aspects of contact with Mr. Rose and Mustard Seed Counseling Services are consistent with standard social work procedure(s) and are consistent with the National Association of Social Workers Code of Ethics." Ford Ex. I.

**\*16** In an attempt to revive his libel claim, which has been dismissed, plaintiff alleges that Ford's preparation of the Letter of Termination constituted malpractice. Plaintiff submits a letter from Quentin John Clough, a licensed clinical social worker who has treated plaintiff. Clough states that the Letter of Termination "mis-represents the facts of [plaintiff's] case" and "has impugned his character and any reasonable person reading this letter will likely fall under the false assumption that Mr. Rose is [a] convicted sexual offender." Document 159. However, plaintiff's libel claim has been dismissed as untimely. Plaintiff submits no evidence to establish the elements of malpractice. Therefore, Ford's motion for summary judgment should be granted and plaintiff's malpractice claim should be dismissed.

**VI. Bellevue Report**

Plaintiff alleges that "defendants refused to provide [him], his attorney or therapist, with copies of any supporting medical documentation verifying that [he] was and/or is in need of any treatment of any nature." Am. Compl. ¶ 22. In his deposition, plaintiff states that Goldman refused to provide him with the report prepared by Dr. Schneider ("Bellevue Report"). Pl. Dep. at 180. Even assuming that Goldman, or any other defendant for that matter, failed to provide plaintiff with the Bellevue Report, plaintiff fails to establish a violation of federal law under § 1983. Access to probation case records is governed by state law. *See* 9

NYCRR § 348; *Collins v. City of New York,* No. 05-CV-5595, 2007 WL 2455142, at \*5 (E.D.N.Y. Aug. 23, 2007) (it is well settled that violations of state law are not cognizable under § 1983). Moreover, plaintiff does not establish that Goldman was mandated to provide him with the Bellevue Report pursuant to 9 NYCRR § 348.4. Accordingly, defendant's motion for summary judgment on this claim should be granted.

**VII. Equal Protection**

Plaintiff alleges that defendants violated his Equal Protection rights under the Fourteenth Amendment. The Fourteenth Amendment provides that "[n]o state shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "To prove an equal protection violation, claimants must prove purposeful discrimination, directed at an identifiable or suspect class." *Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995) (internal citations omitted). "[A] plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005). Here, plaintiff alleges that "I feel that I was treated *indifferently,* I think that if I was going to get statistics of people who go and report to probation who are in a similar situation, they were treated differently." Pl. Dep. at 180-81 (emphasis added). However, plaintiff's feeling that he was treated "indifferently" is insufficient to state a claim under the Fourteenth Amendment. Therefore, defendants' motions should be granted and plaintiff's equal protection claim should be dismissed.

**VIII. Municipal Liability**

**\*17** In order to establish municipal liability under § 1983, a plaintiff must demonstrate an officially adopted policy, custom or practice caused the deprivation of his or her constitutional rights. *Monell v. Dept. of Soc. Servs.,* 436 U.S. 658, 690-91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). "Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell,* unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." *City*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 4891810 (E.D.N.Y.)
(Cite as: 2009 WL 4891810 (E.D.N.Y.))

*of Oklahoma City v. Tuttle,* 471 U.S. 808, 823-24, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985). Plaintiff was asked during his deposition:

**Q:** What, if anything, is the basis for your claim against the City of New York?

**A:** As their employers.

**Q:** Anything else?

**A:** Paying to supervise, etc., etc.

**Q:** When you say etc., etc. I need you to tell me.

**A:** Hiring inept, incompetent individuals, unqualified individuals-that's something that could be done in the Bill of Particulars.

**Q:** Apart from those general boiler plate items, anything else?

**A:** Not that I can recall offhand.

Pl. Dep. at 127. Plaintiff's claims against the City of New York are wholly conclusory. He fails to demonstrate that any officially adopted policy, custom or practice caused the deprivation of his constitutional rights. Therefore, defendant's motion should be granted and plaintiff's claims against the City of New York should be dismissed.

**IX. Eleventh Amendment Sovereign Immunity**

Plaintiff names the State of New Jersey as a defendant. However, under the Eleventh Amendment, states and their agencies are protected by sovereign immunity. *See Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). The

Eleventh Amendment bars suits for damages against states, state agencies, and state officials acting in their official capacity, absent the state's consent to suit or an express or statutory waiver of immunity. *Bd. of Trs. of Univ. of Ala. v. Garrett,* 531 U.S. 356, 363, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001). "[N]either a State nor its officials acting in their official capacities are 'persons' under [42 U.S.C.] § 1983." *Huminski v. Corsones,* 396 F.3d 53, 70 (2d Cir.2005) (quoting *Will v. Mich. Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989)). Accordingly, defendant's motion should be granted and plaintiff's claims against the State of New Jersey should be dismissed.

**X. 42 U.S.C. §§ 1985, 1986, 1987, 1988 and 14141, and Excessive Force**

Plaintiff's amended complaint alleges that defendants violated his rights under 42 U.S.C. §§ 1985, 1986, 1987, 1988 and 14141. However, the Court previously dismissed with prejudice plaintiff's §§ 1985 and 1986 claims against Ford, Document 90, and granted plaintiff's motion to amend his complaint for the sole purpose of adding a malpractice claim against Ford. Plaintiff's efforts to renew his conspiracy claim and add additional claims should be denied and these claims should be dismissed.[FN10]

> [FN10.] To the extent that plaintiff asserts a conspiracy claim against the remaining defendants, there is no basis for this claim and it should be dismissed.

**\*18** Plaintiff's amended complaint also alleges excessive force. However, during his deposition, defendants asked plaintiff about his excessive force claim, and plaintiff responded, "[t]here was no excessive abuse. I'll withdraw that." Pl. Dep. at 194. Therefore, defendants' motions should be granted and plaintiff's excessive force claim should be dismissed.

**CONCLUSION**

Accordingly, it is respectfully recommended that defendants' motions for summary judgment should be

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 4891810 (E.D.N.Y.)
(Cite as: 2009 WL 4891810 (E.D.N.Y.))

granted and plaintiff's amended complaint should be dismissed.

### FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. Such objections (and any responses to objections) shall be filed with the Clerk of the Court. Any request for an extension of time to file objections must be made within the fourteen-day period. Failure to file a timely objection to this Report generally waives any further judicial review. *Marcella v. Capital Dist. Physician's Health Plan. Inc.,* 293 F.3d 42 (2d Cir.2002); *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989); see *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

SO ORDERED.

E.D.N.Y.,2009.
Rose v. Goldman
Not Reported in F.Supp.2d, 2009 WL 4891810 (E.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.


Slip Copy, 2010 WL 2522198 (N.D.N.Y.)
(Cite as: 2010 WL 2522198 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.
Gerrard J. BLAKE, Plaintiff,
v.
Brian FISCHER, Commissioner of New York State Department of Correctional Services; Glenn Goord, Former Commissioner of New York State Department of Correctional Services; George B. Alexander, Chairman of New York State Division of Parole; Kenneth S. Perlman, Deputy Commissioner for Program Services for New York State Department of Correctional Services; John H. Nuttall, Former Deputy Commissioner for Program Services for New York State Department of Correctional Services; Edwin H. Elfeldt, Coordinator for Sex Offender Counseling and Treatment Program for New York State Department of Correctional Services; L. Weingartner, Deputy Superintendent for Programs at Five Points Correctional Facility; Kathleen Altman, Correctional Counselor at Five Points Correctional Facility; Tousignant, Parole Officer at Upstate Correctional Facility; Kratzenberg, Parole Officer at Great Meadows Correctional Facility; Scroggy, Correctional Counselor at Great Meadows Correctional Facility; K. LaPolt, Deputy Superintendent for Programs at Great Meadows Correctional Facility; Joseph T. Smith, Superintendent of Shawangunk Correctional Facility; Neville Andrews, Deputy Superintendent for Programs at Shawangunk Correctional Facility; Ed Rudder, Sex Offender Program Psychologist at Shawangunk Correctional Facility; Stacy Bode, Clinical Social Worker for Sex Offender Program at Shawangunk Correctional Facility; Dick Fitchett, Former Senior Counselor for Sex Offender Program at Shawangunk Correctional Facility; B. McCullough, Senior Counselor for Sex Offender Program at Shawangunk Correctional Facility; Frank Chiapperino, Correctional Counselor for Sex Offender Program at Shawangunk Correctional Facility; John Townley,

Correctional Counselor for Sex Offender Program at Shawangunk Correctional Facility; and E. Trinidad, Former Correctional Counselor for Sex Offender Program at Shawangunk Correction Facility, individually and in their official capacities, Defendants.
**No. 09-CV-266 (DNH/DRH).**

March 5, 2010.

Reisman, Rubeo & McClure, LLP, Mark Irwin Reisman, Esq., of Counsel, Hawthorne, NY, for Plaintiff.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, James J. Seaman, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

**REPORT-RECOMMENDATION AND ORDER[FN1]**

FN1. This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).
DAVID R. HOMER, United States Magistrate Judge.

**\*1** Plaintiff Gerard Blake ("Blake"), an inmate formerly in the custody of the New York State Department of Correctional Services ("DOCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, twenty-one present and former DOCS employees, violated his constitutional rights under the Fifth, Eighth, and Fourteenth Amendments concerning requirements that Blake participate in sex offender treatment while incarcerated. Compl. (Docket No. 1). Presently pending is defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). Docket No. 40. Blake opposes the motion. Docket No. 52. For the following reasons, it is recommended that defendants' motion be granted in part and dismissed in part.

**I. Background**

Slip Copy, 2010 WL 2522198 (N.D.N.Y.)
(Cite as: 2010 WL 2522198 (N.D.N.Y.))

The facts are related herein in the light most favorable to Blake as the non-moving party. *See* subsection II(A) *infra*.

On October 29, 2003, Blake pleaded guilty to one count of promoting prostitution in the third degree, in violation of N.Y. Penal Law § 230.25(1) [FN2], and was sentenced as a second felony offender to a term of two and a quarter to four and a half years. Compl. ¶¶ 37-39. On February 6, 2004, Blake was received into DOCS custody at Downstate Correctional Facility. *Id.* ¶ 40. An initial assessment of Blake's needs during incarceration and parole conditions pending release ("EEP") suggested training in transitional services, alcohol and substance abuse, and vocational training and work assignments. *Id.* ¶¶ 41-42. The EEP was confirmed and reiterated by DOCS staff when Blake was transferred to Sing Sing Correctional Facility. *Id.* ¶¶ 43-44. Neither EEP included any reference to the need for a sex offender program or parole conditions. *Id.* ¶¶ 40-45. Blake's appearance at the parole board on March 16, 2004 resulted in a denial of parole and leave to re-apply in two years. *Id.* ¶ 46.

FN2. Promoting prostitution requires proof of the intentional "[a]dvance[ment] or profit[ ] from prostitution by managing, supervising, controlling or owning, either alone or ... with others, ... a prostitution business ... involving prostitution activity by two or more prostitutes...." N.Y. Penal Law § 230.25(1).

On May 29, 2004, Blake was transferred to Five Points Correctional Facility ("Five Points"). Compl. ¶ 47. Upon arrival, Blake was told by defendant counselor Altman that his EEP had remained the same as that originally set by the counselors at Downstate, which still did not include provisions for a sex offender program or parole conditions. *Id.* ¶ 48. After the meeting, Blake corresponded with the alcohol and substance abuse coordinator and succeeded in having that condition removed from his EEP. *Id.* ¶¶ 48-50.

On March 11, 2005, Blake was involved in an altercation with another inmate. Compl. ¶ 51. On April 1, 2005, during his interview with Altman, Blake was informed that aggressive replacement training ("ART") was recently

included in his EEP due to his involvement in the altercation. *Id.* ¶ 52. Blake disagreed with the decision and terminated the interview. *Id.* Shortly thereafter Blake filed a grievance against Altman for her decision to include ART in his EEP. *Id.* ¶ 53. Blake also corresponded with defendant Weingartner, the Deputy Superintendent for Programs, about the inclusion of ART into his EEP and on May 9, 2005, Weingartner advised that Blake's case was being referred to the DOCS Sex Offender Program ("SOP"). *Id.* ¶ 54-55; *see also* Dkt. No. 40-7 at 32 (explaining that Blake's offense of promoting prostitution "is considered an offense with inherent violent characteristics in that the females who perform this activity do so under the control of another, and frequently do so under the threat of violence"). Blake also contacted defendant Goord, then the Commissioner of DOCS, again expressing concern about Altman and Weingartner's decisions to have him participate in ART and SOP. *Id.* ¶ 57.

**\*2** On June 10, 2005, Blake received a response from defendant Nuttal, the former DOCS Deputy Commissioner for Program Services, on Goord's behalf defending the decision to enroll Blake in SOP and explaining that

> [w]hile it is understood that your instant offense is not a registerable sex offense per penal law Article 130, your instant offense did involve sexual offending behavior in which you profited from prostitution; therefore, based on your sexual exploitation of women for profit, the recommendation to participate in the Sex Offender Counseling Program is appropriate as is the need to participate in the Aggression Replacement Training (ART) Program.

Dkt. No. 40-7 at 39; *see also* Compl. ¶ 59. In September 2005, after being advised that refusal to participate in the SOP would lead to a denial in earned eligibility credit ("EEC"), possibly losing good time credits, and another delay of eligibility for parole, Blake refused to attend and participate in SOP. Compl. ¶ 60. In September 2005, Blake filed an Article 78 proceeding [FN3] in Albany County regarding the appropriateness of being placed in SOP. Compl. ¶ 61; *see also* Dkt. No. 40-7. [FN4] The petition was ultimately dismissed. Compl. ¶ 61; Dkt. No. 40-8 at 2 ("[T]he court finds that the determination of the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2522198 (N.D.N.Y.)
(Cite as: 2010 WL 2522198 (N.D.N.Y.))

respondents as to both [ART and SOP] programs was rational and fully supported by the record below.").

FN3. N.Y. C.P.L.R. art. 78 establishes the procedure for state judicial review of the actions and inactions of state and local government agencies and officials.

FN4. Consideration of a motion to dismiss "is limited to the facts asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir.2007).* However, there are instances where the court may consider documents outside those previously referenced, including when the documents are only "partially quoted in [the] complaint ...; integral to [the] complaint ...; [or] relied upon ... in drafting the complaint...." *Faulkner v. Beer, 463 F.3d 130, 134 (2d Cir.2006)* (internal quotation marks and citations omitted). Blake has lost the documents related to the Article 78; however, Blake still referenced and provided documents which were part of the Article 78 motion. *See* Compl. Additionally, at least a portion of Blake's current complaint incorporates the same allegations and relies upon the same facts proffered in the Article 78. As defendants' counsel was also the counsel involved in the Article 78 proceeding, he has provided a copy of the proceeding with his motion papers. Dkt. Nos. 40-7, 40-8. As the Article 78 was incorporated by reference, defendants' submission of the entire proceeding has been considered in the present motion.

On December 18, 2005, Blake was transferred to Upstate Correctional Facility ("Upstate") whereupon he was informed that his EEP now contained both ART and SOP. Compl. ¶¶ 62-63. On December 30, 2005, Blake was interviewed by defendant Tousignant, a parole officer at Upstate, who, Blake later determined, recommended sex offender treatment among the special parole conditions to which Blake would be subject if released on parole. *Id.* ¶¶ 64, 67.

On February 12, 2006, Blake was transferred to Auburn Correctional Facility (Auburn"). Compl. ¶ 65. Shortly thereafter, Blake's EEC was denied based upon his refusal to participate in the SOP. *Id.* ¶ 68. Additionally, on February 28, 2006, Blake was denied parole release and ruled eligible to re-apply in another two years. *Id.* ¶ 69. The decision made "reference to [Blake's] record indicating a sex offense occured [sic] and factored into its decision ... [when Blake] was denied his EEC." *Id.* On March 13, 2006, Blake requested a revision of his EEP. *Id.* ¶ 70. The request was refused. *Id.*

On February 16, 2007, after being temporarily incarcerated at Upstate, Blake was transferred to Great Meadow Correctional Facility ("Great Meadow"). Compl. ¶¶ 71, 73. Upon arrival, Blake was interviewed by defendant Scroggy, a counselor, who informed Blake "that due to changes in the law, [Blake's] crime of commitment was now a sex offense." *Id.* ¶ 74. Blake agreed to go on the waiting list for the SOP program. *Id.* In December of 2007, Blake was interviewed by defendant Kratzenberg, a parole officer, and asked why the other co-defendants who pleaded guilty to promoting prostitution with Blake were not recommended for sex offender conditions. *Id.* ¶ 75. Kratzenberg could not answer the question or change the recommendations. *Id.*

**\*3** On January 20, 2008, Blake wrote to defendant LaPolt, the Great Meadow Deputy Superintendent for Progams, requesting reevaluation of his EEP. Compl. ¶ 76. Additionally, due to another altercation in which he was involved, Blake agreed to attend ART. *Id.* Blake entered the ART program on February 25, 2008. *Id.* ¶ 79. LaPolt refused to reevaluate Blake's EEP. *Id.* Shortly thereafter, Blake received notification that his EEC was again denied due to his "overall unacceptable level of program attendance," namely missing ninety days of programs from February 2006 to January 2008. *Id.* ¶ 77; Dkt. No. 1-1 at 4. Parole was again denied on February 19, 2008, with his eligibility to re-apply again extended for another two years, citing Blake's denial of EEC as a determinative factor. Compl. ¶ 78.

