IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

FELIPE OTEZE FOWLKES,

                              Plaintiff,

                                                    Civil Action No.
                                                    9:08-CV-1198 (LEK/DEP)

              v.


ROBERT LOVERIDGE, HAROLD SMITH,
ANTHONY PATRICELLI, JOHNNY MAE,
OFFICER ALDRICH, DANIEL KEATING,
and UNKNOWN NAMED MEMBERS OF
THE TROY CITY POLICE DEPARTMENT,

                              Defendants.

_____

APPEARANCES:                            OF COUNSEL:

FOR PLAINTIFF:

FELIPE OTEZE FOWLKES, *Pro Se*
W84202
Souza-Baranowski Correctional Facility
P.O. Box 8000
Shirley, MA  01464

FOR DEFENDANTS:

GOLDBERG, SEGALLA LAW FIRM          JONATHAN BERNSTEIN, ESQ.
8 Southwoods Blvd., Suite 300       WILLIAM J. GREAGAN, ESQ.
Albany, NY 12211-2526

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

Plaintiff Felipe Oteze Fowlkes, a former New York State inmate who is presently incarcerated in Massachusetts, has commenced this action pursuant to 42 U.S.C. § 1983 alleging deprivation of his civil rights.  While the focus of plaintiff's complaint, which was originally filed in another district, is extremely expansive, implicating events spanning over a period of more than eights years and involving both state and local governmental employees, his claims have been substantially narrowed, and all that remains are claims against the sheriff and other named and unnamed employees of Rensselaer County and the City of Troy alleging unlawful retaliation based upon their alleged interference with his ability to prosecute claims in a separate action filed in this court in 1997.[1]

During the course of preparing a report and recommendation in connection with a pending motion for summary judgment filed by the remaining named defendants the court undertook a review of plaintiff's litigation history, which is extensive.  That analysis revealed, as at least one other court has found, that three or more of plaintiff's previous actions were dismissed on grounds that they were frivolous, malicious, or failed to

---

[1]     The unnamed Troy City police officers have never been identified and served and are therefore parties to the action.

state a claim upon which relief may be granted, thereby bringing him within the purview of the three strikes provision of 28 U.S.C. § 1915(g). *See Fowlkes v. Obama*, No. 08 c 5538 (N.D. Ill., filed 2008).  Based upon that discovery, the plaintiff was directed to show cause why his *in forma pauperis* ("IFP") status should not be revoked.

Having carefully conducted an independent review of plaintiff's litigation history and his submission regarding the issue, I conclude that plaintiff experienced at least three dismissals of actions or appeals qualifying as strikes prior to commencement of this suit and, finding no credible basis to conclude that plaintiff suffers from imminent danger as is envisioned within that statute, I recommend that plaintiff's IFP status be revoked.

I.     BACKGROUND

Plaintiff commenced this action in or about January 2007 in the Southern District of New York.[2]  Complaint (Dkt. No. 2).  Plaintiff's complaint named both specific and unidentified Doe defendants falling into three groups, including 1) employees of the New York State

---

[2]     It is difficult to ascertain from available records precisely when plaintiff's complaint, which is dated January 16, 2007, was received by that court.  *See* Dkt. No. 2.

Department of Corrections and Community Supervision ("DOCCS")

(formerly the Department of Correctional Services or the "DOCS"); 2) the

commissioner and three other employees of the New York State Division

of Criminal Justice Services ("DCJS"); and 3) the sheriff and five other

employees of Rensselaer County as well as unnamed Troy City police

officers, and asserted a broad array of constitutional claims against those

defendants.  *Id.*

The action was transferred to the Eastern District of New York by

order entered on March 5, 2007.  Dkt. No. 3.  Thereafter, by decision

issued from that court on November 7, 2008, several of plaintiff's claims

were dismissed, and the portion of the action left intact was transferred to

this district.  Dkt. No. 50.  Since the time of that transfer, by report and

recommendation issued by me on November 9, 2010 and approved by

Senior District Judge Lawrence E. Kahn on January 4, 2011, plaintiff's

claims against the DCJS defendants were dismissed, leaving surviving

only plaintiff's retaliation cause of action against the Rensselaer County

defendants.  Dkt. Nos. 98, 102.  Those defendants have since moved

seeking the entry of summary judgment dismissing that remaining claim.

*See* Dkt. No. 106.   That motion has been referred to me for the issuance

of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and

Northern District of New York Local Rule 72.3(c).

Information concerning plaintiff's litigation history, which was

uncovered by the court in connection with its review of defendants'

pending motion, suggests that plaintiff's continued IFP status could be

jeopardized based upon his having had three prior dismissals qualifying

as strikes pursuant to section 1915(g) before commencing this action as a

prison inmate.  As a result, a text order was issued by the court on August

5, 2011, directing that he show cause why his IFP status should not be

revoked under that three strikes provision.[3]  *See* Text Order Dated 8/5/11.

Plaintiff has since responded, as directed by that order to show cause,

arguing that he qualifies for the imminent danger exception under that

provision and urging the court not to revoke his IFP status.[4]  Dkt. No. 114.

II.   DISCUSSION

A.   Three Strikes Provision

Section 1915(g), which was enacted as part of sweeping inmate

---

[3]       The question of whether a prisoner who has been granted IFP status
falls within the purview of 28 U.S.C. § 1915(g) is a matter which may be raised by the
court of its own initiative.  *Harris v. City of New York*, 607 F.3d 18, 23 (2d Cir. 2010).

[4]       Plaintiff does not appear to challenge the finding that before commencing
this action at least three other cases or appeals brought by him were dismissed under
circumstances qualifying as strikes pursuant to section 1915(g).

litigation reform brought about by adoption of the Prison Litigation Reform

Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), though

engendering far less litigation than some of its PLRA counterparts

including, notably, the exhaustion of remedies requirement of 42 U.S.C. §

1997e(a), provides that

> [i]n no event shall a prisoner bring a civil action or
> appeal a judgment in a civil action or proceeding
> under this section if the prisoner has, on 3 or more
> prior occasions, while incarcerated or detained in
> any facility, brought an action or appeal in a court
> of the United States that was dismissed on the
> grounds that is frivolous, malicious, or fails to state
> a claim upon which relief may be granted, unless
> the prisoner is under imminent danger of serious
> physical injury.

28 U.S.C. § 1915(g).  The manifest intent of Congress in enacting this

"three strikes" provision was to curb prison inmate abuses and to deter the

filing of multiple, frivolous civil rights suits by prison inmates.  *Tafari v.*

*Hues*, 473 F.3d 440, 443-44 (2d Cir. 2007); *Gill v. Pidlychak*, No. 9:02-CV-

1460, 2006 WL 3751340, at *2 (N.D.N.Y. Dec. 19, 2006) (Scullin, S.J. &

Treece, M.J.).[5]  The prophylactic effect envisioned under section 1915(g)

is accomplished by requiring a prisoner who has had three previous

---

[5]     Copies of all unreported decisions cited in this document have been
appended for the convenience of the *pro se* plaintiff.

strikes to engage in the same cost-benefit analysis that other civil litigants

must make before deciding whether to commence suit, accompanied by

the filing of the full fee – that is, to assess whether the result to be

achieved justifies the filing fee expenditure.  *Tafari*, 473 F.3d at 444;

*Ibrahim v. District of Columbia*, 463 F.3d 3, 6 (D.C. Cir. 2006).  As the

Second Circuit has noted, in the context of PLRA amendments requiring

inmates to authorize prison officials to make deductions from inmate

accounts to be applied as partial payments of appellate filing fees for

prisoners granted *in forma pauperis* status,

> [p]rior to the enactment of the *in forma pauperis*
> amendments, inmates suffered no economic
> disincentive to filing law suits.  Indeed, the very
> nature of incarceration – prisoners have
> substantial free time on their hands, their basic
> living expenses are paid by the state and they are
> provided free of charge the essential resources
> needed to file actions and appeals, such as paper,
> pens, envelopes and legal materials – has fostered
> a "'nothing to lose and everything to gain'"
> environment which allows inmates indiscriminately
> to file suit at taxpayers' expense.

*Nicholas v. Tucker,* 114 F.3d 17, 20 (2d Cir. 1997), *cert. denied sub nom.*,

*Nicholas v. Miller*, 523 U.S. 1126, 118 S. Ct. 1812 (1998) (internal

citations omitted); *see also Gill*, 2006 WL 3751340, at *2.

        The question of whether the dismissal of a prior action qualifies as a

strike, for purposes of section 1915(g), is a matter of statutory interpretation, and as such a question for the court.[6] *Tafari*, 473 F.3d at 442-43. In determining whether a dismissal satisfies the failure to state a claim prong of the statute, implicated in this case, courts have drawn upon the provisions of Rule 12(b)(6) of the Federal Rules of Civil Procedure for guidance, particularly in light of the similarity in phrasing utilized in the two provisions. *Tafari*, 473 F.3d at 442 (citing *Andrews v. King*, 398 F.3d 1113, 1121 (9th Cir. 2005)).

> 2.   Application of Section 1915(g)

On October 28, 2008 the United States District Court for the Northern District of Illinois found that as of that date plaintiff had accrued three dismissals qualifying as strikes under section 1915(g). *See Fowlkes v. Obama,* No. 08 C 5538 (N.D. Ill. filed 2008). That finding, however, is not determinative in this instance since the controlling question is whether plaintiff had accrued three strikes prior to the filing of this action in

---

[6]     The Second Circuit has expressed its view that the time for determination of "strikes" is only when the section 1915(g) issue is ripe for adjudication, and that because of the potentially significant consequences flowing from such a finding, a court should not, when dismissing an inmate complaint, contemporaneously signal whether the dismissal should count as a "strike" for the purposes of that section. *DeLeon v. Doe,* 361 F.3d 93, 95 (2d Cir. 2004); *see also Snider v. Melindez*, 199 F.3d 108, 115 (2d Cir. 1999) ("We . . . doubt whether the entry of a strike is properly considered at the time an action is dismissed").

January of 2007.[7]

According to publically available information, plaintiff has filed thirty-four actions in the United States courts, principally in New York and Massachusetts.  *See* http://www.pacer.gov/.  Two of those actions, both of which were commenced prior to the filing of this suit, serve as the focal point of the three strikes analysis.

On November 19, 1989 an action commenced by the plaintiff in the Eastern District of Virginia, while incarcerated in a local jail facility, was dismissed, without prejudice; in a docket entry associated with the dismissal the clerk of the court was directed to note the disposition of the action as qualifying for purposes of the PLRA's three strikes provision. *See Fowlkes v. Barlow*, No. 3:98-CV-00242-RLW (E.D. Va. filed 1998).  In its decision in *Fowlkes v. Obama*, the Northern District of Illinois treated that dismissal as a qualifying strike under section 1915(g).  Having reviewed available information regarding that action, including principally the docket sheet, I similarly conclude that its dismissal qualifies as a strike

---

[7]        The rule, at least in this district, appears to be that in order to constitute a strike, a dismissal must have occurred prior to the filing of the action and the grant of IFP status.  *See Welch v. Seksly,* No. 9:06-CV-00812, 2008 WL 238553, at *5 (N.D.N.Y. 2008) (citing *Welch v. Galie*, No. 97-CV-1369, Dkt. Nos. 119, 131 (N.D.N.Y.) (TJM/DRH)); *Gill*, 2006 WL 3751346, at *4.

for purposes of the PLRA.[8]

Another action in which strikes have occurred was commenced by the plaintiff in this district on October 28, 1999. *See Fowlkes v. Reno*, No. 6:99-CV-1830 (TJM/RWS) (N.D.N.Y. filed 1999). Plaintiff's complaint in that action was dismissed on February 7, 2000 pursuant to 28 U.S.C. § 1915(e)(2)(B) and 1915(a)(b)(1). *See id.* at Dkt. No. 7. Following that dismissal plaintiff appealed to the United States Court of Appeals for the Second Circuit. That appeal was similarly dismissed as lacking an arguable basis in fact or law. *See id.* at Dkt. No. 15. Dismissals in the same case at the district and circuit court levels, if for reasons falling within the ambit of section 1915(g), are properly regarded as constituting two separate and distinct strikes. *Mills v. Fischer*, 645 F.3d 176, 177 n.1 (2d Cir. 2011) (quoting *Chavis v. Chappius,* 618 F.3d 162 (2d Cir. 2010)) (noting that an inmate occurs two strikes when both a complaint and an appeal in the same action are dismissed on one of the listed grounds); *see also Tafari v. Hues*, 472 F.3d at 441-42 (while disagreeing with the district court's determination with regard to other actions brought by the

_____

[8]   In order to assess whether a dismissal constitutes a strike under section 1915(g), a court may properly rely on a docket sheet provided that it contains sufficient information concerning the grounds for dismissal to permit an informed decision as to whether it qualifies as a strike. *See Harris*, 607 F.3d at 20.

plaintiff, the court did not disturb the district court's finding that dismissal by the district court and the circuit court in a prior action commenced by the plaintiff constituted strikes).

From a review of relevant, available information it is clear that prior to commencement of this action Fowlkes had incurred three strikes.[9]

3.    Imminent Danger Exception

As a safety valve, obviously intended to protect a prison inmate exposed to potential danger from the harsh consequences of his or her earlier folly, section 1915(g) provides that a prisoner who is in "imminent danger of serious physical injury" may avoid application of the three strikes rule of section 1915(g).  *See* 28 U.S.C. § 1915(g); *see also Malik v. McGinnis*, 293 F.3d 559, 562-63 (2d Cir. 2002).  In accordance with this exception, an inmate who has had three prior "strikes" but nonetheless wishes to commence a new action *in forma pauperis* must show that he or she was under imminent danger at the time of filing; the exception does

---

[9]        This court's records in *Fowlkes v. Rensselaer County Department of Social Services,* No. 96-CV-0901 (TJM/RWS), note that the dismissal of plaintiff's complaint in that action qualifies as a strike under section 1915(g).  That entry, made shortly after enactment of the PLRA, is mistaken; because the plaintiff was not incarcerated when that action was commenced, its dismissal does not count as a strike as defined in section 1915(g).  *Dillworth v. Goldberg*, No. 10 Civ 2224(RJH)(GWG), 2011 WL 3501869, at *15 (S.D.N.Y. Jul. 28, 2011); *Dolberry v. Levine*, 567 F. Supp. 2d 413, 422 (W.D.N.Y. 2008).

not provide a basis to avoid application of the three strikes on the basis of past harm.  *Malik*, 293 F.3d at 562-63.  An inmate who claims the benefit of this exception must also show that the danger faced rises to the level of exposure to a "serious physical injury."  28 U.S.C. § 1915(g).  The imminent danger claimed by the inmate, moreover, must be real, and not merely speculative or hypothetical.  *Johnson v. Barney*, No. 04 Civ. 10204, 2005 WL 2173950, at *1-2 (S.D.N.Y. Sept. 6, 2005) (finding that inmate's allegation of danger at facility he was not housed at, but may pass through at infrequent occasions in the future, does not establish imminent danger).

For a three-strikes litigant to qualify for the imminent danger exception, his or her complaint "must reveal a nexus between the imminent danger it alleges and the claims it asserts."  *Pettus v. Morgenthau*, 554 F.3d 293, 298 (2d Cir. 2009).  When determining whether the requisite relationship is present a court must examine "(1) whether the imminent danger of serious physical injury that a three-strikes litigant alleges is *fairly traceable* to unlawful conduct asserted in the complaint and (2) whether a favorable judicial outcome would *redress* that injury."  *Id.* (emphasis in original).

The term "serious physical injury," as utilized in section 1915(g), is
nowhere concretely defined, although it has been construed by various
courts as including a "disease that could result in serious harm or even
death[.]" *Ibrahim*, 463 F.3d at 7.  In deciding whether to invoke the
exception, a court must examine the available pleadings, construed in a
light most favorable to the plaintiff, to determine whether the plaintiff has
alleged a serious physical injury.  *McAlphin v. Toney*, 281 F.3d 709, 710
(8th Cir. 2002).  Conditions which have been held to rise to a sufficient
threshold level include denial of treatment for infected gums, resulting in
damages of infection, *McAlphin*, 281 F.3d at 710; denial of adequate
treatment for Hepatitis C, a "chronic and potentially fatal disease,"
*Ibrahim*, 463 F.3d at 6-7; and patterns of harassment from corrections
officers, causing heart palpitations, chest pains and labored breathing,
*Ciarpaglini v. Saini*, 352 F.3d 328, 330-31 (7th Cir. 2003) (finding upon
reaching the merits, however, that plaintiff's complaint did not state an
Eighth Amendment claim).

In his submission to the court Fowlkes urges application of the
imminent danger safety valve provision.  Plaintiff's imminent danger
argument, however, is based upon a purely conclusory allegation that he

has been threatened and targeted for assault and murder by prison guards and other inmates.  *See* Plaintiff's Opposition (Dkt. No. 114) ¶ 2. Plaintiff's assertion is neither credible nor sufficient to trigger the limited imminent danger exception.  The remaining defendants in this case are the Rensselaer County sheriff and five other Rensselaer County employees.  Those individuals have no further involvement in plaintiff's incarceration since he is currently an inmate in a Massachusetts correctional facility.  Under these circumstances plaintiff is unable to establish both the requisite imminent danger and, importantly, a link between the retaliation claims asserted in the action and the circumstances giving rise to imminent danger.  *Pettus*, 554 F.3d at 298. Accordingly, plaintiff fails to qualify for that limited exception.

III.   SUMMARY AND RECOMMENDATION

The record now before the court firmly establishes that at least three prior civil rights actions brought by the plaintiff, a prodigious litigant, during his time as a prison inmate have been dismissed on their merits for failure to state claims upon which relief may be granted.  Since the evidence presented fails to reveal any basis to conclude that plaintiff is in imminent danger of serious physical injury, plaintiff is therefore not entitled to an

exemption from the effects of the three strikes provision of 28 U.S.C. § 1915(g) in this action.  Accordingly, recognizing that the net result of these findings is not denial altogether of plaintiff's access to the courts, but rather only the requirement that he conclude that pursuit of his civil rights claims justifies the expenditure in advance of the full applicable filing fee, it is hereby

RECOMMENDED, that IFP status be revoked and that his complaint be conditionally dismissed unless, within thirty (30) days of the filing of this order he pays the applicable $350 filing fee in full; and it is further

RECOMMENDED that if plaintiff pays the full filing fee within the required time period the clerk be directed to return the file to the court for review of the pending summary judgment motion.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the clerk of the court within FOURTEEN days of service of this report.  FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is further ORDERED that the clerk of the court serve a copy of this

report, recommendation and order upon the parties in accordance with

this court's local rules.

_____

David E. Peebles
U.S. Magistrate Judge

Dated:      September 9, 2011
            Syracuse, NY



Not Reported in F.Supp.2d, 2006 WL 3751340 (N.D.N.Y.)

(Cite as: 2006 WL 3751340 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Anthony G. GILL, Plaintiff,

v.

Chris PIDLYPCHAK, Correction Officer and T.G.
Dygert, Correction Officer, Defendants.

No. 902-CV-1460 (FJS/RFT).

Dec. 19, 2006.

Anthony G. Gill, of counsel, Comstock, NY, Plaintiff, Pro
Se.

Hon. Eliot Spitzer, Attorney General of the State of New
York, Douglas Goglia, Esq., Asst. Attorney General, of
counsel, Albany, NY, for Defendants.

*DECISION AND ORDER*

FREDERICK J. SCULLIN, JR., S.J.

**\*1** The above-captioned matter having been presented
to me by the Report-Recommendation of Magistrate Judge
Randolph F. Treece filed November 20, 2006 and the
Court having reviewed the Report-Recommendation and
the entire file in this matter, and no objections to said
Report-Recommendation having been filed, it is hereby

**ORDERED,** that the Report-Recommendation of
Magistrate Judge Randolph F. Treece filed November 20,
2006 is **ACCEPTED** in its entirety, for the reasons stated
therein; and it is further

**ORDERED,** that the Order granting Gill's IFP status
is **VACATED;** and it is further

**ORDERED,** that Defendants' Letter-Motion seeking
dismissal of Gill's Complaint pursuant to 28 U.S.C. §
1915(g) is **GRANTED** unless Gill pays the filing fee of
$150.00 within thirty days of this final order.

**IT IS SO ORDERED.**

RANDOLPH F. TREECE, United States Magistrate
Judge.

*REPORT-RECOMMENDATION and ORDER*
**I. INTRODUCTION**

Pro se Plaintiff Anthony Gill brings this civil action
pursuant to 42 U.S.C. § 1983, alleging Defendants
violated his civil rights while he was incarcerated at the
Auburn Correctional Facility. Dkt. No. 1, Compl. [FN1]
Specifically, Gills alleges Defendants Pidlypchak and
Dygert filed false misbehavior reports against him and
harassed him in retaliation for the filing of numerous
institutional grievances against them and a civil lawsuit
against Pidlychak for smoking violations. Compl., Pl.'s
Statement of Facts.

> FN1. On December 23, 2002, Defendants filed a
> Motion to Dismiss Gill's Complaint pursuant to
> FED.R.CIV.P. 12(b)(6) for failure to state a
> claim upon which relief can be granted. Dkt. No.
> 6, Mot. to Dismiss. By Order of the Honorable
> Joseph M. Hood, United States District Judge for
> the Eastern District of Kentucky sitting by
> designation, Defendants' Motion was granted
> dismissing Gill's complaint with prejudice. Dkt.
> No. 17, Decision & Order, dated July 28, 2003.
> Judgment was entered on August 1, 2003 and
> Gill appealed. Dkt. Nos. 18 & 19, Notice of
> Appeal, dated Aug. 4, 2003. The Second Circuit
> affirmed the District Court's dismissal of Gill's
> Eighth Amendment claim, but vacated the
> Judgment of the District Court dismissing Gill's
> First Amendment claim and remanded the action
> back to the District Court. *Gill v. Pidlypchak,*
> 389 F.3d 379 (2d Cir.2004).

Presently before the Court is Defendants'
Letter-Motion requesting an order revoking Gill's *in forma
pauperis* (IFP) status and conditionally dismissing this
action pursuant to 28 U.S.C. § 1915(g) pending Gill's
prompt payment of the statutory filing fee of $150.00.[FN2]
Dkt. No. 35, Defs.' Lt.-Mot., dated June 19, 2006, at p. 1.
Gill opposes the motion. Dkt. No. 38, Pl.'s Lt.-Resp.,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 3751340 (N.D.N.Y.)

(Cite as: 2006 WL 3751340 (N.D.N.Y.))

dated July 21, 2006. For the reasons that follow, it is hereby recommended that the Order granting Gill's IFP status be **vacated** and that Defendants' Motion pursuant to § 1915(g) be **granted** unless Gill pays the filing fee of $150.00 **within thirty days (30) days** of the entry of the final order by the District Court.

> FN2. Although Defendants' Letter-Motion states $250.00 as the required filing fee for this action, Defs.' Lt.-Mot. at p. 1, "[D]efendants and their counsel acknowledge that the filing fee was $150.00 when this action was commenced, and their request that [P]laintiff be required to fully pay a filing fee of $250.00 to avoid the dismissal of this action was merely an oversight." Dkt. No. 37, Defs.' Lt.-Reply, dated July 27, 2006, at p. 1.

## II. DISCUSSION

### A. 28 U.S.C. § 1915

Under 28 U.S.C. § 1915, individuals may seek leave of the court to pursue their claims without prepayment of fees and costs and proceed with the litigation as a poor person or *in forma pauperis.* 28 U.S.C. § 1915(a)(1). The IFP statute enables prisoners to similarly apply for this privilege, and indeed, many, if not most, incarcerated individuals bringing suits have taken advantage of such opportunity. *Id.* at § 1915(a)(2). Also under this statute, a court may *sua sponte* dismiss a case if it determines that such action is (1) frivolous or malicious, (2) fails to state a claim on which relief may be granted, or (3) seeks monetary relief against a defendant who is immune from such relief. *Id.* at § 1915(e)(2).

**\*2** Recognizing the potential for prisoner abuse and seeking to relieve congestion of patently frivolous prisoner suits, Congress enacted the Prisoner Litigation Reform Act (**PLRA**) of 1996, which renders several restrictions on a **prisoner's** ability to exploit the justice system. One such mechanism is the so-called "three **strikes** rule" which bars inmates from proceeding IFP after three or more previous claims, where the prisoner was granted IFP status, have been **dismissed** as "frivolous, malicious, or [for] fail[ing] to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury." *Id.*

In recognizing the legitimate government interests fostered by the **PLRA** amendments, the Second Circuit stated that,

> [p]rior to the enactment of the *in forma pauperis* amendments, inmates suffered no economic disincentive to **filing lawsuits**. Indeed, the very nature of incarceration-prisoners have substantial free time on their hands, their basic living expenses are paid by the state and they are provided free of charge the essential resources needed to **file** actions and appeals, such as paper, pens, envelopes and legal materials-has fostered a " 'nothing to lose and everything to gain' " environment which allows inmates indiscriminately to **file** suit at taxpayers' expense. *See Anderson v. Coughlin,* 700 F.2d 37, 42 (2d Cir.1983) (quoting *Jones v. Bales,* 58 F.R.D. 453, 463-64 (N.D.Ga.1972), *aff'd,* 480 F.2d 805 (5th Cir.1973).