On February 26, 2008, Blake was transferred to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2522198 (N.D.N.Y.)
(Cite as: 2010 WL 2522198 (N.D.N.Y.))

Shawangunk Correctional Facility ("Shawangunk") where he was informed he would be "participating in the new Sex Offender Counseling and Treatment Program ["SOCTP"]." Compl. ¶¶ 80-81. When Blake met with defendant Trinidad, formerly a counselor, on February 27 for an initial interview, Trinidad presented Blake with two waivers, a waiver of confidentiality and a waiver for access to pornography, photographs and other material, and told Blake that if he did not sign the waivers he would face civil commitment and lose good time credits. *Id.* ¶ 82. On at least three other occasions, February 29, March 5, and April 1, Blake was approached by defendants Trinidad, Townley, Chiapperion, and Fitchett, all counselors, and was told that he must sign the two waivers; Blake refused. *Id.* ¶¶ 84, 86, 96.

On March 10, 2008, Blake was informed by defendant McCullough, a counselor, that he would be starting the SOCTP on March 17. Compl. ¶ 89. At that time Blake also requested to be enrolled in a second program as a recreation aide, but the request was denied insofar as the only other program spots available to Blake were educational, volunteer vocational, or corridor porter. *Id.* In order to avoid a threatened misbehavior report, Blake agreed to participate in the program. *Id.* ¶ 90. During this time period, Blake continued to write letters seeking explanation as to why he was enrolled in SOP, Blake's cell was searched and seven photographs were confiscated as being in violation of program policy, and two of Blake's books and magazines were confiscated for failure to comply with program policies.[FN5] *Id.* ¶¶ 91-93, 98, 105, 108. After Blake appealed, the materials were provided to him. *Id.* ¶ 120.

> FN5. Liberally construing Blake's complaint, he may also allege a claim for defendants' theft of his property. An inmate has a right not to be deprived of property without due process. However, federal courts do not provide redress for the deprivation of property if there is an adequate state court remedy which the plaintiff can pursue. *Hudson v. Palmer,* 468 U.S. 517, 533 (1984). "An Article 78 proceeding permits a petitioner to submit affidavits and other written evidence, and where a material issue of fact is raised, have a trial of the disputed issue, including constitutional claims." *Locurto v. Safir,*

264 F.3d 154, 174 (2d Cir.2001) (citations omitted); *see also* N.Y. C.P.L.R. §§ 7803, 7804. State law also provides that "[a]ny claim for damages arising out of any act done ... within the scope of ... employment and in the discharge of the duties of any officer or employee of the department [of corrections] shall be brought and maintained in the court of claims as a claim against the state." N .Y. Corr. Law § 24(2). In this case, Blake contends that there was an unconstitutional deprivation when his photographs and magazines were confiscated. Such claims fail as a matter of law for several reasons. First, the Article 78 procedure exists and affords an adequate state court remedy. Second, because Blake seeks monetary damages, he must pursue his claims here against New York State in the New York Court of Claims pursuant to Corrections Law § 24. Thus, the proper venue to litigate such a claim is in state court.

On March 24, 2008, Blake received a response from defendant Smith, Superintendent at Shawangunk, explaining that his placement in SOP "was the result of Central Office Guidance Unit." Compl. ¶ 94. This was confirmed by defendant Rudder, a psychologist, and non-party Rocky who informed Blake "that the final decision was up to Central Office" as to whether or not Blake was to be subject to SOP. *Id.* ¶ 95. The Central Office also denied Blake's grievances alleging that promoting prostitution was not a sex crime stating that, while his conviction was not a sex offense crime under the Sex Offender Registration Act or eligible for civil management review by the Office of Mental Health, those conditions were not a prerequisite for enrollment in SOCTP. Dkt. No. 1-1 at 5. "Rather, a number of factors may serve as the basis for a referral ... including conviction of a sex offense, records indicating that a sexual offense occurred during the commission of the crime ..., or a guilty disposition of a sex offense ...." *Id.*

**\*4** On April 2, 2008, Blake was placed in keeplock[FN6] by Chiapperino for refusing to sign the two aforementioned waivers despite Blake's participation in the SOCTP since mid-March. Compl. ¶ 99. The following day, Blake signed the waivers under duress. *Id.* ¶ 100. On April 17, 2008, an unidentified defendant informed Blake that the SOCTP

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2522198 (N.D.N.Y.)
(Cite as: 2010 WL 2522198 (N.D.N.Y.))

program did not have any official policies or procedures. *Id.* ¶ 102.[FN7] Shortly thereafter, defendants Bode, a social worker, and Fitchett provided all inmates with a memorandum entitled "Shawangunk Correctional Facility Sex Offender Program Inmate Participation Handout," which purported to contain the rules and regulations of the program until an official policy and procedure was developed by the Central Office. *Id.* ¶ 103. On July 30, 2008, the Central Office issued a decision in response to Blake's grievance, in which it advised that DOCS was revising SOCTP guidelines and until those revisions were completed, the October 2001 Policies and Procedures for the Sex Offender Counseling Program, were to be followed. Dkt. No. 1-1 at 7. Moreover, the decision indicated that the waiver of confidentiality form was being reformatted and that, under the current state of the law,

> FN6. "Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities." *Green v. Bauvi,* 46 F.3d 189, 192 (2d Cir.1995); N.Y. Comp.Codes R. & Regs. tit. 7, § 301.6.

> FN7. To the extent that, liberally construing Blake's complaint, he alleges that the failure to follow internal procedures at the SOCTP at Shawangunk resulted in a deprivation of due process, such contentions lack merit. First, as discussed *infra,* Blake has no liberty interest in his participation in the sex offender program. Second, the violation of a state procedural right does not automatically confer a federal right to due process. *See generally Russell v. Coughlin,* 910 F.2d 75, 78 (2d Cir.1990) ("The fact that the State may have specified its own procedures that it may deem adequate for determining the preconditions to adverse official action does not settle what protection the federal due process clause requires") (internal quotation marks and citations omitted). Thus, even if defendants did not comply with internal procedures during Blake's tenure at the treatment program, such transgressions are insufficient to establish a constitutional violation.

**[Blake] is not required to register as a sex offender,** nor is [he] subject to civil management review by the Office of Mental Health (OMH). Accordingly, [Blake's] SOCTP records **are not subject to disclosure** to the Board of Examiners or OMH at this time ... [S]uch records **would only be available to a community treatment provider in the future should such a provider engage [Blake] in treatment and request a copy of the SOCTP file.**

*Id.* (emphasis added to the original).

Beginning in May 2008, Blake wrote various defendants and filed grievances seeking to have his record expunged of all references to SOP. Compl. ¶¶ 106-107, 110-12, 114, 119, 121, 134. Additionally, on May 25, 2008, Blake sent a letter to defendants Elfeldt, an SOP coordinator, Rudder, and Fitchett seeking revocation of the previously signed waiver of confidentiality pursuant to the Health Insurance Portability and Accountability Act ("HIPAA"), Pub .L. 104-191, 110 Stat.1936 (1996), and its privacy protections. *Id .* ¶ 115. Allowing "outside agencies and any community organizations" access to records that purported Blake as a sex offender "created a stigma...." *Id.* On May 28, 2008, Blake was informed by Fitchett and Rudder that Elfeldt was displeased with his revocation of the waiver of confidentiality and was having Blake's waiver be investigated by the Office of the Counsel. *Id.* ¶ 117. On June 19, 2008, Blake received a letter from Elfeldt stating that Blake "would need to make available his records to outside agencies and any community organization, though [Blake] was not a sex offender by any New York state laws." *Id.* ¶ 124.

On September 11, 2008, Blake reviewed his guidance file and found paperwork showing that, prior to filing a grievance against Altman, Altman had submitted referrals indicating that Blake did not need SOCTP. Compl. ¶ 138; *see also* Dkt. No. 40-7 at 25 (inmate review worksheet dated January 3, 2005 indicating that SOCTP was not necessary), 26 (same), 28 (same). Additionally, on May 12, 2005, Elfeldt requested that a Non-Sex Offender Referral be resubmitted in twenty-four months, but no such resubmission had occurred. Compl. ¶ 138. Blake noticed that portions of his file were missing, and when he inquired as to what was omitted, Townley indicated that McCullough had removed the sections. *Id.* On the following day Blake filed a grievance seeking disclosure of the sections of his file which were omitted. *Id.* ¶ 139.

Slip Copy, 2010 WL 2522198 (N.D.N.Y.)
(Cite as: 2010 WL 2522198 (N.D.N.Y.))

**\*5** In November 2008, Blake was informed that all he needed to do to complete the SOCTP was formulate a release plan. Compl. at 144. On November 14, 2008, Blake met with Rudder, Chiapperino, and McCullough to review the release plan previously submitted. *Id.* ¶ 145. Blake again complained that he should not have to participate in the SOCTP without a prior sexual transgression. *Id.* On November 28, 2008, the SOCTP furnished inmates the new waivers for confidentiality. *Id.* ¶ 146. Bode, Rudder, and Chiapperino approached Blake and asked him to sign the waivers, but he protested claiming he was no longer a participant as of November 14 when his release plan was submitted. *Id.* ¶ 147. Bode, Rudder, and Chiapperio informed Blake that he was not finished with the SOCTP until a transfer order was submitted, so Blake signed the waivers, still claiming that he was no longer a participant in the program. *Id.* ¶¶ 147-48. This action followed.

## II. Discussion

In his complaint, Blake alleges that defendants violated his First Amendment rights when he was designated to receive SOP after filing a grievance against Altman. Additionally, Blake alleges that his Eighth Amendment rights were violated when he was labeled a sex offender and required to participate in treatment. Similarly, Blake contends that his due process rights were violated when he was labeled a sex offender, suffered the stigma of that label, and failed to receive the appropriate due process prior to and after being labeled. Lastly, Blake contends that his Fourteenth Amendment rights to Equal Protection were violated when he was the only one of his co-defendants required to undergo SOP. Defendants move to dismiss on the grounds that (1) the statute of limitations bars Blake's claims, (2) Blake has failed to allege the personal involvement of certain supervisory defendants, (3) his constitutional claims are meritless, (4) Blake is not entitled to damages for emotional distress, [FN8] and (5) defendants are entitled to qualified immunity. [FN9]

FN8. Pursuant to the Prisoner Litigation Reform Act of 1995 ("PLRA"), "[n]o Federal civil action may be brought by a prisoner confined in jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e). Because Blake has failed to allege that he has suffered any concomitant physical injury, he is precluded from recovering any type of compensatory damages related to emotional distress. *Jenkins v. Haubert,* 179 F.3d 19, 28-29 (2d Cir.1999) ("[I]n the case of suits seeking damages for mental or emotional injuries ... a defendant in a prisoner § 1983 suit may also assert as an affirmative defense the plaintiff's failure to comply with the PLRA's requirements [and make a prior showing of a physical injury]."). Therefore, defendants' motion to dismiss on this ground should be granted.

FN9. Defendants initially argued, and then retracted, a failure to prosecute claim on Blake. Defs. Mems. of Law (Dkt.Nos.40-9) at 23, 56 at 1).

### A. Legal Standard

Rule 12(b)(6) authorizes dismissal of a complaint that states no actionable claim. When considering a motion to dismiss, "a court must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant." *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994). However, this "tenet ... is inapplicable to legal conclusions[; thus, t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 554, 555 (2007) (holding that "entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action ... [as] courts are not bound to accept as true a legal conclusion couched as a factual allegation.")).

Accordingly, to defeat a motion to dismiss, a claim must include "facial plausibility ... that allows the court to draw

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2522198 (N.D.N.Y.)
(Cite as: 2010 WL 2522198 (N.D.N.Y.))

the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949 (citing *Twombly,* 550 U.S. at 556 (explaining that the plausibility test "does not impose a probability requirement ... it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]."); *see also Arar v. Ashcroft,* 585 F.3d 559, 569 (2d Cir.2009) (holding that, "[o]n a motion to dismiss, courts require enough facts to state a claim to relief that is plausible ....") (citations omitted). Determining whether plausibility exists is "a content specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 129 S.Ct. at 1950-51.

**B. Statute of Limitations**

***6** Defendants move to dismiss Blake's Fourteenth Amendment claims on the ground that they are barred by the statute of limitations.[FN10] While there is no provision in 42 U.S.C. § 1983 for the statute of limitations for a civil rights claim, § 1988 provides that state law may apply if not inconsistent with the Constitution or federal law. 42 U.S.C. § 1988(a); *Moor v. County of Alameda,* 411 U.S. 693, 702-03 (1973). In New York, the applicable statute of limitations for a § 1983 suit is the three-year period governing suits to recover upon a liability created or imposed by statute. *See Owens v. Okure,* 488 U.S. 235, 249-51 (1989); *Romer v. Leary,* 425 F.2d 186, 187 (2d Cir.1970); N.Y. C.P.L.R. 214(2). Federal law governs the determination of the accrual date for the purposes of a § 1983 claim. *Pearl v. City of Long Beach,* 296 F.3d 76, 80 (2d Cir.2002). The claim accrues when the plaintiff "knows or has reason to know" of the harm. *Eagleston v. Guido,* 41 F.3d 865, 871 (2d Cir.1994). The critical time for accrual purposes is when a plaintiff is aware that he or she is suffering a wrong for which damages may be recovered in a civil rights action. *Singleton v. City of New York,* 632 F.2d 185, 192 (2d Cir.1980).

FN10. Defendants concede that this argument applies only to Blake's Fourteenth Amendment claims. Defs. Mem. of Law (Dkt. No. 40-9) at 19.

While Blake was informed that he was being classified as

a sex offender in April and May of 2005, Blake was not informed that his classification required participation in the SOP, and that refusal to do so could result in the denial of EEC, good time credits, and parole until September 2005. Compl. ¶¶ 54-55, 60. However, Blake did not suffer a concrete injury until the denial of his EEC and parole in February 2006. *Id.* ¶¶ 68-69. As this moment represented the time upon which Blake knew of the alleged harm he had suffered, this is when the statute of limitations began to run. Blake filed his present complaint in December 2008, three months before the expiration of the statute of limitations.

Accordingly, defendants' motion on this ground should be denied.

**C. Personal Involvement**

Defendants contend that Blake has failed to allege the personal involvement of defendants Andrews, Fischer or Goord.

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

(1) [T]he defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2522198 (N.D.N.Y.)
(Cite as: 2010 WL 2522198 (N.D.N.Y.))

**\*7** (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts;

(5) or the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986)).

Fischer, Goord, and Andrews cannot be named solely for their respective supervisory positions of Commissioner, Superintendent, and Deputy Superintendent. *Wright,* 21 F.3d at 501. Additionally, the mere receipt of letters is insufficient to establish personal involvement. *See, e.g., Rivera v. Fischer,* 655 F.Supp.2d 235, 238 (W.D.N.Y.2009) (citing cases); *Boddie v. Morgenthau,* 342 F.Supp.2d 193, 203 ("While mere receipt of a letter from a prisoner is insufficient to establish individual liability ... [p]ersonal involvement will be found ... where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint."); *See Garrido v. Coughlin,* 716 F.Supp. 98, 100 (S.D.N.Y.1989) (holding that Commissioner of DOCS not personally liable for ignoring plaintiff's letter of protest and request for an investigation).

Moreover, Goord's actions in referring grievance letters to Nuttall who ultimately responded to the grievance and continued communications with the inmate, is also insufficient to establish personal involvement. *See Vega v. Artus,* 610 F.Supp.2d 185, 198 (N.D.N.Y.2009) ("The same is true if the only involvement of the supervisory official is to refer the inmate's complaint to the appropriate staff for investigation.") (citing *Ortiz-Rodriguez v. N.Y. State Dep't of Corr. Servs.,* 491 F Supp.2d 342, 347 (W.D.N.Y.2007)). There are no allegations of negligent supervision, or creation of a hiring or retention policy which allowed for continuous constitutional violations to continue.