*Nicholas v. Tucker* 114 F.3d 17, 20 (2d Cir.1997).

In calculating which cases **count** towards the three **strikes** rule, a court may look to **dismissals** which predated the enactment of the **PLRA**. *Welch v. Galie,* 207 F.3d 130, 132 (2d Cir.2000). The Second Circuit has held such a calculation to be proper and constitutional given that the determination to revoke IFP status in no way affects the merits of the **prisoner's** case, but rather prevents the inmate from continuing suit without the payment of fees. *Id.*

### B. Gill's "Three Strikes"

As noted by the Second Circuit, Gill "is no stranger ... to the federal courts." *Gill v. Pidlypchak,* 389 F.3d 379, 384 (2d Cir.2004). He "has **commenced** at least 116 different [actions] against the State of New York, its executive agencies, and its officials and employees, *see Gill v. Calescibetta,* 00-CV-1553, Decision & Order, dated Aug. 5, 2004, at p. 3, n. 2 (N.D.N.Y.); has **filed** at least thirty-nine (39) different **lawsuits** in district courts within the Second Circuit, *see* Defs.' Lt.-Mot., Supp. 4; and has initiated nineteen (19) suits, in addition to the pending action, in this District alone.[FN3] In fact, this Court has previously held that in light of Gill's experience in federal court and his overly litigious nature, he is not

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 3751340 (N.D.N.Y.)

(Cite as: 2006 WL 3751340 (N.D.N.Y.))

entitled to "the special solicitude afforded [to] *pro se* litigants [.]" *Gill v. Riddick,* 2005 WL 755745, at *2 (N.D.N.Y. Mar. 31, 2005).

> FN3. *See* (1) *Gill v. LeFevre,* 85-CV-1534 (HGM/RWS) (closed on Jan. 17, 1992-failure to prosecute); (2) *Gill v. Padilla,* 88-CV-147 (NPM/RWS) (closed on Mar. 26, 1992-failure to prosecute); (3) *Gill v. Burch,* 94-CV-369 (FJS/DNH) (closed on Apr. 1, 1999-Defs.' Mot. for Summ. J. granted); (4) *Gill v. Kramer,* 98-CV-45 (FJS/GJD) (closed on Sept. 30, 1999-Stip. of Discont.); (5) *Gill v. Anderson,* 98-CV-1472 (LEK/GLS) (closed on Mar. 3, 2003-Defs.' Mot. for Summ. J. granted); (6) *Gill v. Gummerson,* 99-CV-761 (NAM/DEP) (closed on Aug. 20, 2003-Jury Verdict for Defs.); (7) *Gill v. Dann,* 00-CV-566 (NAM/RFT) (closed on Nov. 21, 2001-failure to prosecute); (8) *Gill v. Tuttle,* 00-CV-585 (DNH/DRH) (currently pending); (9) *Gill v. Doe,* 00-CV-983 (GLS/DEP) (closed on June 8, 2004-Defs.' Mot. for Summ. J. granted); (10) *Gill v. Calescibetta,* 00-CV-1553 (LEK/DEP) (currently stayed); (11) *Gill v. McGinnis,* 00-CV-1787 (LEK/RWS) *(habeas corpus* petition transferred to S.D.N.Y. on Dec. 19, 2000); (12) *Gill v. Smith,* 00-CV-1905 (FJS/GJD) (currently pending); (13) *Gill v. Butero,* 01-CV-82 (LEK/DRH) (closed on Apr. 30, 2003-Defs.' Mot. to Dismiss granted at trial); (14) *Gill v. Hoadley,* 01-CV-323 (FJS/DEP) (currently pending); (15) *Gill v. Steinberg,* 02-CV-82 (DNH/DEP) (closed on Feb. 19, 2004-Stip. of Discont.); (16) *Gill v. Pflueger,* 02-CV-130 (DNH/GJD) (closed on Jan. 30, 2003-Defs.' Mot. to Dismiss granted); (17) *Gill v. Coyne,* 02-CV-1380 (TJM/GHL) (closed on June 22, 2006-Defs.' Mot. for Summ. J. granted); (18) *Gill v. Erickson,* 02-CV-1573 (LEK/RFT) (transferred to S.D.N.Y. on Jan. 21, 2003); and (19) *Gill v. Riddick,* 03-CV-1456 (NAM/RFT) (currently pending).

When Gill commenced this action on November 20, 2002, he had already acquired at least three "strikes" for purposes of § 1915(g). A review of the cases cited in Defendants' Letter-Motion shows that Gill, while incarcerated or detained, brought actions on three or more occasions that were dismissed for "strike" reasons: *Gill v. Accettulli,* 92-CV-5039 (S.D.N.Y. July 8, 1992) (dismissed *sua sponte* as "lack[ing] an arguable basis either in law or in fact") (internal quotation marks and citations omitted); *Gill v. Anna M. Kross Center,* 92-CV-9326 (S.D.N.Y. Dec. 28, 1992) (dismissed *sua sponte* as "lack[ing] an arguable basis either in law or in fact") (internal quotation marks and citations omitted); *Gill v. LeFevre,* 85-CV-1534 (N.D.N.Y. Jan. 13, 1992) (dismissed for failure to prosecute pursuant to FED.R.CIV.P. 11); and *Gill v. Padilla,* 88-CV-147 (N.D.N.Y. Mar. 24, 1992) (dismissed for failure to prosecute pursuant to FED.R.CIV.P. 11).[FN4] Defs.' Lt.-Mot. at p. 2.

> FN4. In their Letter-Motion, Defendants' assert that "[i]n light of *Gill v. Eberhardt,* 04-CV-197Sc (W.D.N.Y. July 30, 2004), Gill is collaterally estopped from asserting that he has not accrued four 'strikes' by the end of 1992, and at least six 'strikes' in total." Defs.' Lt.-Mot. at p. 2, n. 4; *see* Defs.' Lt.-Reply at p. 2. Defendants' concede, however, that two of six actions cited as "strikes" by the Western District in the *Eberhardt* decision, *"Gill v. Anderson and Gill v. Pflueger* [,] ... were dismissed after this action was commenced, and therefore, do not count as 'strikes' for purposes of assessing whether Gill is entitled to IFP status[.]" Defs.' Lt.-Mot. at p. 2. Therefore, Defendants' rely on the remaining four cases to support their conclusion that Gill has acquired the requisite "three strikes" to revoke his IFP status. While the Court agrees with Defendants' conclusion, we do not rely on Defendants' estoppel reasoning as the *Eberhardt* case was not decided by the Western District until after Gill commenced this action. We, instead, engage in our own independent review of the cases cited in the *Eberhardt* decision.

## C. Application of *Snider v. Melindez* and *DeLeon v. Doe*

**\*3** Gill contends that § 1915(g) does not apply to him because the cases cited in Defendants' Letter-Motion as "strikes" do not meet the requirements set forth by the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 3751340 (N.D.N.Y.)

(Cite as: 2006 WL 3751340 (N.D.N.Y.))

Second Circuit in *Snider v. Melindez,* 199 F.3d 108 (2d Cir.1999) and clarified in *DeLeon v. Doe,* 361 F.3d 93 (2d Cir.2004). Pl.'s Lt.-Resp. at pp. 2-3. According to Gill, the cited cases "fail to indicate w [h]ere dismissals [were] with prejudice or without prejudice as mandated in *Snider.*" Pl.'s Lt.-Resp. at p. 3.

In *Snider v. Melindez,* the Second Circuit held that the "three strikes rule" was intended to apply to those "nonmeritorious suits dismissed with prejudice, not suits dismissed without prejudice for failure to comply with a procedural prerequisite." *Snider v. Melindez,* 199 F.3d at 111.[FN5] The Court noted in that case that there are a variety of procedural reasons for which a case may be dismissed *sua sponte* and such a dismissal does not necessarily render a determination on the merits as, for example, a dismissal for frivolousness would. *See id.* at 111-113. Indeed, the Supreme Court has directed that an action is frivolous when it is based on an indisputably meritless legal theory or presents factual contentions that are clearly baseless, thus such dismissal is one on the "merits" of the case. *Neitzke v. Williams,* 490 U.S. 319, 325 (1989) (cited in *Welch v. Galie,* 207 F.3d 130, 132 (2d Cir.2000)).

> FN5. In *Snider,* the Second Circuit held that a pre-answer dismissal based upon a failure to exhaust administrative remedies is a dismissal for failure to comply with procedural prerequisites and such a non prejudicial dismissal does not count towards the "three strikes rule."

In *DeLeon v. Doe,* the Second Circuit, in upholding its ruling in *Snider,* reiterated that "district court judgments *should* clearly set forth the reasons for dismissal, including whether the dismissal is because the claim is frivolous, malicious, or fails to state a claim, whether it is because the prisoner has failed to exhaust an available administrative remedy, or for other reasons." 361 F.3d at 95 (emphasis in original) (internal quotation marks omitted). The Second Circuit further noted that "[t]hese judgment[s] should also state whether the dismissal is with prejudice or without," and that "[c]larifications of this sort 'will undoubtedly assist subsequent courts that must determine whether a plaintiff is barred from maintaining an action *in forma pauperis* by the three strikes rule of Section 1915(g).' " *Id.*

Gill's interpretation of *Snider* and *DeLeon* as they apply to the cases cited by the Defendants is flawed. First, although *Snider* is clear in its application to those cases dismissed on the merits, the Second Circuit does not mandate that district courts expressly use the language "with or without prejudice" in judgments of dismissal. The language used by the Second Circuit, specifically the term "should," indicates that the language is advisory or instructive rather than mandatory. If the Second Circuit had intended district courts to include this specific language, as Gill argues, it would have stated that the district courts "must" or "shall," which indicates a mandate or requirement.

**\*4** Second, Gill's arguments display a crafty articulation of both the *Snider* and *Doe* cases as they apply to § 1915(g) strikes. Both cases addressed the issue of "whether the entry of a strike [under § 1915(g) ] is properly considered *at the time an action is dismissed.*" *Id.* (citing *Snider v. Melindez,* 199 F.3d at 115) (emphasis added). While the Second Circuit expressed strong doubt about this issue in *Snider,* it decided the matter in *DeLeon* and held that "district courts should not issue these **strikes** one by one, in their orders of judgment, as they dispose of suits that may ultimately-upon determination at a proper time-qualify as **strikes** under the terms of § 1915(g)." [FN6] *Id* .

> FN6. The Second Circuit in *DeLeon* based its holding on its rationale in *Snider,* which reads:
>
> > The designation of **strikes** has no practical consequences until a defendant in a **prisoner's lawsuit** raises the contention that the **prisoner's** suit or appeal may not be maintained *in forma pauperis* pursuant to 28 U.S.C. § 1915 because the prisoner has accumulated three **strikes**. At that time, because a practical consequence turns on the answer to the question, a court will need to determine whether the prisoner should be charged with three **strikes**. Litigation over the issue at an earlier juncture would involve the courts in disputes that might never have any practical consequence.

Not Reported in F.Supp.2d, 2006 WL 3751340 (N.D.N.Y.)

(Cite as: 2006 WL 3751340 (N.D.N.Y.))

*DeLeon v. Doe,* 361 F.3d at 95 (quoting *Snider v. Melindez,* 199 F.3d at 115).

The Second Circuit also stated that "[c]ontemporanous classification of dismissals as strikes or non-strikes at a time when the ruling has no immediate consequences may also lead district courts to undertake such classifications carelessly, and with inadequate explanation of why a given dismissal falls into one category and not the other." *Id.* (quoting *Snider v. Melindez,* 199 F.3d at 115, n. 4).

Here, Gill challenges four cases cited by the Defendants as "strikes." Pl.'s Lt.-Resp. at p. 3. Addressing these cases specifically in light of Gill's arguments and as noted above, we find that all four actions were dismissed on the merits and therefore, qualify as "strikes" against Gill for purposes of the "three strikes rule."

Although the Southern District in deciding *Accettulli* and *Kross* did not expressly state that the cases were dismissed "with prejudice" in the orders of dismissal, the District Court dismissed Gill's claims in both cases because they "lack[ed] an arguable basis either in law or fact." *Gill v. Accettulli,* 92-CV-5039, Order of Dismissal, dated July 8, 1992, at p. 4 (S.D.N.Y .) (citing *Neitzke v. Williams,* 490 U.S. at 325); *Gill v. Anna M. Kross Center,* 92-CV-9326, Order of Dismissal, dated Dec. 28, 1992, at p. 2 (S.D.N.Y.) (citing *Neitzke v. Williams,* 490 U.S. at 325). Additionally, in *Kross,* the district court went on to "certify pursuant to 28 U.S.C. § 1915(a) that any appeal from this order would not be taken in good faith." *Kross,* 92-CV-9326, at p. 2. Most importantly, Gill himself concedes that both the *Accettulli* and *Kross* cases "were **dismissed** due to they lacked an arguable basis in law or in fact." Pl.'s Lt.-Resp. at p. 3. In light of these statements and Gill's concession, the **dismissals** of the claims in these cases were clearly on the merits, even though the court did not specifically use the language "with or without prejudice." Each of these cases would, therefore, qualify as "**strikes**" against the Plaintiff.

A review of the docket shows that both the *LeFevre* and *Padilla* cases were **dismissed** by the Northern District for failure to prosecute pursuant to Rule 11 of the Federal

Rules of Civil Procedure.[FN7] By his own admission, Gill concedes that these two cases were **dismissed** pursuant to FED.R.CIV.P. 11. Irrespective of specific language used in the District's Decisions and Orders **dismissing** these actions, we find that a Rule 11 **dismissal** is a **dismissal** on the merits. Therefore, these two cases would also each qualify as "**strikes**" against the Plaintiff.

> FN7. A history of failure to prosecute is akin to the **filing** of a frivolous claim.

From the discussion and analysis above, it is clear that these types of **dismissals** are precisely what Congress had in mind when it enacted the **PLRA**, hoping to discourage and limit the amount of *frivolous* **lawsuits** brought by prisoner litigants. Accordingly, the Court finds that Gill, while incarcerated or detained, had acquired at least three "**strikes**" at the time he **commenced** the present action.

### D. Exception to the "Three Strikes Rule"

*5 Notwithstanding prior **dismissals**, an inmate can overcome the "three **strikes** rule" and proceed with an action if the prisoner can show that he or she "is under imminent danger of serious physical injury." 28 U.S.C. § 1915(g). This imminent danger exception, however, applies only to impending harms that existed at the time the complaint is filed, and not to those harms which already occurred. *Malik v. McGinnis,* 293 F.3d 559, 563 (2d Cir.2002) ( "[T]he language of § 1915(g) makes clear that the 'imminent danger' exception only applies to danger existing at the time the complaint is filed."). Based upon a review of Gill's Complaint, there is nothing to suggest that he was under imminent threat of serious physical injury at the time he filed his Complaint. While Gill raises this exception in his opposition to Defendants' Motion, his claim that he "was encountering impending harms at the time [he] filed this [C]omplaint due to [the fact that] he was still incarcerated at Auburn C[orrectional] F[acility]" is clearly insufficient to overcome the "three strikes rule." Pl.'s Lt.-Resp. at p. 2. Permitting a prisoner to defeat the "three strikes" bar by simply citing incarceration as the impending harm runs afoul of Congress' intent in enacting § 1915 and would essentially render the PLRA meaningless.

### E. Revoking Gill's IFP Status

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 3751340 (N.D.N.Y.)

(Cite as: 2006 WL 3751340 (N.D.N.Y.))

Gill argues that the Defendants are estopped from moving to revoke his *in forma pauperis* status because they failed to move for revocation during earlier proceedings, specifically in their Rule 12(b)(6) Motion to Dismiss, filed on December 23, 2002, *see* Dkt. No. 6, in their Letters to the Court in support of their Motion to Dismiss, filed on April 24, 2003 and May 7, 2003, *see* Dkt. Nos. 14 & 15, during Plaintiff's oral deposition taken in May 2005, or in Defendants' Answer, filed on June 20, 2006.[FN8] Pl.'s Lt.-Resp. at p. 4.

> FN8. Gill also cites applications made by the Defendants to the Second Circuit during his Appeal of Judge Hood's Order and Judgment, *see* Dkt. Nos. 17-19, wherein he alleges Defendants failed to move for revocation of his IFP status, which was granted by the Circuit on August 1, 2003. Pl.'s Lt.-Resp. at pp. 4-5. IFP status granted by the Second Circuit is separate and distinct from IFP status granted by the Northern District. Defendants' objections to IFP status granted by the Second Circuit are not relevant to Defendants' application before this Court and would have no bearing on his IFP status in this District. Further, any objections put forth by the Defendants' in papers submitted to the Second Circuit cannot be accessed or considered by this Court.

Contrary to Gill's suggestion, dismissal is not precluded by the fact that a litigant has already been granted IFP status. "When a court becomes aware of three prior strikes only after granting IFP status, the court may appropriately revoke that status and bar the complaint under § 1915(g)." *Polanco v. Burge,* 05-CV-651, Rep.-Rec. & Order, dated May 12, 2006, at p. 3 (N.D.N.Y) (citing *McFadden v. Parpan,* 16 F.Supp.2d 246, 247 (E.D.N.Y.1998)).

In light of the foregoing, it is recommended that the Order granting IFP status to Gill be **vacated** and that Gill's Complaint be dismissed unless Gill pays the filing fee of $150.00 **within thirty days (30) days** of the entry of the final order by the District Court.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that the Order granting Gill's IFP status (Dkt. No. 4) be VACATED; and it is further

**RECOMMENDED** that Defendants' Letter-Motion seeking dismissal of Gill's Complaint pursuant to 28 U.S.C. § 1915(g) (Dkt. No. 35) be **GRANTED** unless Gill pays the filing fee of $150.00 **within thirty days (30) days** of the entry of the final order by the District Court; and it is further

**\*6 ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action by regular mail.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 72, 6(a) & 6(e).

N.D.N.Y.,2006.

Gill v. Pidlypchak
Not Reported in F.Supp.2d, 2006 WL 3751340 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2008 WL 238553 (N.D.N.Y.)

(Cite as: 2008 WL 238553 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Elbert WELCH, Plaintiff,
v.
Donald SELSKY, et al., Defendants.
Civil Action No. 9:06-CV-00812 (LEK/DEP).

Jan. 28, 2008.
Elbert Welch, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of
New York, Charles J. Quackenbush, Esq., Assistant
Attorney General, of Counsel, Albany, NY, for
Defendants.

### DECISION AND ORDER

LAWRENCE E. KAHN, District Judge.

**\*1** This matter comes before the Court following a
Report-Recommendation filed on December 14, 2007, by
the Honorable David E. Peebles, United States Magistrate
Judge, pursuant to 28 U.S .C. § 636(b) and L.R. 72.3 of
the Northern District of New York. Report-Rec. (Dkt. No.
49). After ten days from the service thereof, the Clerk has
sent the entire file to the undersigned, including the
objections by Plaintiff, which were filed on December 21,
2007. Objections (Dkt. No. 50).

It is the duty of this Court to "make a de novo
determination of those portions of the report or specified
proposed findings or recommendations to which objection
is made." 28 U.S.C. § 636(b). "A [district] judge ... may
accept, reject, or modify, in whole or in part, the findings
or recommendations made by the magistrate judge." *Id.*
This Court has considered the objections and has
undertaken a de novo review of the record and has
determined that the Report-Recommendation should be
approved for the reasons stated therein.

Accordingly, it is hereby

**ORDERED,** that the Report-Recommendation (Dkt.
No. 49) is **APPROVED** and **ADOPTED** in its
**ENTIRETY;** and it is further

**ORDERED,** that the Order granting Plaintiff *in
forma pauperis* status (Dkt. No. 6) is **VACATED;** and it
is further

**ORDERED,** that Defendants' Motion seeking
dismissal of Plaintiff's Complaint (Dkt. No. 41) is
**GRANTED** as to all Defendants and all claims unless
Plaintiff pays the full required filing fee of $350.00 within
thirty days after entry of this Order; and it is further

**ORDERED,** that Plaintiff's Motion seeking the
imposition of sanctions against Defendants pursuant to
Rule 11 of the Federal Rules of Civil Procedure (Dkt. No.
46) is **DENIED;** and it is further

**ORDERED,** that the Clerk serve a copy of this Order
on all parties.

**IT IS SO ORDERED.**

### REPORT AND RECOMMENDATION

DAVID E. PEEBLES, United States Magistrate Judge.

Plaintiff Elbert Welch, a New York State prison
inmate who is proceeding *pro se* and *in forma pauperis,*
has commenced this action pursuant to 42 U.S.C. § 1983
alleging deprivation of his civil rights. In his complaint
the plaintiff, an active litigator who is no stranger to this and
other federal courts, having initiated a myriad of legal
proceedings since the onset of his incarceration, asserts
numerous claims related to his confinement at three
different correctional facilities alleging, *inter alia,* that
various prison officials have failed to protect him from
known dangers, conspired to issue false misbehavior
reports against him, and placed him in cells with
individuals who posed a threat to his safety. Plaintiff
additionally contends that several television broadcasting
corporations have actively participated in or furthered the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 238553 (N.D.N.Y.)

(Cite as: 2008 WL 238553 (N.D.N.Y.))

unlawful actions of prison officials by regularly discussing his circumstances on television principally through news outlets, utilizing various newscasters and other television personalities. In his complaint, in addition to requesting injunctive relief, plaintiff seeks recovery of $10 million in compensatory and punitive damages against each state defendant, as well as $1 billion in compensatory and punitive damages against each corporate defendant individually, or $20 billion on a joint and several basis.

**\*2** Currently pending before the court is a motion by the defendants seeking revocation of plaintiff's *in forma pauperis* ("IFP") status and conditional dismissal of his complaint under 28 U.S.C. § 1915(g), absent his prepayment in full of the applicable filing fee. Defendants' motion is predicated upon the dismissal of three or more such inmate civil rights actions previously brought by the plaintiff, but found to be lacking in palpable merit. Plaintiff has opposed defendants' motion by invoking the imminent danger exception to section 1915(g), contending that despite the dismissal of three or more civil rights cases previously brought by him, he should be permitted to proceed with this action because he faces imminent danger of serious physical injury based on the new facts and events recited in his complaint. Plaintiff also has cross-moved for the imposition of sanctions against defendants under Rule 11 of the Federal Rules of Civil Procedure for what he perceives to be the filing of a frivolous motion to dismiss.

Because I agree that plaintiff is subject to the three strikes provision of section 1915(g), and has not established a basis to invoke the limited, imminent danger exception to that rule, I recommend that defendants' motion be granted. Accordingly, I also recommend that plaintiff's motion for sanctions be denied as moot.

### I. BACKGROUND

Plaintiff is a prison inmate entrusted to the custody of the New York State Department of Correctional Services ("DOCS"); at the various times relevant to his constitutional claims, plaintiff was confined within either the Auburn Correctional Facility ("Auburn") located in Auburn, New York, where he was confined when this action was commenced; the Clinton Correctional Facility ("Clinton") located in Dannemora, New York; or the

Gouverneur Correctional Facility ("Gouverneur") located in Gouverneur, New York. *See generally* Complaint (Dkt. No. 1). In his complaint, plaintiff alleges that while confined at Auburn he was subject to assorted acts of a conspiratorial nature, including prison officials forcing him to house in double-bunked cells in order to provoke him into engaging in conduct that would result in disciplinary action, as well as attempting to place him in disciplinary keeplock confinement. *Id.* at ¶¶ 1-3, 27. Plaintiff claims that while at Clinton, several defendants perpetuated this conspiracy by lodging false misbehavior reports against him. *Id.* at ¶ 5. At Gouverneur, this conspiracy continued in the nature of corrections officials again forcing plaintiff to double-bunk with inmates who attempted to injure him and to provoke him into engaging in physical altercations. *Id.* at ¶ 6. Plaintiff further maintains that he was forced to house with inmates who were inflicted with contagious diseases which threatened his own physical well-being. *Id.* at ¶ 12. According to plaintiff, the defendants have used these housing conditions to place him in imminent danger of serious physical injury, including danger of disease, food poisoning, and physical assault. *Id.* at ¶ 16. Plaintiff also accuses defendants Stone, Sorrell, and Taylor, among others at Gouverneur, of retaliating against him in furtherance of the conspiracy by withholding his personal property upon learning that he had obtained administrative modification of his six-month term of confinement in a prison special housing unit ("SHU"). *Id.* at ¶ 25. Plaintiff alleges that the Federal Bureau of Investigations ("FBI") has infiltrated this conspiracy, which has existed for many years. *Id.* at ¶ 16.

**\*3** In addition to these assertions, plaintiff contends that several television corporations, news broadcasters, television personalities, and professional athletes have participated in this conspiracy by discussing it on the air on a regular basis. *Id.* at ¶¶ 18-22, 28-32.

### II. PROCEDURAL HISTORY

Plaintiff commenced this action on June 29, 2006. Dkt. No. 1. Named as defendants in plaintiff's complaint are the State of New York; Eliot Spitzer, the former New York State Attorney General; Donald Selsky, the DOCS Director of Special Housing/Inmate Discipline; Glenn Goord, the former DOCS Commissioner; Dale Artus, the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 238553 (N.D.N.Y.)