Blake also asserts that Andrews, Fischer, and Goord were grossly negligent in supervising Altman, but fails to advance any plausible facts which would establish a basis for such negligence. Compl. ¶ 149. Such allegations, without more, are insufficient to establish personal involvement as all they proffer is liability based on the theory of *respondent superior. Blyden v. Mancusi,* 186 F.3d 252, 264 (2d Cir.1999) ("[T]he doctrine of *respondeat superior* cannot be used to establish [personal] liability under § 1983.") (citations omitted).

Therefore, the defendants' motion to dismiss on this ground should be granted and defendants Andrews, Fischer, and Goord should be dismissed from the complaint.

### D. Retaliation

To state an actionable claim for retaliation, a plaintiff must first allege that the plaintiff's conduct was constitutionally protected and that this protected conduct was a substantial factor that caused the adverse action against the plaintiff. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996). Courts must view retaliation claims with care and skepticism to avoid judicial intrusion into prison administration matters. *Jackson v. Onondaga County,* 549 F.Supp.2d 204, 214-15 (N.D.N.Y.2008). Even if an actionable claim is stated, "defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct." *Vega v. Artus,* 610 F.Supp.2d 185, 206 (N.D.N.Y.2009) (citations omitted). Conclusory allegations alone are insufficient. *Id.* at 214 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) (explaining that "claim [s] supported by specific and detailed factual allegations ... ought usually be pursued with full discovery.")).

**\*8** In this case, Blake contends that as a result of his grievance against defendant Altman, he suffered the adverse action of having the SOP included in his file. To support such contentions, Blake states that his file shows that prior to filing the grievance against Altman, there were multiple referrals submitted, at least one authored by Altman, indicating that Blake did not need the SOP. Compl. ¶ 138. Blake filed the grievance against Altman in April 2005 and was informed by Weingartner that his case

Slip Copy, 2010 WL 2522198 (N.D.N.Y.)
(Cite as: 2010 WL 2522198 (N.D.N.Y.))

was being referred for consideration of SOP in May 2005. Compl. ¶¶ 53-55. Thus, in less than one month after the grievance was filed, Blake's case underwent SOP review.

Initially it appears that defendants have provided substantial evidence that Blake's transfer to the SOP was imminent. Blake's "offense did involve sexual offending behavior ... based on [his] sexual exploitation of women for profit," so that, regardless of his grievance, defendants' would have recommended him for the SOP. Dkt. No. 40-7 at 39; *see also* Dkt. No. 40-7 at 32. Such contentions are further supported by the fact that Blake's placement in SOP was determined by the Central Office Guidance Unit, and not any of the named defendants. Compl. ¶¶ 94-95; Dkt. No. 1-1 at 5. There are no facts proffered which plausibly suggest that the Central Office or Weingartner were aware of the grievance or that the grievance had any impact on Central Office's eventual decision to enroll Blake in SOP.

However, such contentions conflict with Blake's allegations that Blake was treated differently than his two co-defendants. All three men were convicted of the same crime, and presumably incarcerated for the same duration, yet Blake was the only individual required to undergo the SOP and have parole conditions proposed upon his release. Compl. § 75. If defendants' were going to recommend individuals with Blake's conviction to the SOP, the other two co-defendants reasonably should have also been included in the rehabilitation but were not. Such actions may suggest intentional adverse action against Blake.

On this record and at this stage, therefore, defendants' motion as to this claim should be denied.

### E. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. This prohibition extends to prison conditions. *Horne v. Coughlin,* 155 F.3d 26, 31 (2d Cir.1998). The test for a § 1983 claim is twofold. First, the prisoner must show that the condition to which he was exposed was sufficiently serious. *Farmer v. Brennan,* 511 U.S. 825, 834 (1994).

This prong is satisfied by a showing that the "conditions are ... totally without penological justification, grossly disproportionate, or involve the unnecessary and wanton infliction of pain." *Tinsley v. Goord,* No. 05-CV-3921, 2006 WL 2707324, at *3 (S.D.N.Y. Sept. 20, 2006) (citing *Horne,* 155 F.3d at 31) (internal quotation marks omitted). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Farmer,* 511 U.S. at 834.

**\*9** In this case, Blake alleges that any placement in sex offender training programs or setting special parole conditions of parole amounted to an infliction of cruel and unusual punishment. However, courts have consistently found requiring participation in such programs constitutional. A correctional institution's goal of rehabilitating inmates, and reducing rates of recidivism, by providing such treatment programs represent "important and laudable goals, and the institution of the program itself was well within the State's authority as part of its operation of correctional facilities ... [Moreover,] the State's pursuit of these goals or its administration of the SOTP [does not] ... violate [ ] contemporary standards of decency." *Neal v. Shimoda,* 131 F.3d 818, 833 (9th Cir.1997); *see also Tinsley,* 2006 WL 2707324, at *3-*4 (holding that sex offender treatment status did not subject the inmate to sort of unnecessary or wanton infliction of pain). Thus, Blake is unable to state an Eighth Amendment claim here as a matter of law.

Accordingly, defendants' motion as to this claim should be granted.

### F. Fourteenth Amendment

#### 1. Due Process

The Due Process Clause of the Fourteenth Amendment states that "[n]o State shall ... deprive any person of life, liberty, or property without due process of law." U.S. Const. Amend. XIV § 1. It is important to emphasize that due process "does not protect against all deprivations of liberty. It protects only against deprivations of liberty accomplished without due process of the law." *Baker v.*

Slip Copy, 2010 WL 2522198 (N.D.N.Y.)
(Cite as: 2010 WL 2522198 (N.D.N.Y.))

McCollan, 443 U.S. 137, 145 (1979) (internal quotation and citations omitted). "A liberty interest may arise from the Constitution itself, ... or it may arise from an expectation or interest created by state laws or policies." Wilkinson v. Austin, 545 U.S. 209, 221 (2005) (citations omitted). To establish a protected liberty interest, a prisoner must satisfy the standard set forth in Sandin v. Conner, 515 U.S. 472, 483-84 (1995). This standard requires a prisoner to establish that the confinement or condition was atypical and significant in relation to ordinary prison life. See Jenkins v. Haubert, 179 F.3d 19, 28 (2d Cir.1999); Frazier v. Coughlin, 81 F.3d 313, 317 (2d Cir.1996).

### a. Procedural Due Process

To state a claim for procedural due process, there must first be a liberty interest which requires protection. See generally Valmonte v. Bane, 18 F.3d 992, 998 (2d Cir.1994) ("[P]rocedural due process questions [are analyzed] in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.") (citing Kentucky Dep't of Corr. v. Thompson, 490 U.S. 454, 460 (1989)). In this case, Blake contends that mandating the SOP, based on his conviction for promoting prostitution in the third degree,[FN11] was a violation of his liberty interest to remain free from a sex offender classification. ABlake contends that he should have been provided procedural protections in connection with being recommended for sex offender training.

FN11. "Effective January 1, 2000, promoting prostitution in the second degree became a sex offense ... triggering [the Sex Offender Registration Act]'s requirements." People v. Carey, 850 N.Y.S.2d 260, 261 (3d Dep't 2008). However, promoting prostitution in the third degree does not triggers the Sex Offender Registration Act ("SORA"). Thus, while T promoting prostitution may constitute a sexual offense, it does not trigger the requirements of SORA. If Blake's offense of conviction alone triggered SORA, SORA would have provided all procedural protections required in the event that

a liberty interest was found. Neal v. Shimoda, 131 F.3d 818, 831 (9th Cir.1997).

**\*10** Where an individual, not convicted of an express sex offense, is then required to participate in a SOP, circuits have split as to whether or not a liberty interest exists for the inmate to be free from the label of a sex offender, required to participate in treatment. Compare Coleman v. Dretke, 395 F.3d 216, 222-23 (5th Cir.2004) (holding that "prisoners who have not been convicted of a sex offense have a liberty interest created by the Due Process Clause in freedom from sex offender classification and conditions" and categorizing the "compelled treatment on which [the inmate's] parole was conditioned," as qualitatively different from conditions imposed upon other inmates); Chambers v. Colorado Dep't of Corr., 205 F.3d 1237, 1242-43 (10th Cir.2000) (holding that an inmate has right to procedural due process before good time credits are removed from him since "after five years of being labeled a sex offender without ... admitting that status and with his receiving ten days of earned time credits a month, the ... benefit [was removed] ... implicat [ing] ... a liberty interest in not being labeled a sex offender."); Kirby v. Siegelman, 195 F.3d 1285, 1291-92 (11th Cir.1999) ("[Inmates still] retain [ ] a 'residuum of liberty' that would be infringed by classification as a sex offender without complying with minimum requirements of due process;" accordingly "[a]n inmate who has never been convicted of a sex crime is entitled to due process before the state declares him to be a sex offender."); Neal v. Shimoda, 131 F.3d 818, 830 (9th Cir.1997) ("[T]he stigmatizing consequences of the ... 'sex offender' label couples with the subjection ... to a mandatory treatment program whose successful completion is a precondition for parole eligibility create the kind of deprivations ... that require procedural protections.") with Grennier v. Frank, 453 F.3d 442, 445 (7th Cir.2006) (finding that a prisoner who was not convicted of a sex offense had no protected liberty interest in being free from sex offender classification upon parole); Gunderson v. Hvass, 339 F.3d 639 (8th Cir.2003) (holding that registering as a sex offender and its impact on one's reputation, despite the lack of a sexual offense conviction, "is not sufficient to invoke the procedural protections of the due process clause.").

However, courts within the Second Circuit appear to be

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2522198 (N.D.N.Y.)
(Cite as: 2010 WL 2522198 (N.D.N.Y.))

reaching a consensus that recommendations for sex offender classification and programming do not trigger due process rights. *See Vega v. Lantz,* No. 03-CV-2248, 2008 WL 3992651, at *15-17 (D.Conn. Aug. 25, 2008); *Fitfield v. Eaton,* No. 07-CV-6521 L, 2009 WL 3429791, at *2-3 (W.D.N.Y. Oct. 20, 2009) (granting motion to dismiss inmate's claim that he was denied parole opportunities due to his refusal to participate in SOP because inmate had no liberty interest in parole, conditional release, discretionary good time credits, or choosing his programming); *Tinsley,* 2006 WL 2707324, at *5 (finding no constitutionally protected right, either federally or state-created, which allows "prisoners [to] ... avoid classification as sex offenders or participat[e] in related treatment programs.").

**11** It is undisputed that inmates have no constitutionally protected interest in parol, or other conditional release from prison, prior to the expiration of a valid sentence. *Greenholtz v. Inmates of Neb. Penal and Corr. Complex,* 442 U.S. 1, 7 (1979). However, the holdings in *Neal, Coleman,* and *Kirby* found liberty interests because parole eligibility was preconditioned on the successful completion of the SOP. *Kirby,* 195 F.3d at 1288 (finding that inmate "must participate in group therapy sessions ... as a prerequisite for parole eligibility."); *Coleman,* 395 F.3d at 222-23 ("[T]he Due Process Clause ... provides Coleman with a liberty interest from freedom from stigma and compelled treatment on which his parole was conditioned...."); *Neal,* 131 F.3d at 830. In fact, *Neal* contemplated a situation identical to the present case whn it stated:

[t]he liberty interest implicated by the establishment of the SOTP is not merely the requirement that sex offenders complete the specified treatment program. If that were all that was at stake, we could probably not say that a liberty interest had been created, given the fact that prisons frequently maintain treatment and behavioral modification programs ... that have long withstood legal challenge.

*Neal,* 131 F.3d at 830.

This follows the Second Circuit's holdings that inmates

have no constitutionally protected liberty interest in internal classifications or eligibility for rehabilitative programs. *See Pugliese v. Nelson,* 617 F.2d 916, 923 (2d Cir.1980). This is also consistent to the Second Circuit's holding that inmates have no constitutional right to discretionary good time release or participation in prison programs which expedite the date of release. *See Abed v. Armstrong,* 209 F.3d 63, 66-67 (2d Cir.2000) ("Although inmates have a liberty interest in good time credits they have already earned, no such interest has been recognized in the opportunity to earn good time credit where, as here prison officials have discretion to determine whether an inmate ... is eligible to earn good time credit."); *see also* N.Y. CORRECT. LAWW § 803(a) (explaining that inmates may receive credit to reduce their sentence for "good behavior and efficient and willing performance ... in an assigned treatment program [but] may [also have such credits] be withheld, forfeited or canceled in whole or in part for ... failure to perform properly in the ... program assigned.").

The instant case does not represent one in which parole eligibility was conditioned upon participation in and completion of the SOP. First, Blake was recommended to attend SOP classes, but his participation and attendance were not mandatory. *Matos v. Goord,* 27 A.D.3d 940, 941 (3d Dep't 2006) (explaining that an inmate "cannot be compelled to attend the [sex offender training] program."). Second, Blake was not precluded from having his parole eligibility examined. Blake was given multiple opportunities to have his parole reviewed, and the parole board to grant his parole based on a variety of reasons. Compl. ¶¶ 69, 78. To the extent that Blake was denied earned eligibility or good time credits after receiving notice from defendants that failure to participate in his recommended SOP would result in such, Blake still has failed to state a constitutional claim as those decisions to award such credits are discretionary. *See* N.Y. Correct. Law § 803(a).[FN12] Thus, Blake's circumstances differed from that relied upon by multiple authorities to which he cites. Additionally, denial of Blake's motion is consistent with the authority cited by defendants, as well as the well established case law, that inmates are not entitled to parole, discretionary good time credits, or participation in programming. Therefore, Blake has failed to identify a liberty interest which would require procedural protections.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2522198 (N.D.N.Y.)
(Cite as: 2010 WL 2522198 (N.D.N.Y.))

FN12. To the extent that Blake argues "that he was barred from any *already-earned* good time credit ..., Section 1983 is not the proper vehicle to seek redress ... and a write of habeas corpus is a prisoner's sole recourse in challenging the procedures used to deny him good-time credits." *Fitfield, 2009 WL 3429791, at *3* (internal quotation marks and citations omitted).

**\*12** Furthermore, the Supreme Court has held that "[a] prison clinical rehabilitation program, which is acknowledged to bear a rational relation to a legitimate penological objective, does not ... constitute [an] atypical and significant hardship [ ] in relation to the ordinary incidents of prison life." *McKune v. Lile,* 536 U.S. 24, 37-38 (2002). "Since 'most offenders will eventually return to society, [a] paramount objective of the corrections system is the rehabilitation of those committed to its custody.' " *Id,* at 36 (*quoting Pell v. Procunier,* 417 U.S. 817, 823 (1974)). The SOP has been held to be such a program, especially in instances such as the present where the conviction stemmed from a sexually based act. *See Johnson v. Baker,* 108 F.3d 10, 11-12 (2d Cir.1997) (referring to the SOP as rehabilitative and rationally related to the State's interest in assisting inmates); *Rizzuto v. Goord,* 34 A.D.3d 1164 (3d Dep't 2006) (finding that inmate's "engage[ment] in sexual exploitation in connection with one of his criminal convictions, [ specifically the operation of a prostitution ring, made] ... the recommendation that he be required to participate in the sexual offender counseling program ... rational ....").

While Blake's conviction does not trigger SORA, it does constitute a sexually based crime whereupon Blake acted as a pimp, profiting off women selling themselves for sex. Dkt. No. 40-7 at 39 ("While it is understood that your instant offense is not a registerable sex offense ... [it] did involve sexual offending behavior in which you profited from prostitution; therefore, based on your sexual exploitation of women for profit, the recommendation to participate in the [SOP] is appropriate...."). This presents a situation similar to in *Vega,* where the Second Circuit determined that the conviction "could be found to reflect problematic sexual attitudes and behavior which justify labeling his crimes 'sexual offenses' ... [supporting] the Department's determination that his convicted conduct is reasonably termed a 'sexual offense' ...." requiring

treatment and rehabilitation. *Vega v. Lantz,* 596 F.3d 77, 2010 WL 698384, at *5 (2d Cir. Mar. 2, 2010). Moreover, it presents facts similar to those in *Rizzuto.* Such conclusions by defendants represent a reasonable motivation for DOCS to require rehabilitation. Blake's individual participation in such a program has already been judicially deemed legitimate and rational. Compl. ¶ 61; Dkt. No. 40-8 at 2 ("[T]he court finds that the determination of the respondents as to both [ART and SOP] programs was rational and fully supported by the record below.")

Accordingly, even viewing the allegations of the complaint in the light most favorable to Blake, there is no plausible set of facts which would establish a violation of his procedural due process rights. Defendants' motion on this ground should be granted.

**b. Substantive Due Process**[FN13]

FN13. Blake contends that his retaliation claims come under a Fourteenth Amendment due process analysis. Analysis may be made under either the Fourteenth or First Amendment as they are identical. *Blue v. Koren,* 72 F.3d 1075, 1082 n. 3 (2d Cir.1995) ("[A] right to defend oneself ... without being subjected to retaliation ... may be easily derived either from the ... Due Process Clause or from the First Amendment ...."). Accordingly, our analysis will proceed pursuant to the First Amendment.