(Cite as: 2008 WL 238553 (N.D.N.Y.))

superintendent at Clinton; Captain Brown, allegedly employed at Clinton; Corrections Officers T. Charland, R. Lincoln, T.M. Stone, and Sorrell; Hearing Officer Eggleston, Correctional Counselor Logan; individuals identified only as Lieutenants Quimette and Sawyer, and Captain Coryer; and Superintendents Justin Taylor, Graham, Bellnier, and Rourke (collectively, "the state defendants"). *Id.* Also named as defendants are seventy-some television corporations, newscasters, television personalities and professional athletes (collectively, "the broadcast defendants"). *Id.*

By order issued by Senior District Judge Lawrence E. Kahn on November 30, 2006, the broadcast defendants were dismissed from this civil rights action, *sua sponte,* based upon the plaintiff's failure to allege that they were acting under color of state law, and his presentment of only vague allegations of the existence of a conspiracy between the broadcast defendants and the state defendants. Dkt. No. 6 at 3-4. Judge Kahn also reasoned that Welch should not be permitted to proceed *in forma pauperis* against the broadcast defendants because his allegations against them were clearly baseless and factually frivolous. *Id.* at 4-5. In that order, Judge Kahn additionally dismissed the State of New York from the action on the ground that suits against the state are barred by the Eleventh Amendment to the United States Constitution. *Id.* at 5. Confronted with plaintiff's claim of imminent danger as articulated in his complaint, Judge Kahn preliminarily granted Welch's application to proceed *in forma pauperis;* he cautioned, however, that his IFP status could be revoked in the event of a later finding, after the filing of a response from the remaining state defendants, that plaintiff is not in imminent danger or not otherwise entitled to proceed *in forma pauperis. Id.* at 6.

On March 12, 2007, plaintiff sought to amend his complaint to add to his action the broadcast defendants previously dismissed by the court, also requesting inclusion of several new defendants and additional allegations in support of his claims against the broadcast defendants. Dkt. No. 38. That request was denied by me in an order dated June 4, 2007. Dkt. No. 44.

In lieu of filing an answer, the state defendants moved to revoke plaintiff's IFP status on May 3, 2007, pursuant to the three strikes provision of 28 U.S.C. § 1915(g), and

to dismiss his complaint conditionally. Dkt. No. 41. Plaintiff has opposed defendants' motion, and cross-moved for the imposition of sanctions on the ground that the motion is frivolous. Dkt. Nos. 43, 46. These motions, which are now ripe for determination, have been referred to me for the issuance of a report and recommendation, pursuant to 28 U .S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c).[FN1] *See also* Fed.R.Civ.P. 72(b).

> **FN1.** Plaintiff's motion for sanctions would ordinarily fall within my non-consensual jurisdiction under 28 U.S.C. § 636(b). *See Robinson v. Eng,* 148 F.R.D. 635, 639 (D.Neb.1993) ("[A] magistrate judge has the authority to issue orders resolving Rule 11 issues.") (citing, *inter alia,* 28 U.S.C. § 636(b)(1)(A) (indicating that a magistrate judge can "hear and determine any pretrial matter pending before the court")). This authority is not without exception, however, in that a magistrate judge cannot issue sanctions which "fall within the eight so-called dispositive motions excepted by Section 636(b)(1)(A)." *DePalma v. Nike, Inc.,* No. 95CV1428, 1998 WL 690880, at *6 n. 4 (N.D.N.Y. Sept. 30, 1998) (Pooler, D.J.) (citing, *inter alia, Robinson* ). Because plaintiff's motion for sanctions is intertwined with, and hinges on, my determination regarding defendants' dispositive motion to **dismiss** this action, I have chosen to format my response to that motion as a recommendation to Judge Kahn.

III. *DISCUSSION*

A. *Three **Strikes** Provision Generally*

***4** In their motion defendants invoke 28 U.S.C. § 1915(g), arguing that under that section plaintiff's litigation history, which includes at least three merit-based **dismissals**, warrants revocation of his IFP status. Section 1915(g), which was enacted as part of sweeping inmate litigation reform brought about by adoption of the **Prison** Litigation Reform Act of 1996 ("**PLRA**"), Pub.L. No. 104-134, 110 Stat. 1321 (1996), though engendering far less litigation than some of its **PLRA** counterparts

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 238553 (N.D.N.Y.)

(Cite as: 2008 WL 238553 (N.D.N.Y.))

including, notably, the exhaustion of remedies requirement of 42 U.S.C. § 1997e(a), provides that

> [i]n no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

28 U.S.C. § 1915(g); see also Polanco v. Hopkins, 510 F.3d 152, 2007 WL 4258724, at *1 n. 1 (2d Cir. Dec. 6, 2007). The manifest intent of Congress enacting this "three strikes" provision was to curb prison inmate abuses and to deter the filing of multiple, frivolous civil rights suits by prison inmates. Tafari v. Hues, 473 F.3d 440, 443-44 (2d Cir.2007); Gill v. Pidlypchak, No. 02-CV-1460, 2006 WL 3751340, at *2 (N.D.N.Y. Dec. 19, 2006) (Scullin, S.J. & Treece, M.J.). The prophylactic effect envisioned under section 1915(g) is accomplished by requiring a prisoner who has had three previous **strikes** to engage in a cost-benefit analysis in some ways similar to that which other civil litigants must make before deciding whether to **commence** suit, accompanied by the **filing** of the full fee-that is, to assess whether the result to be achieved justifies the **filing** fee expenditure in advance, rather than in installments. See Ibrahim v. District of Columbia, 463 F.3d 3, 6 (D.C.Cir.2006). As the Second Circuit has noted, in the context of **PLRA** amendments requiring inmates to authorize **prison** officials to make deductions from inmate accounts to be applied as partial payments of appellate **filing** fees for prisoners granted in forma pauperis status,

> [p]rior to the enactment of the in forma pauperis amendments, inmates suffered no economic disincentive to **filing lawsuits**. Indeed, the very nature of incarceration-prisoners have substantial free time on their hands, their basic living expenses are paid by the state and they are provided free of charge the essential resources needed to **file** actions and appeals, such as paper, pens, envelopes and legal materials-has fostered a " 'nothing to lose and everything to gain' "

environment which allows inmates indiscriminately to **file** suit at taxpayers' expense.

Nicholas v. Tucker, 114 F.3d 17, 20 (2d Cir.1997), cert. denied sub nom., Nicholas v. Miller, 523 U.S. 1126, 118 S.Ct. 1812 (1998) (citations omitted); see also Gill, 2006 WL 3751340, at *2.

**\*5** The question of whether the dismissal of a prior action qualifies as a strike, for purposes of section 1915(g), is a matter of statutory interpretation, and as such a question for the court.[FN2] Tafari, 473 F.3d at 442-43. In determining whether a dismissal satisfies the failure to state a claim prong of the statute, implicated in this case, courts have drawn upon the provisions of Rule 12(b)(6) of the Federal Rules of Civil Procedure for guidance, particularly in light of the similarity in phrasing utilized in the two provisions. Tafari, 473 F.3d at 442 (citing Andrews v. King, 398 F.3d 1113, 1121 (9th Cir.2005)).

> FN2. The Second Circuit has expressed its view that the time for determination of "**strikes**" is only when the section 1915(g) issue is ripe for adjudication, and that because of the potentially significant consequences flowing from such a finding, a court should not, when **dismissing** an inmate complaint, contemporaneously signal whether the **dismissal** should **count** as a "**strike**" for the purposes of that section. DeLeon v. Doe, 361 F.3d 93, 95 (2d Cir.2004); see also Snider v. Melindez, 199 F.3d 108, 115 (2d Cir.1999) ("We ... doubt whether the entry of a **strike** is properly considered at the time an action is **dismissed**.").

B. Application of Section 1915(g)

Defendants have offered the specifics of previously **dismissed** actions in support of their section 1915(g) motion, persuasively demonstrating the existence of at least three prior "**strikes**" in this instance, and the court thus need not linger in addressing the issue. Defendants' Memorandum (Dkt. No. 41-2) at 3. Indeed, Welch does not dispute that he has garnered at least three **strikes** prior to his **filing** the current action in this court. See Dkt. No. 43. On March 16, 2000-well before the **filing** of this suit-a decision of District Judge Thomas J. McAvoy, **dismissing** plaintiff's complaint in another action based on the fact

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 238553 (N.D.N.Y.)

(Cite as: 2008 WL 238553 (N.D.N.Y.))

that he had accumulated three **strikes** because at least three of his prior federal suits had been **dismissed** as frivolous, was affirmed by the Second Circuit.[FN3] *Welch v. Galie,* 207 F.3d 130, 131-32 (2d Cir.2000) (affirming *Welch v. Galie,* No. 97-CV-1369, Dkt. Nos. 119, 131 (N.D.N.Y.) (TJM/DRH)); *see also Welch v. Fisher,* No. 07-CV-929, Dkt. No. 8 at 2-3 (N.D.N.Y.) (TJM/DEP) (acknowledging that plaintiff earned three strikes status seven years ago as determined in *Welch v. Galie,* 207 F.3d 130 (2d Cir.2000)). That finding is entitled to preclusive effect in this action, *see Marvel Characters, Inc. v. Simon,* 310 F.3d 280, 288-89 (2d Cir.2002), thus eliminating defendants' need to independently establish the existence of three **strikes** for purposes of this action.

> FN3. In that decision, the Second Circuit went so far as to determine that one of those **dismissals,** which occurred before the enactment of section 1915(g), nonetheless constituted a "**strike**" under the statute. *Galie,* 207 F.3d at 132.

Since defendants have established the **filing** by plaintiff of at least three meritless civil rights complaints while confined as a New York State **prison** inmate, absent applicability of the imminent danger exception set out in the relevant statute, plaintiff is subject to the provisions of 28 U.S.C. § 1915(g), and may properly be required to prepay in full the applicable **filing** fee in order to pursue his claims notwithstanding that IFP status was previously conferred. *See McFadden v. Parpan,* 16 F.Supp.2d 246, 247-48 (E.D.N.Y.1998).

C. *Imminent Danger Exception*

As a safety valve, obviously intended to protect a prison inmate exposed to potential danger from the harsh consequences of his or her earlier folly, section 1915(g) provides that a prisoner who is in "imminent danger of serious physical injury" may avoid application of the three strikes rule of section 1915(g). *See* 28 U.S.C. § 1915(g); *see also Malik v. McGinnis,* 293 F.3d 559, 562-63 (2d Cir.2002). This exception requires a showing that the prisoner was under such imminent danger at the time of filing; the exception does not provide a basis to avoid application of the three strikes provision on the basis of past harm. *Malik,* 293 F.3d at 562-63. An inmate who claims the benefit of this exception must also show that the

danger faced rises to the level of a "serious physical injury." 28 U.S.C. § 1915(g). The imminent danger an inmate faces, moreover, must be real, and not merely speculative or hypothetical. *Johnson v. Barney,* No. 04 Civ. 10204, 2005 WL 2173950, at *1-2 (S.D.N.Y. Sept. 6, 2005) (finding that inmate's allegation of danger at facility he was not housed at, but may pass through at infrequent occasions in the future, did not establish imminent danger).

*6 The term "serious physical injury," as utilized in section 1915(g), is nowhere concretely defined, although it has been construed by various courts as including a "disease that could result in serious harm or even death [.]" *Ibrahim,* 463 F.3d at 7. In deciding whether to invoke the exception, a court must examine the available pleadings, construed in a light most favorable to the plaintiff, to determine whether the plaintiff has alleged a serious physical injury. *McAlphin v. Toney,* 281 F.3d 709, 710 (8th Cir.2002). Conditions which have been held to rise to a sufficient threshold level include denial of treatment for infected gums, resulting in damages of infection, *McAlphin,* 281 F.3d at 710; denial of adequate treatment for Hepatitis C, a "chronic and potentially fatal disease," *Ibrahim,* 463 F.3d at 6-7; and heart palpitations, chest pains and labored breathing, *Ciarpaglini v. Saini,* 352 F.3d 328, 330-31 (7th Cir.2003) (finding upon reaching the merits, however, that plaintiff's complaint did not state an Eighth Amendment claim).

Plaintiff's claims in this action stem chiefly from his belief that he is the subject of an elaborate conspiracy by DOCS officials, in conjunction with the FBI, to fabricate his mental illness, to falsify misbehavior reports against him, to poison his food, to keep him in disciplinary confinement, and to injure and/or kill him. Welch further insists that he confronts imminent danger of serious physical injury because he has been diagnosed with Hepatitis C, which derived from the conspirators' contamination of his food and insistence that he share cells with diseased individuals, and had been denied treatment for this condition while at Clinton, only recently receiving care for the disease since his relocation to Coxsackie Correctional Facility.

Plaintiff filed his complaint while he was housed at Auburn Correctional Facility, although it addresses

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 238553 (N.D.N.Y.)

(Cite as: 2008 WL 238553 (N.D.N.Y.))

circumstances which occurred during the course of his confinement at Auburn, Clinton and Gouverneur. Since the imminent danger exception only applies to danger existing at the time the complaint was filed, *Malik* 293 F .3d at 563, to the extent that Welch's allegations concern events that occurred at the Clinton and Gouverneur facilities, prior to his confinement at Auburn and the filing of his complaint, these claims do not provide any grounds for me to find that plaintiff faces imminent danger of serious physical injury. *See also Abdul-Akbar v. McKelvie,* 239 F.3d 307, 315 (3d Cir.2001) ("By using the term 'imminent', Congress indicated that it wanted to include a safety valve for the 'three **strikes**' rule to prevent impending harms, not those harms that had already occurred."); *McFadden,* 16 F.Supp.2d at 247 (specifying that imminent danger must occur at the time the plaintiff seeks to **file** the suit, and not at the time of the alleged incidents). Likewise, in his opposition to defendants' motion to **dismiss**, plaintiff has attempted to interject a previously unasserted claim that he confronts imminent danger of serious physical injury based on the failure of **prison** officials to treat his Hepatitis C condition while he was confined at Clinton. Plaintiff, however, did not propound this claim in his complaint now before the court. Based on the pleadings before me, it is apparent that this allegation also does not relate to circumstances in existence at the time he filed this lawsuit, and therefore does not provide a basis for me to find that plaintiff is under imminent danger of serious physical injury.[FN4]

> **FN4.** While plaintiff's complaint alleges in wholly conclusory terms that defendants' conspiracy against him is both systemic and ongoing, it is arguable that he can no longer satisfy the imminent danger exception requirement in light of his transfer, after commencement of the action, to the Orleans Correctional Facility, where he is currently housed. *Cf. Salahuddin v. Goord,* 467 F.3d 263, 272 (2d Cir.2006) (indicating that the transfer of an inmate plaintiff complaining of civil rights violations out of the prison facility in which those violations are alleged to have occurred moots any claim for injunctive relief against prison officials of the transferring facility).

**\*7** Moreover, the question of whether claims strikingly similar to those now advanced by plaintiff Welch, regarding the alleged conspiracy against him, meet the imminent danger exception under section 1915(g) was previously addressed in *Welch v. Samuels,* No. 02-CV-1077 (N.D.N.Y.2002) (TJM/GLS) (Defendants' Motion (Dkt. No. 41) Exh. 1) and *Welch v. Fisher,* 07-CV-929 (N.D.N.Y.2007) (TJM/DEP), two of the many other civil rights actions brought by him in the Northern District of New York. In his decision in *Welch v. Samuels,* District Judge McAvoy noted that the claim being raised, to the effect that the plaintiff was the target of a conspiracy by DOCS employees to kill him, was not new but instead was similar to claims raised in previously-filed actions and dismissed as "patently frivolous", and did not establish the existence of imminent danger.[FN5] *See Samuels,* No. 02-CV-1077, Dkt. No. 9 at 3. Five years later, in his recent decision in *Welch v. Fisher,* Judge McAvoy determined that plaintiff's allegations of a "long-standing conspiracy" consisting of efforts by DOCS officials to confine him to cells, to contaminate his food, and to poison him were factually unsupported and did not demonstrate that he was under imminent danger of serious physical injury.[FN6] *Fisher,* No. 07-CV-929, Dkt. No. 8 at 4-5.

> **FN5.** Judge McAvoy reiterated this determination in his denial of plaintiff's subsequent motion for reconsideration, *Samuels,* No. 02-CV-1077, Dkt. No. 12, which was affirmed by the Second Circuit on appeal, *id.* at Dkt. Nos. 15, 19.

> **FN6.** Welch has appealed this ruling to the Second Circuit, and awaits a determination from that court. *Fisher,* No. 07-CV-929, Dkt. No. 13.

Finding nothing in plaintiff's complaint in this action to distinguish the present circumstances from the aforementioned cases previously decided by District Judge McAvoy, I likewise conclude, and therefore recommend a finding to the effect, that plaintiff has failed to demonstrate the existence of imminent danger of serious physical injury of the extent contemplated by Congress when enacting section 1915(g).

D. *Motion for Sanctions*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 238553 (N.D.N.Y.)

(Cite as: 2008 WL 238553 (N.D.N.Y.))

In response to defendants' motion to dismiss, plaintiff has cross-moved for sanctions under Rule 11 of the Federal Rules of Civil Procedure on the ground that the motion is frivolous, specifically seeking an order striking defendants' motion papers.[FN7,FN8] *See* Dkt. Nos. 43, 46.

FN7. Plaintiff also faults defendants for failing to file any affidavit in conjunction with their motion to dismiss as required by Northern District of New York Local Rule 7.1(a)(2). *See* Dkt. No. 43. Contrary to plaintiff's assertion, the lack of an affidavit provides no basis for the imposition of Rule 11 sanctions in this matter. While under a literal interpretation of the court's local rules an affidavit could arguably have been required to support defendants' motion, *see* N.D.N.Y.L.R. 7.1(a)(2), the motion is in the nature of a dismissal motion; such motions are generally exempted from the affidavit requirement, *see id.* In any event, the court is authorized, and in this instance does, overlook this potential, technical shortcoming under the court's local rules. *See Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 73 (2d Cir.2001) ("A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules.").

FN8. Plaintiff further contends that defendants utilized their motion as a dilatory tactic to "stall time" for the court to rule on plaintiff's request to file an amended complaint. *See* Dkt. No. 43. This prong of plaintiff's cross-motion also lacks merit, particularly in light of the fact that the court issued a ruling denying plaintiff's request to amend approximately one month after defendants filed their motion. *See* Dkt. No. 44.

Rule 11 of the Federal Rules of Civil Procedure authorizes sanctions under various circumstances, including where 1) an attorney has certified groundless and frivolous papers; 2) a document has been presented for an improper purpose, such as to harass or cause unnecessary delay or expense; 3) the claims or defenses are not supported by law; and/or 4) the allegations and other factual contentions lack evidentiary support. Fed.R.Civ.P. 11. The imposition of sanctions is purely

discretionary, and that discretion should be exercised only when improper conduct is clear. *Ehrich v. Binghamton City Sch. Dist.,* 210 F.R.D. 17, 26 (N.D.N.Y.2002) (Sharpe, M.J.). A test of objective unreasonableness is employed to assess whether conduct is sanctionable; that is, the conduct must be "totally without merit or utterly lacking in support." *Id.* The alleged improper conduct should be assessed based on the following factors: 1) whether the conduct was willful or negligent; 2) whether the conduct reflected a pattern of behavior or an isolated event; 3) whether the conduct infected the entire proceeding; 4) whether the individual engaged in similar conduct in the past; and 5) the effect on the litigation in time or expense. *See id.*

**\*8** As evidenced by the sound basis on which defendants have grounded their motion, plaintiff is wholly unable to demonstrate that defendants engaged in any improper conduct under Rule 11. In light of my determination that defendants' motion to dismiss indeed has merit and should be granted, I recommend that plaintiff's motion for Rule 11 sanctions be denied as academic.

### IV. *SUMMARY AND RECOMMENDATION*

The record now before the court firmly establishes that at least three prior civil rights actions-and by all accounts a substantially greater number-brought by the plaintiff while a prison inmate have been dismissed on their merits for failure to state claims upon which relief may be granted. The record also fails to reveal any basis to conclude that the plaintiff is in imminent danger of serious physical injury, and thus entitled to exemption from the three strikes provision of 28 U.S.C. § 1915(g). Given the meritorious nature of defendants' motion, plaintiff is not entitled to any of the sanctions available under Rule 11. Accordingly, particularly in light of the fact that the net result of these findings is not denial altogether of plaintiff's access to the courts, but instead only the requirement that he conclude that pursuit of his civil rights claims in this action justifies expenditure of the full applicable filing fee, it is hereby

RECOMMENDED that:

1) The order granting the plaintiff IFP status (Dkt.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 238553 (N.D.N.Y.)

(Cite as: 2008 WL 238553 (N.D.N.Y.))

No. 6) be VACATED;

2) Defendants' motion seeking dismissal of plaintiff's complaint (Dkt. No. 41) be GRANTED as to all defendants and all claims unless Welch pays the full required filing fee of $350.00 within thirty days after the entry of a final order by the district judge addressing this recommendation;

3) Plaintiff's cross-motion seeking the imposition of sanctions against defendants pursuant to Rule 11 of the Federal Rules of Civil Procedure (Dkt. No. 46) be DENIED; and it is further

ORDERED that pending final determination with respect to this report and recommendation and, if approved, the payment by plaintiff of the required filing fee, all discovery in this action be and is hereby STAYED.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; Roldan v. Racette, 984 F.2d 85 (2d Cir.1993).

It is further ORDERED that the Clerk of the Court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

N.D.N.Y.,2008.

Welch v. Selsky
Not Reported in F.Supp.2d, 2008 WL 238553 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2011 WL 3501869 (S.D.N.Y.)

(Cite as: 2011 WL 3501869 (S.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,

S.D. New York.

Anthony G. DILWORTH and Patricia Dilworth, Plaintiffs,
v.
Randy GOLDBERG, M.D., et al., Defendants.
No. 10 Civ. 2224(RJH)(GWG).

July 28, 2011.
*REPORT AND RECOMMENDATION*

GABRIEL W. GORENSTEIN, United States Magistrate Judge.

**\*1** Anthony Dilworth ("Dilworth") and Patricia Dilworth ("Patricia") (together, "the Dilworths") have brought this action arising out of Dilworth's confinement in the Westchester County Jail (the "Jail"). They allege various federal and state claims against New York Medical College ("NYMC"), Aramark Correctional Services LLC ("Aramark"), the Westchester County Department of Correction Superior Officers Association ("SOA"), the Westchester County Department of Correction Superior Officers Association Benefit Fund ("SOA–BF"), and the Westchester County Correction Officers Benevolent Association ("COBA"). Plaintiffs have also sued Westchester County, the Westchester County Health Care Corporation, the Westchester Medical College, and 55 of these three entities' employees (collectively the "County Defendants").[FN1]

> FN1. The parties collectively referred to as the "County Defendants" are: 1) Westchester County; 2) Westchester County Health Care Corporation ("WCHCC"); 3) Westchester Medical Center ("WMC"); 4) Dr. Randy A. Goldberg; 5) Commissioner Joseph Spano; 6) Warden Anthony Amicucci; 7) Captain Raymond Rhodes; 8) Sergeant Wendell Smiley; 9) Captain James Soychak; 10) Sergeant Clyde Hodge; 11) Captain Lloyd Malfer; 12) Sergeant Michael Birrittella; 13) Captain Gary Klivans; 14) Nurse Tracy James; 15) Nurse Terry Alexander; 16) Nurse Jean Kadel; 17) Correction Officer Ronald Freeman; 18) Correction Officer James Feaster; 19) Nurse Millie Phillips; 20) Nurse Nordstrom; 21) Sergeant Danielle Kenney; 22) Assistant Warden John O'Neill; 23) Sergeant Richard Maccabee; 24) June Yozzo; 25) Dr. Gail Bailey–Wallace; 26) Sergeant Anthony SanMarco; 27) Correction Officer Scott Driesen; 28) Correction Officer John Foy; 29) Dr. Alan Schramm; 30) Sergeant Edward Schmidt; 31) Correction Officer Keith Wyatt; 31) Correction Officer Patricia Yancy; 32) Captain Robert Patrick; 33) Assistant Warden Charles Turner; 34) Correction Officer Dennis Quast; 35) Correction Officer Barry Muller; 36) Correction Officer Jeremiah Tejeda; 37) Correction Officer Manuel Vega; 38) Correction Officer Edward Quinoy; 39) Correction Officer Justin Lassiter; 40) Correction Officer William Laughlin; 41) Correction Officer Peter Savino; 42) Correction Officer Patrick Garrett; 43) Assistant Warden Frederick Lantz; 44) Captain John Uhl; 45) Sergeant Frederick Scholl; 46) Correction Officer Tina Smith; 47) Correction Officer Shandon Folkes; 48) Sergeant Luis Martinez; 49) Correction Officer Jason Santos; 50) Sergeant Alvin Rogers; 51) Sergeant Christopher Smith; 52) Correction Officer Patrick Poggi; 53) Correction Officer Calvin Smith; 54) Nurse Dorothy Day; 55) Nurse Marjorie Grimm; 56) Nurse Jayasree Nair; 57) Captain Keith Camera; 59) Dr. Richard Maretzo.

NYMC, Aramark, COBA and the County Defendants have moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons discussed below, the motions to dismiss of NYMC, Aramark, and COBA should be granted, and the County Defendants' motion should be granted in part and denied in part.

I. *BACKGROUND*

Slip Copy, 2011 WL 3501869 (S.D.N.Y.)

(Cite as: 2011 WL 3501869 (S.D.N.Y.))