**\*13** Liberally reading the complaint it also appears that Blake has alleged a substantive due process claim concerning his sex offender classification and recommendation for treatment. "Substantive due process protects individuals against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense...." *Lowrance v. Achtyl,* 20 F.3d 529, 537 (2d Cir.1994) (internal citations omitted). However, for the reasons discussed *supra,* enrollment in the SOP was not arbitrary, conscience-shocking, or oppressive, but rather was rationally related to a legitimate penological purpose and determined to be neither unnecessary nor painful.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2522198 (N.D.N.Y.)
(Cite as: 2010 WL 2522198 (N.D.N.Y.))

Accordingly, defendants' motion to dismiss on this ground is granted.

## 2. Stigma-Plus Claim[FN14]

FN14. Blake relies on *Vega I* to assert that "[b]eing classified in prison as a sex offender ... causes a 'stigma-plus' ...." Blake's Mem. of Law (Dkt. No. 52) at 9 (citing *Vega, 2008 WL 3992651, at \*14).* However, such reliance on the district court decision in *Vega* is misplaced because it was recently reversed. 2010 WL 698384. The stigma-plus holding was reversed because Vega failed to proffer, or prove, that the claims that he committed a sexual offense were false. *Id.* at \*4-5. Thus, Vega was not mischaracterized as a sex offender. *Id.* The same can be argued in the present case, where Blake's conviction of organizing and exploiting women and profiting from their actions of prostituting themselves, represented a sexual offense. Additionally, the conviction has not been attacked, and any such attack would be belied by Blake's voluntary guilty plea to the charge. Compl. ¶¶ 37-39. Therefore, in addition to the lack of publicity required to prove a stigma-plus claim, Blake's claims also fail due to his failure to allege a statement injurious to his reputation which could be proven false.

In order to plead a "stigma plus" claim, an individual must "allege (1) the utterance of a statement about [him or] her that is injurious to [his or] her reputation, that is capable of being proved false, and that he or she claims is false, and (2) some tangible and material state-imposed burden in addition to the stigmatizing statement." *Velez v. Levy, 401 F.3d 75, 87 (2d Cir.2005)* (internal quotation marks and citations omitted). "The defamatory statement must be sufficiently public to create or threaten a stigma; hence, a statement made ... only in private, ordinarily does not implicate a liberty interest." *Id.* (citations omitted). Moreover, there must be a plus factor, composed of "a specific and adverse action clearly restricting the plaintiff's liberty...." *Id.* at 87-88 (citations omitted).

In this case, Blake has failed to allege a sufficiently public statement which would constitute a stigma. Blake's conviction, indisputably, does not require him to publicly register as a sex offender. Dkt. No. 1-1 at 7. Furthermore, Blake's records would only be released to subsequent providers from whom Blake chose to seek treatment and only upon request. *Id.* Thus, Blake's claim lacks the element of notoriety which would compel a finding of stigma. *See Gunderson, 339 F.3d at 644* (finding that where there is no "public dissemination of ... registration," and instead the information "in considered 'private data,' " there has been a failure to satisfy the test). Without such publicity, the "[d]amage to reputation alone, ... is [in]sufficient to invoke the procedural protections of the due process clause." *Id.*

Accordingly, defendants' motion on this ground should be granted.

## 3. Equal Protection

The Fourteenth Amendment's Equal Protection Clause mandates equal treatment under the law. Essential to that protection is the guarantee that similarly situated persons be treated equally. *City of Cleburne, Tex. v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985); *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005) ("To prove a violation of the Equal Protection Clause ... a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination.").

**\*14** [T]he Equal Protection Clause bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.

*Vegas v. Artus,* 610 F.Supp.2d 185, 209 (N.D.N.Y.2009) (internal quotation marks and citations omitted). With respect to prisoners, in order to establish an equal protection violation, the plaintiff must show that "the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2522198 (N.D.N.Y.)
(Cite as: 2010 WL 2522198 (N.D.N.Y.))

disparity in treatment cannot survive the appropriate level of scrutiny which ... means that he must demonstrate that his treatment was not reasonably related to any legitimate penological interests." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005).

If an individual cannot "allege membership in [a protected] class, he or she can still prevail in ... a class of one equal protection claim." *Neilson v. D'Angelis,* 409 F.3d 100, 104 (2d Cir.2005) (internal quotation marks and citations omitted). To succeed, a plaintiff must show "that [he] were intentionally treated differently from other similarly-situated individuals without any rational basis." *Clubside, Inc. v. Valentin,* 468 F .3d 144, 158-59 (2d Cir.2006). Additionally, a plaintiff must establish an extremely high "level of similarity between plaintiffs and the persons with whom they compare themselves...." *Neilson,* 409 F.3d at 104.

Blake has failed to establish membership in a protected class. However, it appears that Blake has adequately alleged a class of one claim, namely that he was treated differently from two other individuals that were convicted, with him, of the same crime. To satisfy a class of one claim, Blake must "allege (1) that [he was] intentionally treated differently ... and (2) that the disparate treatment was either (a) irrational or wholly arbitrary or (b) motivated by animus." *Assoko v. City of New York,* 539 F.Supp.2d 728, 735 (S.D.N.Y.2008) (citations and internal quotation marks omitted). Viewing the facts in the light most favorable to Blake, it appears that his SOP conditions, while not irrational, were arbitrarily applied to Blake, as neither of his co-defendants were required to participate in similar programming. Compl. ¶ 75. Blake's co-defendants were incarcerated for substantially the same offenses, and presumably for a comparable amount of time, thus, the failure to also include them in the SOP and impose special parole conditions is indicative of plausible animus on the part of the defendants and arbitrary and discriminatory conduct.

Accordingly, defendants' motion as to this claim should be denied.

### G. Qualified Immunity

Defendants also contend that they are entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229-30 (N.D.N.Y.2002) (McAvoy, J.), *aff'd,* 80 Fed .Appx. 146 (2d Cir. Nov. 10, 2003). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified ... immunity might still be available ... if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991); *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990) (internal citations omitted)).

**\*15** A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, the second prong of the inquiry need not be reached with respect to Blake's Eighth Amendment allegations because, as discussed *supra,* it has not been shown that defendants violated Blake's constitutional rights.

### 1. Retaliation

It has been well-established law for decades that state actors cannot retaliate against individuals for engaging in constitutionally protected conduct. *Mt. Healthy City Sch. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977). Such conduct has also been prohibited in prisons. *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988) (holding that interference with an inmate's "right to petition government for redress of grievances, as guaranteed by the First and Fourteenth Amendments," is protected by § 1983) (citations omitted). Accordingly, the right of an inmate to file grievances without fear of reprisals was established long before Blake was incarcerated and subjected to the SOP. In this case, viewing the allegations in the light most favorable to Blake, defendants took no actions which were

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2522198 (N.D.N.Y.)
(Cite as: 2010 WL 2522198 (N.D.N.Y.))

reasonable in light of the well established law. At this stage, the allegations suffice to merit discovery on this issue.

Accordingly, defendants' motion on this ground should be denied.

### 2. Stigma-Plus Due Process

Until its recent decision in *Vega,* the Second Circuit case law offered no guidance with respect to whether a liberty interest existed to remain free from being labeled a sex offender and referred to treatment. *See Vega,* 2008 WL 3992651, at *18 (discussing the lack of precedent as "only recently [has the issued been] addressed by one Connecticut state court and one New York federal district court"); *Tinsley,* 2006 WL 2707324, at *4-*5 (explaining that the Second Circuit offers no guidance on whether a "prisoner's classification as a sex offender during imprisonment implicates a liberty interest ....," and noting that "nothing suggests that either New York state law or prison regulations have created a liberty interest in prisoners avoiding classification as sex offenders or participating in related treatment programs.") (citations omitted). Thus, qualified immunity should be granted because there was no well-established case law on point at the time of the conduct alleged in the complaint. However, even if there was preexisting case law, as discussed *supra,* defendants' actions in placing Blake into treatment programs was consistent with defendants' duties to rehabilitate and prepare inmates for reintegration into society. Thus, defendants acted reasonably in referring Blake to SOP given his offense of conviction and goals of rehabilitation.

*16 However, qualified immunity protects defendants from an award of monetary damages on this claim but not from an award of injunctive relief barring Blake from receiving compensatory relief but still allowing the possibility of injunctive relief. *See Ward v. Housatonic Area Regional Transit Dist.,* 154 F.Supp.2d 339, 346 (D.Conn.2001); *see also Vega,* 2008 WL 3992651, at *19. Therefore, defendants motion as to Blake's stigma-plus claim on this ground should be granted as to his claim for damages against defendants in their individual capacities

and denied as to his claim for injunctive relief.

### 3. Equal Protection

There is a well-established right to equal protection, ensuring that the government treat all similarly situated individuals the same at the time of the conduct alleged here. *City of Cleburne, Tex.,* 473 U.S. at 439. Moreover, the safe harbors of the Equal Protection Clause have been afforded specifically to prisoners since at least 1995. *Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995). Thus, the right to equal treatment has been established far before Blake's incarceration or referral to the SOP. In this case, viewing the allegations in the light most favorable to Blake, there are no actions which defendants engaged in which can be said to be reasonable in light of the well-established case law.

Accordingly, defendants' motion as to this claim should be denied.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion to dismiss (Dkt. No. 40) be:

1. **GRANTED** as to:

   A. The Eighth Amendment claim and that claim should be **DISMISSED** in its entirety;

   B. All Fourteenth Amendment due process claims except for the stigma-plus claim for injunctive relief; and

   C. Defendants Andrews, Goord, and Fischer in all respects and those three defendants should be **DISMISSED** from this action in all respects; and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2522198 (N.D.N.Y.)
(Cite as: 2010 WL 2522198 (N.D.N.Y.))


2. **DENIED** as to:


    A. The First Amendment retaliation claim;


    B. The Fourteenth Amendment stigma-plus due process claim for injunctive relief; and


    C. The Fourteenth Amendment equal protection claim.


Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the **Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).


N.D.N.Y.,2010.
Blake v. Fischer
Slip Copy, 2010 WL 2522198 (N.D.N.Y.)


END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 3765847 (N.D.N.Y.)
(Cite as: 2010 WL 3765847 (N.D.N.Y.))

**H**
Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Rudolph McQUILKIN, Plaintiff,
v.
CENTRAL NEW YORK PSYCHIATRIC CENTER, J.
Taylor, J. Berggren, V. Komareth, K. Sangani, Dr.
Hernandez, D. Sawyer, S. Hanna, and G. Bodrog,
Defendants.
**Civil Action No. 9:08-CV-00975 (TJM/DEP).**

Aug. 27, 2010.

Rudolph McQuilkin, New York, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of
New York, Krista A. Rock, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants
CNYPC, J. Taylor, J. Berggren, V. Komareth, Dr.,
Hernandez, D. Sawyer, S. Hanna, and G. Bodrog.

O'Connor, O'Connor Law Firm, Law Firm-Albany Office,
Peter Joslin, Jr., Esq., of Counsel, Albany, NY, for
Defendant K. Sangani.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** Plaintiff Rudolph McQuilkin, a former New York State
prison inmate who is proceeding *pro se* and *in forma
pauperis,* has commenced this action pursuant to 42
U.S.C. § 1983 against the Central New York Psychiatric
Center ("CNYPC" or "Center") and several Center
employees as well as the superintendent of one of the
correctional facilities in which he was previously housed,

claiming that his civil rights were violated during the
course of his confinement. In his complaint, as amended,
plaintiff alleges that he was civilly committed to CNYPC
against his will and forcibly medicated with various
psychiatric drugs in retaliation for having served a "notice
of summons" on the superintendent of the Gouverneur
Correctional Facility ("Gouverneur"), without his consent
and in violation of his religious beliefs. Plaintiff further
complains of the seizure and destruction of certain of his
personal property. Plaintiff's complaint seeks injunctive
relief, elimination of any reference of being a mental
health patient from his institutional record, and an award
of both compensatory and punitive damages.

In response to plaintiff's complaint one of the defendants,
Dr. Kishor R. Sangani, a psychiatrist, has moved for
dismissal alleging that plaintiff's complaint fails to assert
an actionable claim against him. Those remaining
defendants who have been served and appeared in the
action have moved for summary judgment on a variety of
grounds, both procedural and substantive including, *inter
alia,* on the basis of qualified immunity.

Having carefully considered defendants' motions, which
McQuilkin has not opposed, I recommend that they be
granted and that the second amended complaint be
dismissed in its entirety.

*I. BACKGROUND*[FN1]

> **FN1.** In light of the procedural posture of the
> case the following recitation is derived from the
> record now before the court with all inferences
> drawn and ambiguities resolved in favor of the
> plaintiff. *Terry v. Ashcroft,* 336 F.3d 128, 137
> (2d Cir.2003).

At the times relevant to the claims set forth in his second
amended complaint, plaintiff was a prison inmate
entrusted to the care and custody of the New York State
Department of Correctional Services ("DOCS"), and
designated to various DOCS prisons as well as the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3765847 (N.D.N.Y.)
(Cite as: 2010 WL 3765847 (N.D.N.Y.))

CNYPC, a facility located in Marcy, New York and operated under the authority of the New York State Office of Mental Health ("OMH"). *See generally* Second Amended Complaint. Plaintiff was released from DOCS custody on October 27, 2009. Waldron Aff. (Dkt. No. 66) ¶ 35 and Exh. A.[FN2]

FN2. Because defendants' summary judgment moving papers were filed traditionally, they do not appear on the docket but collectively have been assigned docket number 66.

Plaintiff was admitted into the CNYPC from the nearby Mid-State Correctional Facility ("Mid-State"), on September 17, 2007, and was diagnosed with schizophrenia, paranoid type.[FN3] *Id.* at ¶ 6, Exh. B. at P2; Defendants' Rule 7.1(a)(3) Statement ¶ 2. Paranoid schizophrenia can cause a variety of symptoms, the most prevalent of which are delusions, auditory hallucinations and disorganized thinking. Waldron Aff. (Dkt. No. 66) ¶ 7. Individuals who suffer from this type of schizophrenia frequently suffer from feelings of being persecuted or plotted against and may have grandiose delusions that are associated with protecting themselves from the perceived plot. Waldron Aff. (Dkt. No. 66) ¶ 7. According to his referral from Mid-State, on or about September 17, 2007, plaintiff "started to become irritable and paranoid. He displayed a thought disorder and believed that there was a plan by the mental health staff to murder him. He was refusing medication and mental health treatment." Waldron Aff. (Dkt. No. 66) Exh. B at P289.

FN3. The 2007 admission to the Center was plaintiff's second, the first having occurred in 1998. Waldron Aff. (Dkt. No. 66) ¶¶ 8-9. During the first admission, which lasted twenty-seven days, plaintiff was diagnosed with schizophrenia paranoid type. *Id.* The notes of that admission reflect that while at Mid-State plaintiff refused to take psychotropic medications. *Id.* at ¶¶ 8-9 and Exh. B at P289.

**\*2** Upon his arrival at the CNYPC, plaintiff consistently refused his medications. *Id.* at P291. Plaintiff explained the basis for that refusal by stating to CNYPC personnel

"these are heterogeneous medications, work as isotopes, you know, like small nuclear bombs[,]", adding "I am a different organism, therefore under no circumstances I would take them." *Id.*

On or about October 1, 2007, Donald Sawyer, Ph. D., the Executive Director of the Center, petitioned the New York State Supreme Court, Oneida County, for an order committing plaintiff to the CNYPC for a period not to exceed six months. *Id.* at P271-272. Following a hearing regarding the petition held on October 11, 2007, Supreme Court Justice Anthony F. Shaheen issued a ruling, over plaintiff's objection, in which he determined that McQuilkin was mentally ill and a proper subject for custody and continued treatment in the CNYPC within the meaning of New York Mental Hygiene Law ("MHL") § 9.27, and therefore approved the requested retention period.[FN4] Waldron Aff. (Dkt. No. 66) Exh. B. at P263.