A. *Facts*

The following facts are alleged in the second amended complaint and are assumed to be true for the purpose of these motions. *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 508 n. 1 (2002).

From October 3, 2008 through September 23, 2009, Dilworth was a pretrial detainee in the Westchester County Jail. Second Amended Complaint, filed Sept. 17, 2010 (Docket # 134) ("2Am.Compl.") ¶ 72. Between October 5, 2008 and December 16, 2008, Dilworth was a "model inmate" who "enjoyed courteous relations will all staff members, employees and inmates," "[d]id not receive any disciplinary charges," "[w]as never confined to his area or cell for any reason," "[e]njoyed the free flow of mail ... [and] goods purchased through the commissary," "[r]egularly enjoyed uncontaminated meals," "[f]reely practiced his religion," "[k]ept and displayed family pictures and other personal belongings in his area," and enjoyed regular visits with his wife, Patricia. *Id.* ¶ 73. Dilworth is African–American. *Id.* ¶ 23.

On December 16, 2008, a trustee spilled liquid wax while waxing the floor of the Jail. *Id.* ¶ 74(a). No caution signs were placed in the area, *id.* ¶ 74(b), and no correction officer was available to warn passersby of the hazard because the officer assigned to the area had quit his post without the proper authorization, *id.* ¶ 74(c). While walking down the hallway, Dilworth slipped and fell on the wax, "suffered severe injuries to his head, back, and right arm, and lost consciousness due to the fall." *Id.* ¶ 74(d). After the fall, Malfer and Birrittella "happened upon" Dilworth. *Id.* ¶ 74(e). Instead of calling an emergency code, "Malfer instructed other inmates to assist Mr. Dilworth to the Jail's infirmary, in direct contravention to rules, regulation, and policies governing the Jail." *Id.* ¶ 74(h), (g). "Malfer's misconduct was discovered soon after Mr. Dilworth was taken to the infirmary." *Id.* ¶ 74(I). Klivans, Rogers, James, Kadel, Malfer, and Birrittella were in the infirmary when Dilworth arrived. *Id.* ¶ 74(j). James gave Dilworth a "cursory" examination, *id.* ¶ 74(l), and "deliberately understated and inaccurately documented Mr. Dilworth's actual medical condition ...," *id.* ¶ 74(m). Dilworth was released from "medical care in

violation of rules, regulations, and policies governing the Jail." *Id.* ¶ 74(m).

**\*2** Dilworth tried to return to his bed, but Rogers ordered him to attend a previously scheduled visit with Patricia, and "threatened to charge him with disobeying a direct order if he did not comply." *Id.* ¶ 74(o). Dilworth visited with Patricia. *See id.* ¶ 74(r). Dilworth's injuries were immediately apparent to Patricia and various correction officers. *See id.* ¶ 74(p), (r), (s), (u), (w). At no time, however, was a code called or was Dilworth provided with emergency medical care. *Id.* ¶ 74(x). Dilworth "was subsequently brought to his bed in a wheelchair and ... [was] left to his own devices, in direct contravention to controlling emergency medical procedures, and rules, regulations, and policies governing the Jail." *Id.* ¶ 74(y). Rogers went to Dilworth and demanded that he sign "fraudulent paperwork" which stated that Dilworth was the cause of his own accident and would have "effectively waiv[ed] all legal claims against Westchester County, Malfer and others." *Id.* ¶ 74(z).

After the accident, employees of the Westchester County Department of Correction ("WCDOC") conducted an investigation and drafted a "special report" about Dilworth's accident. *Id.* ¶ 74(aa), (bb). This report was read by Spano and Amicucci, pursuant to WCDOC policy, custom, or practice. *Id.* ¶ 74(cc), (dd). In addition, "Amicucci had a practice of holding daily meetings with senior members of his staff ... to discuss and inform each other of the prior day's events, logbook entries, and mandated reporting requirements." *Id.* ¶ 64. Dilworth's accident, injuries, and medical status were discussed at several of these meetings, and "Amicucci, in turn informed Spano." *Id.* ¶ 65.

Following his accident, Dilworth continued to be mistreated by medical personnel and correction officers. On December 17, 2008, Dilworth was visited by Dr. Goldberg, Klivans, Malfer, Rogers, Alexander, James, and Kadel. *Id.* ¶ 75(a). Dilworth informed the group that he "could not breathe and suffered from extreme back pain." *Id.* ¶ 75(c). Dilworth was carried, placed in a wheelchair, and taken to the Jail's medical clinic where he described in detail the extent of his pain. *Id.* ¶ 75(e)-(f). Dilworth was unable to control his bowels and bladder, *id.* ¶ 75(g), and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 3501869 (S.D.N.Y.)

(Cite as: 2011 WL 3501869 (S.D.N.Y.))

his "leg and arm shook uncontrollably," *id.* ¶ 75(h). "Kadel lifted Mr. Dilworth's shirt and discovered [that] he had sustained a chemical burn from the floor wax he fell in the day prior." *Id.* ¶ 75(j). At no time was Dilworth "transported to qualified emergency medical personnel, or otherwise provided access to them." *Id.* ¶ 75(I).

Dr. Goldberg examined Dilworth's back and asked Rogers to view it as well. *Id.* ¶ 75(k). Dr. Goldberg and Rogers then proceeded to have a private conversation, *id.* ¶ 75(l), in which a conspiracy to deny Dilworth "all federal and state rights was spawned ... in order to cover up Malfer's and Birrittella's original misconduct," *id.* ¶ 75(m). Dilworth's medical records were falsified, *see id.* ¶ 75(p), (q), (r), and officers prevented him from being transported to a hospital, despite the fact that he was told that he should have been taken to one, *id.* ¶ 75(n), (u), (v), (x). Instead, Dilworth was transported to J2 Dorm, "a non-handicap accessible housing unit," where Dilworth was left in a bed "in direct contravention to controlling emergency medical procedures, rules, regulations, and policies governing the Jail." *Id.* ¶ 75(v). J2 Dorm "did not have the ability to provide special services," "was unable to detect secondary insults to Mr. Dilworth's brain," and "was unable to adequately monitor his prognosis." *Id.* ¶ 75(w). "Upon arrival at J2 Dorm the correction officer on duty stated to Rogers, James and Kadel that Mr. Dilworth should be in the hospital, and J2 Dorm was not the proper housing area for a handicapped inmate." *Id.* ¶ 75(x) (internal citations omitted).

**\*3** From December 17, 2008 through December 22, 2008, Dilworth was denied meals on several occasions, *see id.* ¶¶ 75(y), 76(a), 79(b); was not able to take a shower, *see id.* ¶ 76(b), (c); and was refused pain medication, *see id.* ¶ 79(d), (e). "Mr. Dilworth was made to lie in his own feces and urine for five days due to his inability to ambulate and the denial of all medical aids, including a portable urinal." *Id.* ¶ 82. Dilworth's request for a wheelchair was ignored and he was forced to walk with crutches, *see id.* ¶¶ 75(s), (t), 76(e)-(g), which were eventually confiscated by Rogers, *id.* ¶¶ 83(a)-(b). During this time, Dilworth was not permitted to file sick call slips or grievances. *See id.* ¶¶ 75(y), 77(a), (b), 79(a), 83(f). Dilworth was repeatedly told by Rogers and other correction officers that he was being denied treatment per

Rogers' orders. *See id.* ¶¶ 79(c), 83(g)-(I), (q). Rogers threatened Dilworth and told him not to file grievances. *See id.* ¶¶ 77(c), 83(f).

During this period, Patricia tried to "learn of her husband's medical status," by calling and visiting the Jail. *Id.* ¶ 75(z), (aa). However, her messages were never returned, *id.* ¶ 75(bb), and when Dilworth did not come to a planned visit on December 20, 2008, Patricia was not provided with any explanation as to his absence, *see id.* ¶ 78(b), (c). Patricia made visits to the Jail on December 23, 2008 and on December 27, 2008. *See id.* ¶¶ 86(a), 91(a). On both occasions, "she waited for an extended period of time, but [Dilworth] never came to see her." *Id.* ¶¶ 86(b), 91(b). Patricia visited the jail again on December 30, 2008, and was able to visit with her husband, however, when he arrived he was crying due to extreme pain and his "hand shook uncontrollably." *Id.* ¶¶ 92(a)-(c). During a subsequent visit with Patricia, Dilworth lost control of his bladder in her presence. *Id.* ¶ 93(a).

On December 23, 2008, Dilworth "submitted to Kenney a grievance with supporting affidavits from other inmates.... Within one hour Rogers approached Mr. Dilworth, reiterated his prior instructions to not submit any more grievances, and that none of Mr. Dilworth's grievances would 'fly.' " *Id.* ¶ 87(a), (b). After the December 23, 2008 grievance, numerous correction officers told Dilworth not to submit any more grievances, *see id.* ¶¶ 87(d), 99(b), (g), 107(b), 121(u), and Dilworth's subsequent requests for sick call slips and grievance forms were denied, *see id.* ¶¶ 116(a)-(c), 124(a)-(b), 172(a), 173(d)-(e). Dilworth "subsequently made copies of his completed grievances and forwarded them to [Patricia]" who sent the grievances to the New York State Commission of Correction. *Id.* ¶¶ 53, 88-89. "Rogers and Maccabee informed Mr. Dilworth that he won the grievance [Patricia] submitted to the Commission, and that he would be taken to the hospital." *Id.* ¶ 99(a). "Rogers and Maccabee were notified of the Commission's decision regarding Mr. Dilworth's grievance from Spano, through their chain of command." *Id.* ¶ 99(c). Dilworth was not taken to the hospital, however. *See id.* ¶ 99(d). During his time in the Jail, multiple officers offered Dilworth medical treatment, commissary items, and early release if he agreed to sign a statement waiving his potential legal

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 3501869 (S.D.N.Y.)

(Cite as: 2011 WL 3501869 (S.D.N.Y.))

claims against Westchester County and other defendants. *See id.* ¶¶ 93(h), 96(d), 99(f), 100, 107(a), 113, 121(a), (k)-(m), 125(f), 133. "On January 9, 2009, Malfer approached Mr. Dilworth, leaned into his face and stated, '[d] o not implicate me in your lawsuit, Dilworth.' " *Id.* ¶ 103. In addition, numerous officers prevented Dilworth's fellow inmates from assisting him. *See id.* ¶¶ 108, 125(a), (g)-(I), 142(i)-(j). If inmates did assist Dilworth, they were punished by correction officers. *See id.* ¶¶ 123(g)-(h), 125(g)-(i), 127, 142(i)-(j).

**\*4** Throughout the course of his stay in J2 Dorm, Dilworth was subjected to numerous adverse actions. Dilworth's law library, church, education and recreation privileges were revoked. *See id.* ¶¶ 99(g), 122(a)-(b), 124(c). His complaints of pain were consistently ignored and medical treatment was denied, despite the fact that Dilworth's injuries were well known. *See id.* ¶¶ 97(c)-(e), 101(c), 109, 111(b), (i), 112, 115(c)-(e), 117, 126. Dilworth "was assigned to Chronic Care, and prescribed various pain medications. However, Dr. Goldberg stated a certain prescription would not be renewed because [Dilworth] was 'costing [him] too much money.' " *Id.* ¶ 97(a)-(b). In addition, Dilworth's subsequent requests for pain medications were ignored. *See id.* ¶¶ 98, 104(a), 106. Instead, Dilworth was prescribed <u>Tylenol</u>. *See id.* ¶ 97(e). When Dilworth told Dr. Goldberg that <u>Tylenol</u> was "contraindicated for people with <u>high blood pressure</u>, such as himself," Dr. Goldberg told Dilworth that if he did not take the medications prescribed, including <u>Tylenol</u>, he would be disciplined. *See id.* ¶ 97(f)-(g).

Dr. Goldberg diagnosed Dilworth as having " '<u>tennis elbow</u>,' " despite the fact that he had previously informed Dilworth that his x-rays revealed that he had a "chipped bone in his right arm, and would need surgery to straighten his arm and remove the bone chip." *Id.* ¶ 97(c), (d). At some point, Dilworth discovered that he had been "authorized the use of a wheelchair for all appointments in the old jail clinic." *Id.* ¶ 104(b). However, Rogers learned of this authorization and deleted it. *Id.* ¶ 104(d). On multiple occasions, the logbooks of the jail and Dilworth's medical records were falsified in order to cover-up the fact that Dilworth was not receiving the services he required. *See id.* ¶¶ 75(r), 99(j), 104(d), 118(k). Dilworth was also prevented from obtaining a copy of his accident report.

*See id.* ¶¶ 95, 115(a)-(b).

On February 12, 2008, Dilworth was referred to Mental Health Services. *Id.* ¶ 111(a). On that day, Dilworth had a mental health session with Dr. Schramm. *See id.* ¶ 111(c), (e). Dr. Schramm was the duly appointed and acting Director of Mental Health at the WCDOC, and was an assistant professor at NYMC. *Id.* ¶ 41. During the session, Dr. Schramm was told "that J2 Dorm was not the proper housing area for Mr. Dilworth." *Id.* ¶ 111(f). While Dr. Schramm told Dilworth he would look into the allegations, Dilworth was not transferred from J2 Dorm or taken to qualified medical personnel. *Id.* ¶ 111(g)-(h). "Schramm also failed to provide any mental health care to Mr. Dilworth." *Id.* ¶ 111(i).

On one occasion, Dilworth was physically examined by Dr. Goldberg and others to determine whether he would be allowed to leave the Jail for medical care. *See id.* ¶ 117(d). During the physical examination, Dr. Goldberg manipulated Dilworth's legs, "causing him extraordinary pain. Mr. Dilworth screamed in agony and pleaded for him to stop." *Id.* ¶ 117(e), (f). Dr. Goldberg persisted. *Id.* ¶ 117(g). "As Goldberg pushed Mr. Dilworth's leg towards his chest[,] Mr. Dilworth heard a pop in his lower back, and experienced the greatest pain of his life." *Id.* ¶ 117(h). Dr. Goldberg ignored the signs of Dilworth's physical distress. *Id.* ¶ 117(l). "Goldberg then compelled Mr. Dilworth to attempt to walk on his heels...." *Id.* ¶ 117(m). Dilworth "attempted to comply, but fell to the floor striking his head and back, thereby exacerbating his original injuries and suffering additional severe pain." *Id.* ¶ 117(p).

**\*5** At some point, Dilworth "attempted to take a shower with the assistance of the only aid available, a plastic chair." *Id.* ¶ 118(a). The chair broke and Dilworth fell in the shower stall "striking his face and teeth [on] the tiled floor." *Id.* ¶ 118(b)-(c). "As a result of the impact, Mr. Dilworth suffered additional physical injuries, including subsequent loss of two teeth and a <u>lacerated lip</u>." *Id.* ¶ 118(d). Dilworth was not provided with emergency dental care. *Id.* ¶ 118(g). "Over the course of the next three months Mr. Dilworth submitted approximately twenty sick call slips to see a dentist, because his tooth and gum had become infected." *Id.* ¶ 118(i). "Goldberg

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 3501869 (S.D.N.Y.)

(Cite as: 2011 WL 3501869 (S.D.N.Y.))

directed Mr. Dilworth to stop submitting call slips for dental, and refused to perform an examination or prescribe an antibiotic even though puss visibly oozed from his lip and gum, emitting a putrid odor." *Id.* ¶ 118(j). Dr. Goldberg falsely stated in Dilworth's medical chart that he had examined Dilworth. *Id.* ¶ 118(k). Approximately two weeks after his fall, Nancy Noes and/or Donald Does, unknown employees of the Jail, told Dilworth he should have been prescribed antibiotics for his infected gum and that his tooth should be pulled. *See id.* ¶ 118(l). However, the Noes and Does refused to pull the tooth because it had broken off below the gum line and an extraction would be considered surgery. *See id.* ¶ 118(m). The Noes and Does recommended that Dilworth have the tooth pulled when he was released from custody. *Id.* ¶ 118(n). The Noes and Does "were acting pursuant to Maretzo's directives or the policies, customs, and practices of NYMC, WCHCC, WMC and/or Westchester County." *Id.* ¶ 118(o). Dr. Maretzo "was the duly appointed and acting Director of Dentistry at WCDOC, a division of NYMC, Department of Dentistry," and was an assistant professor at NYMC. *Id.* ¶ 42.

On one occasion, "Patrick, Rogers and SanMarco compelled Mr. Dilworth to watch a brutal physical assault by Patrick upon an African–American detainee who had injured his head and back when he fell out of the top bunk of a bunk bed." *Id.* ¶ 121(a). Dilworth tried to leave the area and avert his eyes from the "horrific display of brutality, but SanMarco issued a 'direct order' to 'watch.' " *Id.* ¶ 121(e), (f), (i). "As Patrick brutalized the detainee [,] SanMarco assured Mr. Dilworth that if he 'signed' fraudulent papers and waived his legal claims things would get 'easier,' Mr. Dilworth would be transferred to the hospital ward, and 'no more Rogers.' " *Id.* ¶ 121(j). "Goldberg, Kadel, and James were present and personally observed the entire incident, but never attempted to interfere with Patrick's repeated assaults." *Id.* ¶ 121(o). "Patrick, Rogers, and SanMarco were never disciplined for their misconduct against the other detainee or Mr. Dilworth." *Id.* ¶ 121(y).

In February or March 2009, Dilworth asked Rogers "for permission to use the law library to obtain information regarding filing a notice of claim against Westchester County." *Id.* ¶ 122(a). Rogers denied

Dilworth's request but told him that he would provide him with the information. *Id.* ¶ 122(b). "Subsequently, Rogers provided a boilerplate notice of claim form," however, Rogers had altered the address on the form "and a party not authorized by state law to receive a notice of claim on behalf of Westchester County was written in by hand." *Id.* ¶ 122(c)(e).

**\*6** Rogers and other correction officers encouraged other inmates at the prison to assault Dilworth. On a number of occasions, three inmates "filled ... balls with rice and other hard objects and repeatedly hurled them at Mr. Dilworth's head and genitals, often striking their intended target ...." *Id.* ¶ 123(c). "Mr. Dilworth reported the assaults to Maccabee, Poggi, Rogers and Carl Coes on several occasions," however, the officers "refused to intercede with or prevent the physical assaults." *Id.* ¶ 123(d)-(e). The same three inmates later beat and kicked Dilworth in the bathroom of their housing unit. *Id.* ¶ 123(j). One of the inmates, Thomas, told Dilworth that the beatings were "for Big Dog [Rogers]." *Id.* ¶ 123(k). "Freeman was on duty and in close enough proximity to hear Mr. Dilworth's screams for help from the bathroom, but failed to intervene in the prolonged and boisterous beating or document its occurrence." *Id.* ¶ 123(l).

After Dilworth refused protective custody, he was transferred to J1 Dorm. *See id.* ¶ 125(e). Once there, he was not provided access to the law library, *see id.* ¶¶ 128, 129, and his medical needs continued to be ignored. *Id.* ¶ 134. Dilworth was told that there was nothing wrong with him and that he was " 'delusional' " for thinking he was injured. *Id.* ¶¶ 126, 134(c). "Garrett arbitrarily confined Mr. Dilworth to a holding pen and forced him to stand in a manner that caused severe pain[ ] on several occasions. Maintaining that position often resulted in Mr. Dilworth losing control of his bladder and soiling his clothes." *Id.* ¶ 136(b)-(c). On one occasion, "a Muslim Imam observed Mr. Dilworth leaving a trail of urine in the hallway and stated to Klivans that Mr. Dilworth should be in a wheelchair, and in the hospital." *Id.* ¶ 136(d)(v). "Klivans responded, in part, '[w]e're breaking him.' " *Id.* ¶ 136(d)(vi). Dilworth "attempted to return to his area to change clothes" but Garrett refused his request, and then forced him to attend a visit with his wife. *See id.* ¶ 136(d)(vii)-(viii). After the incident, the Dilworths

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 3501869 (S.D.N.Y.)

(Cite as: 2011 WL 3501869 (S.D.N.Y.))

complained to Soychak about Dilworth's medical condition and the fact that he could not control his bladder. *Id.* ¶ 136(d)(x)-(xii). "Soychak replied, '[d]on't drink water.' " *Id.* ¶ 136(d)(xii). On numerous occasions, Dilworth was threatened with physical violence by correction officers. *Id.* ¶ ¶ 137, 139(d), (e). Quinoy also berated Dilworth with racial slurs. *Id.* ¶ 139(c), (f). Rogers instructed Reyes–Amarillo and Carl Coes "that if Mr. Dilworth asked for 'anything' their answer was to be '[n]o, just no.' " *Id.* ¶ 140(b).

On January 8, 2009, Dilworth "was scheduled to see the optometrist due to his blurred vision, which had begun after his slip and fall." *Id.* ¶ 102(a). Dilworth was seen by Dr. Bailey–Wallace, who misdiagnosed Dilworth "with poor vision and in need of glasses, as justification for denying him medical care for his severe head injury." *Id.* ¶ 102(c). In February 2009, Kadel informed Dilworth that a medical report indicated that Dilworth had " 'chronic nerve damage,' [t]hat the nerve damage was due to Mr. Dilworth's 'head injury[,]' [t]he nerve damage was most likely the cause of his blurry vision, uncontrollable shaking and incontinence[,] and [t]hat he probably suffered from a pinched nerve' in his spine." *Id.* ¶ 112(a).

**\*7** "While housed in J Dorm Mr. Dilworth completed and submitted several commissary orders with Aramark, via Carl Coes. Most of these orders were never filled." *Id.* ¶ 142(a)-(b). Dilworth was told that his orders were not being filled because "he did not have sufficient funds in his account, which was inaccurate." *Id.* ¶ 142(c). "Around January 2009[, Dilworth] informed Rogers that he was not receiving the items that he ordered with Aramark." *Id .* ¶ 96(a). Rogers, who "is responsible for maintaining the inmate accounts of detainees and inmates," *id.* ¶ 96(h), told Dilworth "that he would not get any commissary privileges because Mr. Dilworth did not know 'how to keep [his] mouth shut' " and offered to provide him with commissary privileges if he agreed to waive his legal claims." *Id.* ¶ 96(b)-(c) (alteration in original). Dilworth refused. *Id.* ¶ 96(e). "Various Carl Coes informed Mr. Dilworth that Rogers was responsible for the interference with his commissary privileges." *Id.* ¶ 142(d). Dilworth "brought this to the attention of Driesen, Kenney, Laughlin, Poggi, SanMarco, C. Smith, and several Carl Coes," *id.* ¶ 142(e), however, his complaints were never

investigated and his commissary orders "continued to be interfered with," *id.* ¶¶ 142(f)-(g).

Eventually, Dilworth "was reassigned to A–Block for the purpose of being housed in a handicap accessible cell and housing area." *Id.* ¶ 144(a). Dilworth was not, however, placed in a handicapped accessible cell. *See id.* ¶ 144(b). "The following day, Goldberg threatened to stop Mr. Dilworth's pain medications unless he identified the person responsible for assigning him to a handicap cell." *Id.* ¶ 144(c). While in A–Block, Dilworth did not receive his pain medication, was not provided meals on a regular basis, and was not assigned an aide to assist him with daily necessities. *See id.* ¶ 145(a). Dilworth was not allowed to file grievances and was told by Carl Coes that the correction officers were directed by their "supervisors and senior correction officers to not accept any grievances from Mr. Dilworth." *Id.* ¶ 145(b)-(c). "Garrett routinely interfered with Mr. Dilworth's visits, and intentionally inflicted physical, psychological and emotional pain upon him by requiring Mr. Dilworth to stand in a manner that knowingly caused him severe pain." *Id.* ¶ 156(a).

On March 22, 2009, while still incarcerated, Dilworth filed a federal lawsuit *"pro se* ... against Westchester County, Goldberg, Malfer, and other defendants named in the instant action." *Id.* ¶ 46; *see Dilworth v. Goldberg,* 09 Civ. 8410 (filed May 22, 2009). As retaliation for the filing of his lawsuit, "Rogers directed continuous lighting of Mr. Dilworth's cell," *id.* ¶ 146(a); made threats against the lives of the Dilworths and their children, *id.* ¶ 155(a); and "ordered all newly hired [officers] to arbitrarily search Mr. Dilworth" for contraband, *see id.* ¶ 159. Smiley, a member of the Special Investigation Unit, told Dilworth "that the reason he was being tortured was because of his federal lawsuit." *Id.* ¶ 156(f). However, "Smiley refused to inform local, state or federal authorities of the retaliation and/or conspiracy against Mr. Dilworth, or his conditions of confinement." *Id.* ¶ 156(g). "On May 15, 2009, Mr. Dilworth was transferred to a handicap accessible cell." *Id.* ¶ 152. Starting on May 21, 2009, Dilworth "was confined to his cell for forty-one days due to fabricated disciplinary charges filed" against him. *Id.* ¶ 153.

**\*8** While housed in A–Block, Dilworth submitted 50

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 3501869 (S.D.N.Y.)