FN4. Pursuant to the MHL, the director of a hospital may receive and retain therein as a patient any person alleged to be mentally ill and in need of involuntary care and treatment upon the certificates of two examining physicians, accompanied by an application for the admission of such a person. N.Y. MENTAL HYG. § 9.27(a). The examination may be conducted jointly but each examining physician must execute a separate certificate. *Id.*

Based on plaintiff's refusal to consent to the administration of medication while at the Center, and following an evaluation of his condition by CNYPC staff, on or about November 1, 2007, Sawyer once again petitioned the state courts, this time for an order authorizing OMH employees to forcibly administer psychiatric medication to McQuilkin. Waldron Aff. (Dkt. No. 66) ¶ 17 and Exh. B at P276-96. That involuntary treatment petition was granted on November 21, 2007, following a hearing and despite McQuilkin's objection, based upon a finding that plaintiff lacked the capacity to make a reasoned decision regarding his own treatment and that the administration of medication to the plaintiff was in his best interest. *Id.* at ¶¶ 19-20 and Exh. B at P318-19. The order granting the petition authorized the administration of psychiatric drugs "during the concurrent retention of Rudolph McQuilkin,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3765847 (N.D.N.Y.)
(Cite as: 2010 WL 3765847 (N.D.N.Y.))

and any extension thereof at [CNYPC] as well as for a period not to exceed twelve (12) months after the patient is discharged from the [CNYPC] to a psychiatric satellite unit operated by [OMH] at a New York State Correctional facility ...” *Id.* at Exh. B and P319.

Plaintiff was discharged from the CNYPC and transferred into the Clinton Correctional Facility (“Clinton”) on January 4, 2008, commencing the twelve-month period of court-authorized forced medication. Waldron Aff. (Dkt. No. 66) ¶ 21. During that time, plaintiff was injected with fifty milligrams of <u>Haldol</u>, an antipsychotic medication, once a month. *Id.* at ¶¶ 21-22 and Exh. B. at P320-23.

From the expiration of the court-ordered psychiatric treatment period on January 4, 2009 until April of 2009, plaintiff refused to be medicated, which caused him to become symptomatic. Waldron Aff. (Dkt. No. 66) ¶ 23 and Exh. B. at P327-30. On April 8, 2009, Dr. Sohail Gillani, a psychiatrist, requested that McQuilkin be taken to the Clinton Mental Health Satellite Unit (“Satellite Unit”) for evaluation as to whether an involuntary psychiatric hospitalization in the CNYPC, based upon the recommendation of two physicians, should be sought and with the intent of seeking another court order permitting involuntary psychiatric medication. Waldron Aff. (Dkt. No. 66) ¶ 24 and Exh. B at P331-32. This request was based on plaintiff's ongoing refusal to take psychiatric medication and his repeated history of subsequent psychiatric decompensation, as well as his refusal to attend therapy sessions during which his mental status could be clinically monitored. *Id.*

**\*3** As a result of Dr. Gillani's request, plaintiff was escorted from his cell to the Mental Health Satellite unit at Clinton, where he was assigned to a residential crisis treatment program cell. *Id.* at ¶ 26. Once there, McQuilkin showed poor insight and judgment, continued to display symptoms of paranoia, and persisted in his denial of any mental health issues. *Id.* at ¶ 27. Plaintiff remained in the satellite unit for less than twenty-four hours, however, based upon his agreement to take his prescribed psychiatric medication (<u>Haldol</u> 50 mg). *Id.* at ¶ 28.

During the period that <u>Haldol</u> was administered, plaintiff

complained of side effects including a rash.<u>FN5</u> Waldron Aff. (Dkt. No. 66) ¶ 32. The use of <u>Haldol</u> to address plaintiff's condition was ultimately discontinued, and Risperal was added to his prescription drug regimen on or about July 17, 2009. *Id.* at ¶ 33 and Exh. B at P336. Since then, plaintiff has not registered any further medical complaints, and reports that he “like[s] the <u>Risperdal</u> better.” *Id.* at ¶ 34.

> <u>FN5.</u> According to defendants' submissions, this is not a side effect ordinarily associated with Haldol. Waldron Aff. (Dkt. No. 66) ¶ 32.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on September 22, 2008, and has since twice amended his complaint. Dkt. Nos. 1, 8, and 35. As defendants, plaintiff's second amended complaint names the CNYPC; J. Taylor, the Superintendent of the Gouverneur Correctional Facility; CNYPC psychiatrists J. Berggren, V. Komareth, K. Sangani, S. Hanna, and Dr. Hernandez; D. Sawyer, the Director of the CNYPC; and G. Bodrog, whose position is not disclosed in plaintiff's complaint but who appears to be a physician involved in the October, 2007 petition to have him involuntarily committed. Dkt. No. 35; *see* Waldron Aff. (Dkt. No. 66) Exh. B at P287-88. Plaintiff's second amended complaint contains three designated causes of action requesting various forms of relief, including 1) an order prohibiting defendants from forcing McQuilkin to take psychiatric medications against his free will; 2) total expungement of any reference of being a mental health patient from plaintiff's institutional record; and 3) damages for wanton disregard of his Eighth Amendment rights as well as directing that defendants not retaliate against him for filing this proceeding. Dkt. No. 35.

In response all of the defendants, with the exception of Dr. Sangani, have answered generally denying the allegations of plaintiff's complaint and asserting eighteen separate affirmative defenses. Dkt. No. 38. For his part, Dr. Sangani has moved pursuant to <u>Rule 12(b)(6) of the Federal Rules of Civil Procedure</u> seeking the dismissal of plaintiff's claims against him for failure to state a claim

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3765847 (N.D.N.Y.)
(Cite as: 2010 WL 3765847 (N.D.N.Y.))

upon which relief may be granted. Dkt. No. 56.

On January 28, 2010, following the completion of discovery, the defendants other than Dr. Sangani moved for summary judgment dismissing plaintiff's complaint upon a variety of grounds. Dkt. No. 66. In their motion, those defendants argue that 1) all claims against the CNYPC and against the other defendants in their official capacities should be dismissed as barred by the Eleventh Amendment; 2) plaintiff's first cause of action, seeking injunctive relief, should be dismissed as moot in light of his release from DOCS custody; 3) plaintiff's claims are procedurally barred based upon his failure to exhaust administrative remedies with respect the majority of his claims; 4) plaintiff's claims surrounding his interfacility transfer lack merit since inmates do not have a constitutional right to be incarcerated at a correctional facility of their choice; 5) plaintiff's due process claim concerning the alleged seizure and destruction of his personal property is not constitutionally cognizable; 6) plaintiff is not entitled to expungement of his psychiatric records; 7) plaintiff's allegations of wrongdoing are unduly conclusory and therefore subject to dismissal; 8) plaintiff's challenges to his OMH confinement are barred by *Heck v. Humphrey* and the *Rooker-Feldman* doctrine [FN6]; 9) defendants are entitled to qualified immunity; and 10) plaintiff's claims surrounding disagreement with his medical care are not actionable under the Eighth Amendment.

FN6. *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994); *District of Columbia v. Feldman,* 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983); *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923).

**\*4** Despite expiration of the time for responding, plaintiff has failed to offer any submissions in opposition to either of the pending motions, which are now ripe for determination and have been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

III. *DISCUSSION*

A. *Standards of Review*

1. *Motion to Dismiss*

A motion to dismiss a complaint, brought pursuant to Rule 12(b) (6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal,* --- U.S. ----, ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 554, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929, ----, (2007)). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). *Id.* While modest in its requirement, that rule commands that a complaint contain more than mere legal conclusions; "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft,* 129 S.Ct. at 1950.

To withstand a motion to dismiss, a complaint must plead sufficient facts which, when accepted as true, state a claim which is plausible on its face. *Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (citing *Twombly,* 550 U.S. at 570, 127 S.Ct. 1974). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.' " *In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. 1974).

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party. *Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1723, 1734 (1964); *Miller v. Wolpoff & Abramson, LLP,* 321 F.3d 292, 300 (2d Cir.2003), *cert. denied,* 540 U.S. 823,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3765847 (N.D.N.Y.)
(Cite as: 2010 WL 3765847 (N.D.N.Y.))

124 S.Ct. 153, 157 L.Ed.2d 44 (2003); *Burke v. Gregory,* 356 F.Supp.2d 179, 182 (N.D.N.Y.2005) (Kahn, J.). The burden undertaken by a party requesting dismissal of a complaint under Rule 12(b)(6) is substantial; the question presented by such a motion is not whether the plaintiff is likely ultimately to prevail, " 'but whether the claimant is entitled to offer evidence to support the claims.' " *Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.,* 223 F.Supp.2d 435, 441 (S.D.N.Y.2001) (quoting *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995)) (citations and quotations omitted).

2. *Summary Judgment Motions*

**\*5** Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing Anderson). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Though pro

se plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether pro se plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Assn. v. McGowan,* 311 F.3d 501, 507-08 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

B. *Plaintiff's Failure to Oppose Defendants' Summary Judgment Motion*

**\*6** Before turning to the merits of plaintiff's claims, a threshold issue to be addressed is the legal significance, if any, of his failure to oppose defendants' motions, and specifically whether that failure automatically entitles defendants to the relief sought.

This court's rules provide that

[w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3765847 (N.D.N.Y.)
(Cite as: 2010 WL 3765847 (N.D.N.Y.))

N.D.N.Y.L.R. 7.1(b)(3). Undeniably, *pro se* plaintiffs are entitled to some measure of forbearance when defending against dismissal or summary judgment motions. *See Jemzura v. Public Serv. Comm'n,* 961 F.Supp. 406, 415 (N.D.N.Y.1997) (McAvoy, C.J.). The deference owed to *pro se* litigants, however, does not extend to relieving them of the consequences of Local Rule 7.1(b) (3). *Robinson v. Delgado,* No. 96-CV-169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J & Hurd, M.J.) [FN7]; *Cotto v. Senkowski,* No. 95-CV-1733, 1997 WL 665551, at *1 (N.D.N.Y. Oct. 23, 1997) (Pooler, J. & Hurd, M.J.); *Wilmer v. Torian,* 980 F.Supp. 106, 106-07 (N.D.N.Y.1997) (Pooler, J. & Hurd, M.J.). Accordingly, absent a showing of good cause defendants' unopposed motions should be granted, if determined to be facially meritorious. *See Allen v. Comprehensive Analytical Group, Inc.,* 140 F.Supp.2d 229, 231-32 (N.D.N.Y.2000) (Scullin, C.J.); *Leach v. Dufrain,* 103 F.Supp.2d 542, 545-46 (N.D.N.Y.2000) (Kahn, J.).

> FN7. Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

It should also be noted that the plaintiff's failure to properly oppose the pending summary judgment motion is not without further consequences. By failing to submit papers in opposition to their motion, plaintiff has left the facts set forth in defendants' Local Rule 7.1(a)(3) Statement unchallenged, thus permitting the court to deem facts set forth in the defendants' statement of material facts not in dispute to have been admitted based upon his failure to properly respond to that statement. *See Elgamil v. Syracuse Univ.,* No. 99-CV-611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dept. of Corrs.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)).

Based upon plaintiff's failure to oppose defendants' summary judgment motion, I recommend that the court review the motion for facial sufficiency, accepting defendants' assertions of facts as set forth in their Local Rule 7.1(a)(3) Statement as uncontroverted, and that the motion be granted if determined to be facially meritorious.[FN8]

> FN8. I note that defendants' notice of motion contains the required notice to plaintiff of the consequences of his failure to respond to the summary judgment motion. Dkt. No. 66; *see* N.D.N.Y.L.R. 56.2.

C. *Eleventh Amendment Immunity*

At the outset, defendants' summary judgment motion seeks dismissal of plaintiff's claims against the CNYPC as well as the individual defendants, to the extent that they are sued in their official capacities, asserting their entitlement to Eleventh Amendment immunity.

**\*7** As defendants correctly argue, "it is beyond dispute that the State of New York and its agencies have never consented to be sued in federal court." *Dube v. State Univ. of N.Y.,* 900 F.2d 587, 594-95 (2d Cir.1990), *cert. denied,* 501 U.S. 1211, 111 S.Ct. 2814, 115 L.Ed.2d 986 (1991).[FN9] "The law is clear that the state, and state agencies ..., are immune from prisoner § 1983 suits because of their Eleventh Amendment sovereign immunity." *Jackson v. Johnson,* 985 F.Supp. 422, 426 (S.D.N.Y.1997).

> FN9. "On the other hand, a state official acting in his [or her] official capacity may be sued in a federal forum to enjoin conduct that violates the federal Constitution, notwithstanding the Eleventh Amendment bar. *Papasan v. Allain,* 478 U.S. 265, 276-77, 105 S.Ct. 2932, 2939-40 (1986)). Insofar as plaintiff seeks injunctive relief, his claims against the CNYPC and the individual defendants in their official capacities are not barred by the Eleventh Amendment. As will be seen, however, plaintiff's request for injunctive relief is nonetheless moot in light of his release from prison. *See* pp. 21-23, *post.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3765847 (N.D.N.Y.)
(Cite as: 2010 WL 3765847 (N.D.N.Y.))

The Eleventh Amendment protects a state against suits brought in federal court by citizens of that state, regardless of the nature of the relief sought. *Alabama v. Pugh,* 438 U.S. 781, 782, 98 S.Ct. 3057, 3057-58, 57 L.Ed.2d 1114 (1978). This absolute immunity which states enjoy under the Eleventh Amendment extends to both state agencies and state officials sued in their official capacities, when the essence of the claim involved is one against a state as the real party in interest.[FN10] *Richards v. State of New York Appellate Division, Second Dep't,* 597 F.Supp. 689, 691 (E.D.N.Y.1984), (citing *Pugh* and *Cory v. White,* 457 U.S. 85, 89-91 102 S.Ct. 2325, 2328-2329 (1982)). To the extent that a state official is sued for damages in his or her official capacity the official is entitled to invoke the Eleventh Amendment immunity belonging to the state.[FN11] *Kentucky v. Graham,* 473 U.S. 159, 166-67, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985); *Hafer,* 502 U.S. at 25, 112 S.Ct. at 361.

> **FN10.** In a broader sense, this portion of defendants' motion implicates the sovereign immunity enjoyed by the State. As the Supreme Court has reaffirmed relatively recently, the sovereign immunity enjoyed by the states is deeply rooted, having been recognized in this country even prior to ratification of the Constitution, and is neither dependent upon nor defined by the Eleventh Amendment. *Northern Ins. Co. of New York v. Chatham County,* 547 U.S. 189, 193, 126 S.Ct. 1689, 1693, 164 L.Ed.2d 367 (2006).

> **FN11.** By contrast, the Eleventh Amendment does not establish a barrier against suits seeking to impose individual or personal liability on state officials under section 1983. *See Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 361, 116 L.Ed.2d 301 (1991).

Because plaintiff's section 1983 claims against the CNYPC are in reality claims against the State of New York, they typify those against which the Eleventh Amendment protects, and are therefore subject to dismissal. *Daisernia v. State of New York,* 582 F.Supp. 792, 798-99 (N.D.N.Y.1984) (McCurn, J.). Additionally, to the extent that plaintiff asserts claims for damages

against the defendants in their official capacities, those claims are properly regarded as claims against the state, and are likewise barred by the Eleventh Amendment. *Kentucky v. Graham,* 473 U.S. 159, 169, 105 S.Ct. 3107, 87 L.Ed.2d 114 (1985); *Ying Jing Gan v. City of N.Y.,* 996 F.2d 522, 529 (2d Cir.1993). Accordingly, I recommend the entry of summary judgment dismissing plaintiff's claims for damages against the CNYPC and the individual defendants in their official capacities.

## D. *Mootness*

In their motion, defendants next seek summary judgment with respect to plaintiff's first cause of action, in which he seeks "[a]n order prohibiting defendants from forcing plaintiff to take psychiatric medications against his free will." Second Amended Complaint (Dkt. No. 35) p. 9. In support of their request, defendant argues that because the plaintiff is no longer in state custody, that claim is moot.

"The mootness doctrine is derived from Article III of the Constitution, which provides that federal courts may decide only live cases or controversies. 'This case-or-controversy requirement subsists through all stages of federal judicial proceedings, trial and appellate.' " *Van Wie v. Pataki,* 267 F.3d 109, 113 (2d Cir.2001) (citations omitted). A federal court has no authority to decide an issue when the relief sought can no longer be given, or is no longer needed. *Martin-Trigona v. Shiff,* 702 F.2d 380, 386 (2d Cir.1983). The courts have recognized a narrow exception to this rule for repetitive conduct, although only in exceptional circumstances. *City of Los Angeles v. Lyons,* 461 U.S. 95, 109, 103 S.Ct. 1660, 1669, 75 L.Ed.2d 675 (1983). The capable of repetition doctrine applies when the conduct at issue is of insufficient duration to permit it to be fully litigated and is reasonably likely to reoccur. *Spencer v. Kemna,* 523 U.S. 1, 17, 118 S.Ct. 978, 988, 140 L.Ed.2d 43 (1998) (citing and quoting *Lyons* ). This limited exception does not appear to be potentially applicable in this instance.

**\*8** The record now before the court reflects that plaintiff is no longer in state custody. *See* Dkt. No. 57; Waldron Aff. (Dkt. No. 66) Exh. A. To the extent McQuilkin seeks injunctive relief preventing the defendants from forcing

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3765847 (N.D.N.Y.)
(Cite as: 2010 WL 3765847 (N.D.N.Y.))

him to be medicated against his will, they are no longer involved with him, and the claim is now moot. I therefore recommend dismissal of plaintiff's first cause of action on this basis.