(Cite as: 2011 WL 3501869 (S.D.N.Y.))

grievances to Rogers, Kenney, Poggi, Hodge, and Carl Coes regarding his unfilled commissary orders. *See id.* ¶ 158(a). These grievances were never investigated. *See id.* ¶ 158(b). "Donna Blackmon, a supervisor of Aramark, verified that Mr. Dilworth's funds had been improperly removed from his account" and that "she never received any paperwork from Rogers, Kenney, Poggi, or any other correction officer or supervisor regarding Mr. Dilworth's complaints." *Id.* ¶ 161(a), (b). On June 12, 2009, Blackmon discovered "that several of Mr. Dilworth's orders from Aramark were improperly placed in a storage room." *Id.* ¶ 162(a). Blackmon also told Dilworth that another inmate who had a pending legal claim against Westchester County "was also experiencing interference with his commissary privileges." *Id.* ¶ 162(c). Lassiter was present when Dilworth spoke with Blackmon and stated, " '[w]hat do you expect ... you're suing the County.' " *Id.* ¶ 162(b).

While Dilworth was housed in A–Block, "Schramm conducted a physical examination of Mr. Dilworth," *id.* ¶ 151(a), in which he reviewed Dilworth's medical chart and "original pain medications, which had since been stopped by Dr. Goldberg," *id.* ¶ 151(b). "Mr. Dilworth again informed Schramm of the medieval treatment he was suffering," *id.* ¶ 151(c), but Schramm did not take any action to remedy the situation, *see id.* ¶ 151(d). Dilworth "continued to be denied medical or mental health care for his severe injuries." *Id.*

On June 13, 2009, "Rogers, Wyatt, and Tejeda entered Mr. Dilworth's cell and demanded that he surrender the legal papers he received from the Pro Se Clerk...." *Id.* ¶ 163(a). When Dilworth refused, "Rogers ... ordered Wyatt and Tejeda to conduct an illegal strip search of Mr. Dilworth." *Id.* ¶ 163(c). During this search, Dilworth was forced to "strip completely naked in full view of the entire housing area." *Id.* ¶ 163(d). Rogers then "taunted and mocked Mr. Dilworth because of his injuries and medical condition, including his impotence." *Id.* Rogers then ordered "Tejeda and Wyatt to destroy and/or confiscate all [of Dilworth's] personal belongings, including all papers regarding his federal lawsuit, a Bible, prayer books, and family pictures." *Id.* ¶ 163(f). "After reading Mr. Dilworth's legal papers Rogers stated ... 'Fuck the *Pro Se* Clerk. This is Westchester. Nigger World.' "

*Id.* ¶ 163(h). Tejeda and Rogers, then inflicted severe pain on Dilworth by performing "an illegal hand technique" on him. *See id.* ¶ 163(i)-(k). Dilworth's legal papers and personal belongings were never returned. *See id.* ¶ 163(l)-(n). On June 15, 2009, Rogers ordered SanMarco and Wyatt to conduct an additional search of Dilworth's cell. *Id.* ¶ 164(a)-(b). During this search they confiscated Dilworth's "writing material, extra towels, sheets, and blankets which were approved by medical personnel." *Id.* ¶ 164(c), (d). Following these initial searches, Dilworth's cell was searched "every week, about three times a week." *Id.* ¶ 165(a).

**\*9** A second strip search was conducted at the end of June 2009. *Id.* ¶ 166(b)-(g). Again, Dilworth was forced to strip naked in full view of the housing area. *Id.* ¶ 165(c). During the course of the search Dilworth "informed Rogers that he was suffering severe pain in his back...." *Id.* ¶ 165(e). "Rogers stated he didn't 'give a fuck.' " *Id.* ¶ 165(f). Rogers asked Dilworth if he wanted to "waive his legal claims against Westchester County and other defendants." *Id.* ¶ 165(g). When Dilworth refused, Rogers ordered Tejeda to remove one of the medical mattresses that had been prescribed to Dilworth. *See id.* ¶ 165(g)-(j).

On August 11, 2009, the Dilworths "personally informed Spano of Mr. Dilworth's severe injuries[,] the torture he was suffering at the hands of Goldberg, Rogers, and others," and that correction officers were eavesdropping on their visits. *Id.* ¶ 167(a), (c). Spano "turned to Soychak and asked if their statements were true. Soychak affirmatively misrepresented that it was the first time he had heard about [the Dilworths'] complaints." *Id.* ¶ 167(d)-(e). However, nothing changed for Dilworth. *See id.* ¶ 167(f). Correction officers continued to make extortionist threats, *see id.* ¶ 167(g); Dilworth's mail was tempered with, *see id.* ¶ 168(a)(i); his cell was continuously searched and the searches increased in severity and frequency, *see id.* ¶ 168(a) (v), (d); his personal belongings and legal papers were confiscated, *see id.* ¶ 168(a)(iii), (iv), (vi); and he was still prevented from placing commissary orders because of his inaccurate financial account, *see id.* ¶ 168(a)(ii). Dilworth discussed these occurrences with Lantz, who in turn told Amicucci and Spano. *See id.* ¶ 168(a)-(b), (e). After it was discovered that Dilworth had spoken to Lantz, Uhl

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 3501869 (S.D.N.Y.)

(Cite as: 2011 WL 3501869 (S.D.N.Y.))

demanded that Dilworth tell him the full details of what he had told Lantz. *Id.* ¶ 169(a). When Dilworth refused, Uhl "ordered that Mr. Dilworth be confined to his cell for 'five hard days.' " *Id.* ¶ 169(b)-(c). "The ventilation system to Mr. Dilworth's cell was turned off during" this period. *Id.* ¶ 169(d).

On September 1, 2009, Dr. Goldberg told Dilworth that he would like to "serve as his treating physician upon his release from [the] Jail." *Id.* ¶ 170(a)(iv). At that time, Dr. Goldberg disclosed the following medical information to Dilworth: 1) the medication he was receiving in the Jail for his back was not doing anything for him; 2) he had a chipped bone in his elbow; 3) he could not discuss many things regarding his health with him; 4) the shaking in his hands was due to nerve damage and that it might go away with proper treatment; 5) his impotence was caused by the slip and fall in the Jail; 6) "he suffered a crack in his # 2 vertebrae and it was leaking fluid" and his "# 4 and # 5 vertebrae likely need[ed] to be fused"; 6) "he would have only received a CT scan or an MRI, not both due to financial reasons" and "budgetary matters prevented him from receiving all the care he needed while in custody"; and 7) he needed a CT scan. *Id.* ¶ 170(a) (v)-(xiv), (xvi). Dr. Goldberg later "refused to accept Mr. Dilworth's description of his pain based on his race." *Id.* ¶ 182(c).

**\*10** On September 11, 2009, Dilworth retained counsel, who provided him with a copy of the "engagement letter and other legal documents...." *Id.* ¶ 174(a). Dilworth was subsequently stopped by Watson and Tejeda, who conducted a full body search. *Id.* ¶ 174(b)(i). They told Dilworth that they were doing the search because they had "received a call from the main office," which is the term used for Spano's office. *Id.* ¶ 174(b)(ii)-(iii). Following the search, Dilworth's legal documents were forwarded to Spano's office. *Id.* ¶ 174(d). On the way back to his cell, Dilworth was stopped by Garrett, who arbitrarily confined Dilworth to a holding cell, confiscated his crutches, and forced him to stand for 45 minutes. *Id.* ¶ 174(e)(i)-(iii). Garrett also denied Dilworth his pain medication. *See id.* ¶ 174(f), (g), (m). When Dilworth asked to speak to a sergeant, "Garrett replied, '[d]o you know who I am? I am the union rep. I don't need a sergeant. I don't even need a captain. Take your black ass and go lock in.' " *Id.* ¶ 174(i), (j).

"Throughout Mr. Dilworth's detention Garrett boasted and emphasized his position as the COBA union delegate on more than fifty occasions, and often stated he had 'captain status' as a result of that position." *Id.* ¶ 175.

Throughout the course of his stay in A–Block, Dilworth was subjected to various adverse actions. He was denied pain medication and haircuts, *id.* ¶¶ 174(m), 176(c); he was arbitrarily confined to his cell, *id.* ¶¶ 171, 176(a), (d), 177(a); visits with Patricia and his attorney were shortened by correction officers, *id.* ¶¶ 176(b), (e), 177(b); and he received smaller portions of food as a result of Dr. Goldberg arbitrarily assigning him "diet trays," *see id.* ¶ 179(a). His food was also tampered with. *Id.* ¶ 179(b). Dilworth continuously attempted to file grievances, but they were either denied or ignored, *see id.* ¶¶ 178(a)-(c), 180(a), 181, or Dilworth was prevented from obtaining the required forms, *see* ¶ 172(a), (b). "When Mr. Dilworth asked [why] he was being treated so poorly[,] Santos replied he was following 'orders.' " *Id.* ¶ 176(g).

From December 16, 2008 through September 23, 2009, Dilworth "submitted at least ten sick call slips specifically seeking medical care for incontinence" and spoke to Dr. Goldberg on three separate occasions, regarding his incontinence. *Id.* ¶ 187(a)-(b). On each occasion, "Goldberg made handwritten notes in Mr. Dilworth's file" regarding his incontinence and stamped the file. *Id.* ¶ 187(c), (d).

"From December 22, 2008 through September 23, 2009 Rogers arbitrarily confiscated four Bibles, approximately six 'Daily Breads' (prayer books), and approximately six 'Daily Words' (prayer books) from Mr. Dilworth." *Id.* ¶ 84. Dilworth's family pictures, personal diary, writing materials, legal materials, and other personal items were also taken. *Id.* ¶¶ 83(g), 123(a), 130, 165(a), 166(a). Rogers told Dilworth that the items were "confiscated because they were 'contraband.' " *Id.* ¶¶ 83(h), 123(a), 132. "Foy repeatedly prevented Mr. Dilworth from attending Sunday church services." *Id.* ¶ 114. In addition, Rogers and other officers confiscated items that had been prescribed to Dilworth, such as crutches, extra mattresses, sneakers, and portable urinals. *See id.* ¶¶ 119(b), 120(c), 132(d)-(e), 136(a), 164(c),

Slip Copy, 2011 WL 3501869 (S.D.N.Y.)

(Cite as: 2011 WL 3501869 (S.D.N.Y.))

166(h)-(i). Dr. Goldberg told Dilworth that he knew Rogers was confiscating items that he had prescribed, and that he would talk to Rogers about the repeated confiscation of Dilworth's urinals and extra mattresses, but Rogers continued to confiscate these items. *See id.* ¶ 119(b). Dr. Goldberg knew Rogers was denying Dilworth the use of sneakers, but did not stop Rogers. *See id.* ¶ 170(a)(i)-(ii). Instead, Rogers directed James and Kadel to delete from the computer "an entry authorizing [Dilworth] the use of his sneakers." *Id.* ¶ 170(a)(ii).

**\*11** From January 21, 2009 through September 2009, Rogers, Quinoy, and various unknown correction officers fabricated and submitted approximately 20 disciplinary charges against Dilworth. *Id.* ¶¶ 104(h)-(n), 105(a), 139(f), 147, 148(b)-(c). "The majority of the charges were dismissed by the hearing officer, Rhodes. However, neither Rhodes nor other WCDOC personnel conducted an investigation as to why Mr. Dilworth received so many write-ups" and why "such a high percentage of them were dismissed, or investigated Mr. Dilworth's complaints that his signature was repeatedly forged by Rogers." *Id.* ¶ 105(b)-(c). Rhodes charged Dilworth \$25 for each of the charges, even when they were dismissed. *See id.* ¶ 105(d). "[I]t is a violation of rules, regulations and policies governing the Jail to charge an inmate any monies for disciplinary charges that are dismissed." *Id.* ¶ 105(e).

In September 2009, Dilworth requested transportation to the WMC on his expected release date, but none was provided. *Id.* ¶ 184. "On September 16, 2009, the Westchester County Attorney's Office forwarded a letter to counsel" stating that " 'it was not medically necessary' for Mr. Dilworth to be transported to WMC." *Id.* ¶ 183. On September 23, 2009, Dilworth was released from custody. *Id.* ¶ 185(f). While Dilworth was waiting to be transported to the Westchester County Courthouse, Rogers "threatened him with physical bodily harm, due in part to his race." *Id.* ¶ 185(a)-(b). Correction officers "placed all of Mr. Dilworth's personal belongings and legal papers into plastic bags and contaminated them with personal hygiene products." *Id.* ¶ 185(d). "[P]rior to contaminating his legal papers, [those same correction officers] read and made copies of Mr. Dilworth's legal papers...." *Id.* ¶ 185(e).

After his release from prison, the Dilworths "attempted to resume natural marital relations, but were unable to do so ...." *Id.* ¶ 188. "On or about September 25, 2009, Mr. Dilworth was evaluated by the Westchester County Department of Social Services and found to be permanently, totally disabled...." *Id.* ¶ 189. Dilworth then sought medical care at WMC. *Id.* ¶ 190. The WMC medical staff "consulted with Goldberg regarding Mr. Dilworth's medical history. Dr. Goldberg affirmatively misrepresented Mr. Dilworth's medical care and caused additional pain and suffering." *Id.* ¶ 13; *see id.* ¶ 190(a)-(c). Dr. Goldberg told WMC that Dilworth had no " 'documentation of incontinence.' " *Id.* ¶ 190(c).

After the filing of the complaint in the instant matter on March 15, 2010, "Westchester County began to conduct an investigation into the allegations contained in the complaint and interviewed various employees at the Jail .... " *Id.* ¶¶ 191–92. On April 7, 2010, an unknown correction officer hung on the front door of plaintiffs' residence a WCDOC prison uniform containing several writings and markings including the plaintiffs' last name, 'nigger,' and the phrase 'we no [sic] wear [sic] you live so shut your mouth.' " *Id.* ¶ 193. On August 30, 2010, Dilworth entered into the J & J Ossining Service Station and found Garrett and Karl K. Koe, employees of the station, present. *Id.* ¶ 194(a), (b). "Garrett observed Mr. Dilworth at a distance and warned [Koe] of [his] presence." *Id.* ¶ 194(c). Koe immediately left the service station, *see id.* ¶ 194(d), while Garrett repeatedly yelled, " 'Dilworth, get your black ass out of here,' " *id.* ¶ 194(e).

**\*12** The complaint makes general allegations regarding an on-site inspection at the Jail conducted on February 25–28, 2008, by the Department of Justice ("DOJ") with "expert consultants in corrections and custodial medical and mental health care." *Id.* ¶ 4. At some point, the DOJ conveyed preliminary findings and "on-site recommendations" to " 'Jail officials and legal counsel for the County.' " *Id.* (internal brackets omitted). The preliminary findings concluded that the Jail had a pattern and practice of using excessive force and that the Jail failed to: "maintain an adequate grievance system; protect detainees from harm[;] ... adequately review use of force incidents; adequately document use of force incidents; adequately discipline officers for using

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 3501869 (S.D.N.Y.)

(Cite as: 2011 WL 3501869 (S.D.N.Y.))

excessive force; segregate detainees by custody categories; adequately treat, contain and manage infectious disease; provide adequate dental care; maintain an adequate medical grievance system; and ... provide detainees with adequate mental health care." *Id.* ¶ 5. "The preliminary findings and on-site recommendations should have prompted Westchester County, WMC, WCHCC, and NYMC employees and officials to correct the deficiencies, or [should] at least [have] place[d] them on a heightened state of awareness regarding these matters of grave concern." *Id.* ¶ 6. However, all of these entities remained " 'deliberately indifferent.' " *Id.* ¶ 6. "Spano informed Amicucci, Goldberg, Bailey–Wallace, Maretzo, Schramm, Rogers and other Jail officials and employees, either personally or through the chain of command, of [the] DOJ's preliminary findings and on-site recommendations." *Id.* ¶ 69.

NYMC "is a private medical school in Valhalla, New York, organized as a domestic not-for-profit corporation duly existing by reason of and pursuant to the laws of the State of New York, with a principal place of business in Valhalla, New York." *Id.* ¶ 28. NYMC is located on the property of WMC and "has benefitted financially as a result of being located on said property." *Id.* ¶ 51(a), (b). "NYMC and WMC hold themselves out as academic affiliates." *Id.* ¶ 51(c). NYMC and WMC created a "joint internal medicine training program wherein employees of both NYMC and WMC share equally in the training, education, and supervision of [students, interns and residents]." *Id.* ¶ 51(d); *see id.* ¶ 43. NYMC maintains a "Psychiatric Residency Program" and a "Dental Residency Program," both of which are located at WMC. *Id.* ¶ 51(g)-(i). As part of the joint training program, employees of NYMC work inside the Jail, providing medical care, dental care, mental health services, and treatment to detainees and inmates. *See id.* ¶ 51(f)-(h). "NYMC contracted with WCHCC and/or WMC to provide medical, dental and mental health care and treatment to detainees at the Jail." *Id.* ¶ 51(k). Since 2003, "NYMC and WMC have enjoyed a symbiotic relationship," *id.* ¶ 51, and NYMC "is a joint actor with WCHCC, WMC and/or Westchester County in the provision of medical, dental, and mental health care and treatment to detainees in the Jail," *id.* ¶ 52.

**\*13** Drs. Goldberg, Schramm, Maretzo, and Bailey–Wallace are all alleged to have been employed by various divisions of NYMC. *See id.* ¶¶ 39–42. "Bailey–Wallace, Goldberg, Schramm, and Maretzo were specifically tasked by NYMC with responsibilities that mutually benefit both NYMC and WMC, including without limitation the supervision, training and education of Donald Does as they provided medical, dental and mental health care to detainees at the Jail." *Id.* ¶ 51(j). "Defendants Donald Does (the identity and number of whom is presently unknown), were students, interns, and/or residents enrolled in joint WMC/NYMC training program[s] with the express obligation to provide medical, dental and mental health services to detainees at the Jail ...." *Id.* ¶ 43.

Aramark is a corporation that has a written contract with Westchester County "to furnish food and commissary services to detainees and inmates in the Jail." *Id.* ¶ 29 "Adam Arks are responsible for delivering to detainees and inmates the items purchased from Aramark." *Id.* ¶ 96(i). "Aramark terminated an employee for allowing and/or conspiring with WCDOC personnel to interfere with an inmate's commissary orders." *Id.* ¶ 162(d).

COBA "is the recognized bargaining agent for all correction officers of the WCDOC, organized as a domestic not-for-profit corporation duly existing by reason of and pursuant to the laws of the State of New York." *Id.* ¶ 32. Garrett, "at all relevant times, was the duly appointed and acting union delegate for COBA in 2008 and 2009 ...." *Id.* ¶ 38.

**B.** *Procedural History*

On March 15, 2010, the Dilworths filed the complaint in the instant matter. *See* Complaint, filed Mar. 15, 2010 (Docket # 2). On April 2, 2010, plaintiffs filed the first amended complaint "for the primary purpose of withdrawing a medical malpractice claim ." 2Am. Compl. ¶ 49; First Amended Complaint, filed Apr. 2, 2010 (Docket # 8). In an Order dated September 14, 2010 ("September 14 Order"), the Court granted plaintiffs leave to file a second amended complaint. *See* Order, filed Sept. 14, 2010 (Docket # 133) ("Sept. 14 Order"). The September 14 Order also provided that "[a]ny party named

Slip Copy, 2011 WL 3501869 (S.D.N.Y.)

(Cite as: 2011 WL 3501869 (S.D.N.Y.))

in the previous complaints but not named in the Second Amended Complaint should no longer be considered a party to this action." Sept. 14 Order. Plaintiffs' second amended complaint was filed on September 17, 2010. *See* 2d Am. Compl. Hereinafter, we will sometimes refer to this document as "the complaint."

NYMC moved to dismiss the second amended complaint on October 18, 2010. [FN2] COBA filed a motion to dismiss on October 20, 2010. [FN3] The County Defendants moved to dismiss on December 17, 2010. [FN4] Aramark filed its motion on February 11 and 14, 2011. [FN5]

FN2. *See* Notice of Motion, filed Oct. 18, 2010 (Docket # 167); Declaration of Sarah L. Reid, filed Oct. 18, 2010 (Docket # 168); Defendant New York Medical College's Memorandum of Law in Support of its Motion to Dismiss the Second Amended Complaint, filed Oct. 18, 2010 (Docket # 169) ("NYMC Memo"). Plaintiffs filed papers in opposition to NYMC's motion on November 9, 2010, *see* Plaintiffs' Memorandum of Law in Opposition to New York Medical College's Motion to Dismiss the Second Amended Complaint, filed Nov. 9, 2010 (Docket243, 244) ("Pl. Op. Memo (N.Y.MC)"); Declaration in Opposition to Defendant New York Medical College's Motion to Dismiss, filed Nov. 9, 2010 (Docket # 242), and NYMC filed their reply on November 23, 2010, *see* Defendant New York Medical College's Reply Memorandum of Law in Further Support of its Motion to Dismiss the Second Amended Complaint, filed Nov. 23, 2010 (Docket # 251) ("NYMC Reply").

FN3. *See* Notice of Motion, filed Oct. 20, 2010 (Docket172, 173); Memorandum of Law in Support of Defendant Westchester County Correction Officers Benevolent Association's Motion to Dismiss the Complaint Pursuant to FRCP 12(b)(6), filed Oct. 20, 2010 (Docket # 175); Declaration of M. Torgalkar, Esq. in Support of WCCOBA'S Motion to Dismiss, filed Oct. 20, 2010 (Docket # 174). Plaintiffs filed papers in opposition to COBA's motion on November 11, 2010. *See* Plaintiffs'

Memorandum of Law in Opposition to Westchester County Correction Officers Benevolent Association, Inc.'s Motion to Dismiss the Second Amended Complaint, filed Nov. 11, 2010 (Docket # 249).

FN4. *See* Notice of Motion, filed Dec. 17, 2010 (Docket # 256); Memorandum of Law in Support of County Defendants' Motion to Dismiss the Second Amended Complaint, filed Dec. 17, 2010 (Docket # 258) ("County Memo"); Declaration of Reginald J. Johnson, filed Dec. 17, 2010 (Docket # 257). Plaintiffs filed papers in opposition to the County Defendants' motion on January 20, 2011. *See* Plaintiffs' Memorandum of Law in Opposition to County Defendants' Motion to Dismiss the Second Amended Complaint, filed Jan. 20, 2011 (Docket # 260) ("Pl. Op. Memo (County)"). The County Defendants filed their reply papers on January 31, 2011. *See* County Defendants' Reply Memorandum of Law in Further Support of Their Motion to Dismiss the Second Amended Complaint, filed Jan. 31, 2011 (Docket # 261) ("County Reply"); Reply Declaration of Reginald J. Johnson, filed Jan. 31, 2011 (Docket262, 263).

FN5. *See* Notice of Motion, filed Feb. 11 and 14, 2011 (Docket267, 271); Rule 7.1 Corporate Disclosure Statement, filed Feb. 11 and 14, 2011 (Docket # # 266, 270); Declaration of Frank D. Thompson, II, filed Feb. 11 and 14, 2011 (Docket268, 272); Defendant Aramark Correctional Services, LLC's Memorandum of Law in Support of its Motion to Dismiss Plaintiffs' Second Amended Complaint, filed Feb. 14, 2011 (Docket # 273). Plaintiffs filed their opposition papers on January 31, 2011. *See* Plaintiffs' Memorandum of Law in Opposition to Aramark Correctional Services, LLC's Motion to Dismiss the Second Amended Complaint, filed Jan. 31, 2011 (Docket # 264). Aramark filed two distinct sets of reply memoranda of law. The first is dated February 8, 2011 and was filed with this Court on February 11, 2011. *See* Defendant

Slip Copy, 2011 WL 3501869 (S.D.N.Y.)

(Cite as: 2011 WL 3501869 (S.D.N.Y.))

Aramark Correctional Services, LLC's Reply Memorandum of Law in Further Support of its Motion to Dismiss Plaintiffs' Second Amended Complaint, filed Feb. 11, 2011 (Docket # 269). The second is dated February 10, 2011 and was filed with the Court on February 11 and 14, 2011. *See* Defendant Aramark Correctional Services, LLC's Reply Memorandum of Law in Further Support of its Motion to Dismiss Plaintiffs' Second Amended Complaint, filed Feb. 11 and 14, 2011 (Docket265, 274). Since the second memorandum is dated later than the first, the Court will only consider Aramark's second reply memorandum On February 15, 2011, the Court granted plaintiffs' request to file a sur-reply and afforded Aramark an opportunity to file a sur-sur-reply. *See* Endorsed Letter, filed Feb. 15, 2011 (Docket # 275). Plaintiffs submitted their sur-reply on February 22, 2011, *see* Plaintiffs' Memorandum of Law in Support of Their Sur–Reply and in Further Opposition to Aramark Correctional Services, LLC and Adam Arks's Motion to Dismiss the Second Amended Complaint, filed Feb. 22, 2011 (Docket # 277) ("Sur–Reply"), and Aramark filed their sur-sur-reply on March 2, 2011, *see* Defendant Aramark Correctional Services, LLC's Sur–Sur–Reply Memorandum of Law in Further Support of its Motion to Dismiss Plaintiffs' Second Amended Complaint, filed Mar. 2, 2011 (Docket # 278).

## II. *LAW GOVERNING MOTIONS TO DISMISS*

A party may move to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) where the opposing party's complaint "fail[s] to state a claim upon which relief can be granted...." While a court must accept as true all of the allegations contained in a complaint, that principle does not apply to legal conclusions. *See Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949–50 (2009); *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007) ("a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do") (citations, internal quotation marks, and brackets omitted).

In other words, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *Iqbal,* 129 S.Ct. at 1949, and thus a court's first task is to disregard any conclusory statements in a complaint, *id.* at 1949–50.