E. *Exhaustion*

In their motion defendants seek dismissal of certain of plaintiff's claims on the basis of his failure to exhaust available administrative remedies before commencing suit.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see* Woodford v. Ngo, 548 U.S. 81, 84, 126 S.Ct. 2378, 2382, 165 L.Ed.2d 368 (2006); *Hargrove v. Riley,* No. CV-04-4587, 2007 WL 389003, at *5-6 (E.D.N.Y. Jan.31, 2007). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 992, 152 L.Ed.2d 12 (2002) (citation omitted).

The failure of a prisoner to satisfy the PLRA's exhaustion requirement, though not jurisdictional, gives rise to a defense which may affirmatively be raised by a defendant in response to an inmate suit. *Jones v. Block,* 549 U.S. 199, 212, 127 S.Ct. 910, 919, 166 L.Ed.2d 798 (2007). In the event a defendant named in such an action establishes that the inmate plaintiff failed properly to exhaust available remedies prior to commencing the action, his or her complaint is subject to dismissal. *See Pettus v. McCoy,* No. 04-CV-0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford,* 548 U.S. at 94-95, 126 S.Ct. at 2387-88 (holding that the PLRA requires "proper exhaustion" of available remedies). "Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by "compl[ying]

with the system's critical procedural rules." *Woodford,* 548 U.S. at 95, 126 S.Ct. at 2388; *see also Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir.2007) (citing *Woodford* ). [FN12]

FN12. While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "in a substantive sense", an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his or her available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias,* 495 F.3d at 43 (quoting *Johnson v. Testman,* 380 F.3d 691, 697-98 (2d Cir.2004) (emphasis omitted).

New York prison inmates are subject to an Inmate Grievance Program ("IGP") established by the DOCS and recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson,* No. 96 CV 5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb.20, 2004) (citing *Mojias v. Johnson,* 351 F.3d 606 (2d Cir.2003) and *Snider v. Melindez,* 199 F.3d 108, 112-13 (2d Cir.1999)). The IGP consists of a three-step review process. First, a written grievance is submitted to the IGRC within twenty-one days of the incident. 7 N.Y.C.R.R. § 701.5(a). The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance. *Id.* §§ 701.4(b), 701.5(b). If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination and issues a decision. *Id.* § 701.5(c). The third level of the process affords the inmate the right to appeal the superintendent's ruling to the CORC which makes the final administrative decision. *Id.* § 701.5(d). Ordinarily, absent the finding of a basis to excuse non-compliance with this prescribed process, only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to section 1983 in a federal court. *Reyes v. Punzal,* 206 F.Supp.2d 431, 432 (W.D.N.Y.2002) (citing, *inter alia,* *Sulton v. Greiner,* No. 00 Civ. 0727, 2000 WL 1809284, at *3 (S.D.N.Y. Dec.11, 2000)).

**\*9** In support of their exhaustion argument, defendants submit a declaration given by Karen Bellamy, the Director of the IGP, reflecting that from a review of records maintained by the CORC it appears that only one grievance filed by the plaintiff, grievance number CL

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3765847 (N.D.N.Y.)
(Cite as: 2010 WL 3765847 (N.D.N.Y.))

57139-08, relating to missing personal property, was processed through to completion under the IGP. *See* Bellamy Aff. (Dkt. No. 66) ¶ 10. This, they assert, requires dismissal of all of plaintiff's remaining claim as unexhausted.

While McQuilkin does not appear to have filed grievances related to the other matters at issue in this case, including principally his treatment while at the CNYPC, and to have processed those grievances through to completion under the IGP, he did take certain measures to complain of the treatment received while there. At the suggestion of personnel employed at the Mental Hygiene Legal Services, with whom plaintiff communicated in writing concerning his plight on multiple occasions including in February of 2008, plaintiff McQuilkin sent letters on March 28, 2008, and again on June 27, 2008, to Dr. Jonathan Kaplan, the Clinical Director of the Mental Hygiene Psychiatric Center at Marcy, New York, to whom he had been referred.[FN13] *See* Second Amendment Complaint (Dkt. No. 35) pp. 12-23, 26. In those letters, plaintiff requested that Dr. Kaplan review his treatment plan in light of adverse effects from which he claimed to suffer as a result of the medication being administered. *Id.* at pp. 12-13, 26. In addition, McQuilkin forwarded a letter dated February 21, 2008, to "the psychiatrist" at Clinton, again complaining of being compelled to take the drugs and of their side effects, and also that he was not being properly monitored "due to insincere motives on the original action for the court order." *See* Attachments to Second Amended Complaint (Dkt. No. 35) p. 31.

FN13. The attachments to plaintiff's Second Amended Complaint (Dkt. No. 35) are not separately marked as exhibits, nor are the pages numbered. The page numbers referred to herein as are reflected in the court's docket.

While confined at Clinton, plaintiff also filed an inmate grievance, dated April 1, 2008 and assigned grievance number CL-56924-08, complaining that he was being ordered to take psychiatric medication against his will, that he was experiencing adverse side effects from the medication, and requesting that the medication be discontinued. Attachments to Second Amended Complaint (Dkt. No. 15) p. 10. In response to plaintiff's grievance,

the IGRC advised McQuilkin that pursuant to DOCS Directive No. 4040,[FN14] the OMH, together with its employees, policies and procedures, are not within the jurisdiction of the DOCS inmate grievance program, and he was therefore directed to address the issue of psychiatric medication with Joanne Waldron, Satellite Unit Chief. *Id.* at p. 11. Thus, in accordance with the DOCS Directive No. 4040, the matter was deemed closed, and there is no record of plaintiff having appealed this determination. *Id.*

FN14. DOCS Directive No. 4040 provides, in relevant part, that "[t]he IGRC may dismiss and close a grievance after a hearing if it determines, by majority vote (3 of 4), that ... the grievant is seeking action with respect to any policy, regulation, rule or action of any agency not under the supervision of the Commissioner of Correctional Services (see section 701.3[f] of this Part)." 7 N.Y.C.R.R. § 701.5(b)(4)(i)(d).

On June 27, 2008, plaintiff wrote letters to Drs. Gillani and Berggren complaining of the administration of psychiatric drugs, claiming that he was being discriminated against and harassed by certain corrections officers and nurses who administered his oral medication, and requesting a meeting to discuss the possibility of receiving all of his medication once a month by injection. *See* Second Amended Complaint (Dkt. No. 15) at pp. 24-25. Plaintiff wrote a second letter to Dr. Gillani on July 16, 2008, voicing the same complaint and again requesting that he be given all his court-ordered drugs at the same time each month. *Id.* at pp. 27-28.

**\*10** Although the plaintiff was at all relevant times an inmate in the primary care and custody of the DOCS, the conduct giving rise to his claims occurred at the CNYPC, a facility operated by the OMH. Based upon that circumstance, it is arguable that plaintiff's claims are not subject to the PLRA because they do not involve "prison life." While the court's research has not identified a case in this circuit squarely addressing the issue, it appears that even though confined to the CNYPC at the time in question, plaintiff would still qualify as a prisoner subject to the requirements of the PLRA. *See, e.g., Page v. Torrey,* 201 F.3d 1136, 1140 (9th Cir.2000) ("[W]e hold

Slip Copy, 2010 WL 3765847 (N.D.N.Y.)
(Cite as: 2010 WL 3765847 (N.D.N.Y.))

that only individuals who, at the time they seek to file their civil actions, are detained as a result of being accused of, convicted of, or sentenced for criminal offense are 'prisoners' within the definition of 42 U.S.C. § 1997e...."); *Kalinowski v. Bond,* 358 F.3d 978, 979 (7th Cir.) ("As used in this section, the term 'prisoner' means any person incarcerated or detained at any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, [or] probation ....") (quoting 28 U.S.C. § 1915(h)), *cert. denied,* 542 U.S. 907, 124 S.Ct. 2843, 159 L.Ed.2d 273 (2004). It would therefore appear that plaintiff's complaint includes a combination of claims relating to lost property, which were properly exhausted, and claims for which he failed to exhaust his administrative remedies, including those relating to his confinement to CNYPC and the forced administration of psychiatric drugs, as well as that relating to retaliation.[FN15]

> FN15. Because defendants have not raised failure to exhaust administrative remedies with regard to plaintiff's claims that he was denied access to the courts and the right to practice his religion, I have not addressed exhaustion of these claims.

In a series of decisions rendered since enactment of the PLRA, the Second Circuit has crafted a three-part test for determining whether dismissal of an inmate's complaint is warranted for failure to satisfy the PLRA's exhaustion requirement. *Macias,* 495 F.3d 37 at 41; *see Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004). The test for determining whether a claim has not been properly exhausted should nonetheless be considered under the Second Circuit's prescribed exhaustion rubric focuses upon whether special circumstances have been plausibly alleged which, if demonstrated, would justify excusing a plaintiff's failure to exhaust his administrative remedies. *Hemphill,* 380 F.3d at 689; *see also Giano v. Goord,* 380 F.3d at 676-77; *Hargrove,* 2007 WL 389003, at *10. The circumstances potentially qualifying as "special" under this prong of the test can include where a plaintiff's reasonable interpretation of applicable regulations regarding the grievance process differs from that of prison officials and leads him or her to conclude that the dispute is not grievable. *Giano,* 380 F.3d at 676-77; *see also Hargrove,* 2007 WL 389003, at *10 (quoting and citing

*Giano* ).

Undeniably, plaintiff appears not to have pursued to completion a grievance regarding his treatment at the CNYPC. It should be noted, however, that "DOCS Directive 4040 states, *inter alia,* that '[t]he individual decisions or dispositions of any current or subsequent program or procedure having a written appeal mechanism which extends review to outside the facility shall be considered non-grievable.' " *Giano,* 380 F.3d at 678. Indeed, as was previously noted, the IGRC response to plaintiff's grievance number CL 56924-08 requesting discontinuation of his medication specifically stated, "OMH, it's [sic] employees and policies and procedures are not with in [sic] the jurisdiction of the DOCS Inmate grievance program." *See* Attachments to Second Amended Compl. (Dkt. No. 35) p. 11. Given this response, it seems somewhat disingenuous for defendants to now contend that plaintiff failed to fully exhaust his administrative remedies as to the claims relating to his psychiatric treatment. It is true that, strictly construed, plaintiff's grievance number CL 56924-08 does not specifically complain of his CNYPC confinement; nonetheless, after having received the foregoing response from the IGRC, and being specifically advised that the his grievance complaining of being forced to take the drugs was being "closed and dismissed", it certainly would have been reasonable for plaintiff to conclude that he could not grieve either claim, and likewise that an appeal of the denial of the medication grievance would be rejected.

**\*11** It is also worth noting that the IGRC directed the plaintiff to the OMH, and that both before and after he was notified that his grievance was closed and dismissed, he sent numerous letters to the Clinical Director of CNYPC, both the Director and Deputy Director of Mental Hygiene Legal Services, and Drs. Gillani and Berggren complaining of his psychiatric treatment. In each instance, Mental Hygiene Legal Services referred plaintiff to the physicians and ultimately advised that they could provide no further assistance; McQuilkin's letters to the doctors received no responses at all.

In view of the foregoing, it appears that, at a minimum, issues of fact exist as to whether sufficient special circumstances are present to excuse plaintiff's failure to

Slip Copy, 2010 WL 3765847 (N.D.N.Y.)
(Cite as: 2010 WL 3765847 (N.D.N.Y.))

exhaust claims relating to his psychiatric treatment. For the going reasons, I conclude that the defendants' motion for summary judgment dismissing the plaintiff's unexhausted claims regarding his confinement in the CNYPC and involuntarily administration of psychiatric drugs against the plaintiff's wishes will be denied.

F. *Confinement At Clinton*

Although not identified as a discrete cause of action, plaintiff's complaint alleges that he was "transported to the Clinton Correctional Facility against his free will and adamant refusal." Second Amended Compl. (Dkt. No. 35) ¶ 3. To the extent that plaintiff attempts to premise his section 1983 claim in part upon this prison transfer, defendants seek dismissal of that claim as failing to allege a constitutional violation.

It is well-established that convicted prisoners have no right to choose the prison they are housed in. *Montanye v. Haymes,* 427 U.S. 236, 243, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976). Prison authorities are entrusted with unfettered discretion to transfer prisoners from one institution to another. *Pugliese v. Nelson,* 617 F.2d 916, 922-23 (2d Cir.1980).

In view of the foregoing, summary judgment in favor of the defendants on plaintiff's apparent claim of violation of his constitutional rights based upon his alleged involuntarily transfer to Clinton is appropriate.

G. *Due Process Claim Based on Destruction of Personal Property*

Although not alleged as a distinct cause of action, in his second amended complaint plaintiff appears to claim that all of his legal work and documentation-five draft bags altogether-were seized and allegedly destroyed by employees at the Gouverneur Correctional Facility ("Gouverneur"). Second Amended Compl. (Dkt. No. 35) ¶ 2. Defendants contend that this claim also should be dismissed as failing to state a constitutionally cognizable cause of action.

Addressing inmate claims relating to stolen or lost property, the Supreme Court has held that even intentional destruction of prisoner's property may not be the basis for constitutional claims if sufficient post deprivation remedies are available to address the claim. *Hudson v. Palmer,* 468 U.S. 517, 531, 104 S.Ct. 3194, 3202, 82 L.Ed.2d 393 (1984) (citing *Parratt v. Taylor,* 451 U.S. 527, 541, 101 S.Ct. 1908, 1916, 68 L.Ed.2d 420 (1981)). As long as a meaningful post deprivation remedy is provided, the due process requirement is met and the Fourteenth Amendment is satisfied. *Howard v. Leonardo,* 845 F.Supp. 943, 947 (N.D.N.Y.1994) (citing *Paratt,* 451 U.S. at 540, 101 S.Ct. at 1916). With regard to claims of lost or stolen property, the Second Circuit has recognized that New York provides, "an adequate post deprivation remedy in the form of, *inter alia,* a Court of Claims action. *Jackson v. Burke,* 256 F.3d 93, 96 (2d Cir.2001) (citing *Love v. Coughlin,* 714 F.2d 207, 208-09 (2d Cir.1983)).

**\*12** In this instance plaintiff had available to him, and indeed apparently pursued, an internal DOCS process for making a claim for his lost property. Additionally, under the New York Court of Claims Act, the State provides inmates like the plaintiff with a post deprivation remedy by way of an action asserted in the New York Court of Claims for appropriation of personal property. *See* N.Y. CT. OF CLAIMS ACT §§ 8, 9(2). Thus, as a matter of law, McQuilkin was afforded adequate procedural protections and any procedural due process claim premised upon the alleged destruction of his property at Gouverneur is subject to dismissal.[FN16]

[FN16.] The availability of a post-deprivation remedy does not foreclose plaintiff's claim that he was effectively denied meaningful access to the courts as a result of the loss of his legal documents. *See Lewis v. Casey,* 518 U.S. 343, 350, 116 S.Ct. 2174, 2179, 135 L.Ed.2d 606 (1996). As will be seen, however, that claim also lacks merit. *See* pp. 41-43, *post.*

H. *Expungement of Psychiatric Records*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3765847 (N.D.N.Y.)
(Cite as: 2010 WL 3765847 (N.D.N.Y.))

Plaintiff's second cause of action seeks "total expungement from [sic] any reference of mental health patient from Plaintiff's institutional record." Second Amended Compl. (Dkt. No. 35) Second Cause of Action. In their motion, defendants request dismissal of this cause of action as not presenting a constitutional claim, and additionally because the relief sought is not available under New York law.

To state a valid claim under section 1983, a plaintiff must allege that he or she was deprived of a right guaranteed under the Constitution of the United States." *Snider v. Dylag,* 188 F.3d 51, 53 (2d Cir.1999) (citing *Dwares v. City of New York,* 985 F.2d 94, 98 (2d Cir.1993)). Plaintiff has identified no cognizable constitutional right at stake with regard to his mental health records. While plaintiff complains of his involuntary commitment at the Center, it appears from the record now before the court that the commitment occurred, at least in part, based upon state court proceedings conducted pursuant to New York Correction Law § 402.[FN17] *See generally* Waldron Aff. (Dkt. No. 66). As such, plaintiff cannot plausibly allege the denial of procedural due process associated with that commitment.