**\*14** Next, a court must determine if the complaint contains "sufficient factual matter" which, if accepted as true, states a claim that is "plausible on its face." *Id.* at 1949 (citation and internal quotation marks omitted); *accord Port Dock & Stone Corp. v. Oldcastle Ne., Inc.,* 507 F.3d 117, 121 (2d Cir.2007) ("a complaint must allege facts that are not merely consistent with the conclusion that the defendant violated the law, but which actively and plausibly suggest that conclusion"). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 127 S.Ct. at 1949 (citations and internal quotation marks omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," a complaint is insufficient under Fed.R.Civ.P. 8(a) because it has merely "alleged" but not " 'show[n] ... that the pleader is entitled to relief.' " *Id.* at 1950 (quoting Fed.R.Civ.P. 8(a)(2)).

## III. *DISCUSSION*

The Court will now address each of the defendants' motions separately.

### A. *County Defendants' Motion*

#### 1. *Claims Against Dr. Maretzo and Camera*

In their opposition papers to the County Defendants' motion to dismiss, plaintiffs concede that Dr. Maretzo should not have been named as a defendant in the second amended complaint and that sufficient facts have not been alleged to state a claim against Camera. *See* Pl. Op. Memo (County) at 10. Accordingly, the claims against Dr. Maretzo and Camera should be **dismissed**.

#### 2. *Failure to Exhaust Administrative Remedies*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 3501869 (S.D.N.Y.)

(Cite as: 2011 WL 3501869 (S.D.N.Y.))

The County Defendants contend that plaintiffs' federal claims are barred by a provision of the **Prison** Litigation Reform Act ("**PLRA**"), 42 U.S.C. § 1997e(a). This statute provides in relevant part:

No action shall be brought with respect to **prison** conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, **prison**, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). This statute, however, mandates exhaustion only for those actions **filed** by prisoners while "confined" in a jail. Thus, the statute is inapplicable where the litigant **commencing** the action **files** suit after release from confinement. *See Grieg v. Goord,* 169 F.3d 165, 167 (2d Cir.1999) (per curiam); *accord Talamantes v. Leyva,* 575 F.3d 1021, 1024 (9th Cir.2009); *Norton v. The City of Marietta, Okla.,* 432 F.3d 1145, 1150 (10th Cir.2005); *Ahmed v. Dragovich,* 297 F.3d 201, 210 (3d Cir.2002); *Troville v. Venz,* 303 F.3d 1256, 1260 (11th Cir.2002); *Prescott v. Annetts,* 2010 WL 3020023, at *5 (S.D.N.Y. July 22, 2010); *Lopez v. City of New York,* 2009 WL 229956, at *3 (S.D.N.Y. Jan. 30, 2009).

***15** The County Defendants recognize that the instant action was **filed** after Dilworth's release from **prison** but contend that the **PLRA** nonetheless applies because Dilworth **filed** a **lawsuit** in 2009 pro se while he was incarcerated that raised some of the same claims brought here. *See* County Memo at 13–18. That **lawsuit** was **dismissed**, however, and is thus not at issue in this case. Case law makes clear that all that matters for purposes of the **PLRA** is the plaintiff's status at the time he **commenced** the action. *See Grieg,* 169 F.3d at 167. The instant action was not **commenced** when Dilworth was incarcerated. Defendants have pointed to no case that has **dismissed** a **lawsuit filed** by a former prisoner on the ground that the prisoner had previously **filed** a **lawsuit** while incarcerated that was subsequently **dismissed**. Indeed, courts have **dismissed** suits brought by prisoners for non-exhaustion "without prejudice" precisely to allow the prisoner plaintiff to refile the **lawsuit** when he is no longer incarcerated. *See, e.g., Napier v. Preslicka,* 314 F.3d 528, 532 (11th Cir.2002) ("An action barred by § 1997e(e) is barred only during the imprisonment of the

plaintiff; therefore, such action should be dismissed without prejudice by the district court, allowing the prisoner to bring his claim once released ...."), *cert. denied,* 540 U.S. 1112 (2004); *Prescott,* 2010 WL 3020023, at *5 ("a plaintiff, whose claim has been dismissed for failure to exhaust administrative remedies might ... file a new complaint under § 1983, with respect to which administrative exhaustion presumably would not be required since [plaintiff] is no longer a prisoner") (alteration in original and citation omitted); *see also Dixon v. Page,* 291 F.3d 485, 488 n. 1 (7th Cir.2002) ( **PLRA** may not be applicable where a plaintiff **files** new **lawsuit** after being released from incarceration even if he had previously **filed** identical law suit while incarcerated) (dictum).

The County Defendants argue that a failure to apply the **PLRA** to a released prisoner would undermine the purpose of the statute. *See* County Reply at 3. But the Second Circuit has explained that, in passing the **PLRA**, Congress's intent was to prevent the **filing** of frivolous **lawsuits** by prisoners, not those that have been released from confinement. *Grieg,* 169 F.3d at 167. The court explained that

[w]hen introducing the **PLRA**, Senators Dole and Kyl justified treating prisoners differently from other litigants by stating that prisoners **file** frivolous **lawsuits** because **filing lawsuits** "has become a recreational activity for long-term residents of our **prisons**," because prisoners "have little to lose and everything to gain," and because **filing** frivolous complaints is "a means of gaining a short sabbatical in the nearest Federal courthouse." 141 Cong. Rec. S7524–26 (daily ed. May 25, 1995) (statements by Senators Dole and Kyl) (citations and internal quotation marks omitted).

*Grieg,* 169 F.3d at 167; *accord Ahmed,* 297 F.3d at 210 (the spirit of the **PLRA** was "to deter frivolous litigations by idle prisoners"). Thus, the purpose of the **PLRA** was vindicated when the suit Dilworth **filed** while incarcerated was **dismissed**. Dilworth is not relying on the **dismissed** suit for any purpose, such as extending the statute of limitations. Its **filing** is thus irrelevant to the instant **lawsuit**.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 3501869 (S.D.N.Y.)

(Cite as: 2011 WL 3501869 (S.D.N.Y.))

3. *§ 1983 Claims Against Spano, Amicucci, Rhodes, Soychak, Hodge, and Smiley*

**\*16** The County Defendants contend that plaintiffs have failed to state a § 1983 claim against Spano, Amicucci, Rhodes, Soychak, Hodge, and Smiley (collectively, "the Defendants"). County Memo at 7–12. For the most part, they do not argue that the complaint's allegations fail to show that Dilworth was deprived a constitutional right. The only exception is a brief argument that the allegations against Rhodes, Soychak, and Hodge do not "constitute" a claim for "unconstitutional conditions of confinement." *See* County Memo at 11, 12; County Reply at 8, 9. In making this argument, however, the County Defendants provide no reasoning. Nor do they cite to a single case. Accordingly, the Court rejects this argument.[FN6]

> [FN6.] Similarly, the County Defendants assert that plaintiffs have not stated a claim for prima facie tort without any supporting argument, reasoning or case citation. *See* County Memo at 11, 12. We thus do not consider this assertion as well.

The County Defendants' remaining argument consists exclusively of their contention that, with respect to claims brought under § 1983, the plaintiffs have not sufficiently alleged that these defendants were personally involved in the alleged deprivations. Accordingly, we now address this argument.

a. *Personal Involvement*

To state a claim under § 1983, the Dilworths must show that Dilworth was denied a constitutional or federal statutory right and that the deprivation of such right occurred under color of state law. *See* [42 U.S.C. § 1983](); *West v. Atkins,* 487 U.S. 42, 48 (1988). [Section 1983]() does not grant any substantive rights but rather "provides only a procedure for redress for the deprivation of rights established elsewhere," such as in the Constitution or federal statutes. *See* [Sykes v. James,]() 13 F.3d 515, 519 (2d Cir.1993) (citation omitted), *cert. denied,* [512 U.S. 1240 (1994)]()

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [§ 1983]()." [Farrell v. Burke,]() 449 F.3d 470, 484 (2d Cir.2006) (internal quotation marks and citation omitted). Personal liability under [§ 1983]() cannot be imposed upon a state official based on a theory of *respondeat superior.* *See, e.g.,* [Hernandez v. Keane,]() 341 F.3d 137, 144 (2d Cir.2003) ("supervisor liability in a [§ 1983]() action depends on a showing of some personal responsibility, and cannot rest on *respondeat superior*"), *cert. denied,* [543 U.S. 1093 (2005)](); *accord* [Poe v. Leonard,]() 282 F.3d 123, 140 (2d Cir.2002); [Black v. Coughlin,]() 76 F.3d 72, 74 (2d Cir.1996). A claim against an official in his individual capacity under [§ 1983]() will fail if the plaintiff fails to establish the personal involvement of the defendant. *See* [Koehl v. Dalsheim,]() 85 F.3d 86, 89 (2d Cir.1996) (citing [Al–Jundi v. Estate of Rockefeller,]() 885 F.2d 1060, 1065 (2d Cir.1989)).

According to the Second Circuit, personal involvement can be shown by

> evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference ... by failing to act on information indicating that unconstitutional acts were occurring

**\*17** [Back v. Hastings on Hudson Union Free Sch. Dist.,]() 365 F.3d 107, 127 (2d Cir.2004) (quoting [Colon v. Coughlin,]() 58 F.3d 865, 873 (2d Cir.1995)). More recently, however, the Supreme Court held in *Iqbal* that "[b]ecause vicarious liability is inapplicable to ... [§ 1983]() suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* at 1948. *Iqbal* rejected the argument that, "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." *Id.* at 1949. Thus, "[a]bsent vicarious liability, each Government official, his

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 3501869 (S.D.N.Y.)

(Cite as: 2011 WL 3501869 (S.D.N.Y.))

or her title notwithstanding, is only liable for his or her own misconduct." *Id.*

*Iqbal* has caused some courts to question whether all five of the personal involvement categories survive that decision. *See generally D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010) (citing cases and concluding that the five categories were not necessarily preempted by *Iqbal* ). Thus, "[s]ome district court judges ... have observed that *Iqbal* has narrowed the grounds upon which supervisors may be held liable" and have held that only the first and third *Colon* categories survive *Iqbal. Rahman v. Fischer,* 2010 WL 1063835, at *4 (S.D.N.Y. Mar. 22, 2010) (citing *Spear v. Hugles,* 2009 WL 2176725, at *2 (S.D.N.Y. July 20, 2009); *Young v. N.Y. Office of Mental Retardation & Dev. Disabilities,* 649 F.Supp.2d 282, 293–94 (S.D.N.Y.2009)) (other citation omitted). Others have continued to apply the five *Colon* categories without limitation, *see Pierce v. N.Y. State Police,* 2011 WL 1315485, at * 13 n. 11 (N.D.N.Y. Apr. 4, 2011); *Germano v. Dzurenda,* 2011 WL 1214435, at *13 n. 3 (D.Conn. Mar. 28, 2011); *Rahman,* 2010 WL 1063835, at *4 (assuming that "all five categories described in *Colon* remain appropriate grounds for imposing liability on supervisors when there are sufficient allegations that the supervisors' conduct proximately caused the violation of rights").

This Court agrees with those courts that have concluded that *Iqbal* must be viewed in light of the fact that it was dealing with an intentional race discrimination claim, and that *Iqbal* was rejecting an argument that the supervisor's mere knowledge of the subordinate's intent is tantamount to proof that the supervisor himself committed a discriminatory act. *Delgado v. Bezio,* 2011 WL 1842294, at *9 (S.D.N.Y. May 9, 2011); *accord Sash v. United States,* 674 F.Supp.2d 531, 544. (S.D.N.Y.2009). Thus, "where the claim does not require a showing of discriminatory intent, the *Colon* analysis should still apply, insofar as it is 'consistent with the particular constitutional provision alleged to have been violated.' " *Delgado,* 2011 WL 1842294, at *9 (quoting *Qasem v.. Toro,* 737 F.Supp.2d 147, 151–52 (S.D.N.Y.2010)).[FN7]

FN7. The County Defendants' brief does not cite to *Iqbal* in its discussion of personal involvement

and assumes that the five *Colon* categories are still applicable.

i. *Spano*

**\*18** The complaint alleges that Amicucci informed Spano of Dilworth's "original slip and fall, sustained injuries, and medical status," 2Am. Compl. ¶ 65; that a special report of Dilworth's slip and fall was generated and read by Spano, *id.* ¶ 74(aa)-(dd); that the Dilworths personally informed Spano of Dilworth's "severe injuries," the "torture" he was suffering at the hands of Dr. Goldberg, Rogers and others, and that a fellow inmate had attempted to defraud Dilworth's federal lawsuit, *id.* ¶ 167(a), (b); and that the "torture" continued despite the fact that Spano had personal knowledge of Dilworth's physical condition and conditions of confinement, *see id.* ¶ 167(f). In addition, plaintiffs allege that Lantz had personal knowledge about Dilworth's "physical condition and conditions of confinement" and communicated this information to Spano. *Id.* ¶ 168(a), (e). Spano is alleged to be the Administrator of the Jail. *Id.* ¶ 62. These allegations are enough to show that Spano possessed specific knowledge that his subordinates were violating Dilworth's constitutional rights and that he was deliberately indifferent by failing to take any action with respect to this knowledge. *See Back,* 365 F.3d at 127 (personal involvement where "the defendant exhibited deliberate indifference ... by failing to act on information indicating that unconstitutional acts were occurring"). Therefore, plaintiffs have alleged enough facts to establish Spano's personal involvement in the constitutional deprivations alleged. *See Colon,* 58 F.3d at 873; *West v. Whitehead,* 2008 WL 4201130, at *25–26 (S.D.N.Y. Sept. 11, 2008) (court found plaintiffs alleged sufficient facts to establish defendants personal involvement where it was alleged that defendant had knowledge, beyond receipt of letters or grievances from plaintiff, of an alleged unconstitutional deprivation and failed to act on this information); *Woods v. Goord,* 2002 WL 731691, at *10 (S.D.N.Y. Apr. 23, 2002) (same).

ii. *Amicucci*

The complaint alleges § 1983 claims against Amicucci for unconstitutional conditions of confinement and for violation of Dilworth's First Amendment rights.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 3501869 (S.D.N.Y.)

(Cite as: 2011 WL 3501869 (S.D.N.Y.))

Plaintiffs allege that Amicucci was the Warden of the Jail and that he "had a practice of holding daily meetings with senior members of staff, including medical, dental and mental health personnel, to discuss and inform each other of the prior days events, logbook entries, and mandated reporting requirements." 2Am. Compl. ¶¶ 33(b), 64. Dilworth's injuries and medical status were discussed during several of Amicucci's meetings. *Id.* ¶ 65. Amicucci read the "special report" which was generated regarding Dilworth's fall on December 16, 2008. *Id.* ¶ 74(bb)-(dd). Lantz told Amicucci about the conditions of Dilworth's confinement; that Dilworth's mail was being tampered with; that he was prevented from making purchase orders with Aramark because his financial account was not accurate; that Rogers and other officers were preventing Dilworth from wearing his medically prescribed sneakers; that Rogers was arbitrarily searching Dilworth's cell three times a week; and that Rogers confiscated Dilworth's legal paperwork during these arbitrary searches. *See id.* ¶ 168(a), (c), (e). As was true for Spano, these allegations are specific and detailed enough to reflect Amicucci's knowledge that Dilworth's rights were being violated and that his failure to act constituted deliberate indifference. Accordingly, the County Defendants' motion to dismiss the plaintiffs' § 1983 claim against Amicucci for unconstitutional conditions of confinement should be denied.

iii. *Hodge*

**\*19** "A pretrial detainee's claim that he has been subjected to unconstitutional conditions of confinement implicates Fourteenth Amendment liberty interests. The parameters of such an interest are coextensive with those of the Eighth Amendment's prohibition against cruel and unusual punishment." *See Surprenant v. Rivas,* 424 F.3d 5, 18 (1st Cir.2005) (citation omitted); *accord Caizzo v. Koreman,* 581 F.3d 63, 71 n. 4 (2d Cir.2009). "In order to establish a constitutional violation, a plaintiff's claim must meet both objective and subjective criteria." *Suprenant,* 424 F.3d at 18 (citing *Farmer v. Brennan,* 511 U.S. 825, 834 (1994)). "First, the plaintiff must establish that, from an objective standpoint, the conditions of his confinement deny him the minimal measure of necessities required for civilized living. Second, the plaintiff must show that, from a subjective standpoint, the defendant was deliberately indifferent to inmate health or safety. Deliberate

indifference, in this sense, is a mental state akin to criminal recklessness." *Surprenant,* 424 F.3d at 18 (citing *Farmer,* 511 U.S. at 834). With respect to Hodge, the complaint merely alleges that Hodge is a sergeant at the Jail, that Dilworth submitted approximately 50 grievances to Hodge regarding his commissary purchases, and that Hodge refused to investigate these grievances. 2Am. Compl. ¶¶ 33(f), 158(a)-(b). These allegations do not reflect any constitutional violation, let alone Hodge's own personal involvement in the deprivation of Dilworth's constitutional rights.

Even where there has been a constitutional violation, "[r]eceipt of letters or grievances ... is insufficient to impute personal involvement." *Hernandez v. Goord,* 312 F.Supp.2d 537, 547 n. 6 (S.D.N.Y.2004) (quoting *Woods,* 2002 WL 731691, at *25); *accord West,* 2008 WL 4201130, at *25; *Thompson v. New York,* 2001 WL 636432, at *7 (S.D.N.Y. Mar. 15, 2001); *Rivera v. Goord,* 119 F.Supp.2d 327, 344 (S.D.N.Y.2000); *Pritchett v. Artuz,* 2000 WL 4157, at *6 (S.D.N.Y. Jan. 3, 2000); *Thomas v. Coombe,* 1998 WL 391143, at *6 (S.D.N.Y. July 13, 1998). "Were it otherwise, virtually every prison inmate who sues for constitutional torts by prison officials could name the [supervisor] as a defendant since the plaintiff must pursue his prison remedies, and invariably the plaintiff's grievance will have been passed upon by the [supervisor] ." *Hernandez,* 312 F.Supp.2d at 547 n. 6 (alteration in original) (quoting *Woods,* 2002 WL 731691, at *7). Because plaintiffs have failed to allege Hodge's personal involvement in any constitutional violation, the § 1983 claims against Hodge must be dismissed.

iv. *Rhodes*

The complaint alleges that Rhodes, after dismissing numerous disciplinary charges brought against Dilworth, failed to conduct an investigation as to why Dilworth received so many write-ups and why such a high percentage of them were dismissed, or to investigate Dilworth's complaints that his signature was repeatedly forged by Rogers. 2Am. Compl. ¶ 105(a)-(c). In addition, it alleges that Rhodes violated the rules, regulations and policies of the Jail by charging Dilworth $25 for disciplinary charges that had been dismissed. *Id.* ¶ 105(d)-(e). While it may be inferred from these allegations that Rhodes was aware that officers had filed false

Slip Copy, 2011 WL 3501869 (S.D.N.Y.)

(Cite as: 2011 WL 3501869 (S.D.N.Y.))

disciplinary claims against Dilworth, these allegations do not show that Rhodes was in any way personally involved in Dilworth's subjection to unconstitutional conditions of confinement. There are no allegations in the complaint that Rhodes was involved in Dilworth's subjection to confinement that denied him the minimal measure of necessities required for civilized living, let alone that he was deliberately indifferent to Dilworth's health or safety. Because plaintiffs have failed to show that Rhodes was personally involved in the constitutional deprivation, the § 1983 claim against Rhodes for unconstitutional conditions of confinement fails. *See Colon,* 58 F.3d at 873.

v. *Soychak*

**\*20** The complaint alleges § 1983 claims, predicated on a supervisory liability theory, against Soychak, a captain at the Jail, for unconstitutional conditions of confinement and for denial of medical treatment. *See* 2Am. Compl. ¶¶ 200–02, 218–20, 225–27. It alleges that the Dilworths personally complained to Soychak about Dilworth's medical condition and incontinence, *see id.* ¶ 136(d)(x)-(xii); that Soychak failed to assist Dilworth and instead told him that to cure his incontinence he should stop drinking water, *see id.;* that Soychak lied to Spano when asked whether the Dilworths' allegations, that Dilworth was suffering and being tortured, were true, *see id.* ¶ 167(a)-(e); that Soychak told Spano that it was the first time he had heard of the Dilworths' complaints, despite the fact that he had been previously told about Dilworth's condition, *see id.* ¶ 167(e); and that Soychak tried to extort Dilworth by offering him medical care in exchange for Dilworth's discontinuance of his federal lawsuit, *see id.* ¶ 167(g). These allegations are enough show that Soychak had specific knowledge that Dilworth was being subjected to unconstitutional conditions and was being denied medical treatment, yet failed to act to prevent future violations. Thus, plaintiffs have alleged enough to establish Soychak's personal involvement in the constitutional deprivations.

vi. *Smiley*

The County Defendants argue that the § 1983 claims against Smiley should be dismissed because the complaint does not allege that Smiley was personally involved in the deprivation of Dilworth's constitutional rights. *See* County

Memo at 7, 9–10. Smiley, however, has not been sued under § 1983, but only under to §§ 1985(2), (3), and 1986. *See* 2Am. Compl. ¶¶ 241–57.

Nonetheless, there are insufficient allegations to hold Smiley responsible for violations of any of these statutes. Dilworth's claim of conspiracy under § 1985(2) alleges that Smiley conspired with approximately 22 other defendants to commit injury against plaintiffs in retaliation for filing a federal court action. *Id.* ¶¶ 241–46. Putting aside the question of whether the claim can survive as to any defendant inasmuch as § 1985(2) bars conspiracies in relation to impeding state court matters, *see, e.g ., Rodriguez v. City of New York,* 2008 WL 4410089, at \* 15 (S.D.N.Y. Sept. 25, 2008), the only factual allegations against Smiley are that he was a member of a unit charged with investigating prison personnel, 2Am. Compl. ¶ 33(g); that Smiley once told Dilworth that he was being tortured because of his federal lawsuit, *id.* ¶ 156(f); and that Smiley refused to inform the authorities of "the retaliation and/or conspiracy against Mr. Dilworth, or his conditions of confinement, *id.* ¶ 156(g). These allegations are far too vague and conclusory to allow us to conclude that Smiley "entered into an agreement, express or tacit, to achieve [an] unlawful end" as is required for a conspiracy claim. *Webb v. Goord,* 340 F.3d 105, 110 (2d Cir.2003), *cert. denied,* 540 U.S. 1110 (2004); *see, e.g., Gallop v. Cheney,* 642 F.3d 364, 369 (2d Cir.2011) ("It is well settled that claims of conspiracy 'containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss.' ") (quoting *Leon v. Murphy,* 988 F.2d 303, 311 (2d Cir.1993)). Indeed, it would require pure speculation to use the facts alleged against Smiley to assume he formed part of a conspiracy for any purpose. *See, e.g., ATSI Commc'ns, Inc. v. Shaar Fund,* Ltd., 493 F.3d 87, 98 (2d Cir.2007) (To survive dismissal, a plaintiff "must provide the grounds upon which [his] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' ") (quoting *Bell Atl. Corp.,* 550 U.S. at 555). Thus, the conspiracy claim under § 1985(3) must be dismissed as well. Finally, because "a § 1986 claim is contingent on a valid § 1985 claim," *Graham v. Henderson,* 89 F.3d 75, 82 (2d Cir.1996), the claim against Smiley brought pursuant to § 1986 must similarly fail. *See also O'Bradovich v. Village of Tuckahoe,* 325 F.Supp.2d 413, 426–27 (S .D.N.Y.2004) ("Section 1985

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 3501869 (S.D.N.Y.)

(Cite as: 2011 WL 3501869 (S.D.N.Y.))

liability is a predicate to § 1986 liability, 42 U.S.C. § 1986, and so a § 1986 claim must be dismissed when no § 1985 liability is successfully alleged."). Accordingly, all claims against Smiley should be dismissed.

b. *Qualified Immunity*

**\*21** As was stated by the Second Circuit in *Munafo v. Metro. Transp. Auth.,* 285 F.3d 201, 210 (2d Cir.2002):
> A government official sued in his individual capacity is entitled to qualified immunity (1) if the conduct attributed to him was not prohibited by federal law, *see, e.g.,* Cnty. of Sacramento v. Lewis, 523 U.S. 833, 841 n. 5 (1998); *Siegert v. Gilley,* 500 U.S. 226, 232 (1991); or (2) where that conduct was so prohibited, if the plaintiff's right not to be subjected to such conduct by the defendant was not clearly established at the time it occurred, *see, e.g.,* Harlow v. Fitzgerald, 457 U.S. 800, 817–19 (1982); or (3) if the defendant's action was "objective[ly] legal[ly] reasonable[ ] ... in light of the legal rules that were clearly established at the time it was taken." *Anderson v. Creighton,* 483 U.S. 635, 639 (1987) (internal quotation marks omitted); *see Harlow v. Fitzgerald,* 457 U.S. at 819.

 *Munafo,* 285 F.3d at 210; *accord Alali v. DeBara,* 2008 WL 4700431, at \*5 (S.D.N.Y. Oct. 24, 2008). A qualified immunity defense may be asserted as part of a motion under Fed.R.Civ.P. 12(b)(6) if it is based on facts appearing on the face of the complaint, though defendants asserting the defense at this stage face a "formidable hurdle." *McKenna v. Wright,* 386 F.3d 432, 434 (2d Cir.2004).