FN17. Under that provision, upon receiving a report from a physician that an inmate is, in his or her opinion, mentally ill the superintendent of a correctional facility must apply to the court for designation of two examining physicians who, conducting a personal examination, may certify that the inmate is mentally ill and in need of care and treatment, if deemed appropriate. N.Y. Correction Law § 402. In the event that certification is made by the two examining physicians, the superintendent must then apply to an appropriate state court judge for an order of commitment, with notice to the affected inmate as well as any known relative. *Id.* § 402(3). The inmate thereafter may request a hearing, and the court additionally may request one of its own initiative. *Id.* § 402(5). In the event the court determines that the person is mentally ill and in need of care and treatment, the court may order him or her committed for a period not to exceed six months in order that the inmate may be transferred into an OMH facility. *Id.*

Nor has McQuilkin stated a claim under New York law, even assuming such a claim would be actionable under section 1983. Generally, expungement of psychiatric records is not an available form of relief in New York. *Wade v. Dep't of Mental Hygiene of New York,* 49 N.Y.2d 947, 428 N.Y.S.2d 945, 406 N.E.2d 800 (1980). MHL section 33.14 does allow for the sealing of psychiatric records when

the petitioner has demonstrated by competent medical evidence that he is not currently suffering from a mental illness, has not for a period of three years received inpatient services for the treatment of a mental illness, and the interests of the petitioner and society would best be served by sealing the petitioner's records.

N.Y. MENTAL HYG. LAW § 33.14(a)(1)(b). Plaintiff cannot avail himself of the sealing provision in this instance, however. At the outset, plaintiff cannot establish that he has not "received inpatient services for a period of three years." *Id.* Plaintiff was discharged from services on October 27, 2009 and has therefore received inpatient services within the last three years. Waldron. Aff. (Dkt. No. 66) Exh A. Additionally, plaintiff has not established, by competent medical evidence, that he is not currently suffering from a mental illness, nor has he demonstrated that both his interests and those of society would be best served by sealing his records of mental health treatment.

**13** For these reasons, the defendants' motion should be granted with respect to plaintiff's second cause of action.

I. *Religious Discrimination and Access to Court*

Plaintiff's complaint makes passing reference to abridgement of his right to "access the court of law" and his "religious rights." Second Amended Complaint (Dkt. No. 35) ¶¶ 2, 8. As defendants assert in support of their motion, plaintiff's complaint is devoid of any factual allegations to support these claims, and there is nothing in the record that would suggest that these rights are implicated.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3765847 (N.D.N.Y.)
(Cite as: 2010 WL 3765847 (N.D.N.Y.))

### 1. Religious Discrimination

While inmates confined within prison facilities are by no means entitled to the full panoply of rights guaranteed under the United States Constitution, including its First Amendment, the free exercise clause of that amendment does afford them at least some measure of constitutional protection, including their right to participate in congregate religious services. See *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974) ("In the First Amendment context ... a prison inmate retains those First Amendment rights that are not inconsistent with his [or her] status as a prisoner or with the legitimate penological objectives of the corrections system."); *see also Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993) ("It is well established that prisoners have a constitutional right to participate in congregate religious services.") (citing cases). The task of defining the contours of that right in a prison setting requires careful balance of the rights of prison inmates against the legitimate interests of prison officials tasked with maintaining prison security. *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348, 107 S.Ct. 2400, 2404, 96 L.Ed.2d 282 (1987); *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003); *Salahuddin,* 993 F.2d at 308. When determining whether an action taken by prison officials impinges upon that individual's First Amendment free exercise right, the inquiry is "one of reasonableness, taking into account whether the particular [act] affecting [the] right ... is 'reasonably related to legitimate penological interests.' " *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.), *cert. denied,* 498 U.S. 951, 111 S.Ct. 372, 112 L.Ed.2d 335 (1990) (quoting *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987)); *Ford,* 352 F.3d at 588; *see also Farid v. Smith,* 850 F.2d 917, 925 (2d Cir.1988) (citing, *inter alia, O'Lone,* 482 U.S. at 348, 107 S.Ct. at 2404).

In this instance, neither plaintiff's complaint nor the record before the court discloses any facts demonstrating religious discrimination or establishing that plaintiff's religious beliefs were somehow burdened by his confinement to CNYPC or the administration of psychiatric drugs against his will. Plaintiff's complaint does not identify his religion, nor does it explain how the forced administration of psychiatric medications infringes upon his sincerely held religious beliefs. Since plaintiff's

religious deprivation claim is stated in wholly conclusory terms without the articulation of facts demonstrating the existence of a plausible claim, and in light of his failure to come forward with the evidence to support that claim in the face of defendants' summary judgment motion, I recommend that any cause of action deemed to assert a First Amendment freedom of religion violation be dismissed.

### 2. Access to Courts

**\*14** Turning to plaintiff's reference to his deprivation of access to the courts, I note that undeniably "[p]risoners have a constitutional right of access to the courts, which is infringed when prison officials interfere with a prisoner's preparation of legal documents." *Thomas v. Egan,* 1 Fed. App'x 52, 54 (2d Cir.2001) (citing *Lewis,* 518 U.S. at 350, 116 S.Ct. at 2179) (cited in accordance with *Fed. R.App. Proc. 32.1*). "To state a claim of denial of access to the courts, an inmate must allege an actual injury." *Id.* (citing *Lewis,* 518 U.S. at 349, 116 S.Ct. at 2179). Conclusory allegations are insufficient. *Id.* (citing *Lewis,* 518 U.S. at 349, 116 S.Ct. at 2179).

In this instance, plaintiff's complaint alleges that among his property confiscated and destroyed by unnamed prison workers at Gouverneur were legal documents. Second Amended Complaint (Dkt. No. 35) ¶ 2. Neither his complaint nor anything within the record now before court suggests, however, that plaintiff suffered any harm as a result of the alleged destruction of his legal documents. Plaintiff's complaint therefore fails to allege the existence of prejudice, an essential element of such a claim. See *Davidson v. Murray,* 371 F.Supp.2d 361, 366 (W.D.N.Y.2005) (citing cases) (requiring proof on access to courts claim that "a nonfrivolous legal claim had been frustrated or was being impeded due to the action or inaction" of defendants). Based upon this lack of supporting facts, I recommend that plaintiff's court access claim be dismissed.

### J. Retaliation

The claims set forth in plaintiff's complaint appear to be

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3765847 (N.D.N.Y.)
(Cite as: 2010 WL 3765847 (N.D.N.Y.))

centered upon his involuntary commitment into the CNYPC and the forced administering of anti-psychotic medication, allegedly in retaliation for his filing a "notice of summons" against the DOCS. In their motion, defendants assert that plaintiff has failed to state a cognizable claim of retaliation. When adverse action is taken by prison officials against an inmate, motivated by the inmate's exercise of a right protected under the Constitution, including the free speech provisions of the First Amendment, a cognizable retaliation claim under 42 U.S.C. § 1983 lies. *See Franco v. Kelly,* 854 F.2d 584, 588-90 (2d Cir.1988). As the Second Circuit has repeatedly cautioned, however, such claims are easily incanted and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus; courts must therefore approach such claims "with skepticism and particular care." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)), *overruled on other grounds sub nom., Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (same).

In order to state a prima facie claim under § 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); *Dawes,* 239 F.3d at 492 (2d Cir.2001). If the plaintiff carries this burden, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. If taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

**\*15** Analysis of retaliation claims thus requires careful

consideration of the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him or her, and the evidence tending to link the two. When such claims, which are exceedingly case specific, are alleged in only conclusory fashion, and are not supported by evidence establishing the requisite nexus between any protected activity and the adverse action complained of, a defendant is entitled to summary judgment dismissing plaintiff's retaliation claims. *Flaherty,* 713 F.2d at 13.

Plaintiff alleges that he was administered antipsychotic medication "in a continuing retaliation against him for filing a claim in the International Trade Court several years ago which was against the State of New York and the Quango New York State Brokerage Mortmain Collection Department of Correctional Services." Second Amended Compl. (Dkt. No. 35) ¶ 2. Plaintiff also alleges that in retaliation for his service of a "notice of summons upon [Defendant Taylor] on July 2, 2007 and July 3, 2007 ...". defendants seized and destroyed five bags containing his property on July 18, 2007, and "wrongfully referred" him to the psychiatric department at Clinton. *Id.*

Plaintiff's complaint clearly satisfies the first element of the retaliation claim. Both the filing of a claim with the International Trade Court and service of a notice of summons appear to qualify as constituting protected activity. *See Joseph's House and Shelter, Inc. v. City of Troy,* 641 F.Supp.2d 154, 159 n. 5 (N.D.N.Y.2009) (Scullin, S.D.J.) (citing *Dougherty v. Town of N. Hempstead,* 282 F.3d 83, 91 (2d Cir.2002) (finding lawsuit constitutionally protected activity under the First Amendment)). In addition I have assumed, solely for purposes of the instant motion, that the forced administering of drugs and the destruction of plaintiff's property could qualify as sufficiently adverse to trigger the protections of the First Amendment. *See Jones v. Harris,* 665 F.Supp.2d 384, 399 (S.D.N.Y.2009). The evidence of a connection between the two, however, is lacking in this case.

The portion of plaintiff's retaliation claim stemming from his filing of the claim in the International Trade Court is easily dispensed with. By plaintiff's own admission that claim was filed "several years ago" and does not appear to have involved any of the named defendants in this action.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3765847 (N.D.N.Y.)
(Cite as: 2010 WL 3765847 (N.D.N.Y.))

The bare allegation that the filing of that claim is somehow linked to the defendants' actions in forcing him to take medications, without further support, is woefully insufficient to establish the required connection between that protected activity and the adverse consequences claimed in his retaliation cause of action. *Flaherty,* 344 F.3d at 13.

Plaintiff's retaliation claim against defendant Taylor based upon service of a summons, followed by in short order by the seizure of his property, presents a closer question given the close proximity in time between the two events. In the face of a summary judgment motion, however, calling for plaintiff to lay bare his claims and the proof which supports them, however, this alone is insufficient to establish a basis upon which a reasonable factfinder could conclude that unlawful retaliation has occurred. *Vega v. Lareau,* No. 9:04-CV-0750, 2010 WL 2682307, at *10 (N.D.N.Y.2010) (Baxter, M .J.). I note, in that regard, that the record fails to support plaintiff's claim that defendant Taylor, against whom this portion of the retaliation claim is asserted, was involved in any way in the decision to admit the plaintiff into the CNYPC. Instead, the record reflects the decision was made by OMH care providers following an evaluation of plaintiff's mental status, and was authorized by a state court order.

**\*16** Because the record fails to support plaintiff's retaliation cause of action, I recommend that it be dismissed.

K. *OMH Confinement and Involuntary Treatment*

Also embedded in plaintiff's complaint is a claim for violation of his Eighth and Fourteenth Amendment rights arising from his commitment to the CNYPC as well as the drugs he was forcibly administered while there. In support of their motion, defendants argue that these claims should be dismissed as impermissibly conclusory, and further that because they are precluded under *Heck v. Humphrey* and the *Rooker-Feldman* doctrine.

1. *Eighth Amendment*

The claims alleged in plaintiff's complaint relating to his involuntary commitment to the CNYPC and the forced administration of drugs are predicated upon alleged violation of the Eighth and Fourteenth Amendments and, in essence, are directed to the medical treatment that he received for his schizophrenia.

The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291, 50 L.Ed.2d 251 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981)). A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement-the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference". *See Leach,* 103 F.Supp.2d at 546 (citing *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.); *see also, generally, Wilson,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271. Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1978; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer); Waldo,* 1998 WL 713809, at *2 (same).

To satisfy the objective prong of an Eighth Amendment conditions of confinement claim, a plaintiff must demonstrate a deprivation of " 'the minimal civilized

Slip Copy, 2010 WL 3765847 (N.D.N.Y.)
(Cite as: 2010 WL 3765847 (N.D.N.Y.))

measure of life's necessities,' such as adequate food, clothing shelter, sanitation, medical care, and personal safety." *May v. DeJesus,* No.3:06CV1888, 2010 WL 1286800, at *4 (D.Conn. Mar.30, 2010) (quoting *Alvarez v. County of Cumberland,* Civil No. 07-346(RBK), 2009 WL 750200, at *2 (D.N.J. Mar.18, 2009) (citation omitted)). Conditions that are merely restrictive or harsh, however, do not implicate the Eighth Amendment; "they are merely part of the penalty that criminal offenders pay for their offense against society." *May,* 2010 WL 1286800, at *4 (quoting *Alvarez,* 1009 WL 750200, at *2).

**\*17** Plaintiff does not claim that he was deprived of any of basic need or that his personal safety was put at risk during his confinement in the CNYPC or at Clinton. Instead, his complaint is directed to the facts that he was confined to a mental health facility and forced to undergo mental health treatment. Broadly construed, at best, plaintiff's Eighth Amendment claim can be interpreted as a challenge to his medical treatment.

Claims that prison officials have intentionally disregarded an inmate's medical needs are encompassed within the Eighth Amendment's prohibition of cruel and unusual punishment. *Estelle,* 429 U.S. at 104, 97 S.Ct. at 291. Here, however, even liberally construing plaintiff's allegations there is no claim, and indeed no evidence in the record to suggest that plaintiff's medical needs were disregarded. In fact, at the heart of plaintiff's claim is his contention that he did not need mental health treatment at all. It is well established, however, that "[c]harges that amount only to allegations of malpractice, and mere disagreements with respect to quality of medical care do not state an Eighth Amendment claim." *Arroyo v. City of New York,* 2003 WL 22211500, at *2 (S.D.N.Y. Sept.25, 2003) (citing *Estelle,* 429 U.S. at 105-06, 97 S.Ct. at 292). As a result, defendants are correct in their assertion that plaintiff's Eighth Amendment challenge to his CNYPC confinement and mental health treatment must fail as a matter of law.

2. *Heck v. Humphrey*

Defendants also assert that any claim by plaintiff that he

should not have been placed in the CNYPC or in an OMH Satellite Unit is barred by the rule enunciated in *Heck v. Humphrey.* In *Heck,* the United States Supreme Court addressed the types of claims for which state prisoners may seek redress in section 1983 actions. *Heck,* 512 U.S. at 480-82, 114 S.Ct. at 2369-70. The Supreme Court specifically held that a state prisoner's claim for damages is not cognizable under 42 U.S.C. § 1983 if a judgment in his or her favor "would necessarily imply the invalidity of his conviction or sentence." *Heck,* 512 U.S. at 487, 114 S.Ct. at 2372. For a plaintiff to recover damages for actions

whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus.

*Id.* at 486-87, 2372. "But if the district court determines that the plaintiff's action, even if successful, will not demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit." *Id.* The Second Circuit has observed, however, that a section 1983 suit by a prisoner, "challenging the validity of a disciplinary or administrative sanction that does not affect the overall length of the prisoner's confinement is not barred by *[Heck]."* *Jenkins v. Haubert,* 179 F.3d 19, 27 (2d Cir.1999).

**\*18** In this case, plaintiff is not disputing either his conviction or his confinement to prison; rather, McQuilkin is challenging his confinement to a mental health facility, which occurred in accordance with a state court order. Plaintiff additionally challenges the forced administration of psychotropic drugs, which also was court-authorized. It does not appear that these state court determinations had any effect on the length of the plaintiff's prison term. Waldron Aff. (Dkt. No. 66) Exh. B P263, P318-319. Additionally, these state court proceedings clearly were not criminal in nature, but rather were civil state mental health proceedings. As a result, it cannot be said that the instant action would affect the invalidity of a criminal

Slip Copy, 2010 WL 3765847 (N.D.N.Y.)
(Cite as: 2010 WL 3765847 (N.D.N.Y.))

judgment against the plaintiff.[FN18]

> FN18. The fact that plaintiff has been released from custody does not alter this conclusion because "[t]his favorable termination requirement applies to plaintiffs who are incarcerated at the time that they file their section 1983 actions, regardless of whether they are later released." Hamm v. Hatcher, No. 05-CV-503, 2009 WL 1322357, at *8 n. 6 (S.D.N.Y. May 5, 2009).

For these reasons, it therefore does not appear that plaintiff's claims are precluded by the doctrine enunciated in Heck v. Humphrey.

3. Rooker-Feldman

Defendants further assert that plaintiff's OMH retention and involuntary treatment claims are subject to dismissal under the Rooker-Feldman doctrine because the plaintiff was accorded due process in the state court mental health proceedings, and the claim presents a pure question of state law that is not properly raised in a section 1983 action.

"Where a federal suit follows a state suit, the former may be prohibited by the so-called Rooker-Feldman doctrine in certain circumstances." Hoblock v. Albany County Board of Elections, 422 F.3d 77, 83 (2d Cir.2005). A federal district court "has no authority to review final judgments of state court judicial proceedings." District of Columbia v. Feldman, 460 U.S. 462, 482, 103 S.Ct. 1303, 1315, 75 L.Ed.2d 206 (1983). "To do so would be an exercise of appellate jurisdiction which only the Supreme Court possesses over state court judgments." Rooker v. Fidelity Trust Co., 263 U.S. 413, 416, 44 S.Ct. 149, 150, 68 L.Ed. 362 (1923).