 While the County Defendants' memorandum of law contains a brief section asserting that the doctrine of qualified immunity shields Spano, Amicucci, Rhodes, and Smiley from liability, they argue the applicability of the qualified immunity defense only in the vaguest and most general terms. *See* County Memo at 12–13. They offer no explanation either as to what specific right was not "clearly established" or as to why defendants would have been reasonable in believing that their alleged conduct was constitutional. Accordingly, there is no basis on which to conclude that any defendant is entitled to qualified immunity.

4. *§ 1985 Claims*

 Plaintiffs have asserted the following claims pursuant to § 1985:(1) a § 1985(2) claim against the County Defendants, Dreisen, Foy, Garrett, Kenney, Klivans, Maccabee, Malfer, Muller, O'Neill, Patrick, Quinoy, Rogers, SanMarco, Smiley, Calvin Smith, Christopher Smith, Tejada, Turner, Vega and Wyatt, as well as various unknown correction officers, 2Am. Compl. ¶¶ 241–46; and (2) a § 1985(3) claim against Dreisen, Garrett, Dr. Goldberg, Kenney, Malfer, Patrick, Quinoy, Rogers, SanMarco, Smiley, Christopher Smith, Tejada, Turner, and Wyatt, as well as various unknown correction officers, *id.* ¶¶ 247–53.

 In order to state a claim under § 1985 a plaintiff must show that there was " 'an agreement between two or more actors to inflict an unconstitutional injury.' " *See* Walker v. N.Y.C. Dep't of Corr., 2008 WL 4974425, at \*11 (S.D.N.Y. Nov. 19, 2008) (quoting *Anemone v. Metro. Transp. Auth.,* 419 F.Supp.2d 602, 604 (S.D.N.Y.2006)); 42 U.S.C. § 1985(2), (3). However, a plaintiff's allegations fail to state a § 1985 conspiracy claim "if the conspiratorial conduct challenged is essentially a single act by a single corporation acting exclusively through its own directors, officers, and employees, each acting within the scope of his employment." *Herrmann v. Moore,* 576 F.2d 453, 459 (2d Cir.), cert. *denied,* 439 U.S. 1003 (1978). The same principle applies to a municipal entity, such as a county. *See, e.g.,* Crews v. Cnty. of Nassau, 2007 WL 4591325, at \*12 (E.D.N.Y. Dec. 27, 2007) ("the officers, agents, and employees of a single corporate or municipal entity, each acting within the scope of his or her employment, are legally incapable of conspiring with each other") (citing cases).

 **\*22** An exception exists, however, where the plaintiff alleges facts that tend to show that, by engaging in the conspiracy, the defendants were "pursuing personal interests wholly separate and apart from the entity." *Hartline v. Gallo,* 2006 WL 2850609, at \*9 (E.D.N.Y. Sept. 30, 2006) (internal quotation marks omitted); *Salgado v. City of New York,* 2001 WL 290051, at \*8 (S.D.N.Y. Mar. 26, 2001) (citing *Girard v. 94th St. & Fifth Ave. Corp.,* 530 F.2d 56, 71–72 (2d Cir.), *cert. denied,* 425 U.S. 974 (1976)) (other citations omitted);

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 3501869 (S.D.N.Y.)

(Cite as: 2011 WL 3501869 (S.D.N.Y.))

accord *Roniger v. McCall,* 22 F.Supp.2d 156, 167 (S.D.N.Y.1998). Here, there is no allegation that the defendants were acting outside the scope of their employment or that they had some personal interests separate from the interests of their employer. Plaintiffs argue that they have named defendants in their individual capacities, Pl. Op. Memo (County) at 11–12, but "simply joining corporate officers as defendants in their individual capacities is not enough to make them persons separate from the corporation in legal contemplation." *Girard,* 530 F.2d at 72 (brackets omitted). Nor does it matter that some of the defendants' conduct is alleged to be improper as this does not by itself show that they were acting outside the scope of their employment. Finally, the fact that some employees had responsibilities with respect to their union does not change this result as there are no non-conclusory allegations in the complaint that plausibly show a conspiracy between Westchester County and any of the unions. Accordingly, the § 1985 claims against these defendants should be dismissed.

5. *§ 1986 Claim*

As already noted, the § 1986 claims must be dismissed if plaintiffs have failed to state a claim pursuant to § 1985. *Graham,* 89 F.3d at 82; *O'Bradovich,* 325 F.Supp.2d at 426–27. 40 Accordingly, the § 1986 claims against these defendants must also be dismissed.
6. *State Tort Claims*

The County Defendants argue that state law claims alleged against all County Defendants are barred by New York General Municipal Law § 50–e, because the plaintiffs failed to file a notice of claim. New York General Municipal Law § 50–e(1)(a) requires an individual to serve a notice of claim before filing an action for damages against a municipal corporation or its employees. *See* N.Y. Gen. Mun. Law §§ 50–e, -i. The state notice-of-claim requirement applies to state law claims when the state law claims are brought in federal court. *See* Felder v. Casey, 487 U.S. 131, 151 (1988); *Hardy v. N.Y.C. Health & Hosp. Corp.,* 164 F.3d 789, 793 (2d Cir.1999). Where no notice of claim has been filed, state tort claims are routinely dismissed. *See, e.g.,* Grennan v. Nassau Cnty., 2007 WL 952067, at *17 (E.D.N.Y. Mar. 29, 2007) ("The notice of claim

requirements apply equally to state tort claims brought as pendent claims in a federal civil rights action.") (quoting *Warner v. Vill. of Goshen Police Dep't,* 256 F.Supp.2d 171, 175 (S.D.N.Y.2003)); *Fincher v. Cnty. of Westchester,* 979 F.Supp. 989, 1002–03 (S.D.N.Y.1997) (citations omitted); *see also Atkins v. Cnty. of Orange,* 251 F.Supp.2d 1225, 1234–35 (S.D.N.Y.2003) (dismissing alleged violation of N.Y. Correction Law § 137(5) for failure to file a notice of claim).

**\*23** The plaintiffs do not deny that they did not file a notice of claim upon any County Defendant. *See* 2Am. Compl. ¶ 18. Instead, they argue that plaintiffs should be permitted to file a late notice of claim because "Rogers intentionally prevented Mr. Dilworth from serving a notice of claim" and because the defendants had actual notice of the essential facts constituting the claim and have not been prejudiced by the delay. Pl. Op. Memo (County) at 13.

"Pursuant to General Municipal Law § 50–e(5), a court has the discretion to permit the service of a late notice of claim. The relevant factors for the court to consider include whether (1) the petitioner demonstrated a reasonable excuse for failing to serve a timely notice of claim, (2) the municipality acquired actual knowledge of the facts constituting the claim within 90 days from its accrual or a reasonable time thereafter, and (3) the delay would substantially prejudice the municipality in maintaining its defense on the merits." *In re Henriques v. City of New York,* 22 A.D.3d 847, 848 (2d Dep't 2005) (citing N.Y. Gen. Mun. Law § 50–e(5); *Bovich v. E. Meadow Pub. Lib.,* 16 A.D.3d 11, 19–20 (2d Dep't 2005)); *Barnes v. N.Y.C. Hous. Auth.,* 262 A.D.2d 46, 46–47 (1st Dep't 1999). However, § 50–e(7) provides that "all applications under this section shall be made to the supreme court or to the county court...." N.Y. Gen. Mun. Law § 50–e(7). Thus, a federal court "does not have jurisdiction to decide whether [p]laintiffs may file late Notices of Claim." *Bunim v. City of New York,* 2006 WL 2056386, at *1 n. 2 (S.D.N.Y. July 21, 2006) (citing *Gibson v. Comm'r of Mental Health,* 2006 WL 1234971, at *5 (S.D.N.Y. May 8, 2006)); *accord Wood v. Town of E. Hampton,* 2010 WL 3924847, at *27 n. 17 (E.D.N.Y. Sept. 30, 2010) ("It is well-settled that this Court does not have jurisdiction to grant permission to serve a late notice of claim-such an application may be made only to the state court."); *Oshinsky v. N.Y.C. Hous. Auth .,* 2000 WL

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 3501869 (S.D.N.Y.)

(Cite as: 2011 WL 3501869 (S.D.N.Y.))

218395, at * 14 n. 5 (S.D.N.Y. Feb. 23, 2000). Because plaintiffs concede that they failed to serve the County Defendants with the requisite notice, and because this Court does not have the power to permit the plaintiffs to serve late notices, the plaintiffs' state law claims against the County Defendants must be dismissed.[FN8]

> FN8. In the complaint and in their papers opposing the County Defendants' motion to dismiss, plaintiffs state that they filed a motion in state court requesting permission to file a late notice of claim. *See* 2Am. Compl. ¶ 18; Pl. Op. Memo (County) at 13. They do not allege, however, that this motion was granted.

7. *Patricia's Derivative Claims*

In the second amended complaint, Patricia asserts no independent pendent state tort claim. Instead, she asserts a claim for loss of consortium against the County Defendants, based upon Dilworth's state law claims. *See* 2Am. Compl. ¶¶ 296–97. "It is well established, however, that '[a] loss of consortium claim is not an independent cause of action, but is derivative in nature,' and may only be maintained where permitted pursuant to the primary tort." *Goldman v. MCL Cos.,* 131 F.Supp.2d 425, 427 (S.D.N.Y.2000) (alteration in original and citation omitted). Accordingly, insofar as Patricia's loss of consortium claim is predicated on state tort claims against the County Defendants, her claim fails. *See Myers v. Lennar Corp.,* 2010 WL 549112, at *7 (E.D.N.Y. Dec. 30, 2010) ("[B]ecause the Court ... denies defendant's motion as to plaintiffs' negligence claim, defendant's motion is likewise denied as to plaintiffs' derivative tort claims arising therefrom."); *Burke v. Quick Lift, Inc.,* 668 F.Supp.2d 370, 385 n. 13 (E.D.N .Y.2009); *Burrell v. AT & T Corp.,* 2005 WL 2656124, at *4 (S.D.N .Y. Oct. 18, 2005).

**\*24** To the extent the complaint can be interpreted as alleging a loss of consortium claim based upon Dilworth's federal claims against the County Defendants, this claim also fails because a claim for loss of consortium is not cognizable under federal civil rights statutes. *See Dixon v. City of New York,* 2008 WL 4453201, at *21 (E.D.N.Y. Sept. 30, 2008) (loss of consortium claim not cognizable under § 1981) (citations omitted); *Hinds v. City of New York,* 768 F.Supp.2d 512, 516 (S.D.N.Y.2010) (" 'While the Second Circuit has not addressed whether a plaintiff may bring a loss of consortium claim pursuant to federal civil rights statutes, the weight of authority holds they may not.' ") (quoting *Harrison v. Harlem Hosp.,* 2007 WL 2822231, at *4 (S.D.N.Y. Sept. 28, 2007) (citing cases), *aff'd,* 364 F. App'x 686 (2d Cir.2010), *cert. denied,* 131 S.Ct. 1018 (2011)).

B. *NYMC's Motion*

1. *§ 1983 Monell Claim*

The only federal claim alleged against NYMC in the complaint is a § 1983 claim based on *Monell v. N.Y.C. Dep't of Soc. Servs.,* 436 U.S. 658 (1978). *See* 2d Am. Compl. ¶¶ 258–62. NYMC argues that the § 1983 claim is barred because Dilworth has failed to comply with the exhaustion requirements of the PLRA but we have already rejected this argument and thus do not consider it further. We instead address NYMC's remaining argument: that plaintiffs' allegations against them are insufficient to state a claim pursuant to § 1983. NYMC Memo at 7–13.

As discussed above, § 1983 does not grant any substantive rights but rather "provides only a procedure for redress for the deprivation of rights established elsewhere," such as in the Constitution or federal statutes. *See Sykes,* 13 F.3d at 519 (citation omitted). To state a claim under § 1983, Dilworth must show that he was denied a constitutional or federal statutory right and that the deprivation of such right occurred under color of state law. *See* 42 U.S.C. § 1983; *West,* 487 U.S. at 48. In *Monell,* the Supreme Court held that municipalities may be sued under § 1983 "where ... the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the municipality's] officers." *Monell,* 436 U.S. at 690. "Although the Supreme Court's interpretation of § 1983 in *Monell* applied to municipal governments and not to private entities acting under color of state law, case law ... has extended the *Monell* doctrine to private § 1983 defendants" acting under color of state law. *Dubbs v. Head Start, Inc.,* 336 F.3d 1194, 1216 (10th Cir.2003) (citations omitted), *cert. denied,* 540 U.S. 1179 (2004); *see Rojas v. Alexander's Dep't Store,* 924 F.2d

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 3501869 (S.D.N.Y.)

(Cite as: 2011 WL 3501869 (S.D.N.Y.))

406, 408–09 (2d Cir.1990), *cert. denied,* 502 U.S. 809 (1991). Nonetheless, as is true for municipal defendants, "[p]rivate employers are not [vicariously] liable under § 1983 for the constitutional torts of their employees." *Rojas,* 924 F.2d at 408–09; *accord Whalen v. Allers,* 302 F.Supp.2d 194, 202–03 (S.D.N.Y.2003) (private employer cannot be held vicariously liable under § 1983 because "there is no tenable reason[ ] to distinguish a private employer from a municipality"). Rather, to state a § 1983 claim against a private entity, a plaintiff must allege that an action pursuant to some official policy caused the constitutional deprivation. *Rojas,* 924 F.2d 408–09; *Jouthe v. City of New York,* 2009 WL 701110, at *18 (E.D.N.Y. Mar. 10, 2009); *Fisk v. Letterman,* 401 F.Supp.2d 362, 375 (S.D.N.Y.2005) (citing *Monell,* 436 U.S. at 691) (other citations omitted). Moreover, for an entity to be liable under *Monell,* it is not enough that there be an individual from the corporation who implemented the allegedly unconstitutional "policy." Rather, the challenged action must have been undertaken by an authorized "final policymaker." *See City of St. Louis v. Praprotnik,* 485 U.S. 112, 123 (1988) ("only those municipal officials who have 'final policymaking authority' may by their actions subject the government to § 1983 liability"). In addition, a plaintiff must show that the entity was acting under the color of state law. *Rojas,* 924 F.2d 408.

**\*25** To establish a policy, the plaintiff must allege one of the following: "(1) a formal policy, promulgated or adopted by the [entity]; (2) that an official with policymaking authority took action or made a specific decision which caused the alleged violation of constitutional rights; or (3) the existence of an unlawful practice by subordinate officials was so permanent or well settled so as to constitute a 'custom or usage' and that the practice was so widespread as to imply the constructive acquiescence of policymaking officials." *Jouthe,* 2009 WL 701110, at *7 (citing *Monell,* 436 U.S. at 690; *Pembaur v. City of Cincinnati,* 475 U.S. 469, 483–84 (1986); *Praprotnik,* 485 U.S. at 130); *accord Sheikh v. N.Y.C. Police Dep't,* 2008 WL 5146645, at *11 (E.D.N.Y. Dec. 5, 2008). For this third method of establishing the existence of a policy, a plaintiff may show "that the policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions." *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 126 (2d Cir.2004); *accord Bowen v. Rubin,* 385 F.Supp.2d 168, 178 (E.D.N.Y.2005) (court finds that plaintiff failed to establish a custom or usage where no evidence was presented that company was aware and ignored employee's conduct). In other words, a § 1983 plaintiff "may establish the pertinent custom or policy by showing that the [entity], alerted to the [unconstitutional action by its employees], exhibited deliberate indifference." *Vann v. City of New York,* 72 F.3d 1040, 1049 (2d Cir.1995). To establish such deliberate indifference, a plaintiff must show that the necessity for additional action to protect against constitutional violations was "obvious." *Id.*

Here, plaintiffs' *Monell* claim fails because even if the Court were to assume that NYMC was acting under color of state law, plaintiffs' allegations fall far short of meeting any of the methods of showing an official policy or custom. Plaintiffs argue that they "have alleged a pattern of misconduct pursued by NYMC [d]irectors that clearly establishes a course of deblberate inaction engaged in by authorized NYMC's decisionmakers, the NYMC directors, in contravention of Mr. Dilworth's constitutional rights." Pl. Op. Memo (N.Y.MC) at 17. In other words, plaintiffs are relying on the third of the methods of proving a policy or custom. But the allegations in the complaint do not establish that a final policymaker of the NYMC acted in some way to violate Dilworth's rights or that an NYMC director was deliberately indifferent.

This is because there are no allegations in the complaint showing that any of the defendants were final policymakers of NYMC. There are four individuals identified as being employed by NYMC: Drs. Goldberg, Bailey–Wallace, Maretzo, and Schramm (collectively "the doctors"). But none of them is identified in a manner that suggests that they are a final policymaker. Dr. Bailey Wallace is identified as acting "Medical Director for Chronic Care Services" at a division of the NYMC's Department of Medicine. 2Am. Compl. ¶ 39. Dr. Goldberg is the "Assistant Medical Director." *Id.* ¶ 40. Dr. Schramm is the "Director of Mental Health" at a division of the NYMC's Department of Psychiatry, *id.* ¶ 41, and Dr. Maretzo is the "Director of Dentistry" at a division of the NYMC's Department of Dentistry, *id.* ¶ 42. The only

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 3501869 (S.D.N.Y.)

(Cite as: 2011 WL 3501869 (S.D.N.Y.))

allegations regarding the doctors' roles in relation to NYMC is that they were all teachers at the medical college, and worked in the Jail. *See id.* ¶¶ 39–42. Nothing in these allegations suggest that these doctors were final policymakers of NYMC or that their actions constituted NYMC policy.

**\*26** In any event, the allegations in the complaint do not show that NYMC was deliberately indifferent to the unconstitutional acts of its employees. There are no allegations regarding what specific actions were known to a policymaker at NYMC, let alone facts showing that NYMC had ignored past complaints about the doctors' conduct. While plaintiffs contend that NYMC should have known about the unconstitutional conduct from the DOJ preliminary findings, *see id.* ¶ 6, this conclusory allegation is not enough to establish that NYMC was aware of and deliberately ignored the unconstitutional acts of its employees. There is not even an allegation that these findings mentioned NYMC's employees. Instead, plaintiffs allege only that the findings discussed general problems at the Jail. *Id.* ¶ 5. Moreover, even if the Court were to assume that the DOJ's findings put NYMC on notice of the doctors' actions, the findings were not published until November 30, 2009, some two months after Dilworth's release from the Jail. *See id.* ¶¶ 70, 185(f). It is not alleged that any "preliminary findings" were given to NYMC. *See id.* ¶ 67. Thus, it cannot be said that the findings put NYMC on notice of their employees' conduct.

In sum, plaintiffs' *Monell* claim against NYMC must fail.

2. *State Tort Claims*

Plaintiffs have alleged the following state law claims against NYMC: 1) Failure to Supervise, 2) Breach of Implied Covenant of Trust and Confidence in the Physician–Patient Privilege, 3) Respondeat Superior, and 4) Loss of Consortium. *See id.* ¶¶ 276–81, 294–97. NYMC argues that the Court should decline to exercise jurisdiction over these claims if the federal claim against it is dismissed. NYMC Memo at 13–14. The governing statute, 28 U.S .C. § 1367, provides in pertinent part:
(a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any

civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties....

(c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—...

(3) the district court has dismissed all claims over which it has original jurisdiction,....

*Id.* In arguing that the state law claims should be dismissed, NYMC relies on the well-settled doctrine that when all federal claims are dismissed in a case, a court normally does not exercise supplemental jurisdiction. NYMC Memo at 13. But NYMC does not address the question of whether such dismissal is permissible when viable federal claims remain against co-defendants. 28 U.S.C. § 1367(c)(3) permits a district court to dismiss state-law claims only where "all" claims have been dismissed, which is not the case here. The fact that all federal claims against NYMC are being dismissed is insufficient to permit the Court to decline to exercise supplemental jurisdiction inasmuch as other federal claims remain in the case and the state law claims "form part of the same case or controversy" under 28 U.S.C. § 1367(a). *See* 16 Daniel R. Coquillette et al., *Moore's Federal Practice,* ¶ 106.66[1], at 106–92 & n. 6 (3d ed.2011) (citing cases).

**\*27** Accordingly, we now address NYMC's arguments that the plaintiffs have failed to state a claim for each of their four state law causes of action.

a. *Failure to Supervise*

"To state a claim for negligent supervision or retention under New York law, in addition to the standard elements of negligence, a plaintiff must show: (1) that the tortfeasor and the defendant were in an

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 3501869 (S.D.N.Y.)

(Cite as: 2011 WL 3501869 (S.D.N.Y.))

employee-employer relationship, (2) that the employer 'knew or should have known of the employee's propensity for the conduct which caused the injury' prior to the injury's occurrence; and (3) that the tort was committed on the employer's premises or with the employer's chattels." *Ehrens v. Lutheran Church,* 385 F.3d 232, 235 (2d Cir.2004) (citing *D'Amico v. Christie,* 71 N.Y.2d 76, 87–90 (1987); *Kenneth R. v. Roman Catholic Diocese of Brooklyn,* 229 A.D.2d 159, 161 (2d Dep't), *cert. denied,* 522 U.S. 967 (1997)); *accord Papelino v. Albany Coll. of Pharmacy of Union Univ.,* 633 F.3d 81, 94 (2d Cir.2011). Additionally, "[i]t is well settled under New York law that '[a] claim for negligent hiring or supervision can only proceed against an employer for an employee acting outside the scope of her employment.' " *Newton v. City of New York,* 681 F.Supp.2d 473, 488 (S.D.N.Y.2010) (alteration in original) (quoting *Perkins v. City of Rochester,* 641 F.Supp.2d 168, 174–75 (W.D.N.Y.2009); *Colodney v. Continuum Health Partners, Inc.,* 2004 WL 829158, at *8 (S.D.N.Y. Apr. 15, 2004)).

Here, the plaintiffs' failure to supervise claim fails because they have not alleged that NYMC knew or should have known of its employees' propensity to misdiagnose, ignore, and mistreat patients. While the complaint alleges that "NYMC ... knew or should have known of [its] employees' unconstitutional, malicious, and/or reckless conduct, but refused or failed to take appropriate measures," 2Am. Compl. ¶ 195, this is merely a conclusion. There are no facts offered to show NYMC's awareness of their employees' misconduct. Nor did DOJ's preliminary findings put NYMC on notice because, as discussed above, they were not released to NYMC until after the misconduct occurred. The allegation that Drs. Goldberg, Maretzo, Schramm, and Bailey–Wallace were informed of the contents of the DOJ's findings prior to their release, *see id.* ¶ 69, is not enough to establish NYMC's awareness of their employees' actions, because these are the very employees with respect to whom plaintiffs seek to hold NYMC accountable. Morever, it is not alleged that the DOJ findings made mention of the failings of the named doctor defendants. *Id.* ¶¶ 5, 71.

Furthermore, it cannot be said that Dilworth's conversations with Dr. Schramm put NYMC on notice of their employees' propensity to mistreat, misdiagnose, or ignore patients. For one thing, Dr. Schramm is one of the

very doctors that NYMC is said to have failed to supervise, and thus the statement to him would be insufficient to put NYMC on notice of anything. Moreover, the complaint is vague as to what precisely was conveyed to Schramm and there is nothing to suggest that particular improper acts of any of the named doctors were identified for the benefit of NYMC. *See id.* ¶¶ 111(d), 151(c) (alleging that Dilworth told Schramm about his "torture" and "medieval mistreatment").

**\*28** Lastly, to the extent plaintiffs argue that NYMC should have been aware of their employees' propensity because they controlled the medical grievance system and the DOJ found the medical grievance system to be inadequate, *see* Pl. Op. Memo (N.Y.MC) at 18, this argument fails because there are no allegations in the complaint showing that NYMC played any role in the medical grievance system. Accordingly, NYMC's motion to dismiss the failure to supervise claim must be granted.

b. *Breach of the Implied Covenant of Trust and Confidence in the Physician–Patient Privilege*

N.Y. C.P.L.R. § 4504 provides:

Unless the patient waives the privilege, a person authorized to practice medicine ... shall not be allowed to disclose any information which he acquired in attending a patient in a professional capacity, and which was necessary to enable him to act in that capacity. The relationship of a physician and a patient shall exist between a medical corporation, as defined in article forty-four of the public health law, a professional service corporation organized under article fifteen of the business corporation law to practice medicine, a university faculty practice corporation organized under section fourteen hundred twelve of the not-for-profit corporation law to practice medicine or dentistry, and the patients to whom they respectively render professional medical services.

*Id.* While § 4504 does not explicitly provide a private right of action against a corporation for failing to protect the confidentiality of patient information gained during the course of treatment, courts have found that a corporation's duty not to disclose this information "springs from the implied covenant of trust and confidence that is inherent

Slip Copy, 2011 WL 3501869 (S.D.N.Y.)