The Supreme Court of the United States reviewed and redefined the limits of the Rooker-Feldman doctrine in Exxon Mobile Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 125 S.Ct. 1517, 161 L.Ed.2d 454 (2005). The Court

limited application of the doctrine to "cases brought by state court losers complaining of injuries caused by state court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." Exxon Mobile Corp., 544 U.S. at 284, 125 S.Ct. at 1521-22. In Hoblock, the Second Circuit established four elements that must be met before the Rooker-Feldman doctrine applies:

> First, the federal court plaintiff must have lost in state court. Second the plaintiff must 'complain[ ] of injuries caused by [a] state court judgment [.]' Third, the plaintiff must 'invite district court review and rejection of [that] judgment[ ].' Fourth, the state court judgment must have been 'rendered before the district court proceedings commenced.'

Hoblock, 422 F.3d at 85.

*19 Here, the first and fourth elements of this test are clearly satisfied. First, the plaintiff lost in the New York Supreme Court proceedings which resulted in the retention and involuntary treatment described in plaintiff's complaint. See Waldron Aff. (Dkt. No. 66) Exh. B at P263, P318-319. Additionally, the state court decisions at issue, dated October 11, 2007 and November 21, 2007, respectively, see id., were rendered prior to the commencement of this action on September 15, 2008. See Dkt. No. 1.

The second and third elements of the prevailing Rooker-Feldman test also appear to have been established in this instance. Plaintiff's complaint is directly addressed to the injuries suffered as a result of those court determinations. Moreover, plaintiff's complaint, as amended, appears to challenge the correctness of those rulings, seeking both an order prohibiting his forced medication, despite the fact that it was accomplished pursuant to a state court order, as well as expungement of records of his treatment at the Center, also accomplished by court order. This, then, appears to present a classic case of a claim precluded under the Rooker-Feldman doctrine. I therefore recommend dismissal of plaintiff's confinement and administration of psychiatric drug claims on this basis.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3765847 (N.D.N.Y.)
(Cite as: 2010 WL 3765847 (N.D.N.Y.))

L. *Due Process Claims*

In their motion defendants further attack plaintiff's procedural due process claim asserted under the Fourteenth Amendment.

To successfully state a claim under 42 U.S.C. § 1983 for denial of procedural due process, a plaintiff must show that he or she 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir.2000) (citations omitted); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.1998); *Bedoya v. Coughlin,* 91 F.3d 349, 351-52 (2d Cir.1996). It is undeniable that [i]nvoluntary confinement, including civil commitment, constitutes a significant deprivation of liberty, requiring due process." *Abdul-Matiyn v. Pataki,* 9:06-CV-1503, 2008 WL 974409, at *10 (N.D.N.Y. April. 8, 2008) (Hurd, J. and Homer, M.J.) (quoting *Fisk v. Letterman,* 401 F.Supp.2d 362, 374 (S.D.N.Y.2005) (citations omitted). "When a person's liberty interests are implicated, due process requires at a minimum notice and an opportunity to be heard." *Mental Hygiene Legal Service v. Spitzer,* 2007 WL 4115936, at *5 (S.D.N.Y. Nov.16, 2006) (citing *Hamdi v. Rumsfeld,* 542 U.S. 507, 533, 124 S.Ct. 2633, 2648, 159 L.Ed.2d 578 (2004) (plurality opinion)). The Supreme Court has approved the use of involuntary confinement where there has been a determination that the person in question currently suffers from a "mental abnormality" and is likely to pose a future danger to the public. *Abdul,* 2008 WL 974409, at *10 (citing *Kansas v. Hendricks,* 521 U.S. 346, 371, 117 S.Ct. 2072, 2086, 138 L.Ed.2d 501 (1997)).

The primary focus of plaintiff's due process claim and defendants' motion seeking its dismissal, then, is upon the sufficiency of the procedural safeguards associated with that deprivation.[FN19] In this instance, plaintiff was committed to the CNYPC by way of the procedures set out in the New York Corrections Law § 402.

> FN19. The record does not address, and I am therefore unable to determine, whether as a result of his involuntary commitment to the CNYPC and forced medication, plaintiff suffered

deprivation of a cognizable liberty interest beyond that already associated with this criminal conviction and sentence. I have nonetheless assumed, for purposes of the pending motion, that the plaintiff can demonstrate the deprivation of a cognizable liberty interest associated with those acts.

**\*20** It is clear from the record before the court that plaintiff was retained at the CNYPC under the authority of that statute, and his retention and involuntary treatment with the antipsychotic medication were court-ordered. Section 402 provides procedures and safeguards similar to the provisions of MHL section 33.03, the general provision governing involuntary commitment, and one which "has withstood challenges that it was facially unconstitutional." *United States v. Waters,* 23 F.3d 29, 32 (2d Cir.1994) (citing *Project Release v. Prevost,* 722 F.2d 960, 971-981 (2d Cir.1983)).

Plaintiff's claims regarding involuntary medication are similarly destined to fail. The Second Circuit has held that "due process requires an opportunity for hearing and review of a decision to administer antipsychotic medication-but such a hearing need not be judicial in nature." *Project Release,* 722 F.2d at 981. Moreover, due process does not require a guarantee that a physician's assessments in their commitment evaluation be correct. *Rodriguez City of New York,* 72 F.3d 1051, 1062 (2d Cir.1995).

Plaintiff was transferred from Mid-State to the CNYPC on September 17, 2007, after he refused medication and mental health treatment, and once admitted continued to refuse medication without any rational basis for doing so. As a result, the Executive Director of the CNYPC petitioned the court, based upon the certifications of two examining physicians, for an order committing McQuilkin for six months. McQuilkin objected to the retention petition, and a hearing was held in Oneida County Supreme Court to determine whether the plaintiff was mentally ill and a proper subject for involuntary commitment. Following the hearing, on October 11, 2007, the court ordered plaintiff's commitment to CNYPC for six months.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3765847 (N.D.N.Y.)
(Cite as: 2010 WL 3765847 (N.D.N.Y.))

After the commitment order was issued, McQuilkin persisted in his refusal to consent to the administration of medication. As a result, following a similar procedure as he did for commitment, based upon the certification of two examining physicians, defendant Sawyer petitioned the court for an order authorizing the administration of the medication against McQuilkin's will. McQuilkin opposed the petition, and, after a hearing, the court determined that he lacked capacity to make a reasoned decision regarding his own treatment and granted the petition. *United States v. Waters,* 23 F.3d at 32.

Because the evidence in the record establishes that defendants followed the procedures outlined in New York Corrections Law § 402 in obtaining authorization for plaintiff's involuntary commitment, and plaintiff was afforded the constitutionally required process to which he was entitled in connection with both that determination and the court ordered forced mediation, his procedural process claim lacks merit.[FN20]

FN20. To the extent that plaintiff may be suggesting that defendants failed to follow the procedures outlined in the MHL, his claim would still fail. Section 1983 imposes liability for violations of rights protected by the Constitution and laws of the United States, and not for violations arising solely out of state or common law principles. *Fluent v. Salamanca Indian Lease Auth.,* 847 F.Supp. 1046, 1056 (W.D.N.Y.1994). "A violation of a state law or regulation, in and of itself, does not give rise to liability under 42 U.S.C. § 1983." *Cusamano v. Sobek,* 604 F.Supp.2d 416, 482 (N.D.N.Y.2009) (Suddaby, J.) (collecting cases). For this reason, even if defendants had failed to follow the letter of the New York MHL provisions with regard to his confinement and treatment, that failure would not provide the basis a cognizable section 1983 claim.

For the foregoing reasons, I recommend summary judgment granting dismissal of plaintiff's due process claim arising out of his mental health confinement and treatment with psychiatric medication.

M. *Defendant Sangani's Motion to Dismiss*

**\*21** In his motion Dr. K. Sangani, who has yet to answer plaintiff's complaint, seeks its dismissal for failure to state a claim against him upon which relief may be granted. The focus of defendant Sangani's motion is upon plaintiff's failure to allege in his complaint facts showing Sangani's involvement in the constitutional deprivations alleged.

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farid v. Ellen,* 593 F.3d 233, 249 (2d Cir.2010) (quoting *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006)). It should also be noted that personal involvement of a named defendant in any alleged constitutional deprivation is a prerequisite to an award of damages against that individual under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cri.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

The only mention of Dr. Sangani in plaintiff's second amended complaint is in that portion wherein it is alleged, "[t]he next day plaintiff was transferred to Marcy Psychiatric Center and petition before the court upon the application of K. Perlman and the certificates of Doctors K. Sangani and V. Komareth on 10/11/07 ..." Amended Complaint. (Dkt. No. 35) ¶ 5. It is doubtful that the mere provision of a certificate in support of an involuntary commitment petition would suffice to establish a physician's personal involvement in a claim that the involuntary commitment was either retaliatory or accomplished through lack of procedural due process. As such, it seems doubtful that plaintiff's claim against Dr. Sangani is legally plausible, given his failure to sufficiently allege that defendant's personal involvement in a constitutional deprivation. Ordinarily, a court should not dismiss a complaint filed by a *pro se* litigant without granting leave to amend *at least* once if there is any

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3765847 (N.D.N.Y.)
(Cite as: 2010 WL 3765847 (N.D.N.Y.))

indication that a valid claim might be stated. *Branum v. Clark,* 927 F.2d 698, 704-05 (2d Cir.1991) (emphasis added); *see also* Fed. R. Civ. Proc. 15(a) (leave to amend "shall be freely given when justice so requires"); *see also Mathon v. Marine Midland Bank, N.A.,* 875 F.Supp. 986, 1003 (E.D.N.Y.1995) (leave to replead granted where court could not say that under no circumstances would proposed claims provide a basis for relief). I note, however, that I have already recommended dismissal of plaintiff's claims growing out of that commitment as legally insufficient. I therefore similarly recommend that an order be entered dismissing plaintiff's claims against Dr. Sangani on this basis, without leave to replead.

N. *Defendants Komareth and Bodrog*

**\*22** Although defendants' motion does not explicitly request this relief, I have of my own initiative determined to raise the question of whether plaintiff's claims should proceed against the defendants Komareth and Bodrog, two defendants who were never served with the summons and complaint, and who, if this report and recommendation is adopted, would be the sole remaining defendants in the case.

Rule 4(m) of the Federal Rules of Civil Procedure requires that service of a summons and complaint be made within 120 days of issuance of the summons. FN21 "[W]here good cause is shown, the court has no choice but to extend the time for service, and the inquiry is ended." *Panaras v. Liquid Carbonic Indus. Corp.,* 94 F.3d 338, 340 (7th Cir.1996). "If, however, good cause does not exist, the court may, in its discretion, either dismiss the action without prejudice or direct that service be effected within a specified time." *Id.* (citing Fed.R.Civ.P. 4(m)); *Zapata v. City of New York,* 502 F.3d 192, 196 (2d Cir.2007) ("[D]istrict courts have discretion to grant extensions even in the absence of good cause."); *Romandette v. Weetabix Co., Inc.,* 807 F.2d 309, 311 (2d Cir.1986). When examining whether to extend the specified 120 day period for service, a district court is afforded ample discretion to weigh the "overlapping equitable considerations" involved in determining whether good cause exists and whether an extension may be granted in the absence of good cause. *See Zapata,* 502 F.3d at 197.

FN21. That rule provides that

[i]f a defendant is not served within 120 days after the complaint is filed, the court-on motion or on its own after notice to the plaintiff-must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

Fed.R.Civ.P. 4(m). This court's local rules shorten the time for service from the 120 day period under Rule 4(m) to sixty days. *See* N.D.N.Y.L.R. 4.1(b).

A plaintiff's *pro se* status entitles him or her to a certain degree of leniency insofar as service of process is concerned; courts generally favor resolution of such a case on its merits, rather than on the basis of a procedural technicality. *Poulakis v. Amtrak,* 139 F.R.D. 107, 109 (N.D.Ill.1991). When a plaintiff proceeds *in forma pauperis,* such as is the case here, the court is obligated to issue the plaintiff's process to the United States Marshal, who must in turn effect service upon the defendants, "thereby relieving [the] plaintiff of the burden to serve process once reasonable steps have been taken to identify for the court the defendants named in the complaint." *Byrd v. Stone,* 94 F.3d 217, 219 (6th Cir.1996).

I am mindful of the Second Circuit's recent decision in *Murray v. Pataki,* in which the court cautioned that

[a] *pro se* prisoner proceeding *in forma pauperis* is only required to provide the information necessary to identify the defendant, *see, e.g. Sellers,* 902 F.2d at 602, and it is "unreasonable to expect incarcerated and unrepresented prisoner-litigants to provide the current business addresses of prison-guard defendants who no longer work at the prison," *Richardson v. Johnson,* 598 F.3d 734, 739-40 (11th Cir.2010).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3765847 (N.D.N.Y.)
(Cite as: 2010 WL 3765847 (N.D.N.Y.))

*Murray v. Pataki,* No. 09-1657, 2010 WL 2025613, at *2 (2d Cir. May 24, 2010) (summary order) (cited in accordance with Fed. R.App. Proc. 32.1). In this instance, however, plaintiff has failed to demonstrate the requisite vigilance in insuring service upon these defendants and, to the extent necessary, eliciting the court's assistance. Plaintiff's original complaint in this action was filed on September 15, 2008. Summonses issued for defendants Komareth and Bodrog were initially returned unexecuted on January 16, 2009. See Dkt. Nos. 18, 19. The summonses were thereafter reissued and again forwarded to the Marshals for service on April 29, 2009, Dkt. No. 30, and yet again on May 14, 2009, Dkt. No. 36, but were, once again, returned as unexecuted on July 23, 2007 (defendant Komareth), Dkt. No. 44, and August 3, 2009 (defendant Bodrog) Dkt. No. 46. Despite the passage of more than one year, and at least one court intervention at plaintiff's request seeking an order compelling discovery, *see* Dkt. Minute Entry Dated 8/5/09, plaintiff has failed to request assistance from the court in locating and serving these defendants. On that basis I recommend dismissal of plaintiff's claims against defendants Komareth and Bodrog, without prejudice.[FN22]

FN22. In his complaint plaintiff alleges that defendants Komareth and Bodrog are physicians who submitted certifications in support of the applications to confine McQuilkin to the CNYPC and to require that he submit to the administration of psychiatric medication. Since I have already determined that as to the defendants Hanna and Hernandez, who also submitted certifications in support of these applications, plaintiff has failed to establish that his constitutional rights have been violated, for the same reasons I could recommend dismissal of plaintiff's against these two defendants on the merits as well.

IV. *SUMMARY AND RECOMMENDATION*

*23 Although defendants have asserted that certain of plaintiff's claims should be dismissed for failure to exhaust his administrative remedies, the record shows that special circumstances potentially exist that could justify excusing the plaintiff from the exhaustion requirement in this instance. I therefore recommend against dismissal of plaintiff's claims on this procedural basis.

Turning to the merits of plaintiff's claims, I note first that his claim for injunctive relief must be dismissed as moot, based upon his release from custody. I also recommend dismissal of all claims against the CNYPC, and plaintiff's damages claims against the defendants in their official capacities, on the basis of the immunity afforded under the Eleventh Amendment. I further find that the balance of plaintiff's claims are not supported by the record now before the court, and no reasonable factfinder could conclude that those claims are meritorious. Finally, I recommend dismissal of plaintiff's involuntary commitment and forced medication claims on the basis of the *Rooker-Feldman* doctrine, and find it unnecessary, in light of these determinations, to address the additional, alternative basis for dismissal of qualified immunity.

Based upon the foregoing it is hereby respectfully,

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 66) be GRANTED, and that plaintiff's claims against the Central New York Psychiatric Center, Berggren, Hernandez, Sawyer, Hanna and Taylor be DISMISSED in all respects, with prejudice; and it is further

RECOMMENDED that defendant Sangani's motion to dismiss the complaint (Dkt. No. 56) be GRANTED and that all claims against that defendant be DISMISSED for failure to state a plausible civil rights claim; it is further

RECOMMENDED that plaintiff's claims against defendants Komareth and Bodrog be DISMISSED, *sua sponte,* without prejudice.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1);

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3765847 (N.D.N.Y.)
(Cite as: 2010 WL 3765847 (N.D.N.Y.))


Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d
85 (2d Cir.1993).


It is hereby ORDERED that the clerk of the court amend
the court's records to reflect the correct spelling of
defendant Berggen's name; and it is further


ORDERED THAT the clerk serve a copy of this report
and recommendation upon the parties in accordance with
this court's local rules.


N.D.N.Y.,2010.
McQuilkin v. Central New York Psychiatric Center
Slip Copy, 2010 WL 3765847 (N.D.N.Y.)


END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.