(Cite as: 2011 WL 3501869 (S.D.N.Y.))

in the physician patient relationship, the breach of which is actionable as a tort." *Doe v. Cmty. Health Plan–Kaiser Corp.,* 268 A.D.2d 183, 186–87 (3d Dep't 2000); *accord Mark v. Brookdale Univ. Hosp.,* 2005 WL 1521185, at *24 (E.D.N.Y. June 22, 2005); *Burton v. Matteliano,* 81 A.D.3d 1272, 1274 (4th Dep't 2011); *Daly v. Metro. Life Ins. Co .,* 4 Misc.3d 887, 892 (N.Y.Sup.Ct.2004). Liability may be imposed on a corporation even if the corporation's agent, servant or employee was solely responsible for the breach. *Cmty. Health Plan–Kaiser Corp.,* 268 A.D.2d at 187 ("there is no defense to a cause of action seeking to recover damages for wrongful dissemination of confidences by persons or entities upon whom such duty of protection is imposed").

In its motion to dismiss, NYMC argues that "[t]he Complaint does not make any factual allegation that supports the contention NYMC ever possessed, let alone released Mr. Dilworth's medical records." NYMC Memo at 14. Instead, defendants note that the complaint alleges only conclusorily that "WCHCC, WMC, and NYMC released Mr. Dilworth's medical records or information obtained in the course of providing treatment, without authorization." 2Am. Compl. ¶ 280. In their opposition brief, plaintiffs failed to respond to this argument, Pl. Op. Memo (N.Y.MC) at 19–20, and the Court finds it meritorious. Thus, this claim must be dismissed.

c. *Respondeat Superior*

**\*29** The doctrine of respondeat superior "renders a master vicariously liable for a tort committed by his servant while acting within the scope of his employment." *Riviello v. Waldron,* 47 N .Y.2d 297, 302 (1979) (citations omitted); *accord Judith M. v. Sisters of Charity Hosp.,* 93 N.Y.2d 932, 933 (1999). The Court of Appeals of New York has set forth the following guidelines for determining whether tortious acts have been committed within the scope of employment:

[1] the connection between the time, place and occasion for the act, [2] the history of the relationship between employer and employee as spelled out in actual practice, [3] whether the act is one commonly done by such an employee, [4] the extent of departure from normal methods of performance[, and] [5] whether the specific act was one that the employer could reasonably have

anticipated.

*Haybeck v. Prodigy Servs. Co.,* 944 F.Supp. 326, 329 (S.D.N.Y.1996) (citing *Riviello,* 47 N.Y.2d at 303); *accord Golodner v. Ouessant Inc.,* 2007 WL 2844944, at *4 (S.D.N.Y. Sept. 27, 2007); *Mingo v. United States,* 274 F.Supp.2d 336, 346 (E.D.N.Y.2003) ("While all five factors are considered, New York courts generally place greater emphasis on the fifth factor, namely, whether the acts involved ... could reasonably have been anticipated by [the] employer.") (citation omitted).

NYMC argues that it cannot be held liable under a respondeat superior theory because the complaint does not contain "specific allegations as to the scope of the alleged employment." NYMC Memo at 15; *see* NYMC Reply at 10–11.[FN9] Indeed, the complaint alleges only that the doctors were "appointed" to certain titles "at WCDOC," not NYMC. 2Am. Compl. ¶¶ 39–42.[FN10] In a separate paragraph, plaintiffs allege that Westchester County is "the public employer of all WCDOC personnel." *Id.* ¶ 25. Indeed, the attorney for Westchester County has appeared on behalf of each of these individual doctors. County Memo at 1, 6. The complaint thus fails to provide any facts indicating how or in what manner the doctors were acting within the scope of some employment relationship with NYMC. The conclusory, and somewhat inconsistent, allegation in the complaint that the WCDOC is a "division of NYMC," 2Am. Compl. ¶¶ 39–42, does nothing to articulate the scope of the defendants' purported employment with NYMC.[FN11]

FN9. It also argues that it cannot be held liable because the complaint does not allege torts committed by the defendants. NYMC Memo at 15. It is not necessary to reach this argument, however.

FN10. The complaint fails to define "WCDOC" but based on the phrases used in the complaint, it can only refer to the Westchester County Department of Correction.

FN11. Similarly, the allegations regarding a "symbiotic relationship" between NYMC and Westchester Medical Center, *id.* ¶ 5 1, are

Slip Copy, 2011 WL 3501869 (S.D.N.Y.)

(Cite as: 2011 WL 3501869 (S.D.N.Y.))

conclusory and insufficient to define the scope of any purported employment relationship.

d. *Loss of Consortium*

Patricia's loss of consortium claim must be dismissed because all of the plaintiffs' state tort claims are to be dismissed. *See, e.g., Kaisman v. Hernandez, 61 A.D.3d 565, 566 (1st Dep't 2009).*

C. *Aramark's Motion*

1. *Federal Claims Against Adam Arks*

The plaintiffs have not alleged any federal claims against Aramark itself. Instead, they have alleged §§ 1981 and 1983 claims against Aramark employees, who are identified—apparently collectively—as Adam Arks. *See* 2Am. Compl. ¶ 45 ("Defendants ADAM ARKS (the identity and number of whom is presently unknown), were employees or agents of defendant Aramark and responsible for delivering goods and items purchased from Aramark. They are sued individually."). Aramark has moved to **dismiss** these claims arguing that (1) these claims are barred by the **PLRA**, and (2) plaintiffs' allegations fail to state claims pursuant to §§ 1981 and 1983. Because the Court has already determined that the **PLRA** does not bar plaintiffs' federal claims, the Court will address only Aramark's argument that plaintiffs' have failed to state claims against Aramark pursuant to §§ 1981 and 1983.

a. *§ 1983 Claim Against Adam Arks*

**\*30** Plaintiffs have alleged that Adam Arks deprived Dilworth of his property without due process of law. *Id.* ¶¶ 233–35. "Because the United States Constitution regulates only the Government, not private parties, a litigant claiming that his constitutional rights have been violated must first establish that the challenged conduct constitutes state action.... Put differently, a private actor acts under color of state law when the private actor is a willful participant in joint activity with the State or its agents." *Ciambriello v. Cnty. of Nassau,* 292 F.3d 307, 323–24 (2d Cir.2002). Here, plaintiffs concede that Adam Arks are private persons. They argue, however, that Adam Arks acted under color of state law by conspiring with

numerous County Defendants to deprive Dilworth of his property. *See* Sur–Reply at 2–4. "To state a claim against a private entity on a section 1983 conspiracy theory, the complaint must allege facts demonstrating that the private entity acted in concert with the state actor to commit an unconstitutional act." *Ciambriello,* 292 F.3d at 324 (citing *Spear v. Town of W. Hartford,* 954 F.2d 63, 68 (2d Cir.), *cert. denied,* 506 U.S. 819 (1992)); *O'Diah v. Hereford Ins. Co.,* 2011 WL 976415, at \*2 (E.D.N.Y. Mar. 16, 2011); *Watson v. Grady,* 2010 WL 3835047, at \*8 (S.D.N.Y. Sept. 30, 2010); *Burke v. APT Found.,* 509 F.Supp.2d 169, 173 (D.Conn.2007). A plaintiff must allege: "(1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello,* 292 F.3d at 324 (citing *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999)). "[C]omplaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct." *Ciambriello,* 292 F.3d at 325 (quoting *Dwares v. City of New York,* 985 F.2d 94, 100 (2d Cir.1993)).

Here, plaintiffs § 1983 claim against Adam Arks fails because there are no allegations in the complaint showing that Adam Arks acted in concert with a state actor to commit a constitutional tort. In the complaint, plaintiffs allege that Adam Arks "were employees or agents of defendant Aramark and responsible for delivering goods and items purchased from Aramark." 2Am. Compl. ¶¶ 45, 96(i). Beyond these statements, however, there are no other allegations regarding Adam Arks's conduct or any allegations that tend to show that Adam Arks acted in concert with a state actor to deprive Dilworth of his property. Because plaintiffs have failed to allege joint activity between Adam Arks and a state actor, their § 1983 claim must fail. *See Ciambriello,* 292 F.3d at 322–25; *Orr ex rel. Orr v. Miller Place Union Free Sch. Dist.,* 2008 WL 2716787, at \*5 (E.D.N.Y. July 9, 2008); *Concepcion v. City of New York,* 2008 WL 2020363, at \*6–9 (S.D.N.Y. May 7, 2008); *Fisk,* 401 F.Supp.2d at 377.

**\*31** To the extent plaintiffs allege that Adam Arks are state actors because they "are guilty of the deprivation

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 3501869 (S.D.N.Y.)

(Cite as: 2011 WL 3501869 (S.D.N.Y.))

while receiving some benefit from the state," Sur–Reply at 3, this argument also fails because the complaint does not allege that Adam Arks in any way deprived the plaintiffs of a constitutional right. Moreover, the mere fact that Adam Arks are employees of a company that has a contract with Westchester County, *see* 2Am. Compl. ¶ 29, is not enough to establish that the employees are state actors. *See Rendell–Baker v. Kohn,* 457 U.S. 830, 840–41 (1982) (receipt of public funds insufficient to make private entity's action acts of the State); *Horvath v. Westport Library Ass'n,* 362 F.3d 147, 152 (2d Cir.2004) (a "predominance of public funding" is not conclusive proof of state action"); *see generally Ciambriello,* 292 F.3d at 324 ("conclusory allegation that a private entity acted in concert with a state actor does not suffice to state a § 1983 claim against the private entity").

**b. § 1981 *Claim Against Adam Arks***

Plaintiffs allege that Adam Arks violated 42 U.S.C. § 1981 by denying Dilworth the right to make and enforce contracts with Aramark on the basis of his race. *See* 2Am. Compl. ¶¶ 236–41.

"To establish a claim under 42 U.S.C. § 1981, plaintiff must show that (1) he is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) this discrimination concerned one or more of the activities enumerated in 42 U. S.C. § 1981," *Milan v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 7 F.3d 1085, 1087 (2d Cir.1993), which includes the rights to make and enforce contracts, to sue, and the right to the full and equal benefit of all laws and proceedings for the security of persons and property, 42 U.S.C. § 1981; *accord Bishop v. Best Buy, Co.,* 2010 WL 4159566, at *4 (S.D.N.Y. Oct. 13, 2010). A claim for race discrimination under § 1981 is analyzed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). *Ruiz v. Cnty. of Rockland,* 609 F.3d 486, 491–92 (2d Cir.2010) (citing *Holcomb v. Iona Coll.,* 521 F.3d 130, 138 (2d Cir.2008); *Back,* 365 F.3d at 123). "Under that framework, a plaintiff must first satisfy the minimal burden of making out a prima facie case of discrimination; the burden then shifts to the defendant to produce a legitimate, nondiscriminatory reason for its actions; and the final burden rests with the plaintiff to prove that, despite the proffered

nondiscriminatory reason, the defendant intentionally discriminated against the plaintiff—here, on the basis of race." *Gant ex rel. Gant v. Wallingford Bd. of Educ.,* 195 F.3d 134, 146 (2d Cir.1999); *accord Ruiz,* 609 F.3d at 491–92 (citing *Holcomb,* 521 F.3d at 138).

In the complaint, plaintiffs allege that Dilworth ordered commissary items from Aramark, that he never received these items, 2Am. Compl. ¶¶ 96(a)-(b), (d), 142(a)-(b), that the items were later discovered in a storage closet, *id.* ¶ 162(a), and that Adam Arks was responsible for delivering said items, *id.* ¶¶ 45, 96(i). But these allegations do not allege a § 1981 violation. First, these allegations do not reflect that Adam Arks interfered in any way with Dilworth's right to create a contract with Aramark—assuming, *arguendo,* that an agent of an entity could interfere with a contract with that agent's principal. Additionally, there are no allegations that Arks intended to discriminate against Dilworth on the basis of his race. Accordingly, the § 1981 against Adam Arks fails.

**2. *State Claims Against Aramark and Adam Arks***

**\*32** Plaintiffs have also alleged the following state law claims against Aramark and Arks: 1) Tortious Interference with Business Relations against Adam Arks; 2) Conversion against Adam Arks; 3) Failure to Supervise against Aramark; 4) Respondeat Superior against Aramark; and 5) Loss of Consortium against both Aramark and Adam Arks. *See* 2Am. Compl. ¶¶ 270–72, 276–78, 290–97. Aramark makes two arguments for dismissal: 1) the Court should decline to exercise jurisdiction over the remaining state-law claims asserted against Aramark, since the federal claims against Aramark have been dismissed; and 2) the plaintiffs have failed to state a claim for any of the state-law actions alleged. As discussed in section III(b)(2) above, the Court must retain supplemental jurisdiction over plaintiffs' state law claims. Accordingly, we address only Aramark and Arks's arguments that plaintiffs have failed to state their claims. We address each state law claim individually.

**a. *Tortious Interference with Business Relations***

"To prevail on a claim for 'tortious interference with business relations' a party 'must prove that (1) it had a business relationship with a third party; (2) the defendant

Slip Copy, 2011 WL 3501869 (S.D.N.Y.)

(Cite as: 2011 WL 3501869 (S.D.N.Y.))

knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship.' " *State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada,* 374 F.3d 158, 171 (2d Cir.2004) (quoting *Carvel Corp. v. Noonan,* 350 F.3d 6, 17 (2d Cir.2003)) (other citation omitted), *cert. denied,* 543 U.S. 1177 (2005); *accord Semple v. Eyeblaster, Inc.,* 2009 WL 1457163, at *8 (S.D.N.Y. May 26, 2009); *Miller v. Holtzbrinck Publishers, LLC,* 2008 WL 4891212, at *3 (S.D.N.Y. Nov. 11, 2008). Here, it is unclear what "third party" plaintiffs had a business relationship with. More obviously, the complaint is devoid of any allegations that tend to show that Aramark or Arks interfered with any relationship. As noted, the only factual allegation regarding them is that Adam Arks were "responsible for delivering goods and items purchased from Aramark," 2Am. Compl. ¶¶ 45, 96(i), and that certain goods were never delivered, *id.* ¶¶ 96(a), 162(a). These allegations are insufficient to show that Arks intentionally interfered with any relationship or that they acted out of malice, or used dishonest, unfair, or improper means. Accordingly, plaintiffs' claim against Arks for tortious interference with a business relationship must be dismissed.

b. *Conversion*

"Conversion is the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights. This includes a denial or violation of the plaintiff's dominion, rights, or possession over her property. It also requires that the defendant exclude the owner from exercising her rights over the goods." *Thyroff v. Nationwide Mut. Ins. Co.,* 460 F.3d 400, 403–04 (2d Cir.2006) (quoting *Vigilant Ins. Co. of Am. v. Hous. Auth.,* 87 N.Y.2d 36, 44 (1995); *Sporn v. MCA Records. Inc.,* 58 N.Y.2d 482, 487 (1983)) (other citation omitted) (brackets and internal quotation marks omitted). Thus, to establish a cause of action for conversion a plaintiff must allege that the defendant wrongfully exercised dominion or somehow interfered with plaintiff's property. *See Di Siena v. Di Siena,* 266 A.D.2d 673, 674 (3d Dep't 1999); *Ahles v. Aztec Enters., Inc.,* 120 A.D.2d 903, 903 (3d Dep't 1986); *accord Brownstein v. Walsh,* 2010 WL 1930232, at *8 (E.D.N.Y. May 5, 2010); *Regions Bank v. Wieder &*

*Mastroianni, P.C.,* 526 F.Supp.2d 411, 413 (S.D.N.Y.2007).

**\*33** As discussed above, plaintiffs' complaint alleges only that Adam Arks was "responsible for delivering goods and items purchased from Aramark." 2Am. Compl. ¶¶ 45, 96(i). There are no allegations that the Aramark or Arks defendants wrongfully exercised dominion over or somehow interfered with Dilworth's property. Indeed, the only allegations of any interference with the delivery of goods to Dilworth is that Rogers committed such acts. *Id.* ¶¶ 96(b) ("Rogers stated to [Dilworth] that he would not get any commissary privileges because Mr. Dilworth did not know 'how to keep [his] mouth shut.' "), 96(d) ("Rogers then offered to provide Mr. Dilworth with commissary privileges if he signed a fraudulent statement waiving his legal claims against Westchester County and other defendants."), 96(g)-(h) (Rogers is responsible for the processing of detainees' purchase orders with Aramark and for maintaining the inmate accounts of detainees and inmates), 142(d) ("Various Carl Coes informed Mr. Dilworth that Rogers was responsible for the interference with his commissary privileges."), 142(i)-(j) (Rogers had previously interfered with other inmates' commissary orders). Accordingly, plaintiffs' claim against the Aramark/Arks defendants for conversion must be dismissed.

c. *Failure to Supervise and Respondeat Superior*

In addition to the torts discussed above, the Dilworths' seek to impose liability against Aramark under respondeat superior and failure to supervise theories for the torts committed by their employees, Adam Arks. However, to hold Aramark liable under either of these theories, the Dilworths must allege that Adam Arks committed tortious acts. *See Riviello,* 47 N.Y.2d at 302 (the doctrine of respondeat superior "renders a master vicariously liable for a tort committed by his servant while acting within the scope of his employment"); *Ehrens,* 385 F.3d at 235 ("To state a claim for negligent supervision or retention under New York law, in addition to the standard elements of negligence, a plaintiff must show: (1) that the tort-feasor and the defendant were in an employee-employer relationship ....") (citing *D'Amico,* 71 N.Y.2d at 87–90). The complaint alleges no torts committed by Adam Arks. Thus, plaintiffs' claims against Aramark predicated on

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 3501869 (S.D.N.Y.)

(Cite as: 2011 WL 3501869 (S.D.N.Y.))

theories of respondeat superior and failure to supervise must fail.

d. *Loss of Consortium*

Because the Court has determined that the plaintiffs' state tort claims against Aramark are dismissed, the plaintiffs' loss of consortium claim against Aramark must also be dismissed. *See, e.g ., Kaisman,* 61 A.D.3d at 566.

D. *COBA's Motion*

As was true for Aramark, the second amended complaint is virtually devoid of factual allegations regarding COBA. Plaintiffs allege that COBA "is the recognized bargaining agent for all correction officers of the WCDOC." 2Am. Compl. ¶ 32. Plaintiffs also allege that defendant Garrett was a "union delegate" for COBA in 2008 and 2009. *Id.* ¶ 38. The complaint alleges that "Garrett boasted and emphasized his position as the COBA union delegate on more than fifty occasions, and often stated he had 'captain status' as a result of that position." *Id.* ¶ 175; *see also id.* ¶ 174(j) (Garrett referred to his status as a "union rep"). Garrett, who is represented by the County's attorney, is alleged to have committed a number of acts against the Dilworths both with other Jail employees and by himself, including taking Dilworth's property and harming Dilworth in a number of other ways both during his stay at the Jail and afterwards. *See id.* ¶¶ 120(c), 136(a)-(d), 156(a)-(d), 167(g), 174(e)-(m), 175, 194(a)-(f).

**\*34** Plaintiffs asserts COBA is liable under two state law theories: respondeat superior and failure to supervise. *Id.* ¶¶ 276–78, 294–95. However, the complaint fails to allege that any *employee* of COBA was involved in any action against Dilworth. *See Riviello,* 47 N.Y.2d at 302 (the doctrine of respondeat superior "renders a master vicariously liable for a tort committed by his servant while acting within the scope of his employment."). The union itself cannot be liable for its members' actions absent allegations "that the individual members of those organizations authorized or ratified" the particular conduct complained of. *See, e.g., Zanghi v. Laborers' Int'l Union of N. Am., AFL–CIO,* 8 A.D.3d 1033, 1034 (4th Dep't 2004).

The failure to supervise theory of tort liability fails for the same reason. *See Ehrens,* 385 F.3d at 235 ("To state a

claim for negligent supervision or retention under New York law, in addition to the standard elements of negligence, a plaintiff must show: (1) that the tort-feasor and the defendant were in an employee-employer relationship ....") (citing *D'Amico,* 71 N.Y.2d at 87–89). Finally, because Dilworth's state tort claims against COBA are dismissed, Patricia's loss of consortium claim against COBA must also be dismissed. *See, e.g., Kaisman,* 61 A.D .3d at 566.

IV. *CONCLUSION*

For the foregoing reasons, NYMC's motion to dismiss (Docket # 167), Aramark and Adam Arks's motion to dismiss (Docket267, 271), and COBA's motion to dismiss (Docket172, 173) should be granted as to all claims against them. The County Defendants' motion to dismiss (Docket # 256) should be granted in part and denied in part. Specifically, the following claims against the County Defendants should be dismissed: (1) all claims against defendants Dr. Maretzo and Camera, (2) § 1983 claims against Hodges and Rhodes, (3) all claims pursuant to §§ 1985 and 1986, and (4) all state tort claims. The remaining claims against the County Defendants should not be dismissed.

**PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days including weekends and holidays from service of this Report and Recommendation to serve and file any objections. *See also* Fed.R.Civ.P. 6(a), (b), (d). Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. Richard J. Holwell, and to the undersigned, at 500 Pearl Street, New York, New York 10007. Any request for an extension of time to file objections must be directed to Judge Holwell. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. *See Thomas v.* Arn, 474 U.S. 140 (1985); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.,* 596 F.3d 84, 92 (2d Cir.2010).

S.D.N.Y.,2011.

Dilworth v. Goldberg

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 3501869 (S.D.N.Y.)

(Cite as: 2011 WL 3501869 (S.D.N.Y.))

Slip Copy, 2011 WL 3501869 (S.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2005 WL 2173950 (S.D.N.Y.)

(Cite as: 2005 WL 2173950 (S.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

S.D. New York.
Johnathon JOHNSON, Plaintiff,
v.
M.A. BARNEY, Prison Guard, and Oracz, Sergeant,
and Frank J. Tracy, Superintendent, and Sullivan,
Captain, Several Unknown Defendants, Defendants.
No. 04 Civ. 10204(LBS).

Sept. 6, 2005.
*MEMORANDUM AND ORDER*

SAND, J.

**\*1** Plaintiff brought this *pro se* prisoner's civil rights action pursuant to 42 U.S.C. § 1983 alleging that his Eighth Amendment constitutional rights were violated. Defendants now move to dismiss the complaint on the ground that plaintiff is in violation of the Prisoner Litigation Reform Act's "three strikes" provision. *See* 28 U.S.C. § 1915(g).

I. Background

Plaintiff alleges that on October 21, 2003, while temporarily incarcerated at Downstate Correctional Facility ("Downstate"), he was physically assaulted by M.A. Barney, a corrections officer, and three other unidentified corrections offers, while Sergeant Oracz observed the incident. Plaintiff claims that former Superintendent of Downstate, Frank J. Tracy, refused his request to preserve the videotape footage of the incident and that Captain Sullivan fabricated the report of the investigation into the incident.

Plaintiff further claims that he was "provoke[d] and harassed by the same prison guards [involved in the original assault]" when he retuned to Downstate in August 2004.

II. Discussion

Defendants move to dismiss the complaint on the ground that plaintiff is in violation of the Prisoner Litigation Reform Act's "three strikes provision."

Under the PLRA, a prisoner cannot "bring a civil action ... or proceeding [*in forma pauperis* ] if the prisoner, has on 3 or more occasions, while incarcerated or detained in any facility, brought an action ... in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted." 28 U.S.C. § 1915(g). There is an exception to the three strikes rule, however, where a prisoner is under "imminent danger of serious physical injury." *Id.* Plaintiff does not dispute that he has had more than three actions dismissed as frivolous. The sole question, therefore, is whether the imminent danger exception applies.

The Second Circuit has adopted the construction of this statutory provision that every circuit to consider the issue has reached: the imminent danger exception applies only if a prisoner is under imminent danger of serious physical injury at the time his or her complaint is filed. *Malik v. McGinnis,* 293 F.3d 559, 562-63 (2d Cir.2002); *see also Martin v. Shelton,* 319 F.3d 1048, 1050 (8th Cir.2003) ("[T]he exception focuses on the risk that the conduct complained of threatens continuing or future injury, not on whether the inmate deserves a remedy for past misconduct."). Here, the allegations of danger concern the Downstate Correctional Facility, while plaintiff is generally incarcerated at the Southport Correctional Facility. The fact that plaintiff may pass through Downstate on infrequent occasions in the future means that any threat he faces is merely hypothetical, rather than imminent. Moreover, there is no reason to believe plaintiff would be in danger of serious physical injury on the occasions when he may return to Downstate, for he has alleged only a single incident of past physical assault. Were this enough to constitute an ongoing danger, the requirement that the danger alleged be contemporaneous with the complaint would become almost meaningless.

**\*2** Plaintiff's general allegation of "harassment" at

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2173950 (S.D.N.Y.)

(Cite as: 2005 WL 2173950 (S.D.N.Y.))

Downstate during a subsequent stay there is also insufficient to trigger the imminent danger exception. *See Abdul-Akbar v. McElvie*, 239 F .3d 307, 315 (3d Cir.2001) ( "[G]eneralized allegations [of harassment] strike us as insufficient to connect the separate incidents ... into a pattern of threats of serious physical injury that are ongoing.")

Finally, plaintiff attempts to salvage his claim by arguing that Captain Sullivan, who was involved in the incident at Downstate, is currently employed as a corrections officer at Southport, where defendant generally resides. However, the only allegation against Sullivan is that he fabricated a report and not that he in any way physically threatened plaintiff. Therefore, plaintiff's contention that Sullivan's presence at Southport places him in imminent danger is without merit.

III. Conclusion

For the reasons set forth above, defendant's motion to dismiss the complaint is granted.

SO ORDERED.

S.D.N.Y.,2005.

Johnson v. Barney
Not Reported in F.Supp.2d, 2005 WL 2173950 (S.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